# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Civil Action No.: 2:19-CV-37

| | | |
|---|---|---|
| **BILLY JOE BREWSTER, JR., LARRY E. NORMAN, and THOMAS L. HILL, on behalf of themselves and others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**PHILLIP E. BERGER, in his official capacity as Speaker Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, DAMON CIRCOSTA. STELLA ANDERSON, JEFF CARMON III, DAVID C. BLACK , KEN RAYMOND AND KAREN BRINSON BELL, in their official capacities as officers or members of the North Carolina State Board of Elections,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTION, AND FOR ATTORNEY FEES FOR VIOLATION OF CIVIL RIGHTS UNDER SECTION 1983** |

NOW COME the Plaintiffs, by and through undersigned counsel, and complaining of Defendants, do hereby allege as follows:

## INTRODUCTION

This is a complaint for declaratory and injunctive relief under Section 1983 of the Civil Rights Act of 1964 for violation of the right to vote and participate in an electoral structure to protect the integrity of the election process. The Plaintiffs are voters and a

candidate in the upcoming primary elections for congress in North Carolina. North Carolina voters have been subjected to a decade of lawsuits regarding their election districts. This litigation has instituted a dizzying array of actual and threatened last-minute changes to the election process. (A listing of the cases is provided below.)

In the elections of 2016, a three-judge panel in Greensboro in *Harris vs. McCrory*, 159 F. Supp. 3rd 600 (MDNC, 2016) required the North Carolina General Assembly to redraft the congressional districts for the 2016 Congressional Elections. This remedial action led to the passage of Session Law 2016-1 promulgating new congressional districts. Subsequently, the maps were approved and modified then used for the 2018 congressional elections and current congressional incumbents were elected under these maps. In *Common Cause vs. Rucho*, (No. 18-422, 588 U.S. ___, 139 S.Ct. 2484 (2019)). Plaintiffs brought a political gerrymandering case claim challenging the congressional districts under novel political science theories regarding "fairness" of the congressional districts. However, on June 30, 2019, the United States Supreme Court held such claims to be non-justiciable and rejected the novel political science theories advanced therein and adopted by the district court as a justiciable ground for federal equal protection challenges. On November 18, 2018, in *Common Cause vs Lewis* (18 CVS 14001), a different set of voters filed a state action challenging only state legislative districts against the defendant Board and the State Legislature using substantially similar political science theories rejected by the Supreme Court in *Rucho,* claiming the Constitution of North Carolina permitted such claims and theories. These theories were successful and resulted in a judgment issued on September 3, 2019 in which the North

Carolina Legislature redrew state legislative districts to eliminate partisan gerrymandering. On September 27, 2019, new plaintiffs have filed a state constitutional political gerrymandering claim to the districts drawn as a remedy provided to the plaintiffs in *Harris vs Lewis* (19 CVS 12667). A preliminary injunction has been entered forbidding the State Board or the Legislative Defendants to use the 2016 plan for elections in 2018. (A copy of the Preliminary Injunction is attached hereto as Exhibit 1 and incorporated herein as if fully set out.)

Plaintiffs and those whom they associate have a right to vote for candidates for congress arising under the Article I of the United States Constitution. This right to vote is "the right to participate in an electoral structured to protect the integrity of the electoral process. *Burdick vs. Takuski*, 504 U.S. 428, 442 (1972).

The plaintiffs, and the candidates they support, have relied upon the federal decision in *Cooper vs Harris,* 581 U.S. ___, 137 S. Ct. 1455 (2017), and *Harris vs. McCrory*, *Id.* to base their political associations and begin campaigns including fundraising and electioneering for congress since the elections started in 2016. The political parties for example, organize themselves based upon congressional districts which recruit candidates and fundraise for congress. Candidates, should they become congressmen, provide constituent services based upon their residences within the congressional districts so that voters can hold congressmen accountable for their actions. Candidates communicate with voters based upon voter lists which have been geocoded to reflect the congressional district in which the voter lives. Candidates have been communicating with these voters based upon these lists for many months and have

