# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### Civil Action No.: 2:19-CV-37

| | |
|---|---|
| **BILLY JOE BREWSTER, JR.,** et al., | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **PHILLIP E. BERGER, etc., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

The United States Supreme Court has recognized in *Purcell v. Gonzales*, 549 US 1 (2006), the right to vote includes the right to participate in an electoral system which has electoral integrity and late changes to the election process will, at a certain point, rise to a level that the confusion engendered will violate the voters' and candidates' rights assured under the due process and equal protection clauses of the Fourteenth Amendment, as well as the First Amendment of the United States Constitution. Plaintiffs, as candidates and voters, have constitutional interests in preventing voter confusion. Burdening the candidates who have already committed to running for Congress in 2020 with new districts is not merely a "tangential aspect of the franchise"; it instead prevents some individuals from participating in the franchise altogether for reasons that are entirely outside of their control.

The North Carolina General Assembly pursuant to Article I, Section 4 of the United States Constitution has the authority to establish the "time, place and manner" of elections for congress it has done so. Plaintiffs want to ensure their right to vote and of candidates who have announced for Congress to have a timely election and that these rights are not unconstitutionally infringed by the Legislative Defendants and the State Board of Elections. This issue arises under the federal constitution and statutes. Plaintiffs do not request the redrawing any of any congressional districts. This claim requests the court to declare the rights of the parties to the following issue: "If the election cycle begins on December 2, 2019, under current state law, will any changes to the election districts necessarily violate the Constitutional rights of the Plaintiff and those similarly situated?"

## II. FACTS

Statutory Requirements:

Prior to the time of filing a state notice of candidacy, an individual running for a seat in the House becomes a candidate and must file a federal "Statement of Candidacy" when he or she raises or spends more than $5,000 in contributions or expenditures. At the present time, 41 candidates have filed Federal Election Commission (FEC) reports announcing an intent to run for congress in 2020. (*See* List of candidates **Exhibit 1**, note: one of the candidates listed is deceased). Like Plaintiff Brewster, 28 candidates are non-incumbents.

North Carolina's timeline for elections and qualifications for candidates is set out in N. C. Gen. Stat. 163-1 et al. An analysis of the timeline, containing the administrative

steps required to be finished by the State Board of Elections, is set forth in an affidavit from the current Executive Director of the State Board. (*See* **Exhibit 2**)  In 2020, the primary election date is March 3, 2020.  Filing begins on December 2, 2019 and ends on December 20, 2019.  Voting by absentee ballot begins on January 13, 2020.  In addition to laying out the timeline, the affidavit predicts when "geocoding" new maps will be completed.

North Carolina allows voters to register by party affiliation.  In order to be a candidate for congress and run in a party primary for office, a candidate must be affiliated with a party:  "No person shall be permitted to file as a candidate in a party primary unless that person has been affiliated with that party for at least 90 days."  (N C. Gen. Stat. § 163A-972)  To run as a party candidate in the March 3, 2020 primary a potential candidate would have to affiliate with that party between September 3 and September 23, 2019.  The State Board of Elections cannot accept a notice of candidacy for a party primary in the event an applicant fails to meet this 90-day requirement. *Id*.  The right to run for election to Congress in a party primary is a significant right because the primary winner obtains organization, ballot placement and a group of voters who identify with the party of a candidate.  Persons registered with a party have a vested right to file for a primary as of September 23, 2019.  Unlike other candidates, there is no residency requirement for congressional candidates to reside in the district for which he or she represents in Congress.

Up until November, when Legislature decided to begin redrawing the districts, Plaintiff Brewster and the other 40 candidates who had announced for congress and filed

campaign finance reports with the FEC had relied upon the 2016 redistricting plan to organize campaigns and communicate with voters. Before they filed their FEC Statement of Candidacy, they had no notice that a different plan or time table would be enacted by the Legislature and administered by the State Board. From the time Mr. Brewster announced his candidacy, until recently, he has conducted his campaign knowing the boundaries of the current election districts had been the result of settled federal litigation.

