# EXHIBIT 1

STATE OF NORTH CAROLINA
WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 012667

REBECCA HARPER, *et al.*
                    *Plaintiffs,*

v.

Representative DAVID R. LEWIS,
in his official capacity as Senior
Chairman of the House Standing
Committee on Redistricting, *et al.,*
                    *Defendants.*

)
)
)
)
)
)
)
)
)
)
)

ORDER ON INJUNCTIVE RELIEF

THIS MATTER came on for hearing on October 24, 2019, before the undersigned

three-judge panel upon Plaintiffs' Motion for Preliminary Injunction, filed September 30,

2019. All adverse parties to this action received the notice required by Rule 65 of the North

Carolina Rules of Civil Procedure.

## Procedural History

On February 19, 2016, the current North Carolina congressional districts

(hereinafter "2016 congressional districts") were established by an act of the General

Assembly, N.C. Sess. Laws 2016-1 (hereinafter "S.L. 2016-1"), as a result of litigation in

federal court over the congressional districts originally drawn in 2011. On September 27,

2019, Plaintiffs filed a verified complaint in Superior Court, Wake County, seeking a

declaration that the 2016 congressional districts violate the rights of Plaintiffs and all

Democratic voters in North Carolina under the North Carolina Constitution's Free

Elections Clause, Art. I, § 10; Equal Protection Clause, Art. I, § 19; and Freedom of Speech

and Freedom of Assembly Clauses, Art. I, §§ 12 & 14. Plaintiffs seek to enjoin the future

use of the 2016 congressional districts. On September 30, 2019, this action was assigned to

the undersigned panel by the Chief Justice of the Supreme Court of North Carolina.

On September 30, 2019, Plaintiffs filed a motion for a preliminary injunction seeking to bar Defendants from administering, preparing for, or moving forward with the 2020 primary and general elections in North Carolina for the United States House of Representatives using the 2016 congressional districts. Plaintiffs also filed a motion for expedited briefing and resolution of Plaintiffs' motion for a preliminary injunction. On October 2, 2019, Defendants North Carolina State Board of Elections and its members (collectively hereinafter "State Defendants") notified the Court that, among other things, candidate filing for congressional primaries is set to begin on December 2, 2019. On October 9, 2019, a motion to intervene was filed by three incumbent Congressional Representatives seeking to intervene in this action in both their capacity as Representatives and as residents and voters in three of the congressional districts challenged in Plaintiffs' verified complaint.

On October 10, 2019, the Court granted in part Plaintiffs' motion for expedited briefing, establishing a briefing schedule on Plaintiff's motion for preliminary injunction and setting for hearing Plaintiffs' motion for preliminary injunction and the motion to intervene.

On October 14, 2019, Defendants Representative David R. Lewis, Senator Ralph E. Hise, Jr., Speaker Timothy K. Moore, President Pro Tempore Philip E. Berger, Senator Warren Daniel, and Senator Paul Newton (hereinafter "Legislative Defendants") removed this case to the United States District Court for the Eastern District of North Carolina. On October 21, 2019, State Defendants and Legislative Defendants each filed in federal court a brief in response to Plaintiffs' motion for preliminary injunction in accordance with the Court's October 10, 2019 order. Plaintiffs notified and provided to the Court the

Defendants' briefs on October 22, 2019, and, on the same date, the federal court remanded this case to state court.

On October 22, 2019, the Congressional Representatives seeking to intervene in this case submitted a brief in response to Plaintiffs' motion for preliminary injunction. On October 23, 2019, Plaintiffs filed a motion to strike the Congressional Representatives' response brief, the Congressional Representatives submitted a response brief to Plaintiffs' motion, and Plaintiffs submitted a brief in reply to that response brief. Additionally, on October 23, 2019, Plaintiffs submitted a brief in reply to Legislative Defendants' brief in response to Plaintiffs' motion for preliminary injunction.

These matters came on to be heard on October 24, 2019, during which time the Court granted the Congressional Representatives (hereinafter "Intervenor-Defendants") permissive intervention and notified the parties that Intervenor-Defendants' response brief would be considered by the Court in its discretion. Plaintiffs' motion for preliminary injunction was taken under advisement.

The Court, having considered the pleadings, motions, briefs and arguments of the parties, supplemental materials submitted by the parties, pertinent case law, and the record proper and court file, hereby finds and concludes, for the purposes of this Order, as follows.

