**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

BILLY JOE BREWSTER, JR., LARRY E. NORMAN, and THOMAS L. HILL, on behalf of themselves and others similarly situated,

                Plaintiffs,

     v.

PHILLIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, DAMON CIRCOSTA. STELLA ANDERSON, JEFF CARMON III, DAVID C. BLACK , KEN RAYMOND AND KAREN BRINSON BELL, in their official capacities as officers or members of the North Carolina State Board of Elections,

                Defendants,

      and

REBECCA HARPER; AMY CLARE OSEROFF; DONALD RUMPH; JOHN BALLA; RICHARD R. CREWS; LILY NICOLE QUICK; GETTYS COHEN JR.; SHAWN RUSH; JACKSON THOMAS DUNN, JR.; MARK S. PETERS; JOSEPH THOMAS GATES; KATHLEEN BARNES; VIRGINIA WALTERS BRIEN; DAVID DWIGHT BROWN,

                Intervenors-Defendants.

**INTERVENORS' BRIEF IN
SUPPORT OF THEIR MOTION TO
DISMISS AND OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Civil Action No. 2:19-cv-37-FL

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    I.     Federal courts struck down the 2011 plan as an illegal racial gerrymander. ......... 2

    II.    The Republican-led General Assembly enacted the 2016 plan with the explicit partisan goal of guaranteeing a 10-3 Republican advantage in congressional seats. ............................................................................................. 3

    III.   Intervenors have challenged the 2016 congressional map, and the state court's and General Assembly's congressional redistricting proceedings are ongoing ........................................................................................................ 5

    IV.   Two Republican voters and a Republican candidate now challenge the State's redistricting efforts in federal court. ...................................................... 10

LEGAL STANDARD ....................................................................................... 10

ARGUMENT .................................................................................................... 12

    I.     The court need not consider Plaintiffs' Motion for Preliminary Injunction because Plaintiffs' Complaint fails to establish Article III standing. ................. 13

    II.    This court should adhere to the Supreme Court's instruction and defer to ongoing state redistricting proceedings. .......................................................... 16

    III.   Plaintiffs' lawsuit is wholly insubstantial and should be dismissed, or, in the alternative, Plaintiffs' Motion for Preliminary Injunction should be denied. ............................................................................................................ 18

        A.    Plaintiffs are unlikely to succeed on the merits. ..................................... 19

            1.    Plaintiffs fail to state a claim under *Purcell* because altering congressional districts nearly a year before a general election and several months before a primary election does not implicate any federal constitutional rights. ........................... 19

            2.    Plaintiffs have not identified any First Amendment interest implicated by a state court-approved remedial plan and thus fail to state a claim for relief. ...................................................... 24

            3.    Plaintiffs vaguely reference, but have not articulated, any other constitutional rights. ......................................................... 26

        B.    Even if plaintiffs have alleged cognizable injury, they do not establish irreparable harm. ...................................................................... 27

        C.    Equity and public interest weigh against an injunction. .......................... 29

CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

<small>CASES</small>

*ACA Fin. Guar. Corp. v. City of Buena Vista*,
   917 F.3d 206 (4th Cir. 2019) ..................................................................................10

*Adams v. Bain*,
   697 F.2d 1213 (4th Cir. 1982) ...............................................................................10

*Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cty. of Albany*,
   281 F. Supp. 2d 436 (N.D.N.Y. Aug. 22, 2003) ....................................................23

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) .....................................................................................15, 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................10

*Beck v. McDonald*,
   848 F.3d 262 (4th Cir. 2017) .................................................................................15

*Benisek v. Lamone*,
   266 F. Supp. 3d 799 (D. Md. 2017) .......................................................................14

*Bethune-Hill v. Va. State Bd. of Elections*,
   137 S. Ct. 788 (2017) ..............................................................................................23

*Buckley v. American Constitutional Law Foundation, Inc.*,
   525 U.S. 182 (1999) ................................................................................................24

*Cantley v. W. Va. Reg'l Jail and Corr. Facility Auth.*,
   771 F.3d 201 (4th Cir. 2014) .................................................................................12

*City of Greensboro v. Guilford Cty. Bd. of Elections*,
   120 F. Supp. 3d 479 (M.D.N.C. July 23, 2015) .....................................................22

*City of Phila. v. Klutznick*,
   503 F. Supp. 663 (E.D. Pa. 1980) ..........................................................................15

*Collins v. Pond Creek Mining Co.*,
   468 F.3d 213 (4th Cir. 2006) .................................................................................18

*Common Cause v Lewis*,
   No. 18 CVS 014001, 2019 WL 4569584 (N.C. Super. Sep. 03, 2019) ....................5

# TABLE OF AUTHORITIES
## (continued)

*Common Cause v. Lewis*,
No. 18-CVS-014001 (N.C. Super. Ct. 2019) ........................................................... 5

*Common Cause v. Rucho*,
279 F. Supp. 3d 587 (M.D.N.C.), *vacated and remanded*, 138 S. Ct. 2679
(2018) ................................................................................................................... 3, 24

*Cooper v. Harris*,
137 S. Ct. 1455 (2017) ............................................................................................. 2

*Corman v. Torres*,
287 F. Supp. 3d 558 (M.D. Pa. 2018) ............................................................... 15, 27

*Corman v. Torres*,
No. 18-0443 (M.D. Pa., Feb. 2, 2018), ECF No. 17 ............................................... 22

*Covington. Covington v. North Carolina*,
283 F. Supp. 3d 410 (M.D.N.C. 2018) .............................................................. 4, 21

*Covington v. North Carolina*,
No. 1:15CV399, 2018 WL 604732 (M.D.N.C. Jan. 26, 2018) ........................... 20, 21

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) .................................................................... 27, 28, 30

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) .................................................................... 14, 25, 26

*Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
118 F. Supp. 3d 1338 (N.D. Ga. Aug, 3, 2015) ..................................................... 22

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ............................................................................................ 16

*Goosby v. Osser*,
409 U.S. 512 (1973) ................................................................................................ 11

*Growe v. Emison*,
507 U.S. 25 (1993) ........................................................................................ passim

*Harper v. Lewis*,
No. 19-cv-452. ECF No. 5 (E.D.N.C. Oct. 14, 2019) ............................................... 6

*Harper v. Lewis*,
No. 19-CVS-012667 (N.C. Super. 2019) ........................................................ passim

*Harper v. Lewis*,
No. 19-CVS-012667 (N.C. Super. Nov. 15, 2019), available at
https://bit.ly/2QOggWK ............................................................................................9

*Harris v. McCrory*,
159 F. Supp. 3d 600 (M.D.N.C. 2016) ......................................................2, 20, 23

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ....................................................................................................25

*Johnson v. Miller*,
929 F. Supp. 1529 (S.D. Ga. May 24, 1996) ..........................................................23

*Kerns v. United States*,
585 F.3d 187 (4th Cir. 2009) ..................................................................................10

*Lea Co. v. N. C. Bd. of Transp.*,
304 S.E.2d 164 (N.C. 1983) ....................................................................................29

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
884 F.2d 185 (5th Cir. 1989) ..................................................................................15

*League of Women Voters v. Commonwealth*,
178 A.3d 737 (Pa. 2018) ..........................................................................................21

*McCrory v. Harris*,
No. 15A809 (Feb. 9, 2016) ..........................................................................3, 20, 21

*McNutt v. Gen. Motors Acceptance Corp.*,
298 U.S. 178 (1936) ................................................................................................10

*Md. Citizens for A Representative Gen. Assembly v. Governor of Md.*,
429 F.2d 606 (4th Cir. 1970) ............................................................................11, 12

*Minnesota v. Nat'l Tea Co.*,
309 U.S. 551 (1940) ................................................................................................29