expended large amounts of money and resources in these communications. Voters in these districts have received these communications and have become familiar with potential candidates in their districts. Likewise, noncandidate committees have also been engaged in expenditures inside of these districts communicating directly with voters in associating specific candidates with issues which the noncandidate committees support. Thus, these parties and others, electioneer and campaign based upon the congressional maps as passed by the General Assembly in 2016. For example, Plaintiff Brewster has established a campaign committee, hired consultants, published videos solicited donations and communicated directly with identified voters within his district in his effort to become a party nominee in the March, 2020 primary. Voters receive almost all of their information regarding who the candidates are in the district and the positions associated with them from the candidates themselves and from various non-candidate committees. This direct communication with the voters relies upon an accurate list of geocoded voters within a district provided by the North Carolina State Board of Elections. Under the current schedule, and with the changes contemplated in the congressional map, the State Board will be unable to provide political organizations such a list until mere weeks before votes will begin to be received by the State Board. This is simply not an adequate amount of time in which to engage in this crucial campaign communication process. Broader based communication methods are also affected. Advertising needs to be purchased well in advance of its publication or broadcast date. As the date becomes closer, there is less advertising time and space available and it becomes more expensive. However, many of these decisions cannot be made in a timely fashion due to the fact the candidates and

4

committees are unaware of the configurations of the districts. The financial ability to communicate is also directly affected, many candidate contributions, if not most, are solicited and provided from individuals who live within the district. Contributors are less likely to contribute if they do not know whether they will be able to vote for that candidate in the upcoming election. Other contributors are more or less likely to contribute based on the perceived likelihood of the candidates' success. Confusion as to the configuration of the districts inhibits the candidates' ability to raise funds with which to engage in the crucial communication process. Placing this process on pause will leave far too little time for candidates and noncandidate committees to adequately communicate with the voters prior to votes being received.

This effect on the candidate and noncandidate committees directly affects the rights of the individual voters. The voters have been receiving communications from these committees for some months now based upon the current configurations of the congressional districts. The voters have identified candidates who they support or are considering supporting, who they believe are running in the districts in which they vote. They have identified these candidates in large part based upon what they perceive as candidate support of issues which the voter also supports. These decisions by the voters are largely based upon the communications they have received from the candidate and noncandidate committees. Moving blocks of voters from districts where they have already received substantial amounts of communication from candidate and noncandidate committees will significantly confuse the voters particularly when they are essentially denied that same level of communication regarding the candidates and issues in the new

5

districts to which they are moved.  This is the essence of voter confusion and can only be eliminated by maintaining the stability of the election process in the period immediately preceding an election.  Ironically, the North Carolina Supreme Court has already recognized this factual predicate in *Pender County v. Bartlett*, 361 N.C. 491, 510 (2007) "We also realize that candidates have been preparing for the 2008 election in reliance upon the districts as presently drawn. Accordingly, to minimize disruption to the ongoing election cycle, the remedy explained above shall be stayed until after the 2008 election." This decision by the North Carolina Supreme Court was determined over seven months prior to the scheduled primary election not mere weeks as is the case here.

The United States Constitution Article I, Section 4 grants to the state legislatures the power to establish the time, manner and place of elections, which the state legislature has done in passing Session Law 2018-21 to change the primary dates for elections as March 3, 2020 and the filing deadlines beginning on December 2, 2019 and ending on December 20, 2019.  Early voting and the first ballots cast will begin on January 13, 2020.  Furthermore, the North Carolina Board of Elections has previously stated that it must have final redistricting maps prior to December 5, 2019 in order to have the ability to properly geocode voters into their districts prior to January 13, 2020.  The United States Supreme Court has recognized in *Purcell vs. Gonzales*, 549 U.S. 1 (2006), the principle that late changes to the election process will, at a certain point, rise to a level that the confusion engendered will violate the voters and candidates rights assured under the due process and equal protection clauses as well as the First Amendment of the United States Constitution.  Plaintiffs assert that in North Carolina this point has already

been passed and request the court issue a declaratory judgment to protect the integrity of the electoral process and to enjoin the defendants from making any significant changes to the election procedures which fails to comport with this federal standard.

## PARTIES

1.      Plaintiff Larry E. Norman is a registered voter who regularly participates in primary and general elections, donates to political candidates and associates with others to support and Campaign for candidates for the Congress of the United States from North Carolina.  Mr. Norman resides in the Eastern District of North Carolina in Nash County and is an attorney licensed to practice law in the State of North Carolina.  Mr. Norman resides in the Eastern District of North Carolina.