Critically important to congressional campaigns is the use of information on the location of individual voters. The data processing to report this information is called geocoding and candidates and parties may obtain this information from the State Board. New districts require new geocoding which create difficulties in recruiting quality candidates for office (*See* **Exhibit 4**, Affidavit of Frank Hill), make valueless the prior work declared candidates have relied on in fundraising, and in electioneering with voters no longer in their districts (*See* **Exhibit 5***,* Affidavit of Bill Brewster), and it complicates election messaging, truncating the time and effectiveness of political speech, with no offsetting benefits (*See* **Exhibit 6**, Affidavit of Carter Wrenn). The wholesale elimination of old districts for new infringes on political speech and interferes with the election schedule.

At the present time, the North Carolina General Assembly and candidates are unsure how to proceed. The certainty of geocoding is needed for the Plaintiffs and others to continue their campaigns. The Legislature has not been asked to change the timing of the primaries by any state court (s*ee* **Exhibit 3**). Based on past history, if the primary elections for Congress are to be held on a date different from that of the Presidential

4

primary, voter turnout will plummet. Voters will be in doubt if the candidates they want to vote for cannot run and therefore voters will not participate in the election. In addition voters who have been already solicited to vote for a current candidate will be confused when differing candidates appear on the ballot.

## III. LAW

<u>Jurisdiction</u>

District Courts have subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States, 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. § 20510; under 28 U.S.C. §§ 1343(a)(4) and 1357, as a case to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote. The requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, 52 U.S.C. § 20510, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

This case is justiciable because the federal courts have jurisdiction to hear First Amendment challenges to state election laws. *Eu v. San Francisco Cty. Democratic. Central Comm.*, 489 U.S. 214, 109 S.Ct. 1013 (1989). *Williams v. Rhodes*, 393 U.S. 23, 34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

Plaintiff seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201. Section 2201 courts are to "declare the rights and other legal relations of any interested party seeking such declaration" when there is "a case of actual controversy within [the Court's] jurisdiction." 28 U.S.C. § 2201(a). The Declaratory Judgment Act, however, merely creates a remedy, not jurisdiction. *Skelly Oil Co. v. Phillips Petroleum*

5

*Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (noting that a declaratory judgment action requires that the court possess "an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction)"); *Interstate Petroleum Corp. v. Morgan*, 249 F.3d 215, 221 n. 7 (4th Cir. 2001).

The Court can and should exercise its sound discretion to entertain Plaintiffs' claims for Declaratory Judgment. The question the Plaintiffs ask arises from the United States Supreme Court's decision in *Purcell v. Gonzalez* 549 US 1 (2006) and its application to these last minute election law changes. Answering this question will affirmatively eliminate the need for everlasting piecemeal litigation in other forums.

The Plaintiffs are not now, nor have ever been, parties in any state litigation, and will oppose the intervention of other parties who have been litigants in this Court. While we recognize the current defendants are parties in other litigation, they are necessary parties here to answer the questions asked and obtain relief. Plaintiffs raise federal questions about the election of federal officeholders in which a federal court has an interest in determining under principles of federalism and efficiency. The Legislature has not resolved this issue to date and it is unlikely, lacking a declaratory judgment from this Court applying federal law. Plaintiffs will suffer substantial losses of time and money without federal relief.

Preliminary Injunction Standard

To prevail on a motion for preliminary injunction, a party must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

6

absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). inter, 555 U.S. at 20, 129 S.Ct. 365. Such a remedy "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course" *Winter*, 555 U.S. at 32, 129 S. Ct. 365. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief'" *Id*. at 24, 129 S. Ct. 365 [quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 107 S .Ct. 1396, 94 L.Ed.2d 542 (1987)]. In doing so, the Supreme Court has instructed federal courts to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *See Id*. at 23–24, 31 n. 5, 129 S. Ct. 365.

A.    **Likelihood of success on the merits**

States have a right to properly regulate voting. See *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (holding that the "right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system"). The North Carolina Legislature had regulated voting by setting definitive dates for the primary and general elections. Now the Legislature has established a committee to consider redrawing the congressional districts for the 2020 elections.