<u>Political Question Doctrine</u>

Legislative Defendants contend Plaintiffs' claims—challenges to the validity of an act of the General Assembly that apportions or redistricts the congressional districts of this State—present non-justiciable political questions. Such claims are within the statutorily-provided jurisdiction of this three-judge panel, N.C.G.S. § 1-267.1, and the Court concludes that partisan gerrymandering claims specifically present justiciable issues, as

distinguished from non-justiciable political questions. Such claims fall within the broad, default category of constitutional cases our courts are empowered and obliged to decide on the merits, and not within the narrow category of exceptional cases covered by the political question doctrine. Indeed, as the Supreme Court of the United States recently explained, partisan gerrymandering claims are not "condemn[ed] . . . to echo in the void," because although the federal courthouse doors may be closed, "state constitutions can provide standards and guidance for state courts to apply." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019).[1]

## Standing of Plaintiffs

Legislative Defendants and Intervenor-Defendants contend that Plaintiffs lack standing to pursue their claims in this action. The North Carolina Constitution, however, provides: "All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." N.C. Const. art. I, § 18. "[B]ecause North Carolina courts are not constrained by the 'case or controversy' requirement of Article III of the United States Constitution, our State's standing jurisprudence is broader than federal law." *Davis v. New Zion Baptist Church*, 811 S.E.2d 725, 727 (N.C. Ct. App. 2018) (quotation marks omitted); *accord Goldston v. State*, 361 N.C. 26, 35, 637 S.E.2d 876, 882 (2006) ("While federal standing doctrine can be instructive as to general principles . . . and for comparative analysis, the nuts and bolts of North Carolina standing doctrine are not coincident with federal standing doctrine.").

---

[1] Likewise, Legislative Defendants' and Intervenor-Defendants' contentions that federal law—*i.e.*, the Elections clause and Supremacy clause of the United States Constitution—serves as a bar in state court to Plaintiffs' action seeking to enjoin the 2016 congressional districts on state constitutional grounds is equally unavailing. Our state courts have jurisdiction to hear and decide claims that acts of the General Assembly apportioning or redistricting the congressional districts of this State run afoul of the North Carolina Constitution.

4

The North Carolina Supreme Court has broadly interpreted Article I, § 18 to mean that "[a]s a general matter, the North Carolina Constitution confers standing on those who suffer harm." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642, 669 S.E.2d 279, 281 (2008). The "gist of the question of standing" under North Carolina law is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Goldston*, 361 N.C. at 30, 637 S.E.2d at 879 (quoting *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973)). Although the North Carolina Supreme Court "has declined to set out specific criteria necessary to show standing in every case, [it] has emphasized two factors in its cases examining standing: (1) the presence of a legally cognizable injury; and (2) a means by which the courts can remedy that injury." *Davis*, 811 S.E.2d at 727-28.

Plaintiffs in this case have standing to challenge the congressional districts at issue because Plaintiffs have shown a likelihood of "a personal stake in the outcome of the controversy," *Goldston*, 361 N.C. at 30, 637 S.E.2d at 879, and a likelihood that the 2016 congressional districts cause them to "suffer harm," *Mangum*, 362 N.C. at 642, 669 S.E.2d at 281.

<u>Applicable Legal Standards</u>

At its most basic level, partisan gerrymandering is defined as: "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (U.S. 2016). Partisan gerrymandering operates through vote dilution—the devaluation of one citizen's vote as compared to others. A mapmaker draws district lines to

"pack" and "crack" voters likely to support the disfavored party. *See generally Gill v. Whitford*, 138 S. Ct. 1916 (2018).

Plaintiffs claim the 2016 congressional districts are partisan gerrymanders that violate the rights of Plaintiffs and all Democratic voters in North Carolina under the North Carolina Constitution's Free Elections Clause, Art. I, § 10; Equal Protection Clause, Art. I, § 19; and Freedom of Speech and Freedom of Assembly Clauses, Art. I, §§ 12 & 14. Extreme partisan gerrymandering violates each of these provisions of the North Carolina Constitution. *See Common Cause v. Lewis*, 18-CVS-014001, slip. op. at 298-331 (N.C. Sup. Ct. Sept. 3, 2019).