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes
Powell*,
915 F.3d 197 (4th Cir. 2019) ..................................................................................27

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*,
858 F. Supp. 2d 516 (M.D.N.C. March 14, 2012) ...................................................22

*North Carolina v. Covington*,
137 S. Ct. 2211 (2017)........................................................................................4, 21

*North Carolina v. Covington*,
138 S. Ct. 974 (2018)................................................................................................21

*Purcell v. Gonzales*,
549 U.S. 1 (2006) (per curiam)........................................................................ passim

*Radogno v. Illinois State Bd. of Elections*,
2011 WL 5025251 (N.D. Ill. Oct. 21, 2011).........................................................25

*Ravalli Cty. Republican Central Comm. v. McCulloch*,
154 F. Supp. 3d 1063 (D. Mont. 2015)..................................................................25

*Republican Party of N.V. v. Hunt*,
841 F. Supp. 722 (E.D.N.C. Jan. 3, 1994) .............................................................22

*Republican Party of Pa. v. Cortes*,
218 F. Supp. 3d 396 (E.D. Pa. 2016) ......................................................................29

*Rucho v. Common Cause*,
139 S. Ct. 2484 (2019)...................................................................................7, 24, 25

*Sierra Club v. U. S. Dep't of the Interior*,
899 F.3d 260 (4th Cir. 2018) ..................................................................................13

*Smiley v. Holm*,
285 U.S. 355 (1932)..................................................................................................26

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)....................................................................................................10

*Stephenson v. Bartlett*,
180 F. Supp. 2d 779 (E.D.N.C. 2001)...............................................................17, 21

*Taubman Realty Grp. Ltd. P'ship v. Mineta*,
320 F.3d 475 (4th Cir. 2003) ..................................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*United States v. Hays*,
   515 U.S. 737 (1995)......................................................................................................14

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
   *Inc.*,
   454 U.S. 464 (1982)......................................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................................................18, 19, 28

*Zemel v. Rusk*,
   381 U.S. 1 (4th Cir. 2019).............................................................................................26

STATUTES

28 U.S.C. § 1738..............................................................................................................18

28 U.S.C. § 2284..............................................................................................................11

28 U.S.C. § 2284(c)..........................................................................................................11

2019 N.C. Sess. Laws 249..................................................................................................9

OTHER AUTHORITIES

First Amendment ......................................................................................................24, 25, 26

Fed. R. Civ. P. 12(b)(1).............................................................................................10, 11, 13

North Carolina Constitution................................................................................. passim

U.S. Constitution.........................................................................................................12, 20

## INTRODUCTION

Plaintiffs ask this federal court to order state election officials to implement a redistricting plan that a state court has found likely violates the state constitution, and that the state legislature has now repealed. Plaintiffs' claims fail on every level.

On October 28, 2019, a three-judge panel in Wake County Superior Court enjoined North Carolina's 2016 congressional districting plan, finding that the map was likely the result of a partisan gerrymander in violation of the North Carolina Constitution. Since then, the General Assembly enacted a proposed remedial plan, and the state court has set the parties' competing motions for summary judgment for a hearing in ten days.

The present lawsuit attempts to short circuit North Carolina's ongoing judicial proceedings. Without waiting to see what remedial plan would be implemented, Plaintiffs rushed into federal court seeking an order, at the preliminary injunction stage no less, that would effectively overturn the state court ruling and reinstate the 2016 map for the upcoming 2020 elections. Worse yet, Plaintiffs demand extraordinary relief not because the 2016 map is lawful—in fact, Plaintiffs make no attempt to defend its legality under the North Carolina Constitution—but rather for the convenience of candidates who may otherwise be forced to interact with North Carolinians outside their districts, and unnamed voters whom Plaintiffs speculate may be confused by new district boundaries.

The relief Plaintiffs seek is unprecedented. Not only do Plaintiffs' allegations fail to identify any cognizable legal interests, they are contrary to fundamental principles of federalism and comity. Recognizing that states have primary responsibility for apportionment of congressional districts, the United States Supreme Court has made clear that "a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to

impede it." *Growe v. Emison*, 507 U.S. 25, 34 (1993). Yet Plaintiffs' lawsuit asks this Court to do just that, citing speculative injuries that, in any event, do not implicate any constitutional rights.

Plaintiffs now seek to enlist this Court to launch a collateral attack on an unfavorable state court ruling grounded in state law, all to preserve an unconstitutional congressional districting map that has since been repealed. Plaintiffs' claims are procedurally improper, jurisdictionally barred, and entirely lacking in merit. Accordingly, this Court should dismiss this lawsuit, or, in the alternative, Plaintiffs' motion for preliminary injunction should be denied.

## BACKGROUND

### I. Federal courts struck down the 2011 plan as an illegal racial gerrymander.

The upcoming 2020 elections present both the first and last opportunity in this decennial cycle for North Carolinians to elect candidates to the U.S. House of Representatives under a constitutional, lawfully-enacted congressional map. Adopted in 2011, the first congressional map following the 2010 census was struck down as a racial gerrymander by a three-judge federal district court, *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), in a decision affirmed by the United States Supreme Court. *See Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017). In defense of the 2011 plan, the State contended that, rather than being a racial gerrymander, the 2011 plan was "'strictly' [a] political gerrymander." *Id*. In affirming the panel's ruling, the U.S. Supreme Court noted that the State's "sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Id*. at 1473 n.7.

North Carolina conducted two congressional elections—in 2012 and 2014—using the 2011 plan before it was struck down. The plan's unconstitutional racial gerrymander resulted in the election of 9 Republicans and 4 Democrats in 2012, and 10 Republicans and 3 Democrats in 2014.

## II. The Republican-led General Assembly enacted the 2016 plan with the explicit partisan goal of guaranteeing a 10-3 Republican advantage in congressional seats.

Following the decision in *Harris*, the General Assembly set out in 2016 to draw a new congressional plan. Republican lawmakers in charge of the mapmaking process engaged Dr. Thomas Hofeller (as they did for the 2011 plan) and instructed him specifically "to draw a plan that would elect 10 Republicans and 3 Democrats." *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 648 (M.D.N.C.), *vacated and remanded*, 138 S. Ct. 2679 (2018). The General Assembly's Joint Select Committee on Redistricting subsequently adopted "Partisan Advantage" as an official criterion, explicitly directing that the new plan preserve Republicans' existing 10-3 advantage in North Carolina's congressional delegation. Feb. 16, 2016 Tr. of Proceedings, Joint Comm. on Redistricting ("Feb. 16 Joint Comm. Tr."), at 67:2-69:23 (attached as Exhibit A). This criterion stated:

> **Partisan Advantage**: The partisan makeup of the congressional delegation under the enacted plan is 10 Republicans and 3 Democrats. The Committee shall make reasonable efforts to construct districts in the 2016 Contingent Congressional Plan to maintain the current partisan makeup of North Carolina's congressional delegation.

N.C. J. Select Comm. on Cong. Redistricting (2015), 2016 Contingent Cong. Plan Comm. Adopted Criteria at 1 (Fed. 16, 2016) available at https://bit.ly/2D8ZXvS.

Representative Lewis, at the helm of the redistricting process, described the "Partisan Advantage" criterion as requiring the mapmaker "to seek partisan advantage for the Republicans." Feb. 19, 2016 Tr. of Proceedings, N.C. House of Representatives, Floor Session One ("Feb. 19 House Floor Tr."), at 34:16-18 (attached as Exhibit B). He told the Committee that he would "draw the maps to give a partisan advantage to 10 Republicans and 3 Democrats because I do not believe it's possible to draw a map with 11 Republicans and 2 Democrats." Exhibit A, Feb. 16 Joint Comm.

Tr. at 50:6-10. Representative Lewis "acknowledge[d] freely that this would be a political gerrymander." *Id.* at 48:4-5.