2.      Billy Joe Brewster, Jr. is a registered voter who regularly participates in primary and general elections, donates to political candidates and associates with others to support and campaign for candidates for the Congress of the United States from North Carolina.  He is an announced candidate for election to Congress in the 12th Congressional District and plans to file for this office on or about December 2, 2019, when the filing period opens and to run in the primary elections to be held in March 2020.

3.      Plaintiff Thomas L. Hill is a registered voter who regularly participates in primary and general elections, donates to political candidates and associates with others to support and campaign for candidates for the Congress of

the United States from North Carolina. Mr. Hill resides in the Eastern District of North Carolina.

4.     The Plaintiffs bring this complaint on behalf of themselves and those residents, voters and taxpayers that associate with them and are similarly situated and those persons who exercise their rights to free speech, right to petition, right to enjoy open courts and otherwise associate with them to elect candidate for congress and other officials.

5.     Defendant Timothy K. Moore is the Speaker of the North Carolina House of Representatives. Defendant Moore is sued in his official capacity only.

6.     Defendant Philip E. Berger is the President Pro Tempore of the North Carolina Senate. Defendant Berger is sued in his official capacity only.

7.     Defendant Damon Circosta is the Chairman of the State Board of Elections (hereinafter "State Board") and is sued in his official capacity only.

8.      Defendants Stella Anderson, Jeff Carmon III, David C. Black and Ken Raymond are members of the State Board and are sued in their official capacity only.

9.     Defendant Karen Brinson Bell is the executive director of the State Board and is sued in her official capacity only.

10.     Josh Stein is the Attorney General of North Carolina and is not a defendant but is being served to give notice of this civil action pursuant to federal law.

11.     The North Carolina State Board of Elections is an independent agency of the State of North Carolina and it and its officials are responsible for conducting elections throughout North Carolina, including for the election to Congress. Its principal office is in Wake County, North Carolina

12.     No Plaintiff in this action has been a party in any of the matters previously decided by state or federal courts and their specific, individualized interests in the integrity of the elections were not adequately addressed in the current state litigation.  Plaintiffs make no claim that the current redistricting plan as enacted by the General Assembly is unconstitutional.

## JURISDICTION

13.     This action in part arises under the Elections Clause of Article II and the First, Fifth and Fourteenth Amendments to the United States Constitution, the Federal Declaratory Judgment Act, 42 U.S.C. Section 1983 and the All Writs Act, 28 U.S.C. Section 1651,

14.     This court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331, 1243(a)(3), 1357 and 1367.

15.     This court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. Sections 2201 and 2202.

16.     Venue in this district is proper pursuant to 28 U.S.C. Section 1391(b).

17.     This matter involves an actual case or controversy arising under federal law and the United States Constitution as set forth below.

18.     Defendant does not possess immunity under the Eleventh Amendment of the United States Constitution because of its direct role in enforcing the election laws of North Carolina.

19.     This matter is timely and ripe for determination in that the filing for election is less than 40 days away and is necessary to allow an orderly election process.  Crucial electoral decisions of potential contestants and voters including the Plaintiffs and those similarly situated have to be made in the next few weeks. Unless this court intervenes these decisions will be required to be made with inadequate information which will degrade the electoral process in violation of the Plaintiffs and those similarly situated constitutional rights under the First and Fourteenth Amendments.  These decisions will need to be made by candidates with respect to the December filing of notices of candidacy, as well as by voters for the election to be conducted from January 13 to March 3 of 2020. Intervention to prevent violation of civil rights actions are an expressly authorized exception to the Anti-Injunction Act, 38 U.S.C. Section 2283.

20.     The Plaintiffs are electors in North Carolina federal elections and have standing to bring this action on behalf of themselves and similarly situated

citizens. They and those similarly situated are personally aggrieved by any changes at this late date in at least one of the following ways:

A.  Abridging the Plaintiffs the right to vote by creating an election structure which does not insure electoral integrity.