The legal foundation of the Legislature's revisions is based on theories rejected in *Rucho v. Common Cause*, ___U.S.____, 139 S.Ct. 2484 (2019). We note this only to state the imperfect evidentiary basis the Legislature may use to ground its deprivation of

the Plaintiffs' First Amendment right to an electoral process that is necessarily structured to maintain the integrity of the democratic system.

To allow a state court, state board, or a state legislature to restrict political speech for federal office requires a record based on a full trial of evidence by all parties affected. Anything else is unreliable. Put differently, conforming election districts into districts which are more likely to be Democrat and Republican districts is not a compelling reason to restrict political speech of already filed candidates.

Any harm to third parties by answering the declaratory judgment question in the affirmative is temporary. A state court has already produced a "fairer" map for the elections in 2020 to elect a legislature which will be able to draw "fairer" congressional districts by 2021. Gerrymandering is, to some extent, a temporary phenomenon which can be redressed by new districts every ten years.

Given the history of election disputes in North Carolina, delays are inevitable. These plaintiffs have no adequate state remedy to assert their federal interest in any meaningful way which comports with due process because the state court has truncated the process. Moving the primary election dates for all offices, as some contemplate, is constitutionally overbroad involving races that are not even challenged in the lawsuit, and will lead to considerable confusion in the electorate, reduce voter turnout in congressional primary elections, and will impact a host of election laws that exist to promote a transparent and efficient election.

Plaintiffs' relief is timely. The legislative defendants have pointed out previously to this court parties are well within the time in which other courts have refused to make

changes in upcoming elections even if an election will be conducted with unconstitutional defects in state plans.

"This is in line with numerous other cases finding belated requests for relief too late to impact an upcoming election: • Thirteen weeks prior to filing deadline for a primary election too late. *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606 (4th Cir. 1970). • Three months out from election too late. *Chisom*, 853 F.2d at 1190 (vacating *Chisom v. Edwards*, 690 F. Supp. 1524 (E.D. La. July 7, 1988)). • Four months out from election too late. *Dean v. Leake*, 550 F. Supp. 2d 594, 606 (E.D.N.C. 2008). • Five months out from election too late. *Klahr v. Williams*, 313 F. Supp. 148, 152 (D. Ariz. May 19, 1970), aff'd sub nom. *Ely v. Klahr*, 403 U.S. 108 (1971). • Ten months out from election too late. *Kilgarlin v. Martin*, 252 F. Supp. 404, 444 (S.D. Tex. 1966), aff'd in relevant part sub nom. *Kilgarlin v. Hill*, 386 U.S. 120 (1967). • Four months out from election too late. *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 843 (N.D. Cal. 1992). • Two months out from election too late. *In re Pennsylvania Cong. Districts in Reapportionment Cases*, 535 F. Supp. 191, 195 (M.D. Pa. 1982). • Three and a half months out from election too late. *Diaz v. Silver*, 932 F. Supp. 462, 469 (E.D.N.Y. 1996). • Five months out from election too late. *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1362 (M.D. Ala.1986). • Three months out from election too late. *Watkins v. Mabus*, 771 F. Supp. 789, 805 (S.D. Miss. 1991). • Two months out from election too late. *Ashe v. Bd. of Elections in City of New York*, 1988 WL 68721, at *1 (E.D.N.Y. June 8, 1988). In fact, courts have declined to interfere with elections even after finding, after adjudication on the merits, egregious violations of federal constitutional rights. See, e.g., *Vera v. Richards*, 861 F. Supp. 1304, 1351 (S.D. Tex. 1994), aff'd *Bush v. Vera*, 517 U.S. 952 (1996) (declining to issue relief, even after finding egregious racial gerrymanders, either for the 1994 or 1996 elections, even Case 5:19-cv-00452-FL Document 29 Filed 10/21/19 Page 18 of 47 19 though the violation was finally adjudicated in September 1994); *Ashe v. Board of Elections in the City of New York*, 1988 WL 68721 (E.D.N.Y. June 8, 1988) (denying preliminary injunction even after finding a likelihood of success on a Voting Rights Act violation due to proximity to election). Here, the next scheduled election is on March 3, 2020. There is no alternative plan prepared, and there is no final order striking down the 2016 plan. It is too late to engage in court ordered remedial map-drawing." Defendant's brief in Opposition to Plaintiffs Request for Preliminary Injunction. Legislative Defendant's Memorandum in Opposition to Preliminary Injunction. (Case 5:19-cv-00452-FL Document 29 Filed 10/21/19 Page 18 of 47).