*Free Elections Clause*

The North Carolina Constitution, in the Declaration of Rights, Article I, § 10, declares that "[a]ll elections shall be free." Our Supreme Court has long recognized the fundamental role of the will of the people in our democratic government: "Our government is founded on the will of the people. Their will is expressed by the ballot." *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 220 (1875). In particular, our Supreme Court has directed that in construing provisions of the Constitution, "we should keep in mind that this is a government of the people, in which the will of the people--the majority--legally expressed, must govern." *State ex rel. Quinn v. Lattimore*, 120 N.C. 426, 428, 26 S.E. 638, 638 (1897) (citing N.C. Const. art. I, § 2). Therefore, our Supreme Court continued, because elections should express the will of the people, it follows that "all acts providing for elections, should be liberally construed, that tend to promote a fair election or expression of this popular will." *Id.* "[F]air and honest elections are to prevail in this state." *McDonald v. Morrow*, 119 N.C. 666, 673, 26 S.E. 132, 134 (1896). Moreover, in giving meaning to the Free Elections Clause, this Court's construction of the words contained therein must

6

therefore be broad to comport with the following Supreme Court mandate: "We think the object of all elections is to ascertain, fairly and truthfully, the will of the people--the qualified voters." *Hill v. Skinner*, 169 N.C. 405, 415, 86 S.E. 351, 356 (1915) (quoting *R. R. v. Comrs.*, 116 N.C. 563, 568, 21 S.E. 205, 207 (1895)).

As such, the meaning of the Free Elections Clause is that elections must be conducted freely and honestly to ascertain, fairly and truthfully, the will of the people. In contrast, extreme partisan gerrymandering—namely redistricting plans that entrench politicians in power, that evince a fundamental distrust of voters by serving the self-interest of political parties over the public good, and that dilute and devalue votes of some citizens compared to others—is contrary to the fundamental right of North Carolina citizens to have elections conducted freely and honestly to ascertain, fairly and truthfully, the will of the people. *See Common Cause*, 18-CVS-014001, slip. op. at 298-307.

*Equal Protection Clause*

The Equal Protection Clause of the North Carolina Constitution guarantees to all North Carolinians that "[n]o person shall be denied the equal protection of the laws." N.C. Const., art. I, § 19. Our Supreme Court has held that North Carolina's Equal Protection Clause protects "the fundamental right of each North Carolinian to *substantially equal voting power*." *Stephenson v. Bartlett*, 355 N.C. 354, 379, 562 S.E.2d 377, 394 (2002) (emphasis added). "It is well settled in this State that 'the right to vote *on equal terms* is a fundamental right.'" *Id.* at 378, 562 S.E.2d at 393 (quoting *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990) (emphasis added)).

Although the North Carolina Constitution provides greater protection for voting rights than the federal Equal Protection Clause, our courts use the same test as federal courts in evaluating the constitutionality of challenged classifications under an equal

protection analysis. *Duggins v. N.C. State Bd. of Certified Pub. Accountant Exam'rs*, 29-4 N.C. 120, 131, 240 S.E.2d 406, 413 (1978); *Richardson v. N.C. Dep't of Corr.*, 345 N.C. 1 28, 134, 478 S.E.2d 501, 505 (1996). Generally, this test has three parts: (1) intent, (2) effects, and (3) causation. First, the plaintiffs challenging a districting plan must prove that state officials' "predominant purpose" in drawing district lines was to "entrench [their party] in power" by diluting the votes of citizens favoring their rival. *Ariz. State Legis.*, 135 S. Ct. at 2658. Second, the plaintiffs must establish that the lines drawn in fact have the intended effect by "substantially" diluting their votes. *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 861 (M.D.N.C. 2018). Finally, if the plaintiffs make those showings, the State must provide a legitimate, non-partisan justification (*i.e.*, that the impermissible intent did not cause the effect) to preserve its map. *Rucho,* 139 S. Ct. at 2516 (Kagan, J., dissenting).

Generally, partisan gerrymandering runs afoul of the State's obligation to provide all persons with equal protection of law because, by seeking to diminish the electoral power of supporters of a disfavored party, a partisan gerrymander treats individuals who support candidates of one political party less favorably than individuals who support candidates of another party. *Cf. Lehr v. Robertson*, 463 U.S. 248, 265, 103 S. Ct. 2985 (1983) ("The concept of equal justice under law requires the State to govern impartially.")

As such, extreme partisan gerrymandering runs afoul of the North Carolina Constitution's guarantee that no person shall be denied the equal protection of the laws. *See Common Cause,* 18-CVS-014001, slip. op. at 307-17.