On February 19, 2016, the full House debated the 2016 plan. During the debate, Representative Lewis once again "freely acknowledge[d] that [he] sought partisan advantage." Exhibit B, Feb. 19 House Floor Tr. at 31:14-17. He defended the Partisan Advantage criterion by stating: "I think electing Republicans is better than electing Democrats. So I drew this map in a way to help foster what I think is better for the country." *Id.* at 34:21-23. That same day, the General Assembly enacted the 2016 plan. S.L. 2016-1, available at https://bit.ly/2OeVs9v .

The 2016 plan has achieved precisely its intended partisan effects—a guaranteed 10-3 Republican advantage in North Carolina's congressional delegation. In the 2016 elections, Democratic congressional candidates in North Carolina won a combined 47% of the two-party statewide vote, yet won only 3 of 13 seats (23%). *See* SBOE, Nov. 8, 2016 Available Election-related Files, https://bit.ly/2nM2NlS. The results were even more striking in 2018. Despite winning a *majority* of the two-party statewide vote in the 2018 congressional elections, Democrats were unable to flip a single seat. *See* SBOE, Nov. 6, 2018 Available Election-related Files, https://bit.ly/2mW8CNx.

North Carolina's state legislative redistricting plans, meanwhile, have also been litigated and redrawn as a result of parallel proceedings in federal and state court. Like the 2011 congressional plan, a federal court found that the State's 2011 state legislative plans were racial gerrymanders. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017). The challenged districts were subsequently re-drawn by the General Assembly, and subject to modification by the court-appointed special master in *Covington. Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018).

On November 13, 2018, Common Cause, the North Carolina Democratic Party, and a group of North Carolina voters filed suit challenging the state legislative plans as partisan gerrymanders in violation of the North Carolina Constitution. Complaint, *Common Cause v. Lewis*, No. 18-CVS-014001 (N.C. Super. Ct. Nov. 13, 2018), available at https://bit.ly/2D9L78d. On September 3, 2019, after a two-week trial, a three-judge panel of the Wake County Superior Court unanimously invalidated North Carolina's 2017 state House and Senate plans as partisan gerrymanders under the North Carolina Constitution. *See Common Cause v Lewis*, No. 18 CVS 014001, 2019 WL 4569584 (N.C. Super. Sep. 03, 2019). The Court found that the 2017 state legislative plans "do not permit voters to freely choose their representative, but rather representatives are choosing voters based upon sophisticated partisan sorting." *Id.*

The *Common Cause* Court further explained that North Carolina's 2017 state legislative plans and the 2016 Congressional plan "arose in remarkably similar circumstances." *Id.* at 298. "[B]oth the 2016 Congressional map and the 2017 legislative maps were required after a federal court declared existing maps unconstitutional; both were drawn under the direction of many of the same actors working on behalf of the Republican-controlled General Assembly; both were drawn by Dr. Thomas Hofeller; both were drawn in large part before the General Assembly's redistricting committee met and approved redistricting criteria; and *both … were drawn with the intent to maximize partisan advantage and, in fact, achieved their intended partisan effects*." *Id.* (emphasis added).

III. **Intervenors have challenged the 2016 congressional map, and the state court's and General Assembly's congressional redistricting proceedings are ongoing.**

On September 27, 2019, Intervenors—consisting of fourteen North Carolina voters ("Intervenors" or "*Harper* Plaintiffs")—sued the same Defendants named here in Wake County Superior Court, and, relying on the extensive record developed over the preceding several years of

redistricting litigation, alleged that the severely gerrymandered 2016 congressional map violated the constitutional rights of North Carolina voters. Complaint, *Harper v. Lewis*, No. 19-CVS-012667 (N.C. Super. Sept. 27, 2019), available at https://bit.ly/2KKWUyi.[1]

On September 20, 2019, the *Harper* Plaintiffs sought a preliminary injunction barring the defendants from using the 2016 plan in the 2020 primary and general elections. *See* Motion for Preliminary Injunction, *Harper v. Lewis*, No. 19-CVS-012667 (N.C. Super. Sept. 30, 2019), available at https://bit.ly/2KK0WXC. The *Harper* Plaintiffs provided the court with extensive evidence, including: extensive expert analysis, demonstrating that the 2016 congressional redistricting plan diluted the voting power of the *Harper* Plaintiffs and other North Carolina voters by packing them into three districts and cracking them among other districts, *id.* at 12-13; the testimony of Dr. Hofeller, Senator Rucho, and Representative Lewis revealing that the 2016 plan was "specifically and systematically designed for partisan purposes and desire to preserve power," *id.* at 33; and transcripts of legislative hearings, which, as the excerpts above make clear, left no doubt that Republican legislators designed the 2016 congressional map to create partisan advantage "to the greatest extent possible," *id.* at 34.

Two weeks later, on October 14, 2019, the Legislative Defendants removed the *Harper* action to federal court in this district. *See* Notice of Removal, *Harper v. Lewis*, No. 19-cv-452. ECF No. 5 (E.D.N.C. Oct. 14, 2019). The following day, the *Harper* Plaintiffs filed an emergency motion to remand the case to state court. *See* Motion to Remand, *Harper v. Lewis*, No. 19-cv-452. ECF No. 18 (E.D.N.C. Oct. 15, 2019). On October 22, this Court granted that motion. *See* Order Granting Motion to Remand, *Harper v. Lewis*, No. 19-cv-452. ECF No. 33 (E.D.N.C. Oct. 22,

---

[1] Intervenors sued Representative David R. Lewis, Senator Ralph E. Hise, Jr., Senator Warren Daniel, Senator Paul Newton, Speaker Timothy K. Moore, and President Pro Tempore Philip E. Berger (the "Legislative Defendants") as well as the North Carolina Board of Elections, Chairman Damon Circosta, Secretary Stella Anderson, and members Kenneth Raymond, Jeff Carmon, and David Black (the "State Defendants").

2019) ("*Harper* Remand"). In doing so, this Court underscored that the Supreme Court in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), had expressly invited state courts to apply state law to address the problem of partisan gerrymandering so that "complaints about districting [do not] echo into a void." *Harper* Remand at 5-6 (quoting *Rucho*, 139 S. Ct. at 2507).

This Court further noted that the case law Legislative Defendants cited to support federal jurisdiction was "inapposite" and only "illustrate[d] the breadth of state court jurisdiction compared to the limited nature of federal court jurisdiction." *Harper* Remand at 7. Moreover, this Court held that it was "uncertain and speculative whether the ultimate relief sought in [the *Harper* Plaintiffs'] complaint in the form of new plans comporting with the North Carolina Constitution would conflict with federal law." *Id.* at 8 (quoting *Common Cause v. Lewis*, 358 F. Supp. 3d 505, 513 (E.D.N.C. 2019)).

Following remand, the state court granted a motion filed by three incumbent Republican members of Congress to intervene as defendants in the state case. These members intervened both in their official capacities and in their personal capacities as voters. In their answer and in their opposition to the motion for a preliminary injunction, these members of Congress raised the same federal constitutional arguments that Plaintiffs in the instant case now raise; namely, that implementing a new congressional plan purportedly would violate the federal Constitution due to their alleged reliance interests on the old plan and upcoming deadlines for the next election. *See* Intervenors' Answer, No. 19-CVS-012667 (N.C. Super. Nov. 1, 2019), available at https://bit.ly/2s3GeLG; Intervenors Defendants' Resp. in Opp'n to Mot. for Preliminary Injunction, No. 19-CVS-012667 (N.C. Super. Oct. 22, 2019), available at https://bit.ly/2XAKcav.