B.  Abridging Plaintiffs right to free speech and associate by so shortening the campaign times available that candidates and others do not have sufficient time to campaign and fundraise or to effectively communicate with the voters.

C.  Abridging the Plaintiffs right to free speech and association by so shortening the campaign times available that voters are unable receive adequate information based on a reasonable opportunity to communicate so as to make an informed choice in the casting of their ballot.

D.  Violating voters and potential candidates rights to equal protection by being moved from their current districts to districts where they have no familiarity with the candidates and potential candidates within that district, these voters are at a substantial disadvantage to those voters who have remained in the district and have a more complete opportunity to identify and communicate with candidates and issue-based committees regarding the candidates and their new districts.

Case 2:19-cv-00037-D   Document 1   Filed 10/31/19   Page 11 of 25

E.     Abridging minimum electoral due process to candidates, parties, and
       the public so that the voters will have adequate notice of when the
       actual elections process will begin.

F.     Impairing the ability of candidates to raise funds when districts are
       uncertain and donors cannot assess a candidates' chances of election.

## FACTS

### History of Recent Election Litigation in North Carolina 2010 to 2019

21.    Following the return of the 2010 decennial census, the North Carolina
Legislature enacted Session Law 2011- 40, known as the "Rucho-Lewis Congress 3"
plan.  This plan was used in the 2012 and 2014 elections to congress. Following its
enactment, this plan and successive plans have been the subject of state and federal
litigation set forth hereinafter.

### Dickson vs Rucho

22.    On 3 November 2011, Margaret Dickson and forty-five other registered
voters filed a complaint, asking the state courts to declare Rucho-Lewis Congress Plan 3
invalid on both constitutional and statutory grounds. On 4 November 2011, the North
Carolina State Conference of Branches of the NAACP and others filed a complaint
seeking similar relief, subsequently a panel of three superior court judges convened to
hear these actions, pursuant to N.C.G.S. § 1267.1. On 19 December 2011, the three-judge
panel ("the trial court") consolidated these cases. Throughout the *Dickson* case, Plaintiffs
contended North Carolina was afflicted with legally significant racially polarized voting

and the state court so found.  This case is hereinafter referred to as *Dickson vs. Rucho* litigation.

23.     The election of congress in November 2012 was held using the Rucho-Lewis Congress 3 redistricting plan.

24.     *Dickson vs Rucho* was tried on June 4 and 5, 2013, and subsequently on 8 July 2013, the trial court issued its unanimous "Judgment and Memorandum of Decision" denying plaintiffs' relief.  Plaintiffs appealed and the North Carolina Supreme Court.

25.     The election of congress in November 2014 was held using the Rucho-Lewis Congress 3 Plan.

26.     The North Carolina Supreme Court affirmed the judgment of the three-judge panel's ruling.  *Dickson v. Rucho*, 367 N.C. 542, 766 S.E.2d 238 (2014).

27.     The plaintiffs appealed the state supreme court's ruling to the U.S. Supreme Court, the Supreme Court vacated the North Carolina Supreme  Court's opinion and remanded the case to the North Carolina Supreme Court for further consideration in light of its recent decision in *Alabama Legislative Black Caucus v. Alabama,* ___ U.S. ___, 135 S.Ct. 1257, 191 L.Ed.2d 314 (2015) (Alabama).  *Dickson v. Rucho*, ___ U.S. ___, 135 S.Ct. 1843, 191 L.Ed.2d 719 (2015) (mem.). On remand, North Carolina's Supreme Court again affirmed the trial court's rulings*, Dickson v. Rucho*, 781 S.E.2d 404 (2015).

28.     The Plaintiffs again filed for certiorari which was granted and subsequently, the United States Supreme Court vacated the judgment and remanded the case for further consideration in light of *Cooper v. Harris*, 581 U.S. ___ (2017).

29.     On February 11, 2018, the Wake County state three judge panel entered a judgment in the case stating that challenged districts in the 2011 congressional and legislative plan were unconstitutional but holding that no further remedy could be offered by the court since the 2011 maps had already been redrawn. The court declared all of the plaintiffs' remaining claims moot.