An examination of the *Purcell* case and its most recent applications by the United States Supreme Court is instructive. In *Purcell*, the state of Arizona attempted to implement a 2004 ballot measure which required proof of citizenship when registering to vote in the presentation of photo ID or other specified proof of identification in order to cast a ballot on election day for the 2006 general election. Plaintiffs opposed to the requirements of the ballot measure filed suit in May of 2006, seeking an injunction preventing the implementation of the 2004 ballot measure. On September 11, 2006, the District Court denied plaintiff's preliminary injunction request. On October 5, 2006, a panel of the Ninth Circuit, without oral argument, issued an injunction preventing the implementation of the ballot measure for the 2006 elections. Arizona sought a stay of the Ninth Circuit's injunction from the United States Supreme Court. The Supreme Court accepted the filings in the alternative as a petition for certiorari, granted the petition and in a *per curium* opinion, vacated the injunction of the Ninth Circuit.

The Supreme Court, in a short opinion made it abundantly clear that it was taking no position on the ultimate outcome of the litigation attempting to block the implementation of the 2004 ballot measure. The Court noted that court "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell, Id.* The key conclusion of the Court was "in view of the impending election, the necessity for clear guidance to the state of Arizona, and our conclusion regarding the Court of Appeals issuance of the order we vacate the order of the Court of Appeals." The chief concern of the Court in this case

was the proximity of the court orders to the actual election. It's important to note that the Supreme Court did not deal with this in a traditional stay posture, but instead took the unusual step of treating the request for stay as a petition for certiorari and took jurisdiction of the case. The Supreme Court is not applying the traditional balancing test in making the *Purcell* analysis. It examined only one thing - the injury to the orderly election process caused by late changes to the process and procedures under which the elections will be held and administered.

This fact is made clearer when one examines the circumstances of the other cases which the Supreme Court has recently decided under the *Purcell* standard. On the eve of the 2014 elections four cases involving a combination of early voting, registration procedures, and photo ID were decided by the United States Supreme Court. These cases came from Ohio, Wisconsin, North Carolina, and Texas. All of the cases were factually similar regarding changes in election procedure but they had significant differences in terms of timing.

In the Wisconsin voter identification case *Frank v. Walker*, Oct. 9, 2014 574 U.S. ____, a District Court entered an injunction preventing the implementation of Wisconsin's voter ID law for the November 2014 elections on April 29, 2014. Wisconsin promptly sought a stay of this order from the Seventh Circuit, however, the panel did not grant a stay until about two months before the election. Plaintiffs in the case then sought en banc review twice. The Seventh Circuit split 5-5 on both occasions. The United States Supreme Court then vacated the stay of the Seventh Circuit panel, allowing the

election procedures that were put in place by the District Court's April injunction to govern the conduct of the November 2014 elections.

In the Ohio case *Husted v. Ohio State Conference of NAACP*, 135 S.Ct. 42 (2014), the timing was demonstratively different. The District Court did not issue its order granting a preliminary injunction until September 4, 2014, barely more than two months before the election. Ohio first sought a stay of the District Court's order with the Sixth Circuit. This was denied. Ohio then presented an application for stay to the Supreme Court which was granted. *Husted v. Ohio State Conference of NAACP*, 573 U.S. 988, 135 S.Ct. 42 (2014).

In the Texas case *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), a full trial had been held on the Texas photo ID and proof of citizenship law. The District Court issued a 147 page opinion with findings of fact and law. However, the District Court did not issue this opinion until October 9, 2014 - mere weeks before the election. Texas requested and quickly received an emergency stay from the Fifth Circuit. Plaintiffs immediately requested that the Supreme Court vacate the stay from the Fifth Circuit. This was promptly denied by the United States Supreme Court.