### Freedom of Speech and Freedom of Assembly Clauses

The Freedom of Speech Clause in Article I, § 14 of the North Carolina Constitution provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained." The Freedom of Assembly Clause in Article I, § 12

provides, in relevant part, that "[t]he people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances."

"There is no right more basic in our democracy than the right to participate in electing our political leaders"—including, of course, the right to "vote." *McCutcheon v. FEC*, 572 U.S. 185, 191, 134 S. Ct. 1434, 1440 (2014) (plurality op.). "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356, 96 S. Ct. 2673, 2681 (1976). In North Carolina, the right to assembly encompasses the right of association. *Feltman v. City of Wilson*, 238 N.C. App. 246, 253, 767 S.E.2d 615, 620 (2014). Moreover, "citizens form parties to express their political beliefs and to assist others in casting votes in alignment with those beliefs." *Libertarian Party of N.C. v. State*, 365 N.C. 41, 49, 707 S.E.2d 199, 204-05 (2011). And "for elections to express the popular will, the right to assemble and consult for the common good must be guaranteed." John V. Orth, *The North Carolina State Constitution* 48 (1995).

It is "axiomatic" that the government may not infringe on protected activity based on the individual's viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995). The guarantee of free expression "stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340, 130 S. Ct. 876, 898 (2010). Viewpoint discrimination is *most* insidious where the targeted speech is political; "in the context of political speech, . . . [b]oth history and logic" demonstrate the perils of permitting the government to "identif[y] certain preferred speakers" while burdening the speech of "disfavored speakers." *Id.* at 340-41, 130 S. Ct. at 899.

9

The government may not burden the "speech of some elements of our society in order to enhance the relative voice of others" in electing officials. *McCutcheon*, 572 U.S. at 207, 134 S. Ct. at 1450; *see also Winborne v. Easley*, 136 N.C. App. 191, 198, 523 S.E.2d 149, 154 (1999) ("political speech" has "such a high status" that free speech protections have their "fullest and most urgent application" in this context (quotations marks omitted)). The government also may not retaliate based on protected speech and expression. *See McLaughlin*, 240 N.C. App. at 172, 771 S.E.2d at 579-80. Courts carefully guard against retaliation by the party in power. *See Elrod*, 427 U.S. at 356, 96 S. Ct. at 2681; *Branti v. Finkel*, 445 U.S. 507, 100 S. Ct. 1287 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S. Ct. 2729 (1990). When patronage or retaliation restrains citizens' freedoms of belief and association, it is "at war with the deeper traditions of democracy embodied in the First Amendment." *Elrod*, 427 U.S. at 357, 96 S. Ct. at 2682 (quotation marks omitted).

When a legislature engages in extreme partisan gerrymandering, it identifies certain preferred speakers (e.g. Republican voters) while targeting certain disfavored speakers (e.g. Democratic voters) because of disagreement with the views they express when they vote. Then, disfavored speakers are packed and cracked into legislative districts with the aim of diluting their votes and, in cracked districts, ensuring that these voters are significantly less likely, in comparison to favored voters, to be able to elect a candidate who shares their views. Moreover, a legislature that engages in extreme partisan gerrymandering burdens the associational rights of disfavored voters to "instruct their representatives, and to apply to the General Assembly for redress of grievances." N.C. Const. art. I, § 12. As such, extreme partisan gerrymandering runs afoul of these important guarantees in the North Carolina Constitution of the freedom of speech and the right of the people of our State to assemble together to consult for their common good, to instruct their

representatives, and to apply to the General Assembly for redress of grievances. *See Common Cause*, 18-CVS-014001, slip. op. at 317-31.

<u>Injunctive Relief</u>

"It is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people." *City of Asheville v. State*, 369 N.C. 80, 87-88, 794 S.E.2d 759, 766 (2016) (quoting *Glenn v. Bd. of Educ.*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936)); *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989).