On October 28, 2019, after extensive briefing and oral argument, the Wake County Superior Court granted the *Harper* Plaintiffs' motion for preliminary injunction. *See* Order on

Injunctive Relief, *Harper v. Lewis*, No. 19-CVS-012667 (N.C. Super. Oct. 28, 2019), ECF 1-1, available at https://bit.ly/2D9I7c9 ("*Harper* Order"). Highlighting the "detailed record of both the partisan intent and the intended partisan effects of the 2016 congressional districts," the court held that the *Harper* Plaintiffs were likely to succeed on the merits of their state constitutional claims. *Id.* at 12. Although the Legislative Defendants and three Republican members of Congress who intervened in *Harper* argued that the issuance of the injunction would cause disruption, confusion, and uncertainty in the electoral process, the state court held that the balance of the equities weighed in favor of the *Harper* Plaintiffs: absent an injunction, "[s]imply put, the people of our State will lose the opportunity to participate in congressional elections conducted freely and honestly to ascertain, fairly and truthfully, the will of the people." *Id.* at 15. Based on those findings of fact and conclusions of law, the court enjoined the Legislative Defendants and the North Carolina Board of Elections from preparing for or administering the 2020 primary and general elections under the 2016 plan. *Id.* The state court further retained jurisdiction to move the primary date for the congressional elections, "should doing so become necessary to provide effective relief in th[e] case." *Id.* at 18. The court held that any adverse consequences from moving the primaries "pale in comparison to voters of our State proceeding to the polls to vote, yet again, in congressional elections administered pursuant to maps drawn in violation of the North Carolina Constitution." *Id.* at 17.

In the few short weeks since the *Harper* Order issued, redistricting efforts have proceeded on parallel tracks in both the state court and the General Assembly. On October 31, 2019, pursuant to the state court's direction in its preliminary injunction order, the *Harper* Plaintiffs moved for summary judgment in the state court. The state court subsequently entered a scheduling order providing for summary judgment briefing to close on November 26, 2019, and for a summary

judgment hearing before the state court on December 2, 2019. Scheduling Order, *Harper v. Lewis*, No. 19-CVS-012667 (N.C. Super. Nov. 1, 2019), ECF 10-1, available at https://bit.ly/37whX0X.

Meanwhile, one week after the Wake County Superior Court enjoined the use of the 2016 plan, the Joint Select Committee on Congressional Redistricting met and began redrawing North Carolina's congressional districts. Over the following three days, that map passed through North Carolina's House and Senate redistricting committees. *See* H.B. 1029, available at https://bit.ly/2QK5uAP. And just three weeks after the *Harper* Order—on November 15—the General Assembly enacted legislation, as H.B. 1029, that repealed the 2016 plan and replaced it with a new congressional map. *See* 2019 N.C. Sess. Laws 249. The legislation provided that "[t]his act is effective when it becomes law," meaning that the 2016 plan was repealed immediately upon passage of the new map. 2019 N.C. Sess. Laws 249. That same day, the Legislative Defendants filed a motion for summary judgment in the state court, arguing that the state court challenge was purportedly moot because "the enactment of H.B. 1029 . . . immediately replaced the 2016 Congressional Plan." *See* Motion for Summary Judgment, *Harper v. Lewis*, No. 19-CVS-012667 (N.C. Super. Nov. 15, 2019), available at https://bit.ly/337D4U1. The Harper Plaintiffs filed a competing motion on November 15, asking the state court to set a schedule to review the new plan and arguing that the state court case is not moot. *See* Motion for Review of Remedial Plan, *Harper v. Lewis*, No. 19-CVS-012667 (N.C. Super. Nov. 15, 2019), available at https://bit.ly/2QOggWK.

Just two days ago, on November 20, the Wake County Superior Court enjoined the filing period for the 2020 congressional primary elections "[i]n light of the recent developments" in the litigation, and to provide the court "sufficient opportunity to fully consider the significant issues presented by the parties." Order, *Harper v. Lewis*, No. 19-CVS-012667, at 2 (N.C. Super. Nov.

20, 2019) (attached as Exhibit C). The court directed the State Board to not accept candidate filing until further order of the state court. *Id.*

## IV.     Two Republican voters and a Republican candidate now challenge the State's redistricting efforts in federal court.

On October 31, 2019, three days after the Wake County Superior Court issued its preliminary injunction enjoining the use of the 2016 congressional map in the 2020 elections, Plaintiffs here—two Republican voters and a Republican candidate—filed this federal lawsuit. In order to protect the relief they obtained in the state court proceeding, the *Harper* Plaintiffs filed a motion to intervene in the federal action the next day, which this Court granted on November 18, 2019, over Plaintiffs' opposition. In the meantime, Plaintiffs filed this Motion for Preliminary Injunction on November 8, 2019.

## LEGAL STANDARD

Plaintiffs' claims should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The existence of subject matter jurisdiction is a threshold issue and, absent a proper basis for it, a case must be dismissed. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96 (1998). Plaintiffs bear the burden of showing that federal jurisdiction is appropriate. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Demonstrating a "sheer possibility" of jurisdiction is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) ("[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6)."). Plaintiffs must allege facts that "accepted as true, . . . 'state a claim to relief that is plausible on its face.'" *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

- 10 -

To survive a Rule 12(b)(1) motion to dismiss for lack of Article III standing, "a plaintiff must demonstrate that: (1) it has suffered an injury in fact; (2) the asserted injury in fact is fairly traceable to, or caused by, the challenged action of the defendant; and (3) it is likely rather than just conjectural that the asserted injury in fact will be redressed by a decision in the plaintiff's favor." *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). "The injury-in-fact element requires that the plaintiff suffer an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Id.* (internal citation omitted). And even if a plaintiff can satisfy these elements, the Court is authorized to dismiss, on jurisdictional grounds, federal claims that are constitutionally insubstantial and entirely lacking in merit. *See Goosby v. Osser*, 409 U.S. 512, 858-59 (1973).

Additionally, pursuant to 28 U.S.C. § 2284(c), this Court acting as a single Judge cannot grant Plaintiffs' requested preliminary injunction because Plaintiffs' lawsuit is a federal constitutional challenge to the new congressional redistricting plan that the General Assembly has enacted, or to any other plan that the state court adopts in its stead; thus a three-judge panel would have to be convened before any preliminary injunction could issue. 28 U.S.C. § 2284. This Court does have authority, however, to dismiss this action for lack of jurisdiction, or stay the action under *Growe*, and may do so without convening a three-judge panel under 28 U.S.C. § 2284. *Md. Citizens for A Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 611 (4th Cir. 1970) Furthermore, "[i]f it appears to the single district judge . . . therefore, that the complaint does not state a substantial claim for injunctive relief, he need not request the convening of a three-judge court. Insubstantiality in the claim may appear because of absence of federal jurisdiction, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable.

- 11 -

Such insubstantiality may be evident from the frivolous nature of the claim. . . . When it thus appears that there is no substantial question for a three-judge court to answer, dismissal of the claim for injunctive relief by the single district judge is consistent with the purpose of the three-judge statutes, and it avoids the waste and delay inherent in a cumbersome procedure." *Id.*

Finally, Plaintiffs are not entitled to a preliminary injunction unless they can demonstrate: (1) that they are "likely to succeed on the merits" of their case, (2) that they will "suffer irreparable harm" absent "preliminary relief," and (3) that the "balanc[ing] of [the] equities" weighs in their favor. *Cantley v. W. Va. Reg'l Jail and Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014). Courts do not "impose a [preliminary] injunction lightly, as it is 'an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Id.* (quoting *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc)).