### Harris vs McCrory

30.     Concurrently with the *Dickson* case, Plaintiffs David Harris and others brought a federal court action on October 24, 2013, alleging, among other things, that North Carolina used the VRA's section 5 preclearance requirements as a pretext to pack African–American voters into North Carolina's Congressional Districts 1 and 12, and reduce those voters' influence in other districts. Plaintiffs sought to enjoin the State from conducting elections for the U.S. House of Representatives based on the 2011 enacted First and Twelfth Congressional Districts. *Id.* at 19. A three-judge panel was appointed and after a three-day bench trial which began on October 13, 2015, the court found for the plaintiffs. Plaintiffs in *Harris* asserted and the court found there was no legally significant racially polarized voting.

31.    On February 5, 2016, the plan struck down the 2011 Plan as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. *See Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016).

32.    The 2016 remedial plan was not used until the election of 2018.

33.    Following the courts order the General Assembly enacted on February 19, 2016, Session Law 2016-1 a contingency plan pending the States appeal of the three judge panel's decision.  Probable jurisdiction was noted in June 2016, and argument was heard in the United States Supreme Court on December 5, 2016.

## Covington v North Carolina

34.    In a lawsuit filed in May 2015, thirty-one North Carolina voters sued the state board of elections, contending that Republican lawmakers had packed African-American voters into nine Senate districts and 19 House districts in violation of the Equal Protection Clause of the Fourteenth Amendment.  In August 2016, the panel unanimously agreed with the plaintiffs and entered its opinion in *Covington vs North Carolina*, 283 F.Supp.3d 410 (M.D.N.C. 2016).  Plaintiffs argued and the court held there was no legally significant racially polarized voting.

35.    Subsequent the State appealed the panel's ruling to the U.S. Supreme Court, arguing that the legislature drew the districts to avoid violating the Voting Rights Act. While the lawmakers' appeal to the Supreme Court was pending, the panel ordered the General Assembly to create a remedial state house map by March 15, 2017, and to hold a special election in fall 2017 using the new districts. The state petitioned the

Supreme Court to stay the district court's remedy pending the resolution of the state's earlier appeal. The Court granted the stay, issuing an order temporarily blocking the lower court's remedial order and putting the 2017 special elections on hold. *North Carolina vs Covington* 138 S. Ct 974, 200 L.Ed.2d 216 (2018).

36.     On June 5, 2017, the Supreme Court summarily affirmed the decision of the trial court. The Court also vacated the order staying implementation of a remedy and 2017 special elections, with instructions to the trial court to re-weigh the balance of equities in determining whether special elections in 2017 were appropriate.

37.     On June 28, the Supreme Court affirmed in part the lower court's order, upholding changes made to remedy racial gerrymandering but reversing the changes made to two state districts redrawn by the legislature in other parts of the state. *Covington vs North Carolina*, 138 S.Ct. 2548, 201 L.E.d2d 993 (2018).

## Rucho vs Common Cause

38.     On August 5, 2016 plaintiffs filed a "political gerrymandering claim" in federal court asserting North Carolina's remedial 2016 congressional map – adopted by the North Carolina legislature after the previous map was struck down as a racial gerrymander. The plaintiffs argue that the remedial map favored some voters and penalized others for their political party memberships and affiliations, thereby affecting the state government's ability to maintain political neutrality when distributing political representation and power.

Case 2:19-cv-00037-D   Document 1   Filed 10/31/19   Page 16 of 25

39.     On January 9, 2018, the court struck down the map as an unconstitutional partisan gerrymander and blocked the state from using the plan for future elections. The court directed that the North Carolina legislature be given until January 24 to adopt a remedial plan and directed that any such plan be filed with the court by January 29. Because of upcoming election deadlines, the court also ordered that the parties propose special masters to redraw the map in the event the court rejects any legislatively enacted remedial map.

40.     On January 11, the legislative defendants filed an emergency motion to stay the remedial map drawing process pending the Supreme Court's decisions in *Gill v. Whitford* and *Benisek v. Lamone*.  On January 16, the district court denied the defendants' emergency motion to stay.

41.     On January 12, the legislative defendants filed an emergency application with the Supreme Court asking the court to stay proceedings at the district court pending appeal.

42.      On January 18, the 3 judge panel issued an order staying the its decision, including the remedial map process, pending appeal.