Finally, there is North Carolina. North Carolina had passed a comprehensive election reform law that included photo ID. This law was scheduled for a "soft rollout" for the 2014 elections. Plaintiffs sued to prevent the implementation of this law and the "soft rollout" scheduled for the 2014 elections. The District Court denied plaintiff's request for a preliminary injunction and plaintiffs then appealed to the Fourth Circuit. The Fourth Circuit in a 2-1 opinion granted a preliminary injunction in part on October 1,

2014, barely a month before the General Election. The state then requested a stay from the United States Supreme Court which was granted. *North Carolina v. League of Women Voters* 574 U.S. _____ (2014).

It is impossible to reconcile the cases through an examination of the relevant facts and law regarding the substantive claims made by plaintiffs in each of these individual cases. These cases can only be reconciled if one recognizes the Supreme Court did not consider it relevant whether the plaintiffs or the defendants should win on the merits. In fact it is clear that no matter what your legal position is on voter identification at least one state of these four used an illegal election procedure in the 2014 elections. Furthermore, the United States Supreme Court was perfectly aware of this.

Only through an examination of timing and the application of the *Purcell* principle can these results be reconciled. The distinguishing facts of all the results of these cases can only be reconciled by answering two questions: 1) "When was the initial injunction issued?" and 2) How long did the injunction remain in place?" In Wisconsin, the initial injunction was issued by the District Court in April of 2014. The injunction was in place, and the elections were prepared for, on the basis of that injunction until about two months before the November General Election when the Seventh Circuit allowed Wisconsin to implement the previously enjoined statute. In Ohio, the state had long prepared for the implementation of its law only to have the District Court issue a preliminary injunction little more than two months before the General Election. In Texas, a permanent injunction was issued as a result of a full trial and complete findings of fact and law but, as in Ohio, this injunction was not issued until late in the election process, mere weeks

before the General Election. In North Carolina, the same key fact was present. North Carolina was preparing to implement its statute for months. Voters were educated by the candidates and poll workers trained. This orderly election process was disrupted by the Fourth Circuit's attempt to issue a preliminary injunction little more than a month prior to the General Election. In order to maintain the status quo and allow for orderly elections, that maintain crucial constitutional rights of the voters, the Supreme Court vacated the last minute changes regardless of whether that change was the issuance of an injunction or the lifting of an injunction and regardless of what the underlying merits of the election procedures used in the election might be. [1]

When the facts of this case are compared to the facts of the five cases discussed above it is abundantly clear the disruption to the orderly election process in the case before this court is more egregious than in the five cases decided under the *Purcell* principle above. The five cases all involve where and when ballots will be cast and the proper identification required for voters who cast those ballots. The Court is correct when it suggests that last-minute changes to these qualifications can result in lower voter turnout, confusion, and people improperly casting their ballots. These issues can and do affect voters' equal protection and substantive due process rights. However, these are all issues which can be rectified with time and mass communication methods which is why,

---

1 Certain commentators urge that "*Purcell* should not be a stand-alone principle, but the Supreme Court's silence in the 2014 election cases threatens to make it one." Richard L. Hasen, *Reigning in the Purcell Principle* 43 Fla. St. U. L. Rev. 427 at 464 (2017) Plaintiffs in this case assert that *Purcell* should be a stand-alone principle. It protects important Constitutional rights such as the ones identified in the plaintiff's complaint in this case which can be protected in no other manner. Further it is the position of plaintiffs that the *Purcell* principle applies not only to courts but to any election administrator who is attempting to impose last-minute changes to election procedures which will infringe on the voter's rights such as free speech, association, equal protection, and substantive due process that would be infringed by the interruption of an orderly election process.

if the changes are early enough, there is little infringement on the constitutional rights protected by the *Purcell* principle.