"The purpose of a preliminary injunction is ordinarily to preserve the *status quo* pending trial on the merits. Its issuance is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *State ex rel. Edmisten v. Fayetteville Street Christian School*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980). A preliminary injunction is an "extraordinary remedy" and will issue "only (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *A.E.P. Industries, Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759-60 (1983) (emphasis in original); *see also* N.C.G.S. § 1A-1, Rule 65(b). When assessing the preliminary injunction factors, the trial judge "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted. In effect, the harm alleged by the plaintiff must satisfy a

Case 2:19-cv-00037-FL   Document 29-1   Filed 11/12/19   Page 12 of 21

standard of relative substantiality as well as irreparability." *Williams v. Greene,* 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

*Status Quo*

The 2011 congressional districts, enacted by the General Assembly on July 28, 2011, were struck down as unconstitutional racial gerrymanders and ordered to be redrawn on February 5, 2016. *See Harris v. McCrory,* 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016). As a result, the 2016 congressional districts were then enacted by the General Assembly on February 19, 2016. N.C. Sess. Laws 2016-1. Plaintiffs' challenge to the 2016 congressional districts is a challenge to S.L. 2016-1 as enacted; hence, the status quo which Plaintiffs desire to preserve is the existing state of affairs prior to the enactment of S.L. 2016-1. Therefore, the existing state of affairs—*i.e.,* the status quo—prior to the enactment of S.L. 2016-1 was the period in which no lawful congressional district map for North Carolina existed absent the enactment of a remedial map by the General Assembly.

*Plaintiffs are Likely to Succeed on the Merits*

Quite notably in this case, the 2016 congressional districts have already been the subject of years-long litigation in federal court arising from challenges to the districts on partisan gerrymandering grounds. *See Rucho,* 318 F. Supp. 3d 777. As such, there is a detailed record of both the partisan intent and the intended partisan effects of the 2016 congressional districts drawn with the aid of Dr. Thomas Hofeller and enacted by the General Assembly. *See Rucho,* 318 F. Supp. 3d at 803-10 (detailing the history of the drawing and enactment of the 2016 congressional districts); *see also* Declaration of Elisabeth S. Theodore (attaching as exhibits a number of documents from the record in federal court); *Rucho,* 139 S. Ct. at 2491-93.

12

For instance, Dr. Hofeller was directed by legislators "to use political data —
precinct-level election results from all statewide elections, excluding presidential elections,
dating back to January 1, 2008 — in drawing the remedial plan," and was further
instructed to "use that political data to draw a map that would maintain the existing
partisan makeup of the state's congressional delegation, which, as elected under the
racially gerrymandered plan, included 10 Republicans and 3 Democrats." *Rucho*, 318 F.
Supp. 3d at 805 (internal citations omitted).

As another example, the redistricting committee approved several criteria for the
map-drawing process, including the use of past election data (*i.e.*, "Political Data") and
another labeled "Partisan Advantage," which was defined as: "The partisan makeup of the
congressional delegation under the enacted plan is 10 Republicans and 3 Democrats. The
Committee shall make reasonable efforts to construct districts in the 2016 Contingent
Congressional Plan to maintain the current partisan makeup of North Carolina's
congressional delegation." *Id.* at 807. In explaining these two criteria, Representative
David Lewis "'acknowledged freely that this would be a political gerrymander,' which he
maintained was 'not against the law,'" *id.* at 808 (citation omitted), while also going on to
state that he "propose[d] that [the Committee] draw the maps to give a partisan advantage
to 10 Republicans and 3 Democrats because [he] d[id] not believe it[ would be] possible to
draw a map with 11 Republicans and 2 Democrats," *id.* (alterations in original).

Moreover, when drawing the 2016 congressional districts, Dr. Hofeller used "an
aggregate variable he created to predict partisan performance" all while "constantly aware
of the partisan characteristics of each county, precinct, and VTD." *Id.* at 805-06.

Finally, the redistricting committee, and ultimately the General Assembly as a
whole, approved the 2016 congressional districts by party-line vote. *Id.* at 809.

13

In light of the above, this Court agrees with Plaintiffs and finds there is a substantial likelihood that Plaintiffs will prevail on the merits of this action by showing beyond a reasonable doubt that the 2016 congressional districts are extreme partisan gerrymanders in violation of the North Carolina Constitution's Free Elections Clause, Art. I, § 10; Equal Protection Clause, Art. I, § 19; and Freedom of Speech and Freedom of Assembly Clauses, Art. I, §§ 12 & 14.

*Plaintiffs Will Suffer Irreparable Loss Unless the Injunction is Issued*

The loss to Plaintiffs' fundamental rights guaranteed by the North Carolina Constitution will undoubtedly be irreparable if congressional elections are allowed to proceed under the 2016 congressional districts. As discussed above, Plaintiffs' have shown a likelihood of succeeding on the merits of their claims that these districts violate multiple fundamental rights guaranteed by the North Carolina Constitution. And as Defendants have emphasized, the 2020 primary elections for these congressional districts—the final congressional elections of this decade before the 2020 census and subsequent decennial redistricting—are set to be held in March of 2020 with the filing period beginning December 2, 2019.