## ARGUMENT

While a preliminary injunction is by itself an extraordinary remedy, the relief Plaintiffs seek in this lawsuit—to abrogate a state court injunction, issued over a year before the next general election, and to have this federal court reinstitute a (now-repealed) redistricting plan that violates the state constitution—is unprecedented on multiple levels. Plaintiffs' requested injunction would require this Court to disregard long-recognized principles of federalism and comity and to elevate Plaintiffs' desire to keep their districts the same above the constitutional rights of millions of North Carolina voters who have been forced to endure four consecutive congressional elections under unlawful districting plans. And Plaintiffs rest these demands on novel and wholly meritless federal constitutional claims—no court has ever held that it violates the U.S. Constitution to enjoin the use of a redistricting plan months before an election—and ask this Court to grant injunctive relief

notwithstanding the Supreme Court's clear instruction that federal courts must not "obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe*, 507 U.S. at 34.

This Court need not address Plaintiffs' extraordinary demands, however, because they cannot satisfy the minimum threshold requirements of Article III standing, alleging only generalized harm and undifferentiated grievances that do not invoke any legally protected interests, and they do not state a substantial claim for relief. The legal defects in Plaintiffs' lawsuit alone require its dismissal under Federal Rule of Civil Procedure 12(b)(1). To the extent the Court considers Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' legal theories, which contradict well-settled law, should be rejected and their motion denied.

## I. The court need not consider Plaintiffs' Motion for Preliminary Injunction because Plaintiffs' Complaint fails to establish Article III standing.

This Court should dismiss this action for lack of Article III standing without considering Plaintiffs' request for injunctive relief. Plaintiffs have not shown that they can meet any of the required standing elements, as their Complaint relies largely on generalized injuries and personal grievances that are untethered to any cognizable right.

In seeking to reinstate North Carolina's unconstitutional and now-repealed 2016 congressional map, Plaintiff Larry E. Norman surmises that a revised plan may result in his congressman's potential electoral defeat. But Norman's alleged injury is entirely speculative because he describes his district under the 2016 plan as a "swing district" and acknowledges that his congressman's re-election is "not assured." Am. Compl. ¶ 65. From these allegations it is anyone's guess whether a new congressional plan would make his district more or less winnable for his preferred representative, and even less clear that a ruling from this Court would alleviate his alleged harm. *See Sierra Club v. U. S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (holding plaintiffs "must show that 'it is likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision'") (quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 181); *see also United States v. Hays*, 515 U.S. 737, 743 (1995). More importantly, even if a new congressional plan hurts Norman's congressman's prospects in 2020, the potential defeat of a voter's preferred candidate is insufficient to demonstrate an Article III injury in fact unless it "is attributable to gerrymandering or some other constitutionally suspect activity." *Benisek v. Lamone*, 266 F. Supp. 3d 799, 812 (D. Md. 2017). He simply suggests that voters added to his district under a new plan may prefer a different candidate. "[T]hat is not an injury. It is democracy." *Id.*

Plaintiff Thomas Hill fares no better because he does not even attempt to allege an individualized injury. Hill claims that as a county chairman in his political party, he is recruiting candidates to run against an incumbent congressman and "[s]uch candidates will need to know the names [sic] addresses and voting history of the voters in order to conduct an effective campaign and fundraise." Am. Compl. ¶¶ 66-67. Putting aside the fact that this allegation neither articulates what harm is caused by the creation of a new congressional map nor explains why a candidate would not be able to obtain such information, the Fourth Circuit has already confirmed that there is no constitutional right to receive voter lists or other non-public voter records. *See Fusaro v. Cogan*, 930 F.3d 241, 255 (4th Cir. 2019) (noting that the state could have decided not to release its voter registration list). And even if such a right did exist, the injury that Hill alleges belongs to the candidates whom, according to Hill, need voter information to conduct their campaigns, Am. Compl. ¶ 67. To establish standing, Hill "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). Plaintiff Hill has suffered no injury and thus lacks standing to pursue his claim.

The third plaintiff, Billy Joe Brewster, Jr., a candidate in North Carolina's 12th congressional district, suggests that a new congressional map would burden his campaign, but not in any way that implicates a legal interest. Elected officials and candidates have "no legally cognizable interest in the composition of the district" they hope to represent, *Corman v. Torres*, 287 F. Supp. 3d 558, 569 (M.D. Pa. 2018), and a legislator "suffers no cognizable injury, in a due process sense or otherwise, when the boundaries of his district are adjusted by reapportionment," *City of Phila. v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980). Indeed, it is a "core principle of republican government" that voters "choose their representatives, not the other way around." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 188 (5th Cir. 1989) ("As government officials, [elected judges] have no legally protectible interest in redistricting."). This same principle necessarily extends to Brewster, who also has "no . . . interest in representing any particular constituency." *Klutznick*, 503 F. Supp. at 672.

Brewster's suggestion that a change in his district's boundaries will disadvantage his campaign in various ways is also entirely speculative. To date, Brewster has not identified what, if any, changes will be made to his district, and by extension his "donor base." Am. Compl. ¶ 64. The General Assembly's recently-approved map for 2020 illustrates the conjectural nature of his claims; the map shows only minor modifications to the 12th congressional district's boundaries, and, if implemented, it is unclear whether Brewster's threatened injuries will even occur. *See Beck v. McDonald*, 848 F.3d 262, 277 (4th Cir. 2017) (noting that plaintiff seeking to enjoin future action "must demonstrate that he is immediately in danger of sustaining some direct injury"). Indeed, the *Harper* Plaintiffs alleged in the state court case that Congressional District 12 under

- 15 -

the 2016 plan was a packed Democratic district, meaning that the district should become *more favorable* to Republican candidates such as Brewster under a non-gerrymandered map.

Perhaps recognizing the absence of any cognizable injury, Plaintiffs' Amended Complaint attempts to supplement their specific individual allegations with a list of generalized grievances that they claim demonstrate standing on behalf of Plaintiffs and those "similarly situated." Am. Compl. ¶ 20. These allegations are not attributed to any particular plaintiff, however, and they allege only generalized injuries including, "[a]bridg[ment of] the right to vote by creating an election structure which does not ensure electoral integrity." *Id*. ¶ 20(A). The Supreme Court has repeatedly instructed plaintiffs not to rely on undifferentiated grievances or abstract policy statements, whether it be an interest in "influencing the legislature's overall composition and policymaking," *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018), or, as Plaintiffs allege here, an interest in ensuring electoral integrity, identifying and communicating with candidates, or ensuring more time for voters to receive information, among others, Am. Compl. ¶ 20. None of these purported injuries are sufficient to invoke this Court's jurisdiction, and Plaintiffs' Amended Complaint should accordingly be dismissed in its entirety.

## II. This court should adhere to the Supreme Court's instruction and defer to ongoing state redistricting proceedings.

Even if Plaintiffs had Article III standing, which they do not, a second threshold barrier to the relief they seek would stop this case in its tracks: the Supreme Court's ruling in *Growe v. Emison*, 507 U.S. 25 (1993). That decision mandates that federal courts must defer to parallel state court redistricting lawsuits such as the ongoing *Harper* action in state court.

In *Growe*, the district court granted the very relief that Plaintiffs seek here: it actively interfered with ongoing state court litigation and enjoined state officials from implementing the redistricting plans being developed pursuant to those state court proceedings. *See id*. at 30-31. The

Supreme Court unanimously reversed, holding that the district court erred in not deferring to the state court action. *Id*. at 37. The Court explained that, "[i]n the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative or judicial branch, has begun to address that highly political task itself." *Id.* at 33. Because "[t]he power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan . . . has been specifically encouraged" by the Supreme Court, "a federal court must neither affirmatively obstruct" state court redistricting proceedings "nor permit federal litigation to be used to impede it." *Id*. at 33-34. Consequently, a federal court must "stay its hand" and defer to state court proceedings rather than adjudicating redistricting disputes involving the same plan. *See id.* at 33; *see also Stephenson v. Bartlett*, 180 F. Supp. 2d 779, 782 (E.D.N.C. 2001) ("Supreme Court pronouncements on the importance of state control over apportionment decisions are manifold").