43.     On June 25, the United States Supreme Court vacated and remanded the three judge panel's decision on the merits for further consideration in light of *Gill v. Whitford*.

44.     On August 27, the three-judge panel issued a new opinion, ruling for the plaintiffs on all of their claims: the 14th Amendment Equal Protection Clause, the First Amendment, and Article I of the Constitution.

45.     On August 31, the legislative defendants filed a motion to stay the opinion pending Supreme Court review. On September 12, the panel granted that motion.

46.     On January 4, 2019, the Supreme Court agreed to hear the legislative defendants' appeal. The Court heard oral argument on March 26.

47.     On June 27, 2019, in *Rucho vs. Common Cause*, *Id*. the Court vacated the decision below and remanded the case for dismissal, holding that partisan gerrymandering claims are nonjusticiable.

48.      On September 5, 2019, the court dismissed the case for lack of jurisdiction.

## Common Cause vs Lewis

49.     Common Cause, the North Carolina Democratic Party, and a group of voters filed a lawsuit on November 13, 2018, in North Carolina Superior Court, challenging the state's legislative maps on partisan gerrymandering grounds. The legislature drew these maps in 2017 after the federal courts—in *Covington v. North Carolina*—threw out the prior plans for racial gerrymandering. According to the plaintiffs, the Republican legislative leadership created the 2017 plans to entrench lasting Republican majorities. The plaintiffs contended that the new plans violate several

provisions of North Carolina's constitution: the Equal Protection Clause; the Free Elections Clause; and the Freedom of Speech and Freedom of Assembly Clauses.

50.     Trial took place from July 15 to 26.  On September 3, 2019, the state court struck down the maps as unconstitutional and enjoined their use in future elections. The court ordered the North Carolina General Assembly to redraw the maps by September 19. The General Assembly submitted maps to the court, and on September 27, plaintiffs filed objections to the proposed remedial house plan. The court on the court approved the remedial plans on October 39, 2019.

### Harper vs Lewis

51.     On September 27, 2019, Fourteen North Carolina voters filed a lawsuit in state court challenging North Carolina's current 2016 congressional map on partisan gerrymandering grounds following the theories affirmed by the trial court in *Common Cause vs. Lewis*.  The 2016 map, argue plaintiffs, was drawn with express intent to maximize and entrench Republican party advantage in the state's congressional delegation. The plaintiffs contend that the 2016 remedial congressional map violates several provisions of North Carolina's constitution: the Free Elections Clause; the Equal Protection Clause; and the Freedom of Speech and Freedom of Assembly Clauses.

52.     The plaintiffs are asking the court to declare the map unconstitutional under the North Carolina Constitution and to enjoin the state from using the current map in any further elections. The plaintiffs are also asking the court to order the state to adopt a new plan that complies with the North Carolina Constitution.

53.     On October 9, three Republican members of the North Carolina congressional delegation filed a motion to intervene as defendants.

54.     On October 14, the defendants removed the case from state court to a federal district court.

55.     On October 22, the district court ordered the case be remanded.

56.     On October 24, the state court granted the congressional motion to intervene.

57.     On October 28, the panel granted the plaintiffs' motion for preliminary injunction, preventing the use of the 2016 plan in upcoming elections, pending the ultimate resolution of the lawsuit. (*See* Exhibit 1.) The state court's decision in granting the preliminary injunction was over the objections of the State Legislative Defendants raising issues of laches, timeliness, and prior opportunity to raise this issue before September 27, 2019.

58.     On information and belief, it is alleged at the present time, the North Carolina General Assembly is meeting to consider whether to appeal the decision regarding the trial court's preliminary injunction decision or to draw a new congressional plan.

59.     During the hearings on the motion for preliminary injunctions, the trial court received an affidavit from the Executive Director of the State Board of Elections outling the time line needed for any new plan to be incorporated into the administrative

process necessary for voters to participate in the currently scheduled filing period and primary elections. (A copy of this affidavit is attached hereto and incorporated herein as Exhibit 2.)

## COUNT I
## CONSTITUTIONAL INFRINGEMENT

60.     Plaintiffs allege and incorporate the foregoing paragraphs of this Complaint as if fully set forth herein.

61.     In anticipation of the 2020 congressional elections being conducted using existing congressional maps, Plaintiff Brewster in January 2019, began a campaign for congress under the existing 12th Congressional District.