In this case the injury is voter specific. The rights involved are not limited to equal protection and substantive due process rights involved in an orderly election but go directly to plaintiffs' First Amendment rights to speech and association. The defendants in this case are proposing to disrupt and interfere with the communication processes taking place in anticipation of the upcoming election in less than two months. Candidate committees and non-candidate committees have relied upon the voter lists produced by the North Carolina Board of Elections. Identified voters have received communications based upon these lists for several months. These voters also used many modern communication methods, including the Internet, to associate and communicate with these candidate and non-candidate committees regarding the upcoming elections. It would be harmful enough to violate the *Purcell* principle if the defendants provided a geocoded voter list today but that is not what they propose. They intend to not have such a list available until mere weeks before votes will actually be received by the North Carolina Board of Elections. As the affidavits provided prove mere publication of geocoded voter lists will not be sufficient to restart the process of communicating to individual voters. These new geocoded lists will have to be provided to vendors who use proprietary lists they possess to obtain contact information[2] and correlate it with the new geocoded voter lists. This is a task which, in all likelihood, will not be accomplished before votes are

---

2 Contact information in the modern era includes e-mail, social media, and cell phone numbers.

being received by the North Carolina Board of Elections. Protecting these crucial speech and association rights requires far more time and effort prior to the election date than it would to protect voters' equal protection and due process rights from the types of violations that occurred in the five cases discussed above. Moreover, the significant amount of resources already expended by the plaintiffs and other candidate and noncandidate committees cannot be recovered if defendants are allowed to the make last-minute changes they seek to what was only days ago an orderly election process.

**B.    Irreparable harm and Preservation of the Status Quo to enable the Parties to have a Remedy.**

If this Court does not grant this injunction, plaintiffs, particularly individual voters, and those similarly situated to them, will suffer irreparable injury by having their past electioneering nullified and future electioneering infringed. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Connection Distrib. Co.*, 154 F.3d at 288 (quoting *Elrod*, 427 U.S. at 373); *Elrod*, 427 U.S. at 373(1976); *Newsom*, 888 F.2d at 378; *Accord, e.g., Bonnell v. Lorenzo*, 241 F.3d 800, 809-10 (6th Cir. 2001); *Schicke v. Dilger*, 2017 U.S. App. Lexis 27024 *6-7 (6th Cir. 2017). *See also N.Y. Times*, 403 U.S. at 715.

The injunction Plaintiffs seek will not alter the status quo. From the last of the 2018 elections until October 13, 2019, the plaintiffs hold the *status quo ante* was the election districts contained in 2016-1 and the time of filing is December 2, 2019 for the primary election of March 3, 2020. The state court's preliminary injunction did nothing to change the status quo or the statute other than to preliminarily suspend its use for the

2016 elections. That action does not change the legal effect of the statutes for federal purposes of determining the current status quo. If the court finds the preliminary injunction to violate *Purcell* (*Id*). The status quo will be preserved. No other plan currently exists and it is the last legal plan implemented under federal law. In an unconventional sense, plaintiffs want to preserve the status quo to prevent the violation of their First Amendment rights, and if it is allowed to be changed at all, plaintiffs will have no meaningful relief.

**C.    The balance of equities tips in Plaintiffs' favor and Injunctive Relief is in the public interest.**

In evaluating a preliminary injunction request, when the government is a defendant, the third and fourth prongs of the preliminary injunction analysis merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Applying these principles to the facts of this case, leads to the conclusion this court should grant plaintiffs' request for a preliminary injunction.

There are no contested facts here. Attached as Exhibits 4, 5 and 6 are the affidavits of Plaintiff Brewster, and Frank Hill and Carter Wrenn two other independent witnesses. Each explains how the failure to issue an injunction will impair the voters' First Amendment rights. The Defendants cannot seriously contest any of the statements Plaintiff Brewster makes about himself or the independent witnesses make about the effect the anticipated election changes will have on the voting process. As a result, this case is appropriate for consolidation of the preliminary injunction and hearing on the merits pursuant to Fed. R. Civ. P. 65(a)2.