As such, this Court finds that Plaintiffs are likely to sustain irreparable loss to their fundamental rights guaranteed by the North Carolina Constitution unless the injunction is issued, and likewise, issuance is necessary for the continued protection of Plaintiffs' fundamental rights guaranteed by the North Carolina Constitution during the course of the litigation.

*A Balancing of the Equities Weighs in Favor of Plaintiffs*

On one hand, Legislative Defendants contend a general harm to them will result from issuing the injunction because the General Assembly will be prevented from

14

effectuating an act of the General Assembly. On the other hand, Plaintiffs' and all North Carolinians' fundamental rights guaranteed by the North Carolina Constitution will be irreparably lost, as discussed above, if the injunction is not granted. Simply put, the people of our State will lose the opportunity to participate in congressional elections conducted freely and honestly to ascertain, fairly and truthfully, the will of the people. The Court finds that this specific harm to Plaintiffs absent issuance of the injunction outweighs the potential harm to Legislative Defendants if the injunction is granted.

Legislative Defendants and Intervenor Defendants also contend the issuance of the injunction will result in disruption, confusion, and uncertainty in the electoral process for them, candidates, election officials, and the voting public. But, again, such a proffered harm does not outweigh the specific harm to Plaintiffs from the irreparable loss of their fundamental rights guaranteed by the North Carolina Constitution. Moreover, while State Defendants would prefer not to move elections or otherwise change the current schedule for the 2020 congressional primary election, they recognize that proceeding under the 2016 congressional districts "would require the Board to administer an election that violates the constitutional rights of North Carolina voters" and acknowledge that the election schedule can be changed if necessary. State Defs. Response Brief at 2. In that vein, State Defendants agree with Plaintiffs that "it would be appropriate for this Court to issue an injunction that relieves the Board of any duty to administer elections using an unconstitutionally gerrymandered congressional redistricting plan." *Id.*

Finally, Legislative Defendants and Intervenor-Defendants contend Plaintiffs simply waited too long to bring their challenge to the 2016 congressional districts in state court. Plaintiffs, however, filed this action in state court only a matter of months after litigation reached its conclusion in federal court, at a time still prior to the candidate filing

period. While the timing of Plaintiffs' action does weigh against Plaintiffs, the Court does not find that the timing of Plaintiffs' filing of this action should bar them from seeking equitable relief in the form of the requested preliminary injunction.

Consequently, after weighing the potential harm to Plaintiffs if the injunction is not issued against the potential harm to Defendants if injunctive relief is granted, this Court concludes the balance of the equities weighs in Plaintiffs' favor. Indeed, the harm alleged by Plaintiffs is both substantial and irreparable should congressional elections in North Carolina proceed under the 2016 congressional districts.

<u>Conclusion</u>

Under these circumstances, the Court, in its discretion and after a careful balancing of the equities, concludes that the requested injunctive relief shall issue in regard to the 2016 congressional districts. The Court further concludes that security is required of Plaintiffs pursuant to Rule 65(c) of the North Carolina Rules of Civil Procedure to secure the payment of costs and damages in the event it is later determined this relief has been improvidently granted.

This Court recognizes the significance and the urgency of the issues presented by this litigation, particularly when considering the impending 2020 congressional primary elections and all accompanying deadlines, details, and logistics. This Court also is mindful of its responsibility not to disturb an act of the General Assembly unless it plainly and clearly, without any reasonable doubt, runs counter to a constitutional limitation or prohibition. For these reasons, the Court will, upon the forthcoming filing of Plaintiffs' motion for summary judgment, provide for an expedited schedule so that Plaintiffs' dispositive motion may be heard prior to the close of the filing period for the 2020 primary election.

16

This Court observes that the consequences, as argued by Legislative Defendants and Intervenor-Defendants, resulting from a delay in the congressional primary—*e.g.,* decreased voter turnout, additional costs and labor for the State Board of Elections—would be both serious and probable should the primary schedule be adjusted as a result of this Order and Plaintiffs' ultimate success on the merits of this action. But as discussed above, should Plaintiffs prevail through motion or trial, these consequences pale in comparison to voters of our State proceeding to the polls to vote, yet again, in congressional elections administered pursuant to maps drawn in violation of the North Carolina Constitution.