Here, the state court is actively presiding over litigation regarding North Carolina's congressional districts. The state court has entered a preliminary injunction barring use of the 2016 plan, has entered an expedited schedule on summary judgment regarding the 2016 plan, and is hearing arguments on December 2 on whether to review the new congressional plan that the General Assembly has already adopted to replace the 2016 plan. Moreover, to ensure an orderly election process, the state court has enjoined the opening of candidate filing for congressional districts and has retained jurisdiction to move the primaries if necessary to provide effective relief in the case. The state court is engaged in "precisely the sort of state judicial supervision of redistricting [the Supreme Court has] encouraged," and this Court "must neither affirmatively obstruct . . . nor permit federal litigation to be used to impede" the state court action. *Id.* at 34. "[E]lementary principles of federalism and comity" preclude this Court from granting Plaintiffs'

- 17 -

request to interfere with the parallel state court proceedings and *overrule* the state court's actions. *Id.* at 35.

The reasons for this Court to defer under *Growe* are particularly strong because the defendants in the state action have raised the exact federal constitutional arguments that Plaintiffs raise here. Citing *Purcell*, the Legislative Defendants and Intervenor-Members of Congress have asserted in *Harper*—both in their Answers and in their oppositions to the preliminary injunction— that implementing a new congressional plan purportedly would violate the federal Constitution due to their alleged reliance interests on the old plan and upcoming deadlines for the next election. The state court has already adjudicated those defenses in granting the preliminary injunction and will do so again in adjudicating summary judgment. North Carolina "can have only one set of legislative [and congressional] districts, and the primacy of the State in designing those districts compels a federal court to defer." *Id.* The state court is more than competent to address these purported federal issues.[2]

### III. Plaintiffs' lawsuit is wholly insubstantial and should be dismissed, or, in the alternative, Plaintiffs' Motion for Preliminary Injunction should be denied.

Putting aside the jurisdictional defects and *Growe* deference principles that foreclose any consideration of Plaintiffs' preliminary injunction motion, Plaintiffs' claims are wholly insubstantial and they cannot establish any of the four requirements that they must meet to obtain injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). They are not "likely to succeed on the merits," nor will they suffer irreparable harm absent injunctive relief, because they have not identified any cognizable injuries; and "the balance of equities" does not tip in their favor because an injunction would subject North Carolina voters to yet another

---

[2] Indeed, once the state court enters final judgment, that judgment must receive full faith and credit in the federal courts under 28 U.S.C. § 1738, and collateral estoppel regarding the specific federal issues raised in this case will apply as well, *see Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 221 (4th Cir. 2006).

congressional election under a constitutionally-suspect districting plan and would violate long-held principles of federalism and comity by interfering in an ongoing reapportionment process. *Id.* at 20-23.

A.     **Plaintiffs are unlikely to succeed on the merits.**

1.     **Plaintiffs fail to state a claim under *Purcell* because altering congressional districts nearly a year before a general election and several months before a primary election does not implicate any federal constitutional rights.**

Plaintiffs' first claim for relief is not grounded in any cognizable legal right, but rather on the Supreme Court's five-page decision in *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), which Plaintiffs mistakenly cite to suggest that an "election law change[]" issued nearly a year before the general election somehow violates their federal constitutional rights. Pls.' Mem. at 6. Their argument fails at the outset because it attempts to convert *Purcell*, a ruling that merely identifies equitable factors relevant to a request for injunctive relief, into an independent cause of action.

Nothing in *Purcell* provides for a freestanding federal constitutional cause of action, nor does it prevent a state court from ensuring the constitutionality of the state's redistricting plan one year before the general election. In *Purcell*, the district court denied a motion for preliminary injunction in a lawsuit challenging Arizona's voter identification requirements, but did not at the time issue findings of fact or conclusions of law. *Purcell*, 549 U.S. at 3. Without the benefit of the district court's findings of fact, the Ninth Circuit issued a four-sentence order granting the plaintiffs' request for an injunction pending appeal and enjoining Arizona from enforcing its voter identification law. *Id.* at 2. The Supreme Court vacated the injunction, holding that a federal court of appeals cannot enjoin a state's election procedures, within weeks of an election, without either giving "deference to the discretion of the District Court" or providing "factual findings or . . . reasoning of its own." *Id.* at 5. The Court further identified several equitable factors for courts to

consider in deciding whether to enjoin an election law shortly before an election. *See id.* at 4-5. The Supreme Court's decision makes no mention of the U.S. Constitution, however, and Plaintiffs have not identified a single court that interpreted *Purcell* to provide voters or congressional candidates a freestanding constitutional cause of action. For this reason alone, Plaintiffs' claim is not just likely, but certain, to fail.[3]

Even if the Court were to convert the *Purcell* factors into a constitutional claim, those factors do not warrant an injunction here. The state court entered its preliminary injunction on October 28, 2019, more than four months before the primaries currently scheduled for March 2020. "[T]his is not a voting case decided on the eve of an election where the balance of the equities favors maintaining the status quo." *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732, at *7 (M.D.N.C. Jan. 26, 2018). Indeed, courts routinely enjoin redistricting plans in similar timeframes before the next election. The timing of prior redistricting decisions in North Carolina is particularly instructive here.

In *Harris v. McCrory*, the district court enjoined North Carolina's congressional plan on February 5, 2016, just over *one month* before the scheduled primary date of March 15, 2016. *See* 159 F. Supp. 3d 600 (M.D.N.C. 2016). The Legislative Defendants filed an emergency application with the Supreme Court to stay the decision, relying heavily on *Purcell*. *See* Emergency App. to Stay, *McCrory v. Harris*, No. 15A809 (Feb. 9, 2016).[4] But the Supreme Court denied the stay request without any noted dissent. *See* 136 S. Ct. 1001 (2016). The primaries were ultimately delayed until June 7, 2016, as a result of the court's injunction.

---

[3] In fact, though Plaintiffs list no fewer than 16 cases in support of their motion, not one of them even applies *Purcell*, let alone recognizes an independent cause of action under *Purcell*.

[4] Available at https://bit.ly/2KKmNOB.

In *Stephenson v. Bartlett*, the North Carolina Supreme Court enjoined use of North Carolina's state House and state Senate plans on March 7, 2002—just two months before the primaries were set to occur. *See* 355 N.C. 354, 562 S.E.2d 377 (2002). Like in *Harris*, the *Stephenson* defendants filed a stay petition with the U.S. Supreme Court, but Chief Justice Rehnquist denied the request, 122 S. Ct. 1751 (2002), and the 2002 state legislative primaries were ultimately delayed to allow time to implement a lawful remedial plan.

In *Covington*, the Middle District of North Carolina refused to stay its final order adopting a new legislative apportionment plan in January 2018, which was just over three months before the May 2018 primaries. The district court explained that "Defendants identif[ied] no case in which a court relied on the risk of voter confusion to permit the use of an unconstitutional districting plan before the start of an election cycle and over nine months before any general election is set to take place." *See* 2018 WL 604732, at *7. The Supreme Court also denied the defendants' emergency request to stay the district court's remedial plan, with the exception of districts in Wake and Mecklenburg Counties which plaintiffs had argued were not racially gerrymandered. *See North Carolina v. Covington*, 138 S. Ct. 974 (2018) (denying in part emergency application for stay); *Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018) (approving and adopting remedial plan).