62.     Plaintiff Brewster's campaign activities include, personally soliciting voters, conducted meet and greets and coffees with voters, establishing a campaign webpage, hiring a political and media consultant, starting a facebook page and other social media to contact voters in the Charlotte area.

63.     Plaintiff Brewster is not an incumbent congressman and has fewer financial resources than the incumbent congresswoman to electioneer and campaign. His campaign will be disadvantaged by a change in the electoral districts together with a shortening of the primary or general election campaign because he must depend on his free speech rights and personal campaigning to persuade voters to vote for him. Similarly affected will be his volunteers and party supporters who must electioneer on his behalf.

64.     Plaintiff Brewster, unlike his opponent incumbent, must rely primarily on small donations to fund his campaign.  Changing or shortening the campaign period will impair the progress he has made in creating a donor base and require him to start his campaign over in a new district.  Any change in the geography of the districts would force him and congressional candidates similarly situated to expend significant funds in order to reach new constituents while simultaneously depriving them of the necessary time to raise.

65.     Plaintiff Larry E. Norman is currently a voter in the 2nd congressional district whose congressman he has relied upon for constituent services for the past ten years .He regularly votes for and donates to his congressman and associates with others to help his re-election efforts. The district as presently composed is a swing district in which the congressman has won elections in the past but is not assured of winning in the future. The district congressman has obtained seniority in Congress on Committees which consider legislation which impact the Plaintiff and others like him and such influence will be lost if the Legislature or the courts redraws the district boundaries.

66.     Defendant Hill, serves on his political party's congressional district committee.  His party organizes itself by congressional districts for purposes of its internal governance in electing members to its executive and central committees.

67.     Currently Defendant Hill is a county chairman in his political party and is recruiting candidates to run against an incumbent congressman and such

candidates will need to know the names addresses and voting history of the voters in order to conduct an effective campaign and fundraising.

68.    Should changes be made by the state legislature or state board of elections in the congressional districts, the costs of campaigning will rise and plaintiffs will need to employ expensive advertising to reach voters in areas which are not currently contained in their districts.  Grassroots efforts including door to door canvassing, telephone banks, community coffees and precinct walks require candidates are less expensive than advertising available to incumbents. The lack of direct voter contact destroys the benefits of an electoral campaign and focuses on party affiliation rather than a comparison of the individual merits of candidates, harming democracy and placing focus on only well-funded candidates.

69.    Given the possibility of state court action changing the districts, the Plaintiffs will be damaged by any delay in the current districts including the possibility of a disappointed litigant seeking appellate review, adding further confusion and uncertainty for the voters and the candidates. Furthermore, the candidates may be faced with bifurcated primaries in which fewer voters participate in the elections for congress than do in single primaries.

70.    Based upon the foregoing harms, the Plaintiffs ask the court to declare the rights of the parties as follows:

(1)  If the election cycle begins on December 2, 2020, under current state law, will any changes to the election districts necessarily violate the Constitutional rights of the Plaintiff and those similarly situated?

## PRAYER FOR RELIEF

**WHEREFORE** the Plaintiffs pray the court to grant the following relief:

1.      Award temporary and permanent injunctive relief enjoining the Defendants, its agents, officer and employees from enforcing implementing or giving any effort to enforce a congressional election based on a map or plan different from that currently enacted by the State Legislature.

2.      Award Plaintiffs their costs, disbursement and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C.  Section 1988.

3.      Tax the costs of this action against Defendants; and

4.      Grant such other relief as this court seems just and proper.

This 31 day of October, 2019.

*/s/ Robert Neal Hunter, Jr.*
Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone:    (336) 273-1600
Facsimile:     (336) 274-4650
Email:          rnhunterjr@greensborolaw.com

Conrad Boyd Sturges, III (NCSB 22342)
DAVIS, STURGES & TOMLINSON, PLLC
P.O. Drawer 708
Louisburg, NC 27549
Telephone:     (919) 496-2137
Facsimile:     (919) 496-6291
Email:         bsturges@dstattys.com

*Attorneys for Plaintiffs*