Political speech is targeted to individual voters in the boundaries of the election districts.  Geocoding information produced by the State Board of Elections in the voter registration files is critical to this effort.  Geocoding allows candidates, parties, and independent expenditure committees to educate voters, find supporters, get them to the polls, and be sure of an accurate count.   In modern campaigns, well before the filing period, candidates, political parties and independent expenditure committees conduct detailed demographic analysis of a congressional district and how best to organize a communications campaign based upon the boundaries of an election district. Targeting communications is dependent upon geocoding provided by the State Board.  Geocoding is available to the public for the 2016 map since its enactment and relied upon by candidates and others alike. Fundraising, political and communication strategy is time sensitive given primaries have become central to the election process because of extreme voter partisanship and polarization.  Primaries in most all congressional districts are in full effect for the election.[3]  If the state legislature or state board use a differing map and a differing time, it will inevitably require the State Board to geocode the entire state.  A new map could be drawn in early December but the geocoding necessary for candidates to communicate may not be practically usable until after voting started.  This is a significant impairment of free speech.  Furthermore, segregating the congressional from the Presidential primary will eliminate a large percentage of the electorate as likely

---

3 For example, note in the two open seats in 2019, 25 candidates ran in the primary for Congressional District Two and ten candidates ran in the primary for Congressional District 9, because the assumption was the primary election was the general election.  This phenomenon is not new, historically in North Carolina nomination by the Democratic Party was tantamount to election.

voters. These combined effects confuse voters because previous election communications they received and who they voted for in the past will be rendered meaningless. When they go to vote they will be less educated. These interests are of paramount concern and the numbers of voters effected will outweigh the interests of the defendants.

### D. The plaintiffs' interests to be weighed in a declaratory judgment.

Without a declaratory judgment regarding the time of the elections, plaintiff Brewster, and similarly situated congressional candidates, will suffer irreparable harm due to their now obsolete and defunct campaign resource allocations. Brewster, and similarly situated congressional candidates, have been campaigning and fundraising for months in anticipation of the 2020 elections. In running for congressional seats candidates invest substantial time, effort, and money. Congressional candidates' personal efforts, activities, duties, and stakes in their candidacies will be thrown into chaos. These prior activities required knowing with certainty the geographic parameters of congressional districts with sufficient lead time to permit the development of a campaign strategy tailored to the needs of the unique voters in each district. The decisions to undertake such investment were based in no small part on the existing boundaries of the congressional districts under the lawfully enacted 2016 plan. In fact, the district boundaries were a critical factor in making decisions about each candidacy.

Mr. Brewster relied on the existing congressional map for over a year in making campaign and election related decisions regarding the 2018 election. The courts have repeatedly held that upending political geography in the midst of elections can cause

harm through the disruption of the political process, especially as the election approaches. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree."); *see Williams v. Rhodes*, 393 U.S. 23, 35, 89 (1968) (finding last-minute addition to ballot would pose "a risk of interference with the rights of other [citizens], for example, absentee voters"). In the present case, now that the 2020 election cycle is well underway, a new for the 2020 congressional elections will result in "[serious disruption of orderly ... election processes." *Pender Cty. v. Bartlett*, 261 N.C. 491 at 510 (2007).

Not only will congressional candidates have allocated resources towards voters who no longer reside in the same district - and therefore may no longer be potential constituents or supporters - they will have to expend additional resources to reach new voters who will reside in the new districts. Congressional candidate and Congressional Committee resource allocation was carefully targeted to reach potential supporters in each congressional district. Every candidate will now have to expend additional campaign resources in order to reach new potential supporters and voters. These changes will result in candidates expending substantial resources without time to fundraise, given the fast approaching primary filing deadline. Moreover, given the time constraints and

proximity to filing deadlines, more expensive methods of campaign communication will have to be utilized in order to reach voters who are newly located in the congressional districts. Grassroots efforts such as community organizing, door knocking, volunteer phone banking, and canvassing generally require candidates to expend less money, but require much more time. The lack of direct voter contact from campaigns will fundamentally undermine the direct constituent involvement in the political process.

Given the North Carolina State Court's orders, candidates will now be forced to utilize more expensive-and less direct-means of voter outreach such as paid "robo-calls" and advertising through television, internet, radio, and print.