This Court, however, notes that these disruptions to the election process need not occur, nor may an expedited schedule for summary judgment or trial even be needed, should the General Assembly, on its own initiative, act immediately and with all due haste to enact new congressional districts. This Court does not presume, at this early stage of this litigation, to have any authority to compel the General Assembly to commence a process of enacting new Congressional districts, and this Court recognizes that such a decision is wholly within the discretion of a co-equal branch of government. The General Assembly, however, has recently shown it has the capacity to enact new legislative districts in a short amount of time in a transparent and bipartisan manner, and that the resulting legislative districts, having been approved by this Court, are districts that are more likely to achieve the constitutional objective of allowing for elections to be conducted more freely and honestly to ascertain, fairly and truthfully, the will of the people. *See Common Cause v. Lewis*, 18-CVS-014001 (N.C. Sup. Ct., October 28, 2019). The Court respectfully urges the General Assembly to adopt an expeditious process, as it did in response to this Court's mandate in the September 3, 2019, Judgment in *Common Cause v. Lewis,* that ensures full transparency and allows for bipartisan participation and consensus to create new

17

congressional districts that likewise seek to achieve this fundamental constitutional objective.

Accordingly, the Court, in its discretion and for good cause shown, hereby ORDERS that Plaintiffs' motion for preliminary injunction is GRANTED as follows:

1. Legislative Defendants and State Defendants, their officers, agents, servants, employees and attorneys and any person in active concert or participation with them are hereby enjoined from preparing for or administering the 2020 primary and general elections for congressional districts under the 2016 congressional districts established by S.L. 2016-1.
2. Security in an amount of $1,000 shall be required of Plaintiffs pursuant to Rule 65.
3. The Court retains jurisdiction to move the primary date for the congressional elections, or all of the State's 2020 primaries, including for offices other than Congressional Representatives, should doing so become necessary to provide effective relief in this case.

SO ORDERED, this the 28th day of October, 2019.

/s/ **Paul C. Ridgeway**
Paul C. Ridgeway, Superior Court Judge

/s/ **Joseph N. Crosswhite**
Joseph N. Crosswhite, Superior Court Judge

/s/ **Alma L. Hinton**
Alma L. Hinton, Superior Court Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the parties by emailing a copy thereof to the address below, in accordance with the October 10, 2019 Case Management Order:

**Burton Craige**
**Narenda K. Ghosh**
**Paul E. Smith**
PATTERSON HARKAVY LLP
bcraige@pathlaw.com
nghosh@pathlaw.com
psmith@pathlaw.com
*Counsel for Plaintiffs*

**R. Stanton Jones***
**Elisabeth S. Theodore***
**Daniel F. Jacobson***
**William Perdue***
**Sara Murphy D'Amico***
**Graham White***
ARNOLD & PORTER KAYE SCHOLER LLP
Stanton.jones@arnoldporter.com
Elisabeth.theodore@arnoldporter.com
Daniel.jacobson@arnoldporter.com
William.Perdue@arnoldporter.com
Sara.DAmico@arnoldporter.com
Graham.White@arnoldporter.com
*Counsel for Plaintiffs*

**Phillip J. Strach**
**Thomas A. Farr**
**Michael McKnight**
**Alyssa Riggins**
OGLETREE DEAKINS NASH SMOAK & STEWART PC
Phil.strach@ogletree.com
Thomas.farr@ogletree.com
Michael.mcknight@ogletree.com
Alyssa.riggins@ogletree.com
*Counsel for Legislative Defendants*

*Admitted Pro Hac Vice

1

**Amar Majmundar**
**Stephanie A. Brennan**
**Paul M. Cox**
NORTH CAROLINA DEPARTMENT OF JUSTICE
amajmundar@ncdoj.gov
sbrennan@ncdoj.gov
pcox@ncdoj.gov
*Counsel for the State Board of Elections and members of the State Board of Elections*

**Kieran J. Shanahan**
**John E. Branch, III**
**Nathaniel J. Pencook**
**Andrew D. Brown**
SHANAHAN LAW GROUP PLLC
kieran@shanahanlawgroup.com
jbranch@shanahanlawgroup.com
npencook@shanahanlawgroup.com
abrown@shanahanlawgroup.com
*Counsel for Intervenor-Defendants*


This the 28th day of October, 2019.


Kellie Z. Myers
Trial Court Administrator – 10th Judicial District
kellie.z.myers@nccourts.org

*\*Admitted Pro Hac Vice*

2