Courts in other jurisdictions have similarly enjoined unconstitutional redistricting plans much closer to Election Day than here, rejecting requests to block changes to the map due to purported voter confusion and harm to candidates. In *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018), the Pennsylvania Supreme Court enjoined Pennsylvania's congressional plan in February 2018, just over three months before Pennsylvania's May 2018 elections. The legislative defendants, as well as intervenor-Republican voters, filed two separate emergency

motions with the U.S. Supreme Court based largely on *Purcell*, and the U.S. Supreme Court denied both requests without a dissent either time. *See* 138 S. Ct. 1323 (2018). And, just like here, a group of Pennsylvania congressmen filed a collateral attack in federal court seeking to undo the state court's injunction and restore the prior plan. Relying on *Purcell*, the congressmen argued that implementing a new plan would create voter confusion. *Corman v. Torres*, No. 18-0443 (M.D. Pa., Feb. 2, 2018), ECF No. 17. A unanimous three-judge court refused to enjoin the new map. *Id.* "The Plaintiffs," the court explained, "seek an extraordinary remedy: they ask us to enjoin the Executive Defendants from conducting the 2018 election cycle in accordance with the Pennsylvania Supreme Court's congressional redistricting map and to order the Executive Defendants to conduct the cycle using the map deemed by the Pennsylvania Supreme Court to be violative of the Commonwealth's constitution. . . . These are things that, on the present record, we cannot do." *Id*.

The above cases are no anomalies. Numerous courts have enjoined or adopted new apportionment plans under similar or shorter timeframes before the next election. *See City of Greensboro v. Guilford Cty. Bd. of Elections*, 120 F. Supp. 3d 479 (M.D.N.C. July 23, 2015) (enjoining North Carolina's redistricting plan three months before the scheduled primaries and four months before the general election); *NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516 (M.D.N.C. March 14, 2012) (enjoining North Carolina's redistricting plan one week into the filing period); *Republican Party of N.V. v. Hunt*, 841 F. Supp. 722, 727 (E.D.N.C. Jan. 3, 1994) (requiring upcoming elections to be conducted under a modified format on the same day the candidate filing period for judicial primaries was set to begin); *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1340-41 (N.D. Ga. Aug, 3, 2015) (enjoining Georgia's redistricting plan three weeks before early voting

and one month before Election Day); *Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cty. of Albany*, 281 F. Supp. 2d 436 (N.D.N.Y. Aug. 22, 2003) (enjoining New York's redistricting plan just three months before the general election); *Johnson v. Miller*, 929 F. Supp. 1529 (S.D. Ga. May 24, 1996) (enjoining Georgia's redistricting plan six months before the general election).

To the extent Plaintiffs' *Purcell* claim can be interpreted to suggest that last-minute changes to voter qualifications can "affect voters' equal protection and substantive due process rights," Pls.' Mem. at 14, Plaintiffs have not identified, nor have Intervenors located, a single case that applies this principle to an apportionment plan adopted nearly a year before a general election. In fact, North Carolina's 2011 congressional redistricting plan was not precleared by the U.S. Department of Justice until November 1, 2011, *Harris*, 159 F. Supp. 3d at 608, and thus was implemented at a similar point in the election cycle as the state remedial plan that Plaintiffs here characterize as a "last minute" election change. *See* Pls.' Mem. at 6, 14, 16. And following Plaintiffs' logic one step further, all states that conduct general elections in odd-numbered years in the next decennial cycle would be constitutionally barred from implementing new apportionment plans in 2021, the same year 2020 census data will be released.[5]

If anything, the reasoning in *Purcell* counsels against the parallel federal court proceeding and injunction that Plaintiffs seek here. In balancing the equities presented in the *Harper* preliminary injunction proceedings, the state court already considered the potential for "disruption, confusion, and uncertainty" that enjoining the use of the unconstitutional map may cause. *Harper* Order at 15. The state court recognized that the congressional maps at issue here were the subject

---

[5] In Virginia, for instance, the state received 2010 census data in February 2011, passed its state legislative map in April 2011, obtained preclearance in June 2011, and conducted its general election in November 2011 under the newly-apportioned map. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 796 (2017). Plaintiffs' argument suggests that Virginia's adoption of a new map in time for its November 2011 election was unconstitutional and that Virginia was constitutionally mandated to proceed under the previous-cycle's malapportioned plan for the sake of continuity. Notably, Plaintiffs do not point to a single authority that has adopted this theory.

of years-long litigation in federal court that created "detailed records of both partisan intent and intended partisan effects of the 2016 congressional districts," which demonstrated a substantial likelihood that the plan violated the North Carolina Constitution. *Id.* at 12. The court even considered whether the harm imposed by an injunction might be heightened given the proximity of its decision to the election. *Id.* at 15-17. With these factors in mind, the court concluded that "North Carolinians' fundamental rights guaranteed by the North Carolina Constitution" outweighed any harm caused by granting injunctive relief, and to hold otherwise would leave the people of North Carolina with no "opportunity to participate in congressional elections conducted freely and honestly to ascertain, fairly and truthfully, the will of the people." *Id.* at 15. To the extent *Purcell* is instructive here, it requires this Court to defer to the state court's findings. 549 U.S. at 5 (precluding injunctive relief where "[t]here has been no explanation . . . showing the ruling and findings of the District Court to be incorrect").

> **2. Plaintiffs have not identified any First Amendment interest implicated by a state court-approved remedial plan and thus fail to state a claim for relief.**

Having failed to establish a cognizable right under the *Purcell* principle, Plaintiffs attempt to assert a First Amendment interest in maintaining the composition of their congressional districts, which requires them to demonstrate that the new districts "significantly inhibit" election-related speech and association and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 192 (1999). Yet beyond their complaints of delayed voter lists, Plaintiffs' pleadings fail to articulate any burden on their speech that is imposed by the congressional district boundaries.

The Supreme Court's decision in *Rucho* is instructive. There, in declining to recognize the plaintiffs' First Amendment claims, the Court held that "there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue." 139 S. Ct. at

2504. "The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* The same is true here. "It may very well be that Plaintiffs' ability to *successfully* elect their preferred candidate is burdened by the redistricting plan, but that has nothing to do with their First Amendment rights." *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251, at *7 (N.D. Ill. Oct. 21, 2011).

Plaintiffs nonetheless claim they have a purported First Amendment injury stemming from the fact that in the several-week window between the adoption of a new redistricting plan and the release of updated geocoded voter lists, Plaintiffs' internal records of individual voters will be out of date. This purported injury is entirely foreign to the Constitution, as it is well-settled that the Constitution does not guarantee a right to "government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (plurality opinion). Indeed, a state can "decide[] not to release its voter registration list" at all "without violating the First Amendment." *Fusaro v. Cogan*, 930 F.3d 241, 255 (4th Cir. 2019); *see also Ravalli Cty. Republican Central Comm. v. McCulloch*, 154 F. Supp. 3d 1063, 1069-70 (D. Mont. 2015) ("The First Amendment imposes no duty on a state to fund or administer voter registration lists.").[6] Absent a constitutional right to geocoded voter lists to begin with, Plaintiffs do not suffer any legally-cognizable injury simply by having to wait to update their records—even if it takes a few weeks.

The Fourth Circuit has cautioned that the First Amendment "should not be stretched to cover all regulations that could conceivably affect speech at any distant point on a causal chain,"

---

[6] The Fourth Circuit in *Fusaro* recognized that the denial of access to voter lists potentially implicates the First Amendment when the restriction is based on the identity of the speaker; but barring content- or speaker-based discrimination in providing access to records, the Court reaffirmed the general principle that the First Amendment does not confer a right to government information. *See Fusaro*, 930 F.3d at 255 ("[W]hen the government has decided to make certain information available, there are limits to its freedom to decide how that benefit will be distributed.").

as "there are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow." *Fusaro*, 930 F.3d at 251-52 (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (4th Cir. 2019)). Following Plaintiffs' argument to its logical conclusion, every North Carolina redistricting plan would violate their constitutional rights: in each case, the lag between a plan's adoption and the release of the updated, geocoded voter list would leave Plaintiffs momentarily without accurate contact information for the specific voters in their districts. The "right to speak and publish," however, "does not carry with it the unrestrained right to gather information," much less on Plaintiffs' desired timeline. *Zemel*, 381 U.S. at 17. Thus Plaintiffs have failed to identify any legally cognizable right to relief under the First Amendment.