Their rights to vote, to express political opinions, to work to elect candidates of choice, and to run for political office are core free expression and free assembly rights. (N.C. Const. Art. I §§ 7, 20) ("While the right to associate for the advancement of political beliefs includes the right to advance a candidate who represents those interests, ... the right of association does not encompass the right to nominate as a candidate a particular individual who fails to meet reasonable eligibility requirements .... "). Just as Mr. Brewster has been running and expending funds in efforts to win the 2020 election, the citizens of North Carolina have been contributing to and volunteering with congressional candidates in anticipation of the 2020 election. These citizens have supported these representatives in reliance on the existing, lawfully enacted 2016 congressional map. Much of this support would not have been pledged if the contributor resided in a different district than the candidate or if a candidate was not likely to be successful in the 2020 elections. The decisions to undertake this support were based in no

small part on the existing boundaries of the congressional districts. The change in congressional districts before the 2020 elections will now result in some contributors being represented by different representatives than the ones to whom they originally contributed. Many citizens will surely be harmed by this kind of situation because when pledging their support, they wished to support a candidate who had the potential to represent them in congress. Essentially, these contributors relied on the existing, lawfully enacted, congressional map when engaging in the political process.

This Court must rule in favor of Plaintiffs' request for an injunction.

**E.    Defendants Interests to be Weighed.**

The defendants are fully capable of addressing their own interests if any.  In our view, anyone who had their constitutional rights infringed upon by intentional governmental discrimination are entitled to a remedy.  While these plaintiffs do not dispute others are entitled to some remedy even if it is just a declaration, the timing of any remedy is critical.  When the harm to other voters is great, then a judgment must be made balancing these equities. This is the question we raise.  Balancing whatever interests the others have or the state defendants may have in complying with their own state constitution, in our view does not outweigh the rights of the Plaintiffs herein.

## IV.  CONCLUSION

For the foregoing reasons, this Court should declare the rights of the parties, grant Plaintiffs' Motion for Preliminary Injunction and direct defendants to suspend implementation of any revisions to North Carolina's current congressional election districts as enacted by the General Assembly in Session Law 2016-1.

22

This 8th day of November, 2019.

/s/ Robert Neal Hunter, Jr.
Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone:    (336) 273-1600
Facsimile:    (336) 274-4650
Email:        rnhunterjr@greensborolaw.com

Conrad Boyd Sturges, III (NCSB 22342)
DAVIS, STURGES & TOMLINSON, PLLC
P.O. Drawer 708
Louisburg, NC 27549
Telephone:    (919) 496-2137
Facsimile:    (919) 496-6291
Email:        bsturges@dstattys.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Local Rule 7.2(f) and does not exceed 30 pages in length, excluding the certificate of service page.

This 8th day of November, 2019.

*/s/ Robert Neal Hunter, Jr.*

Robert Neal Hunter, Jr.  (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone:   (336) 273-1600
Facsimile:   (336) 274-4650
Email:      rnhunterjr@greensborolaw.com

Conrad Boyd Sturges, III (NCSB 22342)
DAVIS, STURGES & TOMLINSON, PLLC
P.O. Drawer 708
Louisburg, NC 27549
Telephone:   (919) 496-2137
Facsimile:   (919) 496-6291
Email:      bsturges@dstattys.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on this date, November 8th, 2019, I caused the foregoing document to be filed and served on all counsel of record by operation of CM/ECF system for the United States District Court for the Eastern District of North Carolina.

/s/ Robert Neal Hunter, Jr.
Robert Neal Hunter, Jr. (NCSB 5679)
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Telephone:   (336) 273-1600
Facsimile:   (336) 274-4650
Email:       rnhunterjr@greensborolaw.com

Conrad Boyd Sturges, III (NCSB 22342)
DAVIS, STURGES & TOMLINSON, PLLC
P.O. Drawer 708
Louisburg, NC 27549
Telephone:   (919) 496-2137
Facsimile:   (919) 496-6291
Email:       bsturges@dstattys.com

*Attorneys for Plaintiffs*