**3.     Plaintiffs vaguely reference, but have not articulated, any other constitutional rights.**

Plaintiffs' pleadings have alluded to other purported constitutional rights that the arguments in their brief do not address, and which, in any event, provide no basis for relief. First, their Amended Complaint alleges without further explanation that this lawsuit arises under the Elections Clause, Am. Comp. ¶ 13, but that provision merely reinforces the State's authority to do what Plaintiffs seek to enjoin in this lawsuit: enact a new apportionment plan. It is well-settled that congressional redistricting plans must comply with all aspects of state law, and that federal law not only *authorizes* state courts to supervise congressional districting but *requires* federal courts to defer to state courts engaged in the redistricting process. *See, e.g.*, *Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. at 2673; *Growe*, 507 U.S. at 25; *Smiley v. Holm*, 285 U.S. 355 (1932).

Plaintiffs also fail to identify any law that protects their purported "reli[ance] upon the 2016 redistricting plan to organize campaigns and communicate with voters." Pls.' Mem. 4. To the contrary, neither an elected legislator nor a legislative body can establish a "legally cognizable interest in the composition of the district[s] [they] represent," much less congressional candidates

who are unconstrained by elected office or residency requirements and are free to run in whatever district they choose. *Corman*, 287 F. Supp. 3d at 559, 569-70 ("[E]lected officials suffer no cognizable injury when their district boundaries are adjusted.") (citing *Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. at 2677).

Plaintiffs may prefer the gerrymandered congressional districts of prior years, but they advance no theory that converts their desire to keep things as they were into a cognizable legal interest. Both the federal constitution and the Supreme Court recognize that states have primary responsibility for the apportionment of congressional districts, *Growe*, 507 U.S. at 34, and Plaintiffs' lawsuit provides no basis to interfere with this process.

### B. Even if plaintiffs have alleged cognizable injury, they do not establish irreparable harm.

While Plaintiffs' failure to demonstrate any cognizable injury is fatal to their entire lawsuit, including their request for injunctive relief, even assuming Plaintiffs somehow clear these hurdles, the generalized injuries they assert on behalf of all voters and candidates are insufficient to establish irreparable harm. Preliminary injunctive relief is an extraordinary remedy that requires, at a minimum, a "clear showing" that the movant will suffer harm that is "neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). "Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

The injuries that Plaintiffs allege—including those "suffered in terms of time, money and energy expended in the absence of an injunction[—are] not enough to support a finding of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Plaintiffs argue that a new congressional map will harm their

voter outreach efforts but stop short of alleging that the plan will prevent them from communicating with voters. Rather, Plaintiffs allege only that, for "several weeks," they must conduct their voter outreach efforts without the assistance of the State's geocoded voter list, which Plaintiffs have no constitutional right to demand in the first place. *See supra* § III(A)(2).

Plaintiffs also fail to provide any evidence to support their conclusory allegations of voter confusion. *See id*. (denying injunctive relief where the movants "failed to provide evidence that anyone has suffered any of the potential irreparable harms identified, or that any such harms were imminent"). Indeed, nearly a year in advance of the next general election and several months in advance of the primary, Plaintiffs provide no support for the position that voters will be more confused by the adoption of new, lawful congressional districts than they will by the competing and conflicting orders of the state and federal court that Plaintiffs seek here. *See Purcell*, 549 U.S. at 4-5 ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.").

Finally, Plaintiffs' argument that injunctive relief preserves the status quo no longer has any basis in fact, as the General Assembly has since enacted a new congressional districting map. *See* H.B. 1029. While this latest apportionment plan is still subject to judicial review, there is no dispute that the 2016 plan has now been repealed. The shifting factual landscape only further demonstrates that Plaintiffs' alleged harms are not actual or imminent, but speculative. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the courts' recognition that] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Plaintiffs have not demonstrated the irreparable harm necessary to obtain preliminary injunctive relief.

## C. Equity and public interest weigh against an injunction.

Both the "balance of the equities" and the "public interest" strongly disfavor an injunction. If this Court were to reinstate the 2016 plan, Intervenors and millions of other North Carolina voters would suffer grave injury from being forced to vote in districts that a state court has held violate these voters' fundamental rights under the state constitution. Not only has the Supreme Court recognized that "principles of federalism and comity" dictate against a federal court blocking a state's own redistricting efforts, *Growe*, 507 U.S. at 32-34; *see also Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 405 (E.D. Pa. 2016) ("Comity between the state and federal governments also counsels against last-minute meddling."), North Carolina citizens have an interest in their state courts interpreting their rights under the state constitution. *See Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental that state courts be left free and unfettered by [federal courts] in interpreting their state constitutions."); *Lea Co. v. N. C. Bd. of Transp.*, 304 S.E.2d 164, 170 (N.C. 1983) ("Only [the North Carolina Supreme] Court may authoritatively construe the Constitution and laws of North Carolina with finality."). It would be unprecedented for a federal court to reinstate a redistricting plan that a state court has struck down on state constitutional grounds and force state election officials to enforce such plan.

A panel of state court judges has already balanced the equities and considered the public interest as they relate to this case. That court found that the consequences of enjoining the 2016 plan and adopting a new map for the 2020 elections "pale in comparison to voters of our State proceeding to the polls to vote, yet again, in congressional elections administered pursuant to maps drawn in violation of the North Carolina Constitution." *Harper* Order at 17. Plaintiffs would have this Court rebalance those same interests in the opposite direction, contrary to the Supreme Court's instruction that "a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe*, 507 U.S. at 34.

Because "Plaintiffs have not demonstrated a likelihood of success on the merits or irreparable harm, the balance of equities and the public interest are better served by allowing the underlying [state redistricting efforts to] proceed." *Di Biase*, 872 F.3d at 235-36.

## CONCLUSION

For the foregoing reasons, the Court should grant Intervenors' Motion to Dismiss Plaintiffs' First Amended Complaint. In the alternative, Plaintiffs' Motion for Preliminary Injunction should be denied.

Dated:  November 22, 2019

By: /s/ Marc E. Elias

Narendra K. Ghosh, NC Bar No. 37649
Burton Craige, NC Bar No. 9180
Paul E. Smith, NC Bar No. 45014
PATTERSON HARKAVY LLP
100 Europa Dr., Suite 420
Chapel Hill, NC 27517
(919) 942-5200
nghosh@pathlaw.com
bcraige@pathlaw.com
psmith@pathlaw.com

Marc Erik Elias*
Uzoma Nkwonta*
Aria Branch*
Stephanie Command**
Jyoti Jasrasaria**
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
abranch@perkinscoie.com
scommand@perkinscoie.com
jjasrasaria@perkinscoie.com

Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

R. Stanton Jones**
Elisabeth S. Theodore**
Daniel F. Jacobson*
ARNOLD AND PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001-3743
(202) 954-5000
stanton.jones@arnoldporter.com
elisabeth.theodore@arnoldporter.com
daniel.jacobson@arnoldporter.com

*Attorneys for Intervenors-
Defendants*

*\* Admitted Pro Hac Vice*
*\*\*Pro Hac Vice Application Forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, November 22, 2019, I caused the foregoing document to

be filed and served on all counsel of record by operation of the CM/ECF system for the United

States District Court for the Eastern District of North Carolina.

DATED: November 22, 2019

*/s/ Uzoma Nkwonta*
Uzoma Nkwonta