# EXHIBIT A

NORTH CAROLINA GENERAL ASSEMBLY

JOINT COMMITTEE ON REDISTRICTING

---

TRANSCRIPT OF THE PROCEEDINGS

---

In Raleigh, North Carolina

Tuesday, February 16, 2016

Reported by Carol M. Smith

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

2

1    SEN. RUCHO:  Let's come to order for a
2  few moments.  Would everybody please take their
3  seats?  We're going to have about a 10- or 15-
4  minute break to get some papers printed up and
5  ready to go as a part of our agenda, but what we
6  will do first is identify the Sergeant-at-Arms that
7  are here today.  We've got -- for the House side,
8  we've got Reggie Sills, Marvin Lee, David Layden
9  and Terry McCraw, and then we've got our Senate
10  Sergeant-at-Arms Jim Hamilton, Ed Kesler and Hal
11  Roach.  These folks help us make this meeting
12  organized and run efficiently, and we wouldn't be
13  able to do a good job without them.
14    I appreciate everybody yesterday coming
15  out and helping us accomplish our public hearing.
16  We had a lot of good thoughts and advice, and I
17  hope that you've taken some time to read the public
18  comments that came over the Internet so that we can
19  be able to talk about the subject matter on an
20  intelligent level.
21    Representative Lewis and I want to again
22  remark about the fact that the staff has done a
23  remarkable job for us in putting together
24  yesterday's public hearing and this meeting, and
25  the IT folks were miracle workers in trying to

3

1  coordinate six sites plus Raleigh to do a good job
2  and allow us to be able to reach out across the
3  state with this public hearing that is -- that was
4  yesterday, and it was successful, and we're
5  thrilled that they could do such a good job for us.
6    All right, the first point -- and I'm
7  going to have Mr. Verbiest, our clerk, do a roll
8  call, and would you just, as your name is
9  mentioned, please recognize it, or if we hear
10  quiet, we know you're not here.
11    CLERK:  Senator Sanderson?
12    SEN. SANDERSON:  Present.
13    CLERK:  Senator Brown?
14    SEN. BROWN:  Here.
15    CLERK:  Senator Apodaca?
16    (No response.)
17    CLERK:  Senator Clark?
18    SEN. CLARK:  Present.
19    CLERK:  Senator Harrington?
20    SEN. HARRINGTON:  Here.
21    CLERK:  Senator Hise?
22    SEN. HISE:  Here.
23    CLERK:  Senator Lee?
24    SEN. LEE:  Here.
25    CLERK:  Senator McKissick?

4

1    SEN. MCKISSICK:  Here.
2    CLERK:  Senator Smith?
3    SEN. SMITH:  Here.
4    CLERK:  Senator Smith-Ingram?
5    SEN. SMITH-INGRAM:  Present.
6    CLERK:  Senator Wells?
7    SEN. WELLS:  Here.
8    CLERK:  Senator Blue?
9    SEN. BLUE:  Here.
10    CLERK:  Senator Ford?
11    (No response.)
12    CLERK:  Senator Ford?
13    (No response.)
14    CLERK:  Senator Wade?
15    (No response.)
16    CLERK:  Senator Barefoot?
17    SEN. BAREFOOT:  Here.
18    CLERK:  Senator Randleman?
19    SEN. RANDLEMAN:  Here.
20    CLERK:  Senator Jackson?
21    SEN. JACKSON:  Here.
22    CLERK:  Representative Lewis?
23    REP. LEWIS:  Here.
24    CLERK:  Representative Jones?
25    REP. JONES:  Here.

5

1    CLERK:  Representative Hager?
2    REP. HAGER:  Here.
3    CLERK:  Representative Stevens?
4    REP. STEVENS:  Here.
5    CLERK:  Representative Hurley?
6    REP. HURLEY:  (No response.)
7    CLERK:  Representative Stam?
8    REP. STAM:  Here.
9    CLERK:  Representative Jordan?
10    REP. JORDAN:  Here.
11    CLERK:  Representative Johnson?
12    REP. JOHNSON:  Here.
13    CLERK:  Representative Brawley?
14    REP. BRAWLEY:  Present.
15    CLERK:  Representative Hardister?
16    REP. HARDISTER:  Here.
17    CLERK:  Representative Davis?
18    REP. DAVIS:  Here.
19    CLERK:  Representative McGrady?
20    REP. MCGRADY:  Here.
21    CLERK:  Representative Michaux?
22    REP. MICHAUX:  Here.
23    CLERK:  Representative Cotham?
24    REP. COTHAM:  Here.
25    CLERK:  Representative Hanes?

6

1   REP. HANES: Here.
2   CLERK: Representative Moore?
3   REP. MOORE: Here.
4   CLERK: Representative Farmer-
5   Butterfield?
6   REP. FARMER-BUTTERFIELD: Here.
7   CLERK: Representative Dixon?
8   (No response.)
9   CLERK: Representative Hurley?
10  REP. HURLEY: Right here.
11  CLERK: Thank you.
12  SEN. RUCHO: And I think my name was
13  omitted, so I might just mention the fact that I'm
14  here today --
15  CLERK: Yes. Sorry.
16  SEN. RUCHO: -- despite a long day
17  yesterday. All right.
18  We've got some work to do today. We've
19  got just about 15 minutes, and may I ask you to
20  just stay at ease for about 15 minutes, and then we
21  will begin the meeting and have a full agenda
22  before us.
23  Representative Lewis, do you have any
24  other thoughts or comments you'd like to share?
25  REP. LEWIS: No.

7

1   SEN. RUCHO: Okay. Then just at ease for
2   about 10 to 15 minutes. Thank you.
3   (DISCUSSION OFF RECORD)
4   SEN. RUCHO: Spend a few minutes taking a
5   look at that, and see from its beginning on through
6   the latest maps what has transpired. I think it
7   would be very educational. Thank you.
8   (RECESS, 10:14 - 10:23 A.M.)
9   SEN. RUCHO: All right, let's call this
10  Joint Select Committee on Redistricting back into
11  order. You have a copy of the agenda before you,
12  and there's just one correction on the agenda. On
13  the right quadrant, under Senate, it had Harry
14  Warren. It should be Senator Harry Brown, so fix
15  that. Okay.
16  Well, yesterday we had a chance to have a
17  public hearing, and I think each of you knows that
18  the General Assembly, based on the Harris case,
19  there was an opinion given by the three-judge
20  panel, and we are responding to that. We still
21  believe that the maps that are presently enacted
22  are fair, legal, and constitutional, as has been
23  validated by five different bodies, including the
24  Justice Department, including a three-judge panel,
25  including the Supreme Court on three occasions, and

8

1   so under the circumstances, we are taking a
2   precaution, and we anticipate some reaction from
3   the Supreme Court on the motion for stay which will
4   allow the election to continue forward, and then
5   allow the court case to continue on its normal
6   course, which would be, in my judgment, a better
7   way to go, since the election has already been
8   started, and we don't want to disenfranchise the
9   voters in any manner.
10  That being said, we are going to begin
11  our agenda. Representative Lewis, would you have
12  any comments at this time?
13  REP. LEWIS: No, sir.
14  SEN. RUCHO: No? Okay. Then we're going
15  to go on to the second, which is discussion of the
16  criteria of the 2016 Contingent Congressional Maps,
17  and what these are, are criteria as to how these
18  maps should be drawn to try to meet the
19  requirements imposed by the Court and also remain
20  within the legal limits of the law. Representative
21  Lewis?
22  REP. LEWIS: Mr. Chairman, ladies and
23  gentlemen of the Joint Select Committee on
24  Congressional Redistricting and members of the
25  public, I too would like to offer a brief

9

1   historical perspective on what brings us here
2   today.
3   In 2011, after the release of the Census,
4   this General Assembly set out to create fair and
5   legal Congressional districts. In doing so, the
6   2011 process included an unprecedented number of
7   public hearings, 36 scheduled before the release of
8   the maps, 7 after the release of our original
9   proposed districts, 10 dedicated to receiving
10  public comment on the release of the entire plan,
11  and an additional 10 after the release of our
12  respective proposals for the legislative districts.
13  Additionally, we provided easy public
14  access for public comment via the North Carolina
15  General Assembly Web site, and invited additional
16  written comments through both e-mail and the US
17  Postal Service. Senator Rucho and I thank the
18  thousands of citizens who exercised their right to
19  offer comments at that set of public hearings or
20  submit written comments. All of those comments
21  were reviewed by the chairs and preserved as a
22  permanent record of citizen input on this important
23  task.
24  We also took back then the unprecedented
25  step of providing the leadership of the minority

10

1    parties in the House and the Senate and the
2    Legislative Black Caucus specialized computer
3    hardware and software in their respective offices,
4    along with staff support which was available to all
5    members.  The 2011 General Assembly did ultimately
6    adopt redistricting plans, as I recall, largely
7    along party lines, as unfortunately, so many items
8    here are decided.
9        For purposes of my discussion today, I
10   will refer to the 2011 plans as the enacted plans.
11   The enacted congressional redistricting plan of
12   2011 was first precleared by the United States
13   Department of Justice, as was required by Section 5
14   of the Voting Rights Act.  The enacted
15   Congressional redistricting plan was then
16   challenged in state courts through what is known as
17   the Dixon versus Rucho case.  The plan was affirmed
18   by a three-judge panel and by the North Carolina
19   Supreme Court.
20       The enacted Congressional redistricting
21   plan has been used to elect members of the US House
22   of Representatives in 2012 and 2014, and has also
23   seen citizens file for election in each of the 13
24   districts this year.  Further, voting has begun,
25   and we are informed by the State Board of Elections

11

1    that more than 16,000 citizens have already
2    requested to vote by mail.
3        Unfortunately, the enacted plan was
4    challenged again in what is known as the Harris
5    versus McCrory case.  In that decision, in which we
6    respectfully disagree with the three-judge panel,
7    it was found that the 1st Congressional District
8    and the 12th Congressional District are racial
9    gerrymanders, and they ordered new maps be drawn by
10   February 19th, and that the election for US House
11   not be held under the current maps.
12       While, as Chairman Rucho said, we are
13   confident that a stay of this decision, which
14   interrupts an election already in progress, will be
15   granted, and that the enacted map will ultimately
16   be upheld on appeal, we are required to begin the
17   process of drawing a 2016 contingent Congressional
18   map.  I reiterate that while the 2011 plan was
19   dictated by the Cromartie and Strickland decisions
20   of the US Supreme Court, we will move forward to
21   establish a plan based on the Harris opinion.
22       The process -- this process began with
23   the appointment of this joint select committee, and
24   continued yesterday with the public hearings held
25   in six locations across the state, with more than

12

1    70 speakers participating.  There were also more
2    than 80 comments submitted online.
3        The chairs thank all the citizens who
4    participated yesterday.  The chair reminds the
5    members that the written comments have been placed
6    on the General Assembly's Web site, and a link e-
7    mailed to each of your e-mail accounts.
8        Mr. Chairman, at your direction, I would
9    like to submit to the committee a series of
10   proposals to establish criteria for the drawing of
11   the 2016 contingent Congressional map.
12       SEN. RUCHO:  Yes, sir, Chairman Lewis.
13   You can begin and go through the rotation as -- as
14   you planned.
15       REP. LEWIS:  Mr. Chairman, I'd like staff
16   to distribute the 2016 Congressional -- pardon
17   me -- the 2016 contingent Congressional plan
18   proposed criteria, beginning with "Equal
19   Population," to the members.
20       SEN. RUCHO:  Sergeant-at-Arms will be
21   passing this out, and we're going to take our time,
22   read it thoroughly, and then -- so Representative
23   Lewis will explain it, and then we'll debate each
24   of them as we move forward.  (Pause.)
25       Has everyone received a copy of the first

13

1    one?  They're not in any order as far as priorities
2    or anything.  They're just going to be set forward.
3        VARIOUS COMMITTEE MEMBERS:  No, no.
4        SEN. RUCHO:  Okay.  Hang on.  This first
5    one is called "Equal Population."  (Pause.)
6        All right, does everyone have a copy
7    that -- now, let's be clear.  Ladies and gentlemen
8    in the audience, the members of the committee will
9    be participating within this meeting.  I know we
10   have a number of members that have come here with
11   interest, and we're delighted to have them, and
12   recognize that every member that is here can submit
13   a reimbursement form, but the people that are on
14   the committee will be the ones participating in
15   today's business activity of this committee
16   meeting.
17       All right, Representative Lewis, first
18   one.
19       REP. LEWIS:  Mr. Chairman, as I explain
20   this one, I would request that the Sergeant-at-Arms
21   go ahead and distribute the second one, which is
22   entitled "Contiguity."
23       Mr. Chairman, the first criteria that I
24   would urge the committee to adopt is that each
25   district should be of equal population.  This is

14

1  pretty self-explanatory.  This is in line with one
2  person, one vote.  It simply says, as members can
3  read, that the number of persons in each
4  Congressional district shall be as near equal as
5  practicable, as determined under the most recent
6  Census, which of course would be the 2010 Census.
7  Mr. Chairman, I move adoption of this criteria.
8          REP. STEVENS:  Are you waiting for a
9  second?
10         SEN. RUCHO:  I've got a motion from
11 Representative Lewis to move forward with this
12 adoption of this first equal -- equal population.
13 Representative Stevens, thank you.  We've got a
14 second.  Discussion, ladies and gentlemen?
15         (No response.)
16         SEN. RUCHO:  All right, I see none.  All
17 in favor of the adoption of the equal population --
18 yes.  I'll go back.  We're going to go ahead and
19 we're going to do roll-call vote on this.  And so
20 I'm saying we're going to have a roll call from the
21 clerk on the equal population.  Please identify --
22 or just say "Aye" or "Nay," please.  Mr. Verbiest?
23         CLERK:  Senator Rucho?
24         SEN. RUCHO:  Aye.
25         CLERK:  Chairman Lewis?

15

1          REP. LEWIS:  Aye.
2          CLERK:  Representative Jones?
3          REP. JONES:  Aye.
4          CLERK:  Representative Brawley?
5          REP. BRAWLEY:  Aye.
6          CLERK:  Representative Cotham?
7          REP. COTHAM:  Aye.
8          CLERK:  Representative Davis?
9          REP. DAVIS:  Aye.
10         CLERK:  Representative Farmer-
11 Butterfield?
12         REP. FARMER-BUTTERFIELD:  Aye.
13         CLERK:  Representative Hager?
14         REP. HAGER:  Aye.
15         SEN. RUCHO: Please speak up, please.
16         CLERK:  Representative Hanes?
17         REP. HANES:  Aye.
18         CLERK:  Representative Hardister?
19         REP. HARDISTER:  Aye.
20         CLERK:  Representative Hurley?
21         REP. HURLEY:  Aye.
22         CLERK:  Representative Jackson?
23         REP. JACKSON:  Aye.
24         CLERK:  Representative Johnson?
25         REP. JOHNSON:  Aye.

16

1          CLERK:  Representative Jordan?
2          REP. JORDAN:  Aye.
3          CLERK:  Representative McGrady?
4          REP. MCGRADY:  Aye.
5          CLERK:  Representative Michaux?
6          REP. MICHAUX:  No.
7          CLERK:  Representative Moore?
8          REP. MOORE:  Aye.
9          CLERK:  Representative Stam?
10         REP. STAM:  Aye.
11         CLERK:  Representative Stevens?
12         REP. STEVENS:  Aye.
13         CLERK:  Representative Dixon?
14         (No response.)
15         SEN. RUCHO:  You do have Senator Apodaca
16 is here now?
17         CLERK:  Yes, I do.
18         SEN. RUCHO:  Okay.
19         CLERK:  Senator Apodaca?
20         SEN. APODACA:  Aye.
21         CLERK:  Senator Barefoot?
22         SEN. BAREFOOT:  Aye.
23         CLERK:  Senator Blue?
24         SEN. BLUE:  Aye.
25         CLERK:  Senator Brown?

17

1          SEN. BROWN:  Aye.
2          CLERK:  Senator Clark?
3          SEN. CLARK:  Aye.
4          CLERK:  Senator Ford?
5          (No response.)
6          CLERK:  Senator Harrington?
7          SEN. HARRINGTON:  Aye.
8          CLERK:  Senator Hise?
9          SEN. HISE:  Aye.
10         CLERK:  Senator Jackson?
11         SEN. JACKSON:  Aye.
12         CLERK:  Senator Lee?
13         SEN. LEE:  Aye.
14         CLERK:  Senator McKissick?
15         SEN. MCKISSICK:  Aye.
16         CLERK:  Senator Randleman?
17         SEN. RANDLEMAN:  Aye.
18         CLERK:  Senator Sanderson?
19         SEN. SANDERSON:  Aye.
20         CLERK:  Senator Smith?
21         SEN. SMITH:  Aye.
22         CLERK:  Senator Smith-Ingram?
23         SEN. SMITH-INGRAM:  Aye.
24         CLERK:  Senator Wade?
25         (No response.)

18

1    CLERK: Senator Wells?
2    SEN. WELLS: Aye.
3    CLERK: Only one nay.
4    SEN. RUCHO: Okay. Ladies and gentlemen,
5    we had the roll vote, and there was just one
6    negative, so the first criteria establishing equal
7    population has passed. All right. Representative
8    Lewis?
9    REP. LEWIS: Thank you, Mr. Chairman.
10   Mr. Chairman, the next criteria I propose the
11   committee adopt -- adopt is "Contiguity." This
12   simply says that --
13   REP. STEVENS: Mr. Chairman, we don't
14   have copies of it yet.
15   SEN. RUCHO: I'm sorry? Please repeat
16   that again. You don't have the second?
17   REP. STEVENS: I do not have a copy, and
18   perhaps I'm sitting a little out of the way.
19   SEN. RUCHO: Okay. Sergeant-at-Arms,
20   would someone please get the contiguity criteria?
21   REP. LEWIS: Mr. Chairman, if it pleases
22   the Chair, I would respectfully request that -- the
23   next criteria I intend to offer is "Political
24   Data." If that could be distributed to the
25   committee, perhaps to save a little time?

19

1    SEN. RUCHO: Okay, that's fine.
2    Sergeant-at-Arms, would you please distribute the
3    third criteria, which is "Political Data"?
4    Representative Lewis, would you want staff to read
5    this, the specifics as they're presented, or do you
6    prefer to do it yourself?
7    REP. LEWIS: Mr. Chairman, are you trying
8    to imply I can't say "contiguity"?
9    (Laughter.)
10   SEN. RUCHO: That is a mouthful. I agree
11   with you. All right. We have before us -- would
12   you please read this first -- or the second,
13   "Contiguity"?
14   MS. CHURCHILL: "Contiguity:
15   Congressional districts shall be comprised of
16   contiguous territory. Contiguity by water is
17   sufficient."
18   SEN. RUCHO: Representative Lewis?
19   REP. LEWIS: Members, this is a standard
20   redistricting practice, and I would move the
21   adoption of the criteria by the committee.
22   SEN. RUCHO: All right. Senator Blue?
23   SEN. BLUE: Question of Representative
24   Lewis: Does this contemplate single-point
25   contiguity in water?

20

1    REP. LEWIS: Senator Blue, thank you for
2    that question. Let me be clear that it does not,
3    and I would be opposed to any form of single-point
4    contiguity has been ruled as not a legal form of
5    mapmaking in the past.
6    SEN. RUCHO: Follow-up?
7    SEN. BLUE: Does it contemplate any
8    minimal distance on the water that is used to
9    determine that geographically, areas are
10   contiguous?
11   REP. LEWIS: Senator Blue, I don't
12   believe it contemplates the Atlantic Ocean, but, I
13   mean, as you know, sir, we have beautiful sounds in
14   our state that that is a community, and so the
15   water -- I can't give you an exact -- an exact
16   definition of how much water is too much water.
17   SEN. BLUE: Last point.
18   SEN. RUCHO: Follow-up?
19   SEN. BLUE: Does it contemplate the point
20   in the Cape Fear River in one of your counties
21   that's currently used as a basis for connecting
22   geographically parts of the 4th Congressional
23   District?
24   REP. LEWIS: Senator Blue, I appreciate
25   that inquiry. I would -- I would point out that

21

1    there is an island there, so there is actually land
2    in the middle of the Cape Fear, that exact point
3    that you're referring to, but I would have to say
4    that I do not believe that that is the intent of
5    this.
6    SEN. RUCHO: Senator Smith, did you have
7    a question?
8    SEN. SMITH: No.
9    SEN. RUCHO: Oh, okay. Any additional
10   questions or comments on the contiguity criteria?
11   (No response.)
12   SEN. RUCHO: Seeing none, all right, Mr.
13   Verbiest, would you do roll call again?
14   CLERK: Representative Lewis?
15   REP. LEWIS: Aye.
16   CLERK: Representative Jones?
17   REP. JONES: Aye.
18   CLERK: Representative Brawley?
19   REP. BRAWLEY: Aye.
20   CLERK: Representative Cotham?
21   REP. COTHAM: Aye.
22   CLERK: Representative Davis?
23   REP. DAVIS: Aye.
24   CLERK: Representative Farmer-
25   Butterfield?

## 22

1    REP. FARMER-BUTTERFIELD: Aye.
2    CLERK: Representative Hager?
3    REP. HAGER: Aye.
4    CLERK: Representative Hanes?
5    REP. HANES: Aye.
6    CLERK: Representative Hardister?
7    REP. HARDISTER: Aye.
8    CLERK: Representative Hurley?
9    REP. HURLEY: Aye.
10   CLERK: Representative Jackson?
11   REP. JACKSON: Aye.
12   CLERK: Representative Johnson?
13   REP. JOHNSON: Aye.
14   CLERK: Representative Jordan?
15   REP. JORDAN: Aye.
16   CLERK: Representative McGrady?
17   REP. MCGRADY: Aye.
18   CLERK: Representative Michaux?
19   REP. MICHAUX: Aye.
20   CLERK: Representative Moore?
21   REP. MOORE: Aye.
22   CLERK: Representative Stam?
23   REP. STAM: Aye.
24   CLERK: Representative Stevens?
25   REP. STEVENS: Aye.

## 23

1    CLERK: Senator Rucho?
2    SEN. RUCHO: Aye.
3    CLERK: Senator Apodaca?
4    SEN. APODACA: Aye.
5    CLERK: Senator Barefoot?
6    SEN. BAREFOOT: Aye.
7    CLERK: Senator Blue?
8    SEN. BLUE: Aye.
9    CLERK: Senator Brown?
10   SEN. BROWN: Aye.
11   CLERK: Senator Clark?
12   SEN. CLARK: Aye.
13   CLERK: Senator Harrington?
14   SEN. HARRINGTON: Aye.
15   CLERK: Senator Hise?
16   SEN. HISE: Aye.
17   CLERK: Senator Jackson?
18   SEN. JACKSON: Aye.
19   CLERK: Senator Lee?
20   SEN. LEE: Aye.
21   CLERK: Senator McKissick?
22   SEN. MCKISSICK: Aye.
23   CLERK: Senator Sandleman? Senator
24   Randleman? I'm sorry.
25   SEN. RANDLEMAN: Aye.

## 24

1    CLERK: Senator Sanderson?
2    SEN. SANDERSON: Aye.
3    CLERK: Senator Smith?
4    SEN. SMITH: Aye.
5    CLERK: Senator Smith-Ingram?
6    SEN. SMITH-INGRAM: Aye.
7    CLERK: Senator Waddell?
8    (No response.)
9    CLERK: Senator Wade?
10   (No response.)
11   CLERK: Senator Wells?
12   SEN. WELLS: Aye.
13   SEN. RUCHO: Any against?
14   CLERK: Unanimous.
15   SEN. RUCHO: All right, members of the
16   committee, the criterion on contiguity passed
17   unanimously and was adopted unanimously. All
18   right.
19   REP. LEWIS: Mr. Chairman, I'd like to --
20   SEN. RUCHO: Mr. Lewis, you've got
21   "Political Data" before you, and you would like the
22   next criteria sent out to the members?
23   REP. LEWIS: Mr. Chairman, if we could,
24   let's do "Political Data," and then we'll move on
25   to the next one. Let's not distribute --

## 25

1    SEN. RUCHO: All right. So you want to
2    just take care of that. Would -- Ms. Churchill,
3    would you read the one on political data, please?
4    MS. CHURCHILL: "Political Data: The
5    only data other than population data to be used to
6    construct Congressional districts shall be election
7    results in statewide contests since 2008, not
8    including the last two Presidential contests. Data
9    identifying the race of individuals or voters shall
10   not be used in the construction or consideration of
11   districts in the 2016 contingent Congressional
12   plan. Voting districts, referred to as VTDs,
13   should be split only when necessary to comply with
14   the zero deviation population requirements set
15   forth above in order to ensure the integrity of
16   political data."
17   SEN. RUCHO: All right. Representative
18   Lewis, that is before the committee.
19   REP. LEWIS: Mr. Chairman, I --
20   SEN. RUCHO: Let him explain it, please.
21   REP. LEWIS: I believe it explains
22   itself. I'll be happy to yield to --
23   SEN. RUCHO: All right. Question,
24   Senator Blue?
25   SEN. BLUE: Yeah. This might be one for

26

1    the staff, Mr. Chairman.
2         SEN. RUCHO:  All right.  Staff?
3         SEN. BLUE:  The second -- the second full
4    paragraph, can you restrict -- and I think I know
5    where you're trying to go to, but can you restrict
6    the use of race in drawing the two districts in
7    question and be in conformity with the Voting
8    Rights Act as the Court enunciated in its decision
9    several weeks ago?
10        SEN. RUCHO:  Representative Lewis, do you
11    want to respond to that?
12        REP. LEWIS:  Mr. Chairman, thank you.
13    Senator Blue, I appreciate that inquiry.  It is my
14    understanding and reading of the opinion that race
15    is not to be a factor in drawing the districts.
16    Adoption of this criteria would mean that the ISD
17    staff of the General Assembly would be instructed
18    to establish computers, and I believe the software
19    is called Maptitude, and the staff would be
20    instructed not to include race as a field that
21    could be used to draw districts.
22        I'll go one step further and say
23    respectfully that race was not considered when the
24    General Assembly passed the 12th District of the
25    enacted plan, but the Court still questioned its

27

1    use.  This would contemplate that that data would
2    not be available to mapmakers who make maps to
3    comply with the Harris order.
4        SEN. RUCHO:  Follow-up?
5        SEN. BLUE:  You're saying that
6    notwithstanding all of the jurisprudence in this
7    area, at least that I've seen over the last 25, 30
8    years, that you're going to draw minority districts
9    without taking into account whether minorities are
10    in the minority district?
11        REP. LEWIS:  Senator Blue, I believe the
12    Harris opinion found that there was not racially
13    polarized voting in the state, and therefore, the
14    race of the voters should not be considered.  My
15    proposal would be that we use political data only,
16    and do not use race to draw Congressional
17    districts.
18        SEN. BLUE:  One last --
19        SEN. RUCHO:  Follow-up?
20        SEN. BLUE:  I long for the day, just like
21    you do, Representative Lewis, when we can do that,
22    and I hope it's sooner rather than later, but I
23    don't think it's wise to spit in the eyes of three
24    federal judges who control the fate of where we're
25    going to go with redistricting, and I understand

28

1    what you're trying to do here, but I think it's an
2    insult to their intelligence to take this approach,
3    and I think that they will show you the ultimate
4    power of the federal judiciary that's existed since
5    1802 in Marbury versus Madison if you do this.
6        REP. LEWIS:  Respectfully, sir, it would
7    never be my intent to offend or to question the
8    dignity of the office of a federal judge.  If
9    anything I said hitherunto has done that, I
10    apologize; however, it is my understanding that
11    when we drew the enacted plan, we applied the
12    Cromartie and Strickland decisions as best we knew
13    how to do in drawing the 1st.  We did not use race
14    when we drew the 12th.
15        The Court has found those both to be
16    racial gerrymanders.  It would be my -- they also
17    found, based on my reading of the opinion -- I'm
18    certainly not spitting in their face; I'm trying to
19    read what they said -- that there's not racially
20    polarized voting.  If that is indeed the case, then
21    race should not be a factor.
22        SEN. RUCHO:  Smith-Ingram?
23    Representative Smith-Ingram?  I'm sorry.  Before I
24    do that, I -- Senator McKissick got me first.
25    Please, Senator McKissick.

29

1        SEN. MCKISSICK:  Sure.  The thing that
2    I'm deeply concerned about is that the Voting
3    Rights Act and the courts have historically
4    indicated that it's appropriate to use race in
5    drawing Congressional districts, and I don't
6    understand why we would abandon it as a criteria.
7        From what I understand from reading the
8    most recent decision, Harris versus McCrory, what
9    they were concerned about was the fact that it was
10    a predominant consideration, so there was an
11    overconcentration of African-American voters
12    because majority-minority districts were created,
13    and I think that was what I understood to be the
14    finding, the creation of these majority-minority
15    districts, when historically the 1st and 12th
16    districts could elect a candidate choice without
17    being a majority-minority district.  I think it
18    would be a misreading of the case to say that race
19    could not be used as a consideration.
20        REP. LEWIS:  Senator McKissick, as
21    always, I appreciate your counsel.  I would
22    reiterate that in drawing of the 12th, race was not
23    con- -- race was not a considered factor.  In the
24    drawing of the 1st, we attempted to comply with the
25    Cromartie and Strickland cases, which we believed

30

1    called for, and still believe called for the -- if
2    a district is drawn under the Voting Rights Act to
3    be a majority-minority district, that it contain a
4    majority of minorities. The Court has found that
5    racially polarized voting does not exist to the
6    extent to do that.
7        During the trial, which I know Senator
8    Blue attended -- I don't remember who-all else was
9    there -- there was various testimony offered from
10   the stand of how much minority population is
11   enough. The judges were well aware that that
12   conversation had gone on from the stand. They
13   offered no guidance into how much minority
14   population should be used; therefore, I simply say
15   we draw the maps without using minority -- without
16   using any race considerations. That way, they
17   cannot -- the federal court will be clear that in
18   the construction of districts that we did not use
19   racial consideration if it's not even a factor that
20   can be selected on the computer.
21       SEN. MCKISSICK: Follow-up, Mr. Chair?
22       SEN. RUCHO: Follow-up.
23       SEN. MCKISSICK: So how would you propose
24   that you comply with the requirements, say, of the
25   Voting Rights Act, which basically indicates that

31

1    you should create districts that allow minorities
2    to elect a candidate of choice if race is not an
3    appropriate consideration? I don't know how you
4    accomplish that objective without having it,
5    certainly not as the predominant consideration. I
6    would agree that cannot be done, and should not be
7    done, but I'm trying to understand how you do that
8    otherwise if you completely eliminate race as a
9    criteria that you look at in drafting the maps, and
10   then secondly -- and this shifts gears a little
11   bit -- why would we not want to consider the --
12       SEN. RUCHO: Which question? Is this
13   your --
14       SEN. MCKISSICK: Okay, yeah.
15       SEN. RUCHO: -- first question?
16       SEN. MCKISSICK: Yeah, first question.
17       SEN. RUCHO: Okay.
18       SEN. MCKISSICK: Go ahead, Representative
19   Lewis. Thank you, sir.
20       REP. LEWIS: Senator, I believe that my
21   earlier answer that -- and I have a great deal of
22   respect for you. I understand that you are an
23   attorney, and I am not an attorney. It's my
24   reading of the case that the Court has found that
25   there was not racially polarized voting, which is

32

1    the trigger point to draw a VRA -- VRA district.
2    Therefore, if that is not the case, then we believe
3    the enacted maps should stand as they are. If
4    we're going to redraw the maps with the Harris
5    order, which says there's not racially polarized
6    voting, then we believe that race should not be a
7    consideration in drawing the maps.
8        SEN. MCKISSICK: Follow-up, Mr. Chairman.
9        SEN. RUCHO: Follow-up.
10       SEN. MCKISSICK: Why would we not here
11   want to consider the election results of the 2008
12   and 2000 -- I guess '12 presidential elections? Is
13   there a specific reason why we want to exclude
14   those specific election results and include other
15   potential election results within that same general
16   time frame?
17       REP. LEWIS: Yes, sir.
18       SEN. MCKISSICK: Because, I mean, the
19   thing that's obvious to anybody is we had an
20   African-American running for President in those two
21   election cycles.
22       REP. LEWIS: Yes, sir, and I don't recall
23   which pages it's on, but in the Harris opinion, one
24   of the judges wrote that using the 2008
25   Obama/McCain data was really a code for trying to

33

1    use black versus white, so we simply say we
2    exclude -- we take that off the table. We can use
3    all the other ones.
4        SEN. MCKISSICK: And I would suggest that
5    we should --
6        SEN. RUCHO: Follow-up?
7        SEN. MCKISSICK: Yes. Thank you, Mr.
8    Chair. I would suggest that there's nothing
9    improper in considering those particular races
10   within a greater context of all races that we might
11   have used as benchmarks for consideration for the
12   performance of districts or how they might vote,
13   but I think to eliminate those specifically would
14   be an inappropriate criteria.
15       I would have to go back to the decisions.
16   I think things can be used as code in combination
17   with other actions that are taken, like drawing
18   minority -- majority-minority districts, but yet
19   saying race is not a factor, and it was done for
20   political reasons. I think within the greater
21   context, perhaps the Court might have viewed it
22   that way, but if you identify this discretely as
23   being one parameter among many, I don't think that
24   that would be inappropriate to consider.
25       I find it fine -- you know, I don't think

## 34

1   we need to go in there and split these precincts.
2   I think splitting the precincts would probably be a
3   code word for understanding that you could
4   segregate voters out based upon race as well, so I
5   mean, I have no problems not -- not going in there
6   and splitting out these precincts, and I think
7   keeping the voter tabulation districts as whole as
8   possible is a good component, but I would be
9   opposed to the elimination of consideration of the
10  2008 and 2012 presidential data as well as other --
11  any other racial data that would be provided in the
12  normal data packages that for many, many years have
13  always been used by this General Assembly in
14  drawing these Congressional districts.  Thank you,
15  sir.
16          REP. LEWIS:  Mr. Chairman, respectfully,
17  I --
18          SEN. RUCHO:  Yes, sir?
19          REP. LEWIS:  -- believe that was a
20  statement, to which I'll just respond I
21  respectfully disagree with the gentleman from
22  Durham.
23          SEN. RUCHO:  All right.  Thank you.
24  Senator Smith-Ingram?
25          SEN. SMITH-INGRAM:  Thank you, Mr. Chair.

## 35

1   In regards to the proposed criteria as it relates
2   to the voting districts and the split, one of the
3   concerns that resonated across the state, as shown
4   in the hearings, as we talked to constituents,
5   particularly in the finger counties in
6   Congressional District 1, there is some concern
7   about precincts being split, and a lot of voter
8   confusion because of split counties and split
9   precincts.  Do you think the language in the last
10  sentence goes far enough to help us alleviate that
11  problem, and not have that issue as we move toward
12  drawing new maps?
13          REP. LEWIS:  Senator, thank you for
14  that question.  I would say that, as I've
15  maintained all along, I believe that voters are
16  sophisticated enough that split political districts
17  do not cause confusion, but to the extent that we
18  can not split them, we shouldn't, so I do think
19  this sentence goes far enough in saying the only
20  reason you would want to split a VTD, or a voting
21  district, is to help with the zero population
22  requirement that this committee has already
23  adopted.
24          SEN. SMITH-INGRAM:  Follow-up.
25          SEN. RUCHO:  Follow-up.

## 36

1           SEN. SMITH-INGRAM:  So I can assume from
2   what you are saying that the only reason we had
3   split counties and split precincts in the previous
4   plan is because we were trying to meet the mandate
5   of the zero deviation?
6           REP. LEWIS:  No, ma'am, that's not at all
7   what I said.  What this says is that -- what this
8   says is in drawing the map, this contingent plan
9   that we are -- that we are talking about is that
10  the VTDs should be split only when necessary to
11  comply with the zero deviation requirements.  I was
12  not at all speaking about the enacted map, in which
13  I'm certain that some precincts and voting
14  districts were split for political purposes.
15          SEN. SMITH-INGRAM:  Last follow-up, Mr.
16  Chair.
17          SEN. RUCHO:  Last follow-up.
18          SEN. SMITH-INGRAM:  Just a statement.  I
19  understand that our voters across the state are
20  very sophisticated; however, there was a lot of
21  confusion created with the split counties and the
22  split precincts, and so I just -- as we're moving
23  forward, we need to be careful that they are not
24  disenfranchised by that confusion.  Thank you,
25  Representative Lewis.

## 37

1           SEN. RUCHO:  Thank you.  I've got
2   Representative Stam.
3           REP. STAM:  Yes.  I like this criteria.
4   It's very principled, and it's principles that I've
5   heard, for example, the Senate Minority Leader
6   state publicly many times.  Let's not -- let's not
7   consider race anymore.  We're past that.
8           SEN. RUCHO:  Okay.  Representative
9   Michaux?
10          REP. MICHAUX:  Mr. Chairman, I'm having a
11  problem not identifying race, and if I recall, Mr.
12  Lewis -- and I'm reading from the opinion.  It says
13  here that "This does not mean that race can never
14  play a role in redistricting.  Legislatures are
15  almost always cognizant of race when drawing
16  district lines, and simply being aware of race
17  poses no Constitutional violation."
18          What they're saying to you is that you
19  still can use race in the matter, but you cannot
20  make it the predominant factor.  That's the way I
21  read it, and I think that this --
22          SEN. RUCHO:  Representative Lewis?
23          REP. LEWIS:  Representative Michaux,
24  thank you for that.  My response to that would be
25  that not being aware of race means that you

## 38

1   couldn't have been motivated by race.
2           REP. MICHAUX: May I follow up?
3           SEN. RUCHO: Follow-up, Representative
4   Michaux?
5           REP. MICHAUX: What did you say just now?
6           REP. LEWIS: Sir, I believe you read from
7   the opinion, which I don't have before me, that --
8   in which the judges said being aware of race does
9   not necessarily mean that race was a predominant
10  factor, but it doesn't require it. And if that's
11  not what you read, understand that you have the
12  opinion in front of you, and I don't.
13          REP. MICHAUX: What they're saying is it
14  cannot be a predominant factor, Mr. Lewis, but you
15  can use race.
16          SEN. RUCHO: Representative Michaux, I
17  think what Senator -- Representative Lewis is
18  saying is you can use race, but it doesn't require
19  you to use race.
20          REP. MICHAUX: It says you can use race,
21  but it must not be the predominant factor.
22          REP. LEWIS: Mr. Chairman, I would say
23  "can use" does not say "must use." Therefore, I
24  would move the adoption of this criteria.
25          SEN. RUCHO: Representative Hager,

## 39

1   please?
2           REP. HAGER: Thank you, Mr. Chairman.
3   Representative Lewis, I want to commend you on
4   the -- when you said only when necessary when you
5   split districts and precincts. I come from a
6   district and precinct prior to these maps. My
7   precinct was split, and we worked it out, like I
8   said, and I appreciate what you said about the
9   sophistication of the voters. It was there, but
10  this criteria does help that situation, and prior
11  to these maps, we see -- we saw that with the
12  previous maps in Rutherford County, so thank you
13  very much.
14          SEN. RUCHO: I'm sorry. I've got Senator
15  Blue. Excuse me.
16          SEN. BLUE: Just a comment, since the
17  motion to adopt it has been made. Mr. Chairman, I
18  agree totally with Representative Stam. As I told
19  Representative Lewis, there are places in this
20  state where considering race in redrawing districts
21  is inappropriate under the Voting Rights Act, under
22  the 14th Amendment. There are places in this
23  state where the Voting Rights Act requires that race be
24  considered to some degree to ensure that, based on
25  history, that minorities can elect people of their

## 40

1   choice.
2           We know that this three-judge panel has
3   the power of its own to draw districts, and we can
4   play these games with them. I thought that as a
5   body from the standpoint of letting the
6   Legislature, the reason that we ordered -- or at
7   least required that the Court, if reversing these
8   districts, sent it back to the Legislature to have
9   an opportunity or a shot at fixing it is because it
10  was felt that the Legislature could fix it, but I
11  can assure you that if you go about doing this,
12  then those three gentlemen are going to draw
13  districts for you.
14          Maybe that's what you want, and if that's
15  what you want, I will vote with you on this
16  amendment, but I think that you -- that it's
17  transparent the game that you're trying to play.
18  Some of us do strongly believe that we should move
19  away from using race in making any decision in
20  American life, but we also believe that you comply
21  with the law until we get to that point, and I
22  think that you're aware of the fact, just as I am,
23  that if you take this blind approach, you're in
24  direct violation of Section 2 of the Voting Rights
25  Act. And so I'm just -- I just say that to you.

## 41

1   I'm going to vote against this proposal.
2   You'll probably withdraw it, given the debate, but
3   I'm going to vote against it because I think that
4   it's showing disrespect for the law as it exists
5   and disrespect for this three-judge federal
6   district court.
7           REP. LEWIS: Well, Senator --
8           SEN. RUCHO: Representative Lewis?
9           REP. LEWIS: Thank you, Mr. Chairman.
10  I'm going to reiterate my earlier comments to you,
11  sir, that in no way has anything that I have said
12  had the intent, and I hope not the effect, of
13  causing any offense to any member of the federal
14  judiciary. I would reiterate the only way to make
15  sure that race is not the predominant factor is to
16  make sure it's not a factor when the maps are being
17  considered.
18          This Court -- I'll go one step further.
19  With the utmost respect to the Court, this Court
20  was shown that race was not a factor that was
21  considered in drawing of the 12th, but they still
22  found that it was a factor. This is -- this way we
23  make sure that in fact, it is not.
24          SEN. RUCHO: Members of the committee?
25  Senator McKissick?

42

1      SEN. MCKISSICK: Representative Lewis,
2  are you aware of any racially polarized voting
3  studies which have been conducted since the 2010
4  Census occurred?
5      REP. LEWIS: Senator McKissick,
6  respectfully, I would direct you to the
7  redistricting tab of the General Assembly Web site.
8  I believe there are some studies that are listed
9  there. Certainly there are numerous studies that
10 are referenced in the various lawsuits. I know the
11 General Assembly did commission a study on racially
12 polarized voting. I do not believe the Harris
13 court admitted or considered it.
14     SEN. MCKISSICK: Follow-up, Mr. Chair.
15     SEN. RUCHO: Follow-up.
16     SEN. MCKISSICK: Is it not possible to go
17 back and find that data, which is reasonably
18 current, since it was done since 2010, to examine
19 the racially polarized voting patterns throughout
20 the state, because different parts of the state are
21 different? Our urban areas have different
22 characteristics, and there's more coalition
23 politics. Other parts of our state, racially
24 polarized voting patterns are present, and continue
25 to exist.

43

1      I would suggest that we go back and look
2  at those studies, analyze them, and use those
3  studies as part of the database that would be used
4  to move forward in drawing these districts. Any
5  reason why we cannot do that?
6      REP. LEWIS: Respectfully, sir, I may --
7  I may agree with you, but the Court does not.
8      SEN. MCKISSICK: And I'd have to
9  respectfully disagree on that.
10     REP. LEWIS: Noted.
11     SEN. RUCHO: Senator Clark?
12     SEN. CLARK: Thank you, Mr. Chairman.
13 With regard to the language on the voting districts
14 in here, would it not be more appropriate to
15 separate that and have it stand alone as its own
16 criteria? I don't understand the rationale for
17 including it in the criteria about political data.
18     REP. LEWIS: Senator, I appreciate that
19 question. Frankly, we could have had an additional
20 criteria. I prefer just to let it stay as it is.
21     SEN. RUCHO: Excuse me. Representative
22 Lewis, do you make the motion to adopt the
23 political data criteria?
24     REP. LEWIS: I do, Mr. Chairman.
25     SEN. RUCHO: All right.

44

1      REP. MCGRADY: Second.
2      SEN. RUCHO: Second, Representative
3  McGrady. Any additional discussion?
4  (No response.)
5      SEN. RUCHO: All right. Seeing none, we
6  can -- Mr. Clerk, would you begin the roll call?
7  CLERK: Lewis?
8  REP. LEWIS: Aye.
9  CLERK: Jones?
10 REP. JONES: Aye.
11 CLERK: Brawley?
12 REP. BRAWLEY: Aye.
13 CLERK: Cotham?
14 REP. COTHAM: No.
15 CLERK: Davis?
16 REP. DAVIS: Aye.
17 CLERK: Farmer-Butterfield?
18 REP. FARMER-BUTTERFIELD: No.
19 CLERK: Hager?
20 REP. HAGER: Aye.
21 CLERK: Hanes?
22 REP. HANES: No.
23 CLERK: Hardister?
24 REP. HARDISTER: Aye.
25 CLERK: Hurley?

45

1      REP. HURLEY: Aye.
2  CLERK: Jackson?
3  REP. JACKSON: No.
4  CLERK: Johnson?
5  REP. JOHNSON: Aye.
6  CLERK: Jordan?
7  REP. JORDAN: Aye.
8  CLERK: McGrady?
9  REP. MCGRADY: Aye.
10 CLERK: Michaux?
11 REP. MICHAUX: No.
12 CLERK: Moore?
13 REP. MOORE: No.
14 CLERK: Stam?
15 REP. STAM: Aye.
16 CLERK: Stevens?
17 REP. STEVENS: Aye.
18 CLERK: Rucho?
19 SEN. RUCHO: Aye.
20 CLERK: Apodaca?
21 SEN. APODACA: Aye.
22 CLERK: Barefoot?
23 SEN. BAREFOOT: Aye.
24 CLERK: Blue?
25 SEN. BLUE: No.

Worley Reporting
Case 2:19-cv-00037-FL   Document 41-2   Filed 11/22/19   Page 13 of 46
Case 1:13-cv-00949-WO-JEP   Document 159-9   Filed 03/07/16   Page 12 of 45

46

1        CLERK: Brown?
2        SEN. BROWN: Aye.
3        CLERK: Clark?
4        SEN. CLARK: No.
5        CLERK: Harrington?
6        SEN. HARRINGTON: Aye.
7        CLERK: Hise?
8        SEN. HISE: Aye.
9        CLERK: Jackson?
10        SEN. JACKSON: Aye.
11        CLERK: Lee?
12        SEN. LEE: Aye.
13        CLERK: McKissick?
14        SEN. MCKISSICK: No.
15        CLERK: Randleman?
16        SEN. RANDLEMAN: Aye.
17        CLERK: Sanderson?
18        SEN. SANDERSON: Aye.
19        CLERK: Smith?
20        SEN. SMITH: No.
21        CLERK: Smith-Ingram?
22        SEN. SMITH-INGRAM: Nay.
23        CLERK: Wells?
24        SEN. WELLS: Aye.
25        SEN. RUCHO: What have we got?

47

1        CLERK: Nine nays. Nine nays. (Pause.)
2 There's 11. 11 out of 34.
3        SEN. RUCHO: 11 out of 34 nays. Okay.
4 The result of that is 23 ayes, 11 nos, and two were
5 not present. Okay. Representative Lewis?
6        REP. LEWIS: Mr. Chairman, I would ask --
7 with your permission, I've asked the Sergeants-at-
8 Arms to distribute the criteria labeled "Partisan
9 Advantage." If you could direct the staff to read
10 that, I'd be happy to speak on it.
11        SEN. RUCHO: Ms. Churchill, would you
12 read the one on partisan advantage?
13        MS. CHURCHILL: "Partisan Advantage: The
14 partisan makeup of the Congressional delegation
15 under the enacted plan is 10 Republicans and 3
16 Democrats. The committee shall make reasonable
17 efforts to construct districts in the 2016
18 contingent Congressional plan to maintain the
19 current partisan makeup of North Carolina's
20 Congressional delegation."
21        SEN. RUCHO: Representative Lewis,
22 explain.
23        REP. LEWIS: Mr. Chairman, the
24 explanation of this is reasonably simple. As we
25 are allowed to consider political data in the

48

1 drawing of the maps, I would propose that to the
2 extent possible, the map drawers create a map which
3 is perhaps likely to elect 10 Republicans and 3
4 Democrats. I acknowledge freely that this would be
5 a political gerrymander, which is not against the
6 law.
7        SEN. RUCHO: All right. Members of the
8 committee, any questions? Senator Blue?
9        SEN. BLUE: Just one, Mr. Chairman, and
10 this is a point of order since you've got my friend
11 the rules committee chairman up there. What are
12 the rules under which this committee is operating,
13 House or Senate? If it's the Senate -- and if it's
14 neither, where do they come from, but if it's the
15 Senate, aren't ayes and nays prohibited in
16 committee votes?
17        SEN. APODACA: The chairs agreed we'd
18 operate under the House rules, and I can tell you I
19 wasn't here for that, but they did.
20        (Laughter.)
21        SEN. RUCHO: All right. Senator Blue?
22        SEN. BLUE: One follow-up.
23        SEN. RUCHO: Let me have your attention.
24        SEN. BLUE: Since I'm not familiar with
25 the House rules anymore, there is a permitted

49

1 abstention in the ayes and nos under the House
2 rules; is there not?
3        SEN. APODACA: Mr. Chairman?
4        SEN. RUCHO: Representative Stam, if you
5 can respond to that question?
6        REP. STAM: I could. There is no such
7 rule under House rules now or when Senator Blue was
8 the Speaker of the House.
9        SEN. RUCHO: Senator Blue, did you get
10 your answer?
11        SEN. BLUE: I got an answer.
12        (Laughter.)
13        SEN. RUCHO: Good. Thank you. Okay.
14 Members of the committee, let's pay close attention
15 to this. Senator McKissick?
16        SEN. MCKISSICK: In looking at this
17 particular criteria, I mean, certainly partisan
18 advantage is a legitimate consideration, but I
19 don't know why, based upon the number of Democratic
20 registered voters, Republican registered voters and
21 unaffiliated voters in this state we would want to
22 ever sit and ingrain as a criteria for
23 redistricting that we would only allow one party 3
24 seats in Congress, and the other one, 10 in
25 Congress, when not very long ago, before 2010, we

50

1  had 7 Democrats and 5 Republicans, so I'm trying to
2  understand why you feel this would be fair,
3  reasonable, and balanced in terms of voter
4  registrations in this state as it is currently
5  divided.
6      REP. LEWIS: Thank you for your question,
7  Senator. I propose that we draw the maps to give a
8  partisan advantage to 10 Republicans and 3
9  Democrats because I do not believe it's possible to
10  draw a map with 11 Republicans and 2 Democrats.
11      (Laughter.)
12      SEN. MCKISSICK: Follow-up, if I could.
13      SEN. RUCHO: Follow-up.
14      SEN. MCKISSICK: Were you aware of the
15  fact that in the 2012 election cycle, if you total
16  the total number of votes received by Democrats
17  running for Congress versus the total number of
18  votes cast for Republicans running for Congress,
19  that Democratic candidates had a higher number of
20  total votes, but ended up with fewer seats? Were
21  you aware of that factor in drawing up this
22  criteria?
23      REP. LEWIS: I am aware, Senator -- first
24  of all, thank you for your question. I am aware
25  that there are numerous examples, especially

51

1  through the 2000s, when the majority of seats went
2  to a party that had the fewer votes. We elect our
3  representatives based on a system of drawing
4  districts and the people in those districts being
5  able to vote. We do not elect at large. I know
6  you're very much aware of that, and we will -- this
7  will maintain that system.
8      SEN. MCKISSICK: Last follow-up, Mr.
9  Chairman.
10      SEN. RUCHO: Follow-up. Last follow-up.
11      SEN. MCKISSICK: I would simply say this:
12  If we were looking at a fair and reasonable
13  division as a criteria moving forward, it wouldn't
14  necessarily have to be an even division. It
15  could -- obviously, since majority -- Republicans
16  are a majority now, give Republicans a slight edge,
17  but to come up with such an imbalance in a split I
18  think is highly inappropriate. It's unfair. It
19  does not recognize the way votes have been cast in
20  this state as recently as 2012. It doesn't
21  recognize the division of registered voters in this
22  state between Democrats, Republicans, and
23  Independents, and it's really a matter of political
24  gerrymandering in the worst sense in which we can
25  do so.

52

1      Come up with something different. It
2  could be 5 Democratic seats, and there's no reason
3  why that couldn't be accomplished. It could be 6
4  Democratic seats and still give the Republicans an
5  edge, but to say you're going to marginalize with
6  only 3 seats as a criteria, let the voters decide.
7      REP. LEWIS: Well, sir, I definitely -- I
8  thank you for that comment. Certainly we look
9  forward to receiving -- what I'm asking this
10  committee to adopt is the maps that this -- that
11  the chairs will present to this committee absent a
12  stay arriving from the Court. Certainly the
13  members of this committee that don't feel this
14  balance is appropriate can certainly offer their
15  own maps for consideration.
16      SEN. RUCHO: Representative Lewis, in the
17  case Senator McKissick brought forth, if you see
18  some districts that tend to have a larger voter
19  turnout than others, that could easily explain what
20  Senator McKissick described. Am I not correct?
21      REP. LEWIS: Yes, sir. I think that's a
22  constant variable in this. If you have an area
23  that has a lot of contested races, those areas tend
24  to produce more folks to the polls. If you have --
25  you know, we don't want to get into the Electoral

53

1  College, but I can remember this debate's been
2  going on since 2000 because of the use -- you know,
3  there are times -- do you maximize or, for lack of
4  a more polite term, do you pump up or boost up
5  votes in certain areas to try and create the larger
6  cumulative total, or do you file, run, and win in
7  the districts in which you live? Our system has
8  historically been the latter.
9      SEN. RUCHO: I have a follow-up there.
10  Senator McKissick, go ahead.
11      SEN. MCKISSICK: Yeah. Simply this: I
12  think what voters want are more competitive
13  districts, more competitive districts where they
14  have a clear choice between a Democrat, a
15  Republican, and perhaps an unaffiliated candidate
16  that's running, but not ones that are gerrymandered
17  to give one party or the other just a clear
18  partisan advantage. More competitive districts, I
19  support completely, but that means drawing the maps
20  in a way where you're not from the outset
21  establishing criteria that gives one party an
22  unfair advantage.
23      SEN. RUCHO: Representative Lewis?
24      REP. LEWIS: Mr. Chairman, the only thing
25  that I could add is that we want to make clear that

54

1   we to the extent are going to use political data in
2   drawing this map, it is to gain partisan advantage
3   on the map. I want that criteria to be clearly
4   stated and understood. I have the utmost respect
5   for those that do not agree with this particular
6   balance.
7        I will say -- and the gentleman from
8   Durham did not say this, but I will say that during
9   the public comment yesterday, more than one speaker
10  referred to, "Can't we just draw them where there's
11  5 this way or 6 that way?" That is partisan
12  gerrymandering if you're drawing 5 and 7 or 6
13  and -- whatever it is. I'm making clear that our
14  intent is to use -- is to use the political data we
15  have to our partisan advantage.
16       SEN. RUCHO: Representative Michaux?
17       REP. MICHAUX: Yeah. Mr. Chairman, you
18  know if we were where you are today and we came up
19  with this idea, you-all would be jumping all over
20  the place, trying to dissuade us from that. First
21  you want to -- you really want to dissuade race
22  from being put in here. Now you want to make sure
23  that you keep your 10 to 3 advantage, the same
24  situation that got you in trouble before, and now
25  you're going to -- what you're telling us is, "We

55

1   want you to do this, and you vote for it, and this
2   is the way it's going to be," period, end of
3   report.
4        SEN. RUCHO: Okay. There was no
5   question, I don't think, so -- unless you want to
6   respond to his comment.
7        REP. LEWIS: No.
8        SEN. RUCHO: Okay. I've got
9   Representative Stam first.
10       REP. STAM: Yes. I'd like to share a
11  statistic that I haven't used in about 10 years,
12  but I'll tell you why. During the last
13  redistricting by the other party in 2004, I did
14  jump up and down because I saw what was coming. In
15  the election of 2004 for the House -- write these
16  statistics down -- 52 percent of the voters chose
17  the Republican candidate, 44 percent, the
18  Democratic candidate, and 4 percent, Libertarian.
19  Well, that should be a landslide for Republicans,
20  but it ended up that we were in the minority, 57 to
21  63.
22       The reason I stopped using those type of
23  statistics is I realized that it can be totally
24  skewed by whoever happens to not have a candidate
25  opposing that person. That shows a huge advantage.

56

1   For example, near a military base, they have much
2   fewer voters than the population -- in other words,
3   it's a bogus statistic, so I don't use it anymore.
4        SEN. RUCHO: Thank you. I've got
5   Representative Hager.
6        REP. HAGER: Thank you, Mr. Chairman.
7   You know I haven't been long, but I guess in
8   the House, I've become one of the more senior
9   members of my colleagues that came in 2011,
10  but, you know, I got to thinking -- and I have the
11  utmost respect for Senator McKissick and
12  Representative Michaux, but, you know, if I beat my
13  dog every day for 4 or 5 years and then I quit
14  doing it and I told David to quit beating his dog,
15  you'd consider me a little bit hypocritical,
16  wouldn't you, David?
17       If you look at that map on the wall and
18  look at the 1992 map and look at District 10 and
19  District 1, District 10 is my district now. Look
20  at where we've come with District 10 since then. I
21  mean, it's just -- it's amazing to me that we can
22  argue that we shouldn't -- that the folks that have
23  been here for a long time can argue that we
24  shouldn't gerrymander these on political reasons,
25  and they're some of the same people that developed

57

1   that map of District 1 and District 10 in 1992.
2        SEN. RUCHO: Thank you. Any additional
3   questions? Senator Smith-Ingram?
4        SEN. SMITH-INGRAM: Thank you, Mr. Chair.
5   Can you be specific as to what constitutes partisan
6   advantage? Do we have to tie it to a number?
7        REP. LEWIS: No, ma'am, but I will -- I
8   first of all, thank you for the question. To
9   perhaps expound on it a bit, this would -- this
10  would contemplate looking at the political data,
11  which was an earlier criteria adopted by this
12  committee, and as you draw the lines, if you're
13  trying to give a partisan advantage, you would want
14  to draw the lines so that more of the whole VTDs
15  voted for the Republican on the ballot than they
16  did the Democrat, if that answers your question.
17       SEN. SMITH-INGRAM: I think that --
18       SEN. RUCHO: Follow-up?
19       SEN. SMITH-INGRAM: Thank you. Follow-
20  up. It answers about 50 percent of my question.
21  If I could ask you another one, maybe a different
22  way? You threw out some numbers. Would there not
23  be partisan advantage with 8/5?
24       REP. LEWIS: Thank you for that question,
25  Senator. I would point out that indeed, you could

58

1    use political numbers to draw a partisan -- to draw
2    districts in which 8 Republicans would win or 5
3    Democrats. I'm saying to the extent that you can,
4    make it 10/3.
5            SEN. SMITH-INGRAM: Last follow-up.
6            SEN. RUCHO: Last follow-up.
7            SEN. SMITH-INGRAM: Just a statement. I
8    am concerned that we are trying to mimic the
9    outcome of the previous election that never existed
10   for a very long time in North Carolina until this
11   district was redrawn in 2011. The challenge here
12   is we are balancing where we are with where we have
13   been historically, but at the end of the day, we
14   are elected to come together, to work together, to
15   serve the constituents and citizens of North
16   Carolina. This is one of the concerns resonated
17   yesterday, and many of us have it here. We are
18   drawing these lines so that we get to pick our
19   voters as opposed to them choosing us. It is
20   unfair. It should not be perpetuated in this
21   process, and I will not be supporting it.
22           SEN. RUCHO: Thank you. Representative
23   Jones?
24           REP. JONES: Thank you, Mr. Chair. I
25   appreciate it. I want to say how much I have

59

1    enjoyed this discussion about -- about
2    gerrymandering. You know, that's a word that seems
3    to me, as someone who has lived in North Carolina
4    for all my life and has really kind of studied the
5    political process particularly over the last few
6    decades, a word that was never really used until
7    somehow the Republicans came to a majority in 2010.
8            Just as we're taking this little trip
9    down memory lane for just a moment, I -- I remember
10   things like multi-member districts in North
11   Carolina when we were drawing the legislature. I
12   thought what an extreme opportunity that was to
13   gerrymander.
14           I saw it happen in my own area where you
15   know, we couldn't do single-member districts. We
16   couldn't even do double-member districts.
17   Sometimes it had to be three- or four-member
18   districts in order for the political party in
19   charge at the time, which was the Democratic Party,
20   to gain a political advantage, so Representative
21   Lewis, I appreciate your honesty as you come
22   forward today, and we -- and we explain that
23   political gerrymandering I guess is what it is, but
24   I just find it very interesting to hear some of the
25   comments coming from some of the avenues that we're

60

1    hearing them come from today. We never heard those
2    comments for decades and decades and decades in
3    North Carolina, whether it was the media, whether
4    it was the majority party, whomever, and so I guess
5    the process is what it is.
6            I'm glad that we have had some court
7    decisions that have led to what I think is a lot
8    less gerrymandering than what we had in prior
9    decades, where we -- now we do have single-member
10   districts. Now we do have where we don't just
11   split counties in any possible way, and we have the
12   pod system and things like that, so I really take
13   offense when I hear those that say that somehow the
14   political gerrymandering of today is greater than
15   somehow it was in prior years, when anybody that
16   goes back and studies the history knows that that's
17   simply not the case.
18           That's my comment, and I will ask I guess
19   a question for you, Representative Lewis. Is it
20   possible that people might choose to vote for a
21   candidate that is of a different political party
22   than what their political affiliation is?
23           REP. LEWIS: Well, thank you for that
24   question, Representative Jones. Of course it is.
25   I mean, we all offer ourselves, and the voters in

61

1    our districts decide that we best represent what we
2    believe the direction of the government should be
3    and that's how they cast their votes, so certainly
4    a person is free to vote ever how they choose to
5    vote.
6            REP. JONES: Well, that's what I think,
7    and I think regardless how you draw these
8    districts -- you know, I come from an area where I
9    can remember a time where voting for the Democratic
10   party was extremely -- extremely high, and that
11   time has changed, and those votes have changed. A
12   lot of people that I can tell don't necessarily
13   vote for the same party that they're registered,
14   and so I -- you know, I think we ought to respect
15   the voters as individuals, and whether they're
16   registered Democrat, Republican, Libertarian,
17   unaffiliated, whatever, recognize that they do have
18   an opportunity to vote for any candidate that is on
19   the ballot before them. I appreciate your answer,
20   and I appreciate your honesty and integrity and
21   going forward with the process.
22           SEN. RUCHO: Thank you, Representative
23   Jones. Senator Clark?
24           SEN. CLARK: Thank you, Mr. Chairman.
25   I'm having difficulty understanding why I should

62

1  agree to vote for maps to bake in partisan
2  advantage that was achieved through the use of
3  unconstitutional maps. Could you explain that to
4  me?
5      REP. LEWIS: Well, to be clear, sir,
6  we -- we are proposing that the maps that are drawn
7  now under this criteria which we have passed a
8  plank of, and continue to move forward, one of the
9  goals in drawing the map will be to preserve the
10  10/3. With all due respect, I've listened to this,
11  and we can of course continue to discuss this as
12  long as the committee wants to. It's always sort
13  of amazed me that if the map elects one side, the
14  other side considers -- considers it a gerrymander,
15  and something bad. If it elects their side, they
16  consider it a work of art, and good government, so
17  this is saying that one of the goals will be to
18  elect -- to speak directly to your point, the goal
19  is to elect 10 Republicans and 3 Democrats.
20      SEN. RUCHO: Thank you. Representative
21  Lewis, there was a comment earlier about the
22  districts, the 13 districts that exist, 10
23  presently Republican, and 3 Democrat, and under the
24  circumstances, could you explain a little bit about
25  the makeup of the Republican districts and who

63

1  they're composed of, and what is necessary for that
2  Republican to win an election?
3      REP. LEWIS: Thank you for the question,
4  Mr. Chairman. First of all, it would be necessary
5  to go back and review the stat packs and whatnot
6  from the 2011 districts, which are online if
7  anybody would like to do that, but to the best of
8  my knowledge, Republicans hold no majority as far
9  as voter registration in any of those districts.
10      It's also -- well, and it is firmly my
11  belief that it's the responsibility of each of the
12  political parties to nominate quality candidates
13  who can appeal to the entire political spectrum.
14  It was pointed out yesterday during the public
15  hearing that the unaffiliated ranks in our state
16  continue to grow. If you don't get them -- if you
17  don't get a large percentage of the unaffiliated
18  vote in most of our districts, you're not going to
19  win, and so I would say that you are required to
20  have a good-quality candidate that appeals to the
21  political expectations of the majority of the folks
22  in that district.
23      I can go back, and we can go through some
24  of the points. I do still -- I actually maintain
25  that the districts that we have now are largely

64

1  competitive. I pointed out before that in the race
2  for attorney general that Attorney General Cooper
3  won nearly all of these. We can go back through
4  this 2011 debate if we'd like to, but I would again
5  maintain that you've got to put forward a good
6  candidate that appeals to the majority of folks,
7  and that the majority of folks in these districts
8  in the enacted plan are not registered Republicans.
9  In fact, to the best of my knowledge, in all but
10  perhaps one, we are the minority in all of the
11  districts.
12      SEN. RUCHO: Thank you. Okay,
13  Representative Jackson?
14      REP. JACKSON: Thank you, Mr. Chairman.
15  Senator Clark took one of my points that I was
16  going to make, but part of my uneasiness with this
17  is that it refers to the current Congressional
18  plan. I think you could make reference just saying
19  that you want to do it to a partisan advantage and
20  maximize Republican members, and I could agree with
21  that, I guess, but you have that opportunity.
22      I would point out that your maps
23  originally had a 9/4 split, and that any reference
24  to 10/3 is not what your maps were; your maps were
25  a 9/4 split. What you've done is taken out the

65

1  2012 election, but that's not my question.
2      My question is, are we going to rank
3  these criteria in any order, because you've used
4  words in this criteria like "reasonable efforts."
5  Well, if -- are the -- how will the mapmakers know
6  what a reasonable effort is? In trying to come up
7  with 10 Republican districts, will they be able to
8  make a reasonable effort that means they can now
9  consider race? Will they be able to make a
10  reasonable effort that means that now they can
11  consider the 2008, 2012 elections? Will they be
12  able to split precincts as part of making a
13  reasonable effort to make a 10/3 split?
14      REP. LEWIS: Representative Jackson,
15  thank you for that series of questions. The answer
16  to your question, the first part was -- I'm sorry.
17  Mr. Chairman, I'm sorry.
18      SEN. RUCHO: Go ahead, please.
19      REP. JACKSON: Will there be any type of
20  ranking of these criteria anywhere?
21      REP. LEWIS: No. No is the answer.
22  That's why these criteria are being presented
23  individually and discussed and debated
24  individually. Map -- drawing maps is largely a
25  balancing act. We are trying to specify certain

66

1   things that you cannot use.  You asked about race.
2   You cannot use that, and I apologize; I don't
3   remember what else you asked about, Representative
4   Jackson.
5       REP. JACKSON:  Follow-up, Mr. Chairman?
6       SEN. RUCHO:  Follow-up.
7       REP. JACKSON:  Okay.  So it would be your
8   contention, then, that making reasonable efforts
9   would not include violating any of the other
10  criteria that we have passed?
11      REP. LEWIS:  Absolutely.  Mr. Chairman?
12      SEN. RUCHO:  Yes?
13      REP. LEWIS:  If there aren't further
14  questions, I move adoption of the 2016 contingent
15  Congressional plan proposed criteria labeled
16  "Partisan Advantage."
17      SEN. RUCHO:  All right.
18      REP. JONES:  Second.
19      SEN. RUCHO:  Representative Jones has
20  seconded.  All right, members of the committee,
21  there has been considerable discussion, and if
22  there's any additional thoughts, this is your
23  opportunity.
24      (No response.)
25      SEN. RUCHO:  Seeing none, Mr. Clerk,

67

1   please go through the roll.
2       CLERK:  Lewis?
3       REP. LEWIS:  Aye.
4       CLERK:  Jones?
5       REP. JONES:  Aye.
6       CLERK:  Brawley?
7       REP. BRAWLEY:  Aye.
8       CLERK:  Cotham?
9       REP. COTHAM:  No.
10      CLERK:  Davis?
11      REP. DAVIS:  Aye.
12      CLERK:  Farmer-Butterfield?
13      REP. FARMER-BUTTERFIELD:  No.
14      CLERK:  Hager?
15      REP. HAGER:  Aye.
16      CLERK:  Hanes?
17      REP. HANES:  No.
18      CLERK:  Hardister?
19      REP. HARDISTER:  Aye.
20      CLERK:  Hurley?
21      REP. HURLEY:  Aye.
22      CLERK:  Jackson?
23      REP. JACKSON:  No.
24      CLERK:  Johnson?
25      REP. JOHNSON:  Aye.

68

1       CLERK:  Jordan?
2       REP. JORDAN:  Aye.
3       CLERK:  McGrady?
4       REP. MCGRADY:  Aye.
5       CLERK:  Michaux?
6       REP. MICHAUX:  No.
7       CLERK:  Moore?
8       REP. MOORE:  No.
9       CLERK:  Stam?
10      REP. STAM:  Aye.
11      CLERK:  Stevens?
12      REP. STEVENS:  Aye.
13      CLERK:  Rucho?
14      SEN. RUCHO:  Aye.
15      CLERK:  Apodaca?
16      SEN. APODACA:  Aye.
17      CLERK:  Barefoot?
18      SEN. BAREFOOT:  Aye.
19      CLERK:  Blue?
20      SEN. BLUE:  No.
21      CLERK:  Brown?
22      SEN. BROWN:  Aye.
23      CLERK:  Clark?
24      SEN. CLARK:  No.
25      CLERK:  Harrington?

69

1       SEN. HARRINGTON:  Aye.
2       CLERK:  Hise?
3       SEN. HISE:  Aye.
4       CLERK:  Jackson?
5       SEN. JACKSON:  Aye.
6       CLERK:  Lee?
7       SEN. LEE:  Aye.
8       CLERK:  McKissick?
9       SEN. MCKISSICK:  No.
10      CLERK:  Randleman?
11      SEN. RANDLEMAN:  Aye.
12      CLERK:  Sanderson?
13      SEN. SANDERSON:  Aye.
14      CLERK:  Smith?
15      SEN. SMITH:  No.
16      CLERK:  Smith-Ingram?
17      SEN. SMITH-INGRAM:  No.
18      CLERK:  Wells?
19      SEN. WELLS:  Aye.
20      CLERK:  23-11.
21      SEN. RUCHO:  All right, members of the
22  committee, roll call on the "Partisan Advantage"
23  criteria was ayes, 23, nos, 11.
24      We'll be going on to the next one, and
25  that is -- okay, got it.  This is the 12th

Worley Reporting
Case 2:19-cv-00037-FL   Document 41-2   Filed 11/22/19   Page 19 of 46
Case 1:13-cv-00949-WO-JEP   Document 159-9   Filed 03/07/16   Page 18 of 45

70

1   District. Would you, Ms. Churchill, read out --
2   read this criteria, please?
3        MS. CHURCHILL: "12th District: The
4   current General Assembly inherited the
5   configuration of the 12th District from past
6   General Assemblies. This configuration was
7   retained because of the -- because the district had
8   already been heavily litigated over the past two
9   decades, and ultimately approved by the courts.
10  The Harris court has criticized the shape of the
11  12th District, citing its serpentine nature. In
12  light of this, the committee shall construct
13  districts in the 2015 contingent Congressional plan
14  that eliminate the current configuration of the
15  12th District."
16       SEN. RUCHO: And, Representative Lewis,
17  would you explain the criteria under the "12th
18  District" heading?
19       REP. LEWIS: Thank you, Mr. Chairman.
20  This largely goes -- I'll try to use my friend from
21  Wake, Representative Jackson's, words. As these
22  criteria stand on their own and have to be
23  considered together, what this is saying is that
24  the mapmakers will make an effort to draw the 12th
25  Congressional District in a shape that the judges

71

1   would not consider serpentine.
2        SEN. RUCHO: Does that conclude your
3   explanation?
4        REP. LEWIS: Yes, sir.
5        SEN. RUCHO: Okay. Members of the
6   committee.
7        SEN. BLUE: Mr. Chairman?
8        SEN. RUCHO: Senator Blue?
9        SEN. BLUE: I want to commend
10  Representative Lewis. I agree that the 12th
11  District ought to be contiguous, it ought to be
12  compact, as all of the other districts in the
13  state, and I think a good starting point for
14  drawing constitutional maps would be to start with
15  the 12th District and make it compact, and let it
16  impact the other districts.
17       I think differently about the 1st,
18  because I think that the law requires it. I have
19  no particular love for any of these
20  strange districts, but if you're serious about
21  creating a district that's compact, that's
22  contiguous, and that covers as few counties as
23  possible by not unreasonably splitting county
24  lines, by not splitting county lines except where
25  necessary to comply with population, I think it's a

72

1   good idea.
2        SEN. RUCHO: Members of the -- oh, I'm
3   sorry. Go ahead, Chairman Lewis.
4        REP. LEWIS: Mr. Chairman, I just -- I
5   just wanted to thank Senator Blue for his words.
6   I'm glad that after two decades of drawing maps,
7   we've found something we can agree on.
8        SEN. RUCHO: All right, members of the
9   committee. Senator McKissick?
10       SEN. MCKISSICK: While I appreciate the
11  fact that the 12th District has an unusual shaped
12  appearance, I'm also aware of the fact that it's
13  gone up before the Supreme Court previously, and
14  when I think of the fact that one of the things we
15  have to consider is communities of interest, and
16  communities of interest is certainly something
17  that's a very valid consideration in drawing
18  Congressional districts, and I've heard it stated
19  on numerous occasions that communities of interest
20  test here is met and satisfied with the shape being
21  what it is today.
22       Now, while it may appear a bit
23  serpentine, a little bit unusual, I think it's
24  possible to reconfigure the district, perhaps to
25  make it somewhat more compact, but it links

73

1   together significant cores of the urban parts of
2   our state along the main street of the state, which
3   is now Interstate 85. Interstate 85 is the main
4   corridor.
5        Those urban areas are linked from
6   Charlotte going through Greensboro and back up into
7   the Piedmont area of our state, so I would not want
8   to abandon it. I'd want to perhaps reconfigure it,
9   but keeping in mind the communities of interest
10  that it ties together, major urban cores with
11  populations that have similar interests and
12  concerns, along with major banking centers.
13       One of the -- I've heard before that
14  particular district had more banking headquarters
15  than any Congressional district in our country, and
16  I rely upon that based upon the sources of that
17  data, so I would not abandon it; I would simply try
18  to reconfigure it, perhaps make it more compact,
19  but to respect the communities of interest that it
20  does unify.
21       SEN. RUCHO: Thank you. Any additional
22  questions? Well, let me first say, Representative
23  Lewis, do you want to make a comment to that?
24       REP. LEWIS: (Shakes head.)
25       SEN. RUCHO: Representative Hanes?

74

1       REP. HANES:  Thank you, Mr. Chairman.  I
2  think both the senators have -- have excellent
3  points.  I agree especially with Senator Blue and
4  his statements with regard to what we need to be
5  looking at as a whole as we consider what these
6  districts look like.  Certainly when it comes to
7  Democrats -- and I know we're trying to avoid the
8  word "race" here, but when it comes to folks who
9  look like me, we want our voices heard everywhere,
10  and so in that regard, part of the way we do that
11  is to put our communities together within our
12  counties.  I think while we certainly don't have to
13  abandon what the 12th is right now, certainly we
14  need to be looking at very strongly doing what
15  Senator Blue suggests, and so I will be supporting
16  it.  Thank you.
17       SEN. RUCHO:  Thank you.  Members of the
18  committee, any additional questions or comments?
19       (No response.)
20       SEN. RUCHO:  Representative Lewis, do you
21  have a motion?
22       REP. LEWIS:  Mr. Chairman, I move that
23  the 2016 contingent Congressional plan proposed
24  criteria labeled "12th District" be adopted.
25       SEN. APODACA:  Second.

75

1       SEN. RUCHO:  Second by Senator Apodaca.
2  Members of the committee, you have this motion
3  before you.  Any questions or comments prior to a
4  roll call vote?
5       (No response.)
6       SEN. RUCHO:  Seeing none, Mr. Clerk,
7  would you go through the roll call, please?
8       CLERK: Lewis?
9       REP. LEWIS: Aye.
10       CLERK: Jones?
11       REP. JONES: Aye.
12       CLERK: Brawley?
13       REP. BRAWLEY: Aye.
14       CLERK: Cotham?
15       REP. COTHAM: Yes.
16       CLERK: Davis?
17       REP. DAVIS: Aye.
18       CLERK: Farmer-Butterfield?
19       REP. FARMER-BUTTERFIELD: Yes.
20       CLERK: Hager?
21       REP. HAGER: Aye.
22       CLERK: Hanes?
23       REP. HANES: Yes.
24       CLERK: Hardister?
25       REP. HARDISTER: Aye.

76

1       CLERK: Hurley?
2       REP. HURLEY:  Aye.
3       CLERK: Jackson?
4       REP. JACKSON:  Yes.
5       CLERK: Johnson?
6       REP. JOHNSON:  Aye.
7       CLERK: Jordan?
8       REP. JORDAN:  Aye.
9       CLERK: McGrady?
10       REP. MCGRADY:  Aye.
11       CLERK: Michaux?
12       REP. MICHAUX:  Aye.
13       CLERK: Moore?
14       REP. MOORE:  Aye.
15       CLERK: Stam?
16       REP. STAM:  Aye.
17       CLERK: Stevens?
18       REP. STEVENS:  Aye.
19       CLERK: Rucho?
20       SEN. RUCHO:  Aye.
21       CLERK: Apodaca?
22       SEN. APODACA:  Aye.
23       CLERK: Barefoot?
24       SEN. BAREFOOT:  Aye.
25       CLERK: Blue?

77

1       SEN. BLUE: Aye.
2       CLERK: Brown?
3       SEN. BROWN: Aye.
4       CLERK: Clark?
5       SEN. CLARK: Aye.
6       CLERK: Harrington?
7       SEN. HARRINGTON: Aye.
8       CLERK: Hise?
9       SEN. HISE: Aye.
10       CLERK: Jackson?
11       SEN. JACKSON: Aye.
12       CLERK: Lee?
13       SEN. LEE: Aye.
14       CLERK: McKissick?
15       SEN. MCKISSICK:  No.
16       CLERK: Randleman?
17       SEN. RANDLEMAN:  Aye.
18       CLERK: Sanderson?
19       SEN. SANDERSON:  Aye.
20       CLERK: Smith?
21       SEN. SMITH:  Aye.
22       CLERK:  Smith-Ingram?
23       SEN. SMITH-INGRAM:  Aye.
24       CLERK: Wells?
25       SEN. WELLS:  Aye.

78

1           CLERK: One no.
2           SEN. RUCHO: So 33 aye and 1 no, correct?
3           CLERK: Yes.
4           SEN. RUCHO: Members of the committee,
5  the roll call vote on that, the criteria for the
6  12th District adoption, is 33 aye and 1 no. All
7  right.
8           Before we go on to the next criteria,
9  I'll make a statement to the committee that under
10  the House rules, there is a way of amending or
11  submitting an amendment forward. If you'll contact
12  Ms. Churchill on this, she will assist you in doing
13  so if you desire.
14           All right, that being said,
15  Representative Lewis, before us is --
16           REP. LEWIS: "Compactness."
17           SEN. RUCHO: -- "Compactness." All
18  right. Please, Ms. Churchill, would you read that?
19           MS. CHURCHILL: "Compactness: In light
20  of the Harris court's criticism of the compactness
21  of the 1st and 12th Districts, the committee shall
22  make reasonable efforts to construct districts in
23  the 2016 contingent Congressional plan that improve
24  the compactness of the current districts and keep
25  more counties and VTDs whole as compared to the

79

1  current enacted plan. Division of counties shall
2  only be made for reasons of equalizing population,
3  consideration of incumbency, and political impact.
4  Reasonable effort shall be made not to divide a
5  county into more than two districts."
6           SEN. RUCHO: Representative Lewis, would
7  you please explain the "Compactness" criteria?
8           REP. LEWIS: Thank you, Mr. Chairman. To
9  be clear, the -- trying to explain compactness is
10  very difficult, as I don't know that there is a
11  hard-and-fast definition that I can offer to the
12  committee. The way that I will interpret it is
13  again trying to keep as many counties whole as
14  possible, to split as few precincts as possible,
15  and again, only to -- and to only do that to
16  equalize population.
17           I would -- I would point out, again going
18  back to my friend, Representative Jackson's
19  question, these criteria kind of layer on each
20  other, and so I would -- I would urge the committee
21  to adopt the guideline on compactness.
22           SEN. RUCHO: Senator Blue?
23           SEN. BLUE: Thank you. Representative
24  Lewis, other than in 3 counties, are there multiple
25  incumbents? I know that there's more than 1 in

80

1  Mecklenburg. There's only 1 in Wake, I believe.
2  There's only 1 in Wake, and so 2 counties. There
3  may be 2 in Guilford. Is there any other county
4  with more than 1 incumbent?
5           REP. LEWIS: Senator Blue, thank you for
6  that question, and candidly, I don't believe so,
7  but I don't know that, either.
8           SEN. RUCHO: Follow-up?
9           SEN. BLUE: So if the only place that you
10  would worry about splitting the county to protect
11  the incumbency would be Mecklenburg County based on
12  the current layout -- I know that there are some of
13  us counties that are split 3 and 4 different ways,
14  but I know in Wake County, there's only 1 resident
15  Congressperson, although we have 4 districts here,
16  and I think that the same is true of every other
17  county except Mecklenburg, with the exception of
18  Guilford. There may be 2 from Guilford. I'm not
19  sure, but nevertheless, why should we split
20  counties if you don't have to, to protect the
21  incumbents? Why shouldn't we leave counties whole
22  all over the state except where you have to split
23  them because of population?
24           SEN. RUCHO: Representative Lewis?
25           REP. LEWIS: Thank you for that question,

81

1  Senator Blue. My response would simply be that
2  considering where incumbents live, and for lack of
3  a better way to say it, the protection of
4  incumbents has always been an accepted political
5  practice in drawing maps. This does not require us
6  to do that. This simply says that that could be
7  one of the reasons that a county would be split.
8           The most important part of this is trying
9  to establish that we won't split counties more than
10  2 times, and we've already passed a criteria that
11  this reiterates, that the biggest reason a county
12  should be split is only to equalize the population
13  between the districts.
14           SEN. BLUE: Follow-up.
15           SEN. RUCHO: Follow-up.
16           SEN. BLUE: And I agree with that, but
17  I'm saying under the current scenario -- and in
18  fact, I think Mecklenburg is the only county that
19  has two Congresspeople, so you could split
20  Mecklenburg anyhow because you've got to split it
21  because it's got over 750,000, or whatever the
22  number is, people. You've got to split Wake;
23  you've got to split Mecklenburg. The others could
24  be made whole except for population purposes, so
25  why would you adopt criteria saying that you're not

82

1    going to split counties except to protect
2    incumbents when you don't have any incumbents to
3    protect, and you ultimately say that you will split
4    them for political impact, which means that you can
5    indiscriminately split counties however you want to
6    anyhow if you determine what the political impact
7    is? Why would you say that, and why would you put
8    that provision in there?
9              SEN. RUCHO: Representative --
10             SEN. BLUE: And that being said, would
11   you be willing to --
12             SEN. RUCHO: One question. Let him
13   answer this one first, please.
14             SEN. BLUE: It's part of the same
15   question. That being said, would you be willing to
16   strike after the comma and the word "population" on
17   the third from the bottom line the phrases
18   "consideration of incumbency" and "political
19   impact" so that there's a clear signal that you're
20   not going to split counties since you don't have to
21   split them to protect incumbents, so that you're
22   not going to split counties except where you have
23   to, to get to the one person, one vote requirement?
24             SEN. RUCHO: Representative Lewis, why
25   don't you answer his first question first? He

83

1    asked too many questions.
2              REP. LEWIS: Senator Blue, thank you for
3    that series of inquiries. I do apologize because I
4    don't remember exactly what you asked.
5              SEN. BLUE: Do you need me to reask it?
6              REP. LEWIS: Let me just say that it is
7    my intent to split as few counties as we possibly
8    can, and to not allow the counties to be divided
9    more than two times. Our overarching goal of this,
10   as Representative Jackson and I have had some
11   continued conversation, all of these criteria kind
12   of overlap on each other.
13             I would agree with you that equalizing
14   population is a mandatory reason that a county may
15   have to be split. I would also say that it would
16   be dishonest of me to say that political impact
17   can't be considered in how you draw districts.
18             I don't see any harm in leaving the words
19   "consideration of incumbency" because there's no
20   requirement that the districts be drawn to include
21   the current seated members. It just allows for
22   the -- the consideration that they are -- that they
23   are in fact there.
24             SEN. BLUE: One last follow-up.
25             SEN. RUCHO: Last follow-up.

84

1              SEN. BLUE: If there is no incumbency,
2    then incumbents won't be considered in splitting
3    districts, and that can't be the reason for
4    splitting it. I'm simply saying that when you say
5    "political impact," you take away everything else
6    you put in that phrase, and if we believe in
7    keeping counties whole to the extent possible,
8    especially small counties, if we believe in that,
9    then all we've got to do is say we're only going to
10   split counties to equalize population, and I'm
11   wondering why it's so critical that you say
12   "political impact," since that phrase is loaded
13   with all kinds of subjective determinations, with
14   the ability to totally disregard this earlier
15   portion saying that you're not going to split
16   counties, or you're only going to split counties to
17   put them into two districts, because you don't say
18   you won't split them; you say you'll make
19   reasonable efforts not to. I'm saying why don't we
20   have an absolute prohibition on splitting counties
21   except when it's necessary to comply with one
22   person, one vote?
23             REP. LEWIS: Thank you for that question,
24   Senator Blue. My response to that would be that we
25   will look forward to reviewing maps that you may

85

1    submit that follow that criteria. I feel very
2    comfortable that we've made clear through this
3    process of what our -- what our intents are, and I
4    would prefer that this criteria remain as it's
5    written.
6              SEN. RUCHO: Thank you. Representative
7    Jones?
8              REP. JONES: Thank you, Mr. Chairman. I
9    just wanted to clarify the record that there are
10   two Congressmen that live in Guilford County, Mark
11   Walker of the 6th District, and Alma Adams of the
12   12th District.
13             SEN. RUCHO: Okay. I've got -- I've got
14   Senator Smith.
15             SEN. SMITH: Thank you, Mr. Chairman. I
16   certainly appreciate the idea of compactness. I
17   very much want to see precincts and counties left
18   whole. I would respectfully tell you that in 2011,
19   there was a district drawn where an incumbent was
20   drawn out. It was the district that I lived in,
21   and so the 7th Congressional District drew -- was
22   changed to the 8th Congressional District, and the
23   Congressman McIntyre, who was the incumbent, was
24   drawn out essentially of his own district, and my
25   concern is what Senator Blue has said. The idea of

## 86

1  compactness is great, but when we leave in this
2  other phrase about incumbency, we have taken away
3  the other reason, the only reason that really
4  should be the case, and that is population.
5      REP. LEWIS: Senator, I appreciate that.
6  Again, I would state that equalizing population is
7  definitely the required reason a county may
8  have to be split. This simply allows for
9  consideration of incumbency and consideration of
10  political impact. I don't -- I don't see that that
11  would interfere with us being able to use
12  compactness in drawing the maps.
13      SEN. SMITH: Follow-up, Mr. Chair?
14      SEN. RUCHO: Follow-up.
15      SEN. SMITH: I just would point out that
16  population was not the case in 2011, and my concern
17  is that if we agree to this and keep this as
18  incumbency and political impact, that that will end
19  up trumping population, and splitting counties and
20  precincts.
21      SEN. RUCHO: Thank you. Representative
22  Lewis, do you want to comment?
23      REP. LEWIS: No.
24      SEN. RUCHO: You're all set? Just a
25  quick -- is it -- a question for the Chair,

## 87

1      Representative Lewis: Is it a requirement for a
2  Congressional candidate to live in the district
3  they're running in?
4      REP. LEWIS: No. A candidate for
5  Congress is not required to reside in the district
6  in which they run.
7      SEN. RUCHO: Okay, thank you. I've got
8  Representative Hager.
9      REP. HAGER: Thank you, Mr. Chairman, and
10  thank you, Representative Lewis, for -- for this
11  particularly, because as I said earlier, Rutherford
12  County, prior to the Rucho-Lewis maps that we're
13  under today, split Rutherford County between the
14  10th and the 11th. Now, I find it -- and I have a
15  question for you. I find it very ironic that that
16  split for the 11th included -- came down Main
17  Street in Rutherfordton to include Walter Dalton's
18  house, so the question I have for you is we won't
19  split districts depending on who we think may run
20  for that Congressional district; would that be
21  correct?
22      REP. LEWIS: Yes, sir, that's correct.
23      SEN. RUCHO: Okay. All right. I've got
24  Senator McKissick.
25      SEN. MCKISSICK: Let me ask you this,

## 88

1      Representative Lewis: The way this is drafted now,
2  what I'm seeing is a statement of an aspirational
3  goal, but not a strict requirement. Is that
4  correct, or is that a misreading? It's one thing
5  to aspire to accomplish these things, which I
6  support. It's another thing if you make it a
7  litmus test, so can you clarify that?
8      REP. LEWIS: Thank you for that question,
9  Senator McKissick. Let me say that this is an
10  aspirational goal.
11      SEN. MCKISSICK: In which case, I embrace
12  it.
13      SEN. RUCHO: Okay. From the Chair,
14  Senator McKissick [sic], a question that
15  Representative Jackson asked earlier, and when you
16  talk about the criteria, is it accurate to say that
17  all of them are weighted at the same level, and
18  it's a matter of harmonizing to try to get to a map
19  that meets those criteria?
20      (No response.)
21      SEN. RUCHO: David?
22      REP. LEWIS: I'm sorry, Mr. Chairman.
23      SEN. RUCHO: Oh, I'm sorry. From the
24  Chair, a question for you.
25      REP. LEWIS: Yes, sir?

## 89

1      SEN. RUCHO: Based on what Representative
2  Jackson asked earlier, all of these criteria listed
3  that's being submitted and voted upon, is it fair
4  to say that the criteria established are not ranked
5  as far as priorities, but are a matter of
6  harmonizing until you can get a map that meets
7  those criteria?
8      REP. LEWIS: That's correct, sir. We are
9  seeking aspirational harmony.
10      (Laughter.)
11      SEN. RUCHO: Okay. Do you have a motion?
12      REP. LEWIS: Mr. Chairman, I would move
13  that the 2016 contingent Congressional plan
14  proposed criteria labeled "Compactness" be adopted
15  by the committee.
16      SEN. RUCHO: All right. I've got --
17  Representative Davis has seconded that motion.
18  Members of the committee, any questions, comments
19  prior to a roll call vote? Representative Farmer-
20  Butterfield?
21      REP. FARMER-BUTTERFIELD: Thank you. I
22  want to ask about the hearings yesterday and how
23  much impact they had on the criteria, if any, based
24  on what you're presenting today.
25      SEN. RUCHO: Representative Lewis?

90

1      REP. LEWIS:  Thank you for that -- thank
2  you for that inquiry, Representative.  I will tell
3  you that many things that stand out in my mind are
4  do away with the 12th, keep counties whole, all of
5  which we've addressed in this, so I would say that
6  they had a great deal of impact on the criteria
7  that you have before you.
8      SEN. RUCHO:  All set?  Okay.  Yes,
9  Representative Stevens?
10     REP. STEVENS:  Thank you, Mr. Chair, and
11 I just wanted to commend Representative Lewis and
12 perhaps answer some of the things that some of the
13 people are talking about, and I'd like to read -- I
14 guess it's about one and a half paragraphs of one
15 of the most recent redistricting cases in March of
16 2015.
17     It says, "Now consider the nature of
18 those offsetting 'traditional race-neutral
19 districting principles.'  We have listed several,
20 including 'compactness, contiguity, respect for
21 political subdivisions or communities defined by
22 actual shared interests,' incumbency protection,
23 and political affiliation," those things that we've
24 done.
25     The next paragraph says, "But we have not

91

1  listed equal population objectives.  And there is a
2  reason for that omission.  The reason that equal
3  population objectives do not appear on this list of
4  'traditional' criteria is that equal population
5  objectives play a major -- different role in a
6  State's redistricting process.  That role is not a
7  minor one.  Indeed, in light of the Constitution's
8  demands, that role may often prove 'predominant' in
9  the ordinary sense of that word," because the equal
10 population, it goes on to talk about in the voting
11 rights districts we really have to take a different
12 focus on that, so I commend you for all of the
13 criteria you've set forward.  It seems to comply
14 with the most recent case law.
15     SEN. RUCHO:  Representative Lewis?
16     REP. LEWIS:  Yes, sir, Mr. Chairman?
17     SEN. RUCHO:  All set?  We've got a motion
18 before us that we approve of the criteria that was
19 listed and debated on the compactness.  We've had a
20 second from Representative Davis.  Mr. Clerk, would
21 you call the roll?
22     CLERK:  Lewis?
23     REP. LEWIS:  Aye.
24     CLERK:  Jones?
25     REP. JONES:  Aye.

92

1      CLERK:  Brawley?
2      REP. BRAWLEY:  Aye.
3      CLERK:  Cotham?
4      REP. COTHAM:  No.
5      CLERK:  Davis?
6      REP. DAVIS:  Aye.
7      CLERK:  Farmer-Butterfield?
8      REP. FARMER-BUTTERFIELD:  No.
9      CLERK:  Hager?
10     REP. HAGER:  Aye.
11     CLERK:  Hanes?
12     REP. HANES:  Yes.
13     CLERK:  Hardister?
14     REP. HARDISTER:  Aye.
15     CLERK:  Hurley?
16     REP. HURLEY:  Aye.
17     CLERK:  Jackson?
18     REP. JACKSON:  No.
19     CLERK:  Johnson?
20     REP. JOHNSON:  Aye.
21     CLERK:  Jordan?
22     REP. JORDAN:  Aye.
23     CLERK:  McGrady?
24     REP. MCGRADY:  Aye.
25     CLERK:  Michaux?

93

1      REP. MICHAUX:  No.
2      CLERK:  Moore?
3      REP. MOORE:  Yes.
4      CLERK:  Stam?
5      REP. STAM:  Yes.
6      CLERK:  Stevens?
7      REP. STEVENS:  Yes.
8      CLERK:  Rucho?
9      SEN. RUCHO:  Aye.
10     CLERK:  Apodaca?
11     SEN. APODACA:  Aye.
12     CLERK:  Barefoot?
13     SEN. BAREFOOT:  Aye.
14     CLERK:  Blue?
15     SEN. BLUE:  No.
16     CLERK:  Brown?
17     SEN. BROWN:  Aye.
18     CLERK:  Clark?
19     SEN. CLARK:  No.
20     CLERK:  Harrington?
21     SEN. HARRINGTON:  Aye.
22     CLERK:  Hise?
23     SEN. HISE:  Aye.
24     CLERK:  Jackson?
25     SEN. JACKSON:  Aye.

Worley Reporting
Case 2:19-cv-00037-FL   Document 41-2   Filed 11/22/19   Page 25 of 46
Case 1:13-cv-00949-WO-JEP   Document 159-9   Filed 03/07/16   Page 24 of 45

94

1   CLERK: Lee?
2   SEN. LEE: Aye.
3   CLERK: McKissick?
4   SEN. MCKISSICK: Aye.
5   CLERK: Randleman?
6   SEN. RANDLEMAN: Aye.
7   CLERK: Sanderson?
8   SEN. SANDERSON: Aye.
9   CLERK: Smith?
10  SEN. SMITH: No.
11  CLERK: Smith-Ingram?
12  SEN. SMITH-INGRAM: Aye.
13  CLERK: Wells?
14  SEN. WELLS: Aye.
15  SEN. RUCHO: Members of the committee,
16  the roll was taken. We have the ayes, 27, the
17  noes, 7. That was adopted. Okay, everyone, pay
18  close attention here. We have before us another
19  criteria entitled "Incumbency." Ms. Churchill?
20  MS. CHURCHILL: "Incumbency: Candidates
21  for Congress are not required by law to reside in a
22  district they seek to represent; however,
23  reasonable efforts shall be made to ensure that
24  incumbent members of Congress are not paired with
25  another incumbent in one of the new districts

95

1   constructed in the 2016 contingent Congressional
2   plan."
3   REP. LEWIS: Mr. Chairman, I'd call this
4   the Senator Smith criteria, and I'd move its
5   adoption.
6   SEN. RUCHO: All right. That was the
7   explanation?
8   REP. LEWIS: Well, this is also
9   aspirational, and attempting to harmonize the other
10  criteria.
11  SEN. RUCHO: All right. Members of the
12  committee, any questions or comments on the
13  criteria before you dealing with incumbency?
14  (No response.)
15  SEN. RUCHO: Seeing none, Representative
16  Lewis has a motion that we -- that we approve --
17  adopt the incumbency criteria. Representative
18  Brawley seconded. We have before us -- any
19  additional thoughts or questions?
20  (No response.)
21  SEN. RUCHO: If not, we'll take a roll.
22  Mr. Clerk?
23  CLERK: Lewis?
24  REP. LEWIS: Aye.
25  CLERK: Jones?

96

1   REP. JONES: Aye.
2   CLERK: Brawley?
3   REP. BRAWLEY: Aye.
4   CLERK: Cotham?
5   (No response.)
6   CLERK: Davis?
7   (No response.)
8   CLERK: Farmer-Butterfield?
9   REP. FARMER-BUTTERFIELD: Yes.
10  CLERK: Hager?
11  REP. HAGER: Aye.
12  CLERK: Hanes?
13  REP. HANES: Aye.
14  CLERK: Hardister?
15  REP. HARDISTER: Aye.
16  CLERK: Hurley?
17  REP. HURLEY: Aye.
18  CLERK: Jackson?
19  REP. JACKSON: Aye.
20  CLERK: Johnson?
21  REP. JOHNSON: Aye.
22  CLERK: Jordan?
23  REP. JORDAN: Aye.
24  CLERK: McGrady?
25  REP. MCGRADY: Aye.

97

1   CLERK: Michaux?
2   REP. MICHAUX: Aye.
3   CLERK: Moore?
4   REP. MOORE: Aye.
5   CLERK: Stam?
6   REP. STAM: Aye.
7   CLERK: Stevens?
8   REP. STEVENS: Aye.
9   CLERK: Rucho?
10  SEN. RUCHO: Aye.
11  CLERK: Apodaca?
12  SEN. APODACA: Aye.
13  CLERK: Barefoot?
14  SEN. BAREFOOT: Aye.
15  CLERK: Blue?
16  SEN. BLUE: Aye.
17  CLERK: Brown?
18  SEN. BROWN: Aye.
19  CLERK: Clark?
20  SEN. CLARK: No.
21  CLERK: Harrington?
22  SEN. HARRINGTON: Aye.
23  CLERK: Hise?
24  SEN. HISE: Aye.
25  CLERK: Jackson?

Worley Reporting
Case 2:19-cv-00037-FL   Document 41-2   Filed 11/22/19   Page 26 of 46
Case 1:13-cv-00949-WO-JEP   Document 159-9   Filed 03/07/16   Page 25 of 45

98

1    SEN. JACKSON: Aye.
2    CLERK: Lee?
3    SEN. LEE: Aye.
4    CLERK: McKissick?
5    SEN. MCKISSICK: Aye.
6    CLERK: Randleman?
7    SEN. RANDLEMAN: Aye.
8    CLERK: Sanderson?
9    SEN. SANDERSON: Aye.
10   CLERK: Smith?
11   SEN. SMITH: Aye.
12   CLERK: Smith-Ingram?
13   SEN. SMITH-INGRAM: Aye.
14   CLERK: Wells?
15   SEN. WELLS: Aye.
16   SEN. RUCHO: All right.
17   REP. MICHAUX: Mr. Chairman?
18   SEN. RUCHO: One second. Let me call the
19   vote, please. We had aye, 31, no, 1. That
20   criteria for incumbency has been adopted. All
21   right. Question, Senator -- Representative
22   McKissick -- I mean, excuse me -- sorry. Mr.
23   Michaux, did you have a question?
24   REP. MICHAUX: No.
25   SEN. RUCHO: Okay. I thought I heard

99

1    something from over there.
2    REP. LEWIS: Thank you, Mr. Chairman,
3    members.
4    SEN. RUCHO: Okay, let me see. All
5    right. We -- I mentioned earlier that --
6    amendments being submitted. Are there any
7    amendments that are going to be submitted? All
8    right. Representative Blue?
9    SEN. BLUE: I have one that --
10   SEN. RUCHO: Excuse me, Senator Blue.
11   I'm sorry.
12   SEN. BLUE: I have one. I had to change
13   it after the adoption of one of the other
14   amendments. I had given it to Erika earlier.
15   SEN. RUCHO: All right. It's being
16   worked on?
17   SEN. BLUE: Yeah.
18   SEN. RUCHO: Okay. I think Senator Hise
19   has an amendment. Okay. Senator Hise, do you have
20   an amendment?
21   SEN. HISE: I have a motion.
22   SEN. RUCHO: Motion. One second. They
23   need to have copies for distribution. (Pause.)
24   I'd like to have the committee stand at ease for a
25   few moments while we have some copies made of the

100

1    amendments, so a couple of minutes to break.
2    (RECESS, 12:04 - 12:22 P.M.)
3    SEN. RUCHO: All right, members of the
4    committee, I think you have on each of your desks a
5    copy of an amendment submitted by Representative
6    Paul Stam, "Amendment to Political Data Criteria
7    #3." Representative Stam?
8    REP. STAM: Yes. It's just sort of
9    technical. I kept reading that thing, and the way
10   it read, you could read it that you couldn't
11   consider data from the 2008 election, since it said
12   "since 2008," so this makes clear that yes, you can
13   consider 2008 and things forward.
14   SEN. RUCHO: All right. You've explained
15   it. Is that a motion you're making?
16   REP. STAM: I move the amendment.
17   SEN. RUCHO: Representative Lewis?
18   REP. LEWIS: Mr. Chairman, if I could, to
19   the maker of the amendment, Representative Stam,
20   would the gentleman consider striking "#3" to make
21   clear that these are in no particular order? In
22   other words, it would say, "Amendment to Political
23   Data Criteria."
24   REP. STAM: Oh, sure. Well, it would
25   be -- yes, yes, I do. Whether it's spelled

101

1    "criterion" or "criteria," I will.
2    SEN. RUCHO: All right. So therefore,
3    the amendment that you've having strikes out -- or
4    it just says "Amendment to Political Data," and
5    then you're striking out -- excuse me -- "Political
6    Data Criteria." You're striking out "#3"?
7    REP. STAM: We're striking out "#3."
8    SEN. RUCHO: Just "#3." Members of the
9    committee, is that clear?
10   REP. LEWIS: Mr. Chairman?
11   SEN. RUCHO: Who's calling me? Oh,
12   Representative Lewis?
13   REP. LEWIS: I would support the
14   gentleman's amendment.
15   SEN. RUCHO: All right. Representative
16   Stam has submitted an amendment before you, and
17   it's open for discussion. Members of the
18   committee?
19   (No response.)
20   SEN. RUCHO: Seeing none, would you have
21   a roll call, Mr. Clerk?
22   CLERK: Lewis?
23   REP. LEWIS: Aye.
24   CLERK: Lewis, aye. Jones?
25   REP. JONES: Aye.

## 102

1    CLERK: Jones, aye. Brawley?
2    REP. BRAWLEY: Aye.
3    CLERK: Brawley, aye. Cotham?
4    REP. COTHAM: Aye.
5    CLERK: Cotham, aye. Davis?
6    REP. DAVIS: Aye.
7    CLERK: Davis, aye. Farmer-Butterfield?
8    REP. FARMER-BUTTERFIELD: Aye.
9    CLERK: Farmer-Butterfield, aye. Hager?
10   REP. HAGER: Aye.
11   CLERK: Hager, aye. Hanes?
12   REP. HANES: Aye.
13   CLERK: Hanes, aye. Hardister?
14   REP. HARDISTER: Aye.
15   CLERK: Hardister, aye. Hurley?
16   REP. HURLEY: Aye.
17   CLERK: Hurley, aye. Jackson?
18   REP. JACKSON: Aye.
19   CLERK: Jackson, aye. Johnson?
20   REP. JOHNSON: Aye.
21   CLERK: Johnson, aye. Jordan?
22   REP. JORDAN: Aye.
23   CLERK: Jordan, aye. McGrady?
24   REP. MCGRADY: Aye.
25   CLERK: McGrady, aye. Michaux?

## 103

1    REP. MICHAUX: Aye.
2    CLERK: Michaux, aye. Moore?
3    REP. MOORE: Aye.
4    CLERK: Moore, aye. Stam?
5    REP. STAM: Aye.
6    CLERK: Stam, aye. Stevens?
7    REP. STEVENS: Aye.
8    CLERK: Stevens, aye. Rucho?
9    SEN. RUCHO: Aye.
10   CLERK: Rucho, aye. Apodaca?
11   SEN. APODACA: Aye.
12   CLERK: Apodaca, aye. Barefoot?
13   SEN. BAREFOOT: Aye.
14   CLERK: Barefoot, aye. Blue?
15   SEN. BLUE: No.
16   CLERK: Blue, no. Brown?
17   SEN. BROWN: Aye.
18   CLERK: Brown, aye. Clark?
19   SEN. CLARK: No.
20   CLERK: Clark, no. Harrington?
21   SEN. HARRINGTON: Aye.
22   CLERK: Harrington, aye. Hise?
23   SEN. HISE: Aye.
24   CLERK: Hise, aye. Jackson?
25   SEN. JACKSON: Aye.

## 104

1    CLERK: Jackson, aye. Lee?
2    SEN. LEE: Aye.
3    CLERK: Lee, aye. McKissick?
4    SEN. MCKISSICK: No.
5    CLERK: McKissick, no. Randleman?
6    SEN. RANDLEMAN: Aye.
7    CLERK: Randleman, aye. Sanderson?
8    SEN. SANDERSON: Aye.
9    CLERK: Sanderson, aye. Smith?
10   SEN. SMITH: No.
11   CLERK: Smith, no. Smith-Ingram?
12   SEN. SMITH-INGRAM: Nay.
13   CLERK: Smith-Ingram, no. Wells?
14   SEN. WELLS: Aye.
15   CLERK: 4.
16   SEN. RUCHO: That makes 30 yeses. Did
17   everybody vote?
18   CLERK: Yes. 30 to 4.
19   SEN. RUCHO: All right, members of the
20   committee, on the roll-call vote on Representative
21   Stam's amendment dealing with -- and it's titled
22   "Amendment to Political Data Criteria." It is
23   adopted 30 to 4.
24   Okay, we'll now just -- we'll go on to
25   the next. (Pause.) All right, members, you have

## 105

1    an amendment coming out toward you, and it is
2    "Amendment, Compactness Criteria." It's -- all
3    right.
4    REP. LEWIS: Mr. Chairman?
5    SEN. RUCHO: Yes, sir, Representative
6    Lewis? Excuse me, Representative Lewis. I've
7    got -- we need to have Senator Blue explain his
8    amendment. Go ahead.
9    REP. LEWIS: I was wondering if Senator
10   Blue would agree to a -- to a technical fix to
11   strike the number sign and the 6.
12   SEN. BLUE: I would.
13   SEN. RUCHO: Okay. Members of the
14   committee, on Senator Blue's amendment, the title
15   will be, "Amendment, Compactness Criteria." You
16   will scratch "#6." That will not be in there.
17   All right, Senator Blue, everyone has a
18   copy of the amendment. Would you like to explain
19   your amendment?
20   SEN. BLUE: I would. Thank you, Mr.
21   Chairman. Mr. Chairman and ladies and gentlemen of
22   the committee and Senators and House members
23   present, what I tried to do in this amendment is
24   simply recognize that the county is the most
25   important governmental unit following the state,

106

1 because they're extensions of the state, and to set
2 forth clearly that we are -- we're only going to
3 divide counties when you're equalizing population,
4 although that's a federal requirement, too, and
5 when you're complying with federal law.
6 It's something you've got to do. You
7 might as well admit that we have to comply with
8 federal law. Federal law is supreme, and so this
9 says that we will split counties only when you're
10 trying to get down to zero deviation in population,
11 which we're going to try to do, I take it, and only
12 when you're complying with a federal law regarding
13 redistricting. All of the other reasons that have
14 been given would not be justification for splitting
15 counties, and I move the adoption of the amendment.
16 SEN. RUCHO: Representative Lewis?
17 REP. LEWIS: Thank you, Mr. Chairman, and
18 thank you, Senator Blue, for that explanation. Let
19 me be clear, ladies and gentlemen. We of course
20 are going to comply with federal law. We would not
21 be here were we not attempting to comply with the
22 federal decision issued by the courts. I would
23 submit that this amendment is not necessary, and
24 should not be adopted because we of course are
25 going -- as Senator Blue said, of course we're

107

1 going to comply with the federal law.
2 As we've already had a pretty lengthy
3 discussion, that consideration, the word
4 "consideration" of incumbency and political impact
5 may be considered. It's not required to be
6 considered, and I've already stated for the record
7 that equalizing population is the most important
8 reason that a county would be divided. I would
9 respectfully ask the members to vote against this
10 amendment.
11 SEN. RUCHO: I've got Representative
12 Stam.
13 REP. STAM: I would oppose the amendment,
14 and point out what may be obvious. Senator Blue as
15 the Minority Leader is going to be perfectly
16 entitled to submit his own plan, and nothing in
17 what we've written would prohibit him from striking
18 those two criteria from his maps. He doesn't need
19 this amendment to do what he wants to do.
20 SEN. RUCHO: Yes, Senator Blue?
21 SEN. BLUE: Just a comment. My cape
22 disappeared, and I'm not Superman anymore, so I
23 can't do a map in a day that takes into account all
24 of the stuff that we have as criteria. I was
25 thinking we were narrowing the things that we

108

1 were looking at. I can't really look at all that I
2 want to.
3 SEN. RUCHO: Okay. You all set? Members
4 of the committee -- oh, excuse me. Senator Hise?
5 SEN. HISE: Thank you, Mr. Chairman, and
6 this may be for -- just trying to get clarity on
7 what this amendment would actually do. One of the
8 outcomes of the last maps is that all of the major
9 urban areas in the state were represented by two
10 Congressmen that was coming in, and something we
11 saw at least that was coming in. Would this
12 amendment prohibit that type of decision for those
13 districts so that -- as that would be a political
14 impact that was coming in that we could not make
15 sure that urban areas were represented by two
16 Congressmen?
17 SEN. RUCHO: Okay. Representative --
18 excuse me. Senator Blue, would you please answer
19 that question?
20 SEN. BLUE: I'll be happy to answer that.
21 Certainly not. As I said, the only two counties
22 that absolutely would be guaranteed to be
23 represented by two Congresspeople would be
24 Mecklenburg and Wake, since each of them has a
25 population in excess of the 700-plus thousand

109

1 that's necessary to draw a Congressional district.
2 If you started drawing a district toward an urban
3 area, then you could split that urban area when you
4 got to it so that it's in two separate districts.
5 This would in no way prohibit having two
6 Congresspeople from whichever other urban areas
7 other than Wake and Mecklenburg, where you'd be
8 guaranteed at least two, where you could bring them
9 into one of the urban counties, but you couldn't
10 split it but one time, so you get -- you could get
11 two from Guilford, two from Cumberland, two from
12 Forsyth, two from any of the counties, including
13 the smallest, if you paired it with a much bigger
14 population.
15 SEN. RUCHO: Representative Lewis,
16 comment?
17 REP. LEWIS: No, sir. I would say I'm
18 sure that the answer Senator Blue gave is correct
19 to Senator Hise's question. I just again would not
20 support the amendment as it's drafted for the
21 reasons that I've already stated.
22 SEN. RUCHO: All right. Members of the
23 committee, you have an amendment before you from
24 Senator Blue, and the amendment is entitled
25 "Amendment, Compactness Criteria." Any additional

Worley Reporting
Case 2:19-cv-00037-FL   Document 41-2   Filed 11/22/19   Page 29 of 46
Case 1:13-cv-00949-WO-JEP   Document 159-9   Filed 03/07/16   Page 28 of 45

## 110

1    questions, comments?
2              (No response.)
3              SEN. RUCHO:  Seeing none, the roll call,
4    Mr. Clerk?
5              CLERK: Lewis?
6              REP. LEWIS:  No.
7              CLERK: Lewis, no.  Jones?
8              REP. JONES:  No.
9              CLERK: Jones, no.  Brawley?
10             REP. BRAWLEY:  No.
11             CLERK: Brawley, no.  Cotham?
12             REP. COTHAM:  Yes.
13             CLERK: Cotham, yes.  Davis?
14             REP. DAVIS:  No.
15             CLERK: Davis, no.  Farmer-Butterfield?
16             REP. FARMER-BUTTERFIELD:  Yes.
17             CLERK: Farmer-Butterfield, yes.  Hager?
18             REP. HAGER:  No.
19             CLERK: Hager, no.  Hanes?
20             REP. HANES:  Yes.
21             CLERK: Hanes, yes.  Hardister?
22             REP. HARDISTER:  No.
23             CLERK: Hardister, no.  Hurley?
24             REP. HURLEY:  No.
25             CLERK: Hurley, no.  Jackson?

## 111

1              REP. JACKSON:  Yes.
2              CLERK: Jackson, yes.  Johnson?
3              REP. JOHNSON:  No.
4              CLERK: Johnson, no.  Jordan?
5              REP. JORDAN:  No.
6              CLERK: Jordan, no.  McGrady?
7              REP. MCGRADY:  No.
8              CLERK: McGrady, no.  Michaux?
9              REP. MICHAUX:  Aye.
10             CLERK: Michaux, aye.  Moore?
11             REP. MOORE:  Aye.
12             CLERK: Moore, aye.  Stam?
13             REP. STAM:  No.
14             CLERK: Stam, no.  Stevens?
15             REP. STEVENS:  No.
16             CLERK: Stevens, no.  Rucho?
17             SEN. RUCHO:  No.
18             CLERK: Rucho, no.  Apodaca?
19             SEN. APODACA:  No.
20             CLERK: Apodaca, no.  Barefoot?
21             SEN. BAREFOOT:  No.
22             CLERK: Barefoot, no.  Blue?
23             SEN. BLUE:  Aye.
24             CLERK: Blue, aye.  Brown?
25             SEN. BROWN:  No.

## 112

1              CLERK: Brown, no.  Clark?
2              SEN. CLARK:  Aye.
3              CLERK: Clark, aye.  Harrington?
4              SEN. HARRINGTON:  No.
5              CLERK: Harrington, no.  Hise?
6              SEN. HISE:  No.
7              CLERK: Hise, no.  Jackson?
8              SEN. JACKSON:  No.
9              CLERK: Jackson, no.  Lee?
10             SEN. LEE:  No.
11             CLERK: Lee, no.  McKissick?
12             SEN. MCKISSICK:  Aye.
13             CLERK: McKissick, aye.  Randleman?
14             SEN. RANDLEMAN:  No.
15             CLERK: Randleman, no.  Sanderson?
16             SEN. SANDERSON:  No.
17             CLERK: Sanderson, no.  Smith?
18             SEN. SMITH:  Aye.
19             CLERK: Smith, aye.  Smith-Ingram?
20             SEN. SMITH-INGRAM:  Aye.
21             CLERK: Smith-Ingram, aye.  Wells?
22             SEN. WELLS:  No.
23             CLERK:  No.
24             SEN. RUCHO:  All right, members of the
25    committee, the roll call vote was aye -- excuse

## 113

1    me -- no, 23; aye, 11.
2              All right, we have another one before us,
3    and this one will be Senator Erica Smith-Ingram's
4    amendment on criteria.
5              REP. LEWIS:  Mr. Chairman?
6              SEN. RUCHO:  Yes, Representative Lewis?
7              REP. LEWIS:  Would Senator Smith-Ingram
8    agree to a small technical amendment to strike the
9    number and "6"?
10             SEN. SMITH-INGRAM:  Yes.
11             REP. LEWIS:  Thank you, ma'am.
12             SEN. RUCHO:  Members of the committee,
13    Senator Smith-Ingram has agreed to a technical
14    amendment that will strike the title, and the title
15    will read "Amendment to Compactness Criteria," and
16    that'll be all it'll say there.
17             Okay, I have Senator Smith-Ingram to
18    present her amendment.
19             SEN. SMITH-INGRAM:  Thank you, Mr. Chair.
20    In light of our previous discussions and our effort
21    to promote harmony, you can have one-part harmony,
22    two-part, three-part.  In this case, this will add
23    the four-part harmony, and I would ask staff if
24    there is needed discussion about the actual
25    language, it came from the federal case.

114

1       REP. LEWIS: Mr. Chairman?
2       SEN. RUCHO: Representative Lewis,
3   comment?
4       REP. LEWIS: Yes, sir. I appreciate the
5   amendment and the sentiment expressed by the
6   Senator. I would offer that it appears to me that
7   the language that's attempting to be added is
8   somewhat vague and nebulous, as I don't know that
9   we have a defined -- or an actionable definition of
10  what "community of interest" is, or "community of
11  shared interest," so respectfully, I would ask the
12  committee to defeat this amendment.
13      SEN. RUCHO: Members of the committee,
14  any questions or comments?
15      (No response.)
16      SEN. RUCHO: We have a motion before us
17  dealing with "Amendment to Compact Criteria"
18  submitted by Senator Erica Smith-Ingram. You have
19  that before you. Seeing no comments or questions,
20  Mr. Clerk, roll call, please?
21      CLERK: Lewis?
22      REP. LEWIS: No.
23      CLERK: Lewis, no. Jones?
24      REP. JONES: No.
25      CLERK: Jones, no. Brawley?

115

1       REP. BRAWLEY: No.
2       CLERK: Brawley, no. Cotham?
3       REP. COTHAM: Yes.
4       CLERK: Cotham, yes. Davis?
5       REP. DAVIS: No.
6       CLERK: Davis, no. Farmer-Butterfield?
7       REP. FARMER-BUTTERFIELD: Yes.
8       CLERK: Farmer-Butterfield, yes. Hager?
9       REP. HAGER: No.
10      CLERK: Hager, no. Hanes?
11      REP. HANES: Yes.
12      CLERK: Hanes, yes. Hardister?
13      REP. HARDISTER: No.
14      CLERK: Hardister, no. Hurley?
15      REP. HURLEY: No.
16      CLERK: Hurley, no. Jackson?
17      REP. JACKSON: Yes.
18      CLERK: Jackson, yes. Johnson?
19      REP. JOHNSON: No.
20      CLERK: Johnson, no. Jordan?
21      REP. JORDAN: No.
22      CLERK: Jordan, no. McGrady?
23      REP. MCGRADY: No.
24      CLERK: McGrady, no. Michaux?
25      REP. MICHAUX: Yes.

116

1       CLERK: Michaux, yes. Moore?
2       REP. MOORE: Yea.
3       CLERK: Moore, yea. Stam?
4       REP. STAM: No.
5       CLERK: Stam, no. Stevens?
6       REP. STEVENS: Yes.
7       CLERK: Stevens --
8       REP. STEVENS: Sorry. No.
9       CLERK: Stevens, no. Rucho?
10      SEN. RUCHO: No.
11      CLERK: Rucho, no. Apodaca?
12      SEN. APODACA: No.
13      CLERK: Apodaca, no. Barefoot?
14      SEN. BAREFOOT: No.
15      CLERK: Barefoot, no. Blue?
16      SEN. BLUE: Yes.
17      CLERK: Blue, yes. Brown?
18      SEN. BROWN: No.
19      CLERK: Brown, no. Clark?
20      SEN. CLARK: Yes.
21      CLERK: Clark, yes. Harrington?
22      SEN. HARRINGTON: No.
23      CLERK: Harrington, no. Hise?
24      SEN. HISE: No.
25      CLERK: Hise, no. Jackson?

117

1       SEN. JACKSON: No.
2       CLERK: Jackson, no. Lee?
3       SEN. LEE: No.
4       CLERK: Lee, no. McKissick?
5       SEN. MCKISSICK: Yes.
6       CLERK: McKissick, yes. Randleman?
7       SEN. RANDLEMAN: No.
8       CLERK: Randleman, no. Sanderson?
9       SEN. SANDERSON: No.
10      CLERK: Sanderson, no. Smith?
11      SEN. SMITH: Aye.
12      CLERK: Smith, aye. Smith-Ingram?
13      SEN. SMITH-INGRAM: Aye.
14      CLERK: Smith-Ingram, aye. Wells?
15      SEN. WELLS: No.
16      CLERK: Wells, no. 23-11.
17      SEN. RUCHO: 23 no; 11 yes?
18      CLERK: Yes.
19      SEN. RUCHO: Members of the committee, on
20  "Amendment to Compactness Criteria" from Senator
21  Erica Smith-Ingram, the ayes, 11; the noes, 23.
22  That amendment was not adopted.
23      All right, we have another one, and I
24  believe it's already at your desk, and this one is
25  "Communities of Interest," submitted by Senator

118

1 Floyd McKissick. Senator McKissick, would you like
2 to explain your amendment?
3 SEN. MCKISSICK: Sure, and it's very
4 straightforward. It's not seeking to amend any
5 other criteria. This would just be a criteria that
6 is aspirational, as many of the others. It does
7 follow case law in terms of what is stated, and
8 what this says is that the committee will make
9 reasonable efforts to respect political
10 subdivisions, cities, towns, what have you, as well
11 as communities as defined by actual interest. What
12 I would like to do is recognize Kara as well as
13 Erica, perhaps, to provide further clarification in
14 terms of existing case law.
15 I think we are -- we would be remiss if
16 we did not include this as one of the benchmarks
17 that we would seek to use in drawing the plans as
18 we move forward. I can't imagine why we would want
19 to ignore communities of shared interest or not
20 respect political subdivisions other than counties.
21 This is talking about other political subdivisions
22 or towns that might be within these Congressional
23 districts, which should also be respected to the
24 extent it's possible and feasible to do so, not
25 just counties.

119

1 Kara, Erika, if you could comment,
2 please?
3 SEN. RUCHO: Please identify yourself and
4 respond to Senator McKissick's request if you can.
5 MS. MCCRAW: I'm Kara McCraw, staff
6 attorney with the Legislative Analysis Division.
7 Senator McKissick is referring to the last part of
8 this amendment. The term -- the language "respect
9 political subdivisions and communities defined by
10 actual shared interests" is language that was used
11 by the Supreme Court in the Miller v. Johnson case
12 from 1995 as part of the list of traditional race-
13 neutral districting principles.
14 SEN. RUCHO: All right. Representative
15 Lewis?
16 REP. LEWIS: Thank you, Mr. Chairman, and
17 thank you, Senator, for offering this additional
18 criteria. As best I can understand it, to the
19 extent it's required by federal law, of course
20 we're going to be mindful of that, but as you and I
21 had an aside conversation earlier, I don't believe
22 we have defined in this state at least what a
23 community of interest is. I don't understand,
24 actually, what "actual shared interests" means, so
25 therefore, I would have to ask the committee, based

120

1 on the vagueness of these terms, to reject this
2 additional criteria.
3 SEN. MCKISSICK: Follow-up, Mr. Chair?
4 SEN. RUCHO: Senator McKissick?
5 SEN. MCKISSICK: Let me ask you this,
6 Representative Lewis: I see you have some problems
7 with that terminology that was used by the US
8 Supreme Court, which I think is pretty clear in
9 terms of a directive, but what is the objection to
10 respecting political subdivisions, because I would
11 think that we would all want to do so for the
12 cities and towns and communities --
13 SEN. RUCHO: Representative Lewis?
14 SEN. MCKISSICK: -- represent, and they
15 are used collectively by the Supreme Court, but I
16 mean, if you have problems with that, I think
17 you've got still to follow it, or you end up in
18 litigation. I don't think any of us want to end up
19 in litigation any more than we already are in this
20 state. I don't know why -- what's the objection to
21 respecting political subdivisions?
22 REP. LEWIS: Well, sir, to be clear, as I
23 pointed out when we adopted the compactness
24 criteria, it's not our intent to split -- we're
25 going to do the best we can to keep as many

121

1 counties and as many VTDs whole. I'll give you a
2 direct example of why I think this is vague.
3 We've already heard from the gentleman
4 from Wake, Senator Blue, as he I think correctly
5 stated that a county is the most important
6 political subdivision. I actually -- I actually
7 agree with that. Your city, Durham, has annexed
8 into Wake County, so when I say it's vague and
9 nebulous, how do you know which -- which interest
10 you're going to follow? I think we've done a good
11 job in this committee of saying we're going to keep
12 as many counties and as many VTDs whole as we can.
13 SEN. RUCHO: Okay, I've got
14 Representative Stam.
15 REP. STAM: Yes, I was about to make the
16 same point. Cary has annexed into Chatham, so
17 under this, it would give mapmakers an excuse to
18 break the Wake/Chatham line so they could keep Cary
19 together. Angier, if you can believe it, has
20 annexed into Wake County. I don't know how David
21 Lewis let them do that. With this amendment,
22 mapmakers could despoil Wake County just to get a
23 few more Republicans into the Harnett County
24 district.
25 REP. LEWIS: Mr. Chairman?

122

1        SEN. RUCHO: Representative Lewis?
2        REP. LEWIS: For the record, while I do
3 not support Senator McKissick's amendment, I think
4 anywhere Angier can be shared is a positive thing.
5        (Laughter.)
6        SEN. RUCHO: Senator McKissick?
7        SEN. MCKISSICK: I would simply say that
8 we ought to try to respect these political
9 subdivisions. I don't think with the current mood
10 of this General Assembly, we have to worry about
11 too many more annexations occurring for a while,
12 so, you know, respecting political subdivisions is
13 a valid criteria regardless of what those political
14 subdivisions might look like, so obviously I
15 support it, but I can certainly put my finger in
16 the air and see the way these winds are blowing.
17        SEN. RUCHO: Members of the committee,
18 any additional questions? Senator?
19        SEN. SMITH-INGRAM: Yes. Representative
20 Lewis, I'm a little bit confused about your
21 objection to the use of this language inasmuch as
22 it relates to not having a definitive definition.
23 Is it possible for staff to be able to comment on
24 what the definition used in North Carolina of
25 "communities of interest" as we have applied it in

123

1 the past?
2        SEN. RUCHO: The chair will allow that.
3 Which staff member would like to define
4 "communities of interest"?
5        MS. MCCRAW: I'm Kara McCraw, staff
6 attorney with the Legislative Analysis Division.
7 North Carolina has not adopted a definition of
8 "communities of interest."
9        SEN. RUCHO: Follow-up?
10        SEN. SMITH-INGRAM: Follow-up. As I
11 recall, Representative Stevens just read from -- I
12 believe she was citing case law, but it just seems
13 that all the other elements that you have already
14 in the criteria are there, with the exception of
15 communities of interest, and so I'm just concerned
16 about why you have adopted the other three, and why
17 you feel comfortable with that, but not with the
18 communities of interest.
19        SEN. RUCHO: Representative Lewis?
20        REP. LEWIS: Well, again, thank you for
21 that inquiry, Senator. I would just say again that
22 as we've never defined what a community of interest
23 is -- and the example I tried to use with Senator
24 McKissick, how do you define -- is the City of
25 Durham a more important community of interest than

124

1 the citizens of Wake County? I don't think we've
2 ever defined it. I certainly think that to the
3 extent that it's not restricted from being used as
4 the maps are prepared that, you know, I think
5 that's something that the map drawers may wish to
6 try and use, but I don't know that it -- I don't
7 understand -- I don't understand it enough, and I
8 do want to take this opportunity to respectfully
9 let my friend from Durham know that, as I reminded
10 him, I'm not an attorney, and in no way have I
11 tried to disrespect or disregard any ruling from
12 the US Supreme Court, nor from this federal court,
13 court, but I'm not prepared to stand before this
14 committee today and say that I understand what this
15 is trying to do; therefore, I continue to oppose
16 this new criteria.
17        SEN. RUCHO: Members of the committee?
18        (No response.)
19        SEN. RUCHO: From the Chair,
20 Representative Lewis, I recognize, and I think the
21 committee recognizes the full effort to keep
22 counties whole. I think the counties are
23 relatively stable in their -- in their borders, but
24 yet a municipality and a town and the like, with
25 annexation, deannexation and the like, is more

125

1 variable. Do you think that that may be one of the
2 reasons for what could be adding confusion?
3        REP. LEWIS: I think that's fair. I
4 think that's a good indication of why I say this is
5 vague, and not really defined. We got a request
6 from a member for the central staff to explain how
7 communities of interest are defined in the state,
8 and they're not, so since there's not a definition,
9 they shouldn't be in the criteria.
10        SEN. RUCHO: Members of the committee,
11 we've had discussion on this issue. We have an
12 amendment before us, submitted by Senator Floyd
13 McKissick dealing with communities of interest.
14 Any additional questions, comments?
15        (No response.)
16        SEN. RUCHO: Seeing none, Mr. Clerk, a
17 roll call, please?
18        CLERK: Lewis?
19        REP. LEWIS: No.
20        CLERK: Lewis, no. Jones?
21        REP. JONES: No.
22        CLERK: Jones, no. Brawley?
23        REP. BRAWLEY: No.
24        CLERK: Brawley, no. Cotham?
25        REP. COTHAM: Yes.

126

1  CLERK: Cotham, yes. Davis?
2  REP. DAVIS: No.
3  CLERK: Davis, no. Farmer-Butterfield?
4  REP. FARMER-BUTTERFIELD: Yes.
5  CLERK: Farmer-Butterfield, yes. Hager?
6  REP. HAGER: No.
7  CLERK: Hager, no. Hanes?
8  REP. HANES: Yes.
9  CLERK: Hanes, yes. Hardister?
10  REP. HARDISTER: No.
11  CLERK: Hardister, no. Hurley?
12  REP. HURLEY: No.
13  CLERK: Hurley, no. Jackson?
14  REP. JACKSON: Yes.
15  CLERK: Jackson, yes. Johnson?
16  REP. JOHNSON: No.
17  CLERK: Johnson, no. Jordan?
18  REP. JORDAN: No.
19  CLERK: Jordan, no. McGrady?
20  REP. MCGRADY: No.
21  CLERK: McGrady, no. Michaux?
22  REP. MICHAUX: Aye.
23  CLERK: Michaux, aye. Moore?
24  REP. MOORE: Aye.
25  CLERK: Moore, aye. Stam?

127

1  REP. STAM: No.
2  CLERK: Stam, no. Stevens? Stevens?
3  (No response.)
4  CLERK: Rucho?
5  SEN. RUCHO: No.
6  CLERK: Rucho, no. Apodaca?
7  SEN. APODACA: No.
8  CLERK: Apodaca, no. Barefoot?
9  SEN. BAREFOOT: No.
10  CLERK: Barefoot, no. Blue?
11  SEN. BLUE: Aye.
12  CLERK: Blue, aye. Brown?
13  SEN. BROWN: No.
14  CLERK: Brown, no. Clark?
15  SEN. CLARK: Aye.
16  CLERK: Clark, aye. Harrington?
17  SEN. HARRINGTON: No.
18  CLERK: Harrington, no. Hise?
19  SEN. HISE: No.
20  CLERK: Hise, no. Jackson?
21  SEN. JACKSON: No.
22  CLERK: Jackson, no. Lee?
23  SEN. LEE: No.
24  CLERK: Lee, no. McKissick?
25  SEN. MCKISSICK: Aye.

128

1  CLERK: McKissick, aye. Randleman?
2  SEN. RANDLEMAN: No.
3  CLERK: Randleman, no. Sanderson?
4  SEN. SANDERSON: No.
5  CLERK: Sanderson, no. Smith?
6  SEN. SMITH: Aye.
7  CLERK: Smith, aye. Smith-Ingram?
8  SEN. SMITH-INGRAM: Aye.
9  CLERK: Smith-Ingram, aye. Wells?
10  SEN. WELLS: No.
11  CLERK: Wells, no.
12  SEN. RUCHO: Members of the committee,
13  the result of the vote on Senator McKissick's
14  amendment dealing with communities of interest,
15  aye, 11; no, 22. The motion is not adopted.
16  Members of the committee, any additional
17  amendments? Any motions?
18  REP. LEWIS: Mr. Chairman --
19  SEN. RUCHO: Senator Hise? Oh, excuse
20  me.
21  REP. LEWIS: Mr. Chairman?
22  SEN. RUCHO: Yes, sir?
23  REP. LEWIS: I just wanted to thank the
24  members for their indulgence this morning, and I'm
25  proud of the 2016 contingent Congressional plan

129

1  proposed criteria that we have adopted. I did want
2  to say for the record that it's my intent that
3  these be used in the drawing of the 2016 contingent
4  Congressional plan in response to the lawsuit only.
5  This is not an attempt to establish any other long-
6  running criteria.
7  SEN. RUCHO: Okay. Senator Hise, you
8  have a motion?
9  SEN. HISE: Mr. Chairman, I have a
10  motion, a written motion.
11  SEN. RUCHO: Okay. Has that been sent
12  out to each member?
13  SEN. HISE: Sergeant-at-Arms --
14  SEN. RUCHO: Are the Sergeant-At Arms
15  distributing it? Let's take about a two- or three-
16  minute break so everybody can read this motion.
17  (Pause.)
18  Has everyone had an opportunity to review
19  Senator Hise's motion? Representative Jackson?
20  REP. JACKSON: Thank you, Mr. Chairman.
21  One question would be the way this is worded --
22  SEN. RUCHO: Well, let me do this: if
23  it's dealing with what's in there, I'm going to
24  give Senator Hise a chance to explain it. I was
25  giving everybody a chance to review it.

### 130

1    All right, everybody has it. Senator
2  Hise, would you like to explain that motion, and
3  then we'll open it up for discussion?
4    SEN. HISE: Thank you, Mr. Chairman.
5  Basically what this does is it consolidates the
6  criteria we've already adopted and voted on into
7  one piece, and then directs the co-chairs to go
8  through the process of developing the maps on the
9  basis of those criteria, and provides the sum of
10  $25,000 under the way we need to appropriate it,
11  with approval of the speaker, and those type of
12  things in the interim that are coming in, and then
13  allows the minority party to have access to the
14  same funds, and to draw maps under those criteria
15  or any other criteria that they would establish.
16  It also rescinds that provided that the Supreme
17  Court issues a stay.
18    SEN. RUCHO: Representative Lewis,
19  comment?
20    REP. LEWIS: Thank you, Mr. Chairman and
21  members. Just to be clear where I hope we're going
22  with this, as you know, we are still optimistic
23  that we'll receive a stay from the Supreme Court.
24  If we do not receive a stay, it would be the
25  chairs' intent to bring a map before this committee

### 131

1  for recommendation for introduction to a special
2  session that would be held later this week.
3    The chairs would encourage in the
4  issue -- in the -- for the goal of increased
5  transparency that should other people have maps
6  that they'd like this committee to consider, that
7  they get them prepared and submitted as well, but
8  to be clear, once the General Assembly convenes,
9  there would also be an opportunity for maps to be
10  presented to either the House or the Senate
11  redistricting committees when they meet.
12    However, the House rules, and I believe
13  the Senate rules -- I won't speak for the Senate
14  rules, but I know the House rules will require that
15  any amendments that are offered to the plans that
16  are submitted in fact be complete plans. In other
17  words, you would have to have all 13 districts
18  drawn to -- you would -- instead of trying to amend
19  whatever plan that this committee will release, you
20  would have to in essence prepare and release a plan
21  to compete with this plan.
22    SEN. RUCHO: All right. Members of the
23  committee? Senator Blue? Oh, excuse me. Let me
24  do this: Representative Jackson asked a question
25  earlier. Go ahead, please.

### 132

1    REP. JACKSON: My question, I guess, was
2  directed to you as chairman, or either Senator
3  Hise. I was just wondering if we could change the
4  first sentence of Paragraph 3. The way you've got
5  it written is that the co-chairs, Lewis and Rucho,
6  can pick their mapmakers, but our entire caucus
7  would have to do it, the members of this committee,
8  which means we'd have to stay together and vote and
9  do things like that, and I would just ask that you
10  consider substituting that, and as Minority Leader
11  of the Senate, let Senator Blue make that choice
12  for us, and our entire caucus not be involved and
13  have to make that decision.
14    SEN. RUCHO: Senator Hise, do you have a
15  thought or a comment, or would you like to ponder
16  that one a little bit?
17    SEN. HISE: I don't see what's written as
18  requiring that type of vote or operation from the
19  minority caucus. This coming in would allow them
20  to decide if they want to allow their leader to
21  make that decision all on his own. I think that's
22  within the way it's written here, so I don't
23  necessarily see that issue in the way it's written,
24  but however the minority -- the members of the
25  minority part of this committee choose to select

### 133

1  who the mapmaker is their concern.
2    SEN. RUCHO: Okay. Senator Blue?
3    SEN. BLUE: Two questions, basically,
4  practical questions. I assume that the co-chairs
5  have consulted with somebody who's available to be
6  the consultant to draw a map. We haven't, but I
7  can assure you that anybody that you consult with
8  normally isn't going to do it, at least not for us,
9  on a contingent fee basis, and we don't know when
10  there may be an order one way or the other on this
11  stay if the plaintiffs have until midafternoon to
12  submit their papers. I don't know what the Chief
13  Justice is going to do or when he's going to do it,
14  but practically speaking, first, we haven't
15  consulted with anybody, but secondly, if you
16  consult with somebody, you've got to promise them
17  you're going to pay them, and this says that you
18  won't pay them even if they work two or three days
19  if a stay is granted.
20    SEN. RUCHO: All right. Representative
21  Lewis?
22    REP. LEWIS: Mr. Chairman and Senator
23  Blue, if we need to have the attorney review this,
24  we certainly can, and correct any offending
25  language. I just wanted to state for the record

## 134

1       that it is the intent, after having consulted with
2   the Speaker and the President Pro Tem, that any
3   mapmaker engaged would be paid.
4       I think -- well, I don't think. What the
5   language is trying to say is that should a stay be
6   issued, the maps would never be released, not that
7   the person would not be paid for their time. We're
8   not trying to get somebody to draw maps on a
9   contingency fee. We're having maps drawn
10  contingent upon us not getting a stay.
11      I would be glad, if you are concerned
12  about the way the language is written, to take a
13  moment and have that defined, but I did want to
14  state for the record that the intent would be any
15  map drawer that you would engage or the minority
16  party would engage would be paid for their time.
17      SEN. RUCHO: Senator Blue?
18      SEN. BLUE: Andrew has some language
19  that'll fix it.
20      SEN. RUCHO: All right. Senator Hise?
21      SEN. HISE: I think they may be -- I just
22  wanted to say I think they may be working on some
23  clarification, but the intent as drafted is that
24  work done while it's authorized to be done would be
25  paid for, but once the stay came out or a ruling

## 135

1       came out that we would stop work at that point, and
2   wouldn't be paid for work done after that point
3   that was coming in, but while the authorization
4   exists, we would pay for those funds, thinking we'd
5   get the check cut within 24 hours.
6       SEN. RUCHO: We'll stand at ease a moment
7   while we're studying some language, if we may.
8   While that's being looked at, Senator Blue, did you
9   have a second point that you were making?
10      SEN. BLUE: I did, as a matter of fact.
11  Do you have some experts hanging around who can do
12  this mapmaking that we might could talk to? We
13  haven't engaged anybody.
14      SEN. RUCHO: I think we're probably going
15  to use the one that you're presently using now.
16      SEN. BLUE: Which one is that one?
17      SEN. RUCHO: Whichever one that is.
18      SEN. BLUE: Is there capability within
19  the staff to do it, Mr. Chair?
20      SEN. RUCHO: I'm sorry. Say that again?
21      SEN. BLUE: Is there capability within
22  the staff to do mapmaking?
23      SEN. RUCHO: Ms. Churchill? Okay. Is
24  there capability within the staff of being able to
25  draw maps as requested by the minority party?

## 136

1       MS. CHURCHILL: If there is a member of
2   the General Assembly that would like a map drawn,
3   we will do so at their direction; however, we will
4   need instruction from that member how to assign all
5   the geography of the state.
6       SEN. RUCHO: Does that answer your
7   question?
8       SEN. BLUE: You need instructions as to
9   how to sign -- assign what?
10      SEN. RUCHO: No, how to assign.
11      MS. CHURCHILL: How to assign the
12  geography of the state.
13      SEN. RUCHO: How you want the -- they can
14  draw the map. Just give them the direction on how
15  you want the -- the districts to be drawn.
16      SEN. BLUE: Okay.
17      SEN. RUCHO: Follow-up?
18      SEN. BLUE: Yeah, one follow-up. I'm
19  trying to keep up with the many iterations of the
20  case -- cases involving redistricting, and I think
21  that in that sense, even those instructions now are
22  considered confidential; is that correct?
23      MS. CHURCHILL: At this point in time,
24  any member of the General Assembly that makes a
25  drafting or information request to any legislative

## 137

1       employee, that drafting and information request is
2   treated as confidential, subjective to legislative
3   confidentiality by that legislative employee. Upon
4   enactment of any Congressional plan, the plans
5   themselves and the drafting and information
6   requests related to that plan do become a public
7   record.
8       SEN. RUCHO: Okay. Still working, so
9   just -- oh, excuse me. Senator McKissick? We're
10  working on the language, so --
11      SEN. MCKISSICK: Sure. I understand.
12  This is a question to Erika to get further
13  clarification. In terms of the stat packs of data
14  that would be available, would we have the same
15  type of data that was available in 2011 as a basis
16  for drawing -- drawing plans? I mean, I know
17  there was some discussion today about not
18  considering race as a factor and, you know, things
19  of that sort, but would we still have available
20  data packs that are -- provide the statistics and
21  data that we would have used in 2011 were we
22  drawing those districts, and if so, is any of that
23  data updated at this time as well?
24      MS. CHURCHILL: Mr. Chair, as I
25  understand it -- and Mr. Frye will need to correct

138

1    me, because he maintains our databases, but there
2    have been no changes to the 2011 database. It
3    still has the 2010 Census data in it. It still has
4    the voter registration data in it. It still have
5    the election data in it. We still have the
6    capability of running exactly the same reports off
7    of that database.
8            SEN. MCKISSICK: Last follow-up.
9            SEN. RUCHO: Follow-up.
10           SEN. MCKISSICK: Yeah. Erika, I mean --
11   and I know this is not a fair question, perhaps,
12   but to what extent can we get reasonably quick
13   turnaround, considering the time frame that we're
14   in? I think our challenge is obviously we relied
15   upon consultants and experts before, Mr. David
16   Harris and Mr. Bill Gilkeson, but they are both
17   attorneys engaged in private practice, handling
18   clients, and to think that we can displace them
19   this quickly to get them reengaged on less than 24
20   hours notice is not a -- perhaps a reasonable
21   expectation.
22           I'm trying to see if we want to get these
23   maps drawn, I think Senator Blue is on the right
24   track. We're going to need to rely upon in-house
25   resources, perhaps supplemented by consultants, but

139

1    are we going to be able to get quick turnaround?
2            MS. CHURCHILL: Mr. Chair, if I might, we
3    will do our best. We do have a limited number of
4    people who have the capa- -- the knowledge to
5    actually use the mapping software, but amongst
6    ourselves, once we know what the requests are, we
7    will try to efficiently meet all of the needs.
8            SEN. MCKISSICK: Thank you.
9            SEN. RUCHO: All right. Senator
10   McKissick, any specifics? I mean, you were talking
11   about the stat packs and all that. Do you have any
12   specific criteria that you want included in the
13   stat pack?
14           SEN. MCKISSICK: I mean, as long as we
15   have the same type of stat pack that we had
16   previously, the demographic data and the political
17   data that's available, I think we'll probably be
18   okay. I cannot think of any additional data that
19   we would need. As long as that's readily
20   accessible and we can get pretty quick
21   turnaround -- I am deeply concerned that since we
22   did not learn about the availability of the funds
23   for consultants before today that trying to engage
24   people who are deeply familiar with be challenging
25   at this late point in time.

140

1            SEN. RUCHO: I think what you're -- what
2    you reflect is what our concern is, that we have a
3    short -- short window, and we're all faced with
4    that same tight timeline, so -- but I'm sure staff,
5    as Ms. Churchill said, will do its best to help you
6    achieve your goal. Representative -- or Chairman
7    Lewis?
8            REP. LEWIS: Thank you, Mr. Chairman.
9    Senator McKissick, just to be clear, sir, the
10   criteria that will be available to the mapmaker
11   that Senator Rucho and I employ will only be the
12   criteria that this -- that this committee has
13   adopted. The stat packs, as you well recall,
14   contain additional information. That information
15   obviously will be available at the end of the map
16   drawing process. Just to be clear, the map drawer
17   that Senator Rucho and I will contract with will
18   have only access to the criteria that this
19   committee has adopted.
20           SEN. MCKISSICK: Follow-up.
21           SEN. RUCHO: Yes, sir. Follow-up.
22           SEN. MCKISSICK: Some of the critical
23   language in here under Bullet 3, if we go down
24   about five lines, it talks about using the adopted
25   criteria or any other criteria selected by the

141

1    minority caucus, so if we want to use other
2    criteria that might be consistent with the ruling
3    in Harris versus McCrory -- and we would contend
4    that race can be used; it just cannot be the
5    predominant factor. I just want to know that that
6    data will be available if we need to use and rely
7    upon it in drafting constitutionally correct
8    districts, because that was not included in your
9    criteria, but this language in this particular
10   motion does give us as the minority caucus the
11   right to use other criteria.
12           SEN. RUCHO: Hold on. I'll try to get
13   you an answer. (Pause.) Our understanding -- the
14   Chairs' understanding is that, you know, in drawing
15   maps, you can request any data you feel that needs
16   to be there to help you achieve what you believe is
17   a -- a map trying to resolve the issue dealing with
18   the court decision.
19           SEN. MCKISSICK: Thank you.
20           SEN. RUCHO: Okay. Senator Blue?
21           SEN. BLUE: Yes. So that I can follow
22   that point up, it's my understanding, and correct
23   me, that the -- that the database will have
24   information about the 2012, 2014 elections in
25   addition to the data that was available at the time

142

1   the original maps were drawn. That is, they will
2   be current in the information that they have. Is
3   that right?
4        SEN. RUCHO: Let's ask Mr. Frye if he'll
5   be kind enough to explain what is in the database,
6   and of course, it's based on the 2010 Census, but
7   election results you're asking about.
8        MR. FRYE: Yes. So -- so what I've got
9   worked up for this round is there's -- you know, of
10  course, you know, like we were talking about, all
11  of the old data is totally in place if it makes
12  sense to use that for whoever wants it, and for the
13  2016 database, I've got total population, voting
14  age population, because that's the only thing
15  that's not -- just election data, right, and that
16  is just election data. There's the 2008 general
17  election, basically all the Council of State
18  contests. There's the 2010 general election, US
19  Senate, the 2012 general election, you know,
20  basically governor and Council of State contests,
21  and -- and then the 2014 US Senate.
22        SEN. RUCHO: Does that help you?
23        SEN. BLUE: You said 2014 US Senate.
24  2014 Congressional data, elections data?
25        SEN. RUCHO: Mr. Frye?

143

1        MR. FRYE: Well, for the -- no, for the
2   2014 database, it has just the US Senate.
3        SEN. BLUE: I can't hear him.
4        SEN. RUCHO: Could you repeat that again?
5   We missed you with that.
6        MR. FRYE: For the 2014 general election,
7   I've just got US Senate. There are other --
8   because there's sort -- there's a difference
9   between like what data is -- has been generally
10  processed and what data is sort of ready to go in
11  our redistricting database. There's kind of a fair
12  gap between those two things, so we do have some
13  other information relating to other contests from
14  2014, but --
15        SEN. BLUE: So the database will not have
16  the location of current incumbents or anything like
17  that?
18        SEN. RUCHO: Mr. Frye?
19        MR. FRYE: What we have is locations of
20  current incumbents that -- a lot of them were
21  updated as of the 2011 cycle, so we may want to
22  double-check. There are a few of them I was
23  looking at that we may want to double-check on
24  their addresses and see if they've moved.
25        SEN. RUCHO: Senator Blue?

144

1        SEN. BLUE: I'm just trying to make sure
2   that whatever data is used by one is used and
3   available by all.
4        SEN. RUCHO: Well, my --
5        SEN. BLUE: If we're basing it on the
6   legislative computers and the legislative database.
7        SEN. RUCHO: If I'm understanding it
8   correctly, any data that you need to have is going
9   to be available as long as you give some -- some
10  request for it. Am I correct?
11        MR. FRYE: Well, certainly --
12        SEN. BLUE: Aspirational.
13        MR. FRYE: Yeah. I'm concerned about
14  timeline, you know, about preparing things, and
15  certain things are prepared and ready to go, and
16  yeah, those things can be --
17        SEN. RUCHO: Ms. Churchill?
18        MS. CHURCHILL: (Inaudible.)
19        SEN. RUCHO: Talking about the data -- I
20  think that was Mr. Frye's question. Okay, that's
21  where we are. All right, still on -- did we get
22  the language?
23        REP. STAM: Yeah, on a big-picture issue
24  here, while they're working out the language, I was
25  minority leader during the Pender County

145

1   redistricting. Speaker Hackney was the speaker.
2   If I had been offered a deal like this, I would go
3   give Representative Lewis and Senator Rucho a big
4   bear hug and "Thank you."
5        SEN. RUCHO: Don't hug us.
6        SEN. BLUE: Certainly no kiss associated
7   with it.
8        (Laughter.)
9        SEN. RUCHO: Representative -- or Senator
10  Blue?
11        SEN. BLUE: Yeah. I have a question of
12  the Chair, but I guess you've got a motion pending,
13  so I'll wait --
14        SEN. RUCHO: We've got a motion.
15        SEN. BLUE: -- until after the motion.
16        SEN. RUCHO: Yeah, we've got a motion
17  first. Senator Hise?
18        SEN. HISE: Question, probably directed
19  for staff. If -- and under this motion where it
20  currently is, if the minority caucus is going to
21  load additional information, including things like
22  race and others, onto the stat pack for the
23  operations, do we have a sufficient wall of
24  separation, say separate computers, separate
25  databases, separate operating, that the co-chairs

|  | 146 |
|---|---|

1    do not have access to that information, or the
2    other committees cannot have access to that
3    information, because it's inconsistent with the
4    criteria that's established, so can we make sure
5    that once those are loaded, they are not available
6    if they are not part of the criteria for the co-
7    chairs' drawing?
8         SEN. RUCHO: Mr. Frye?
9         MR. FRYE: Yes. I believe for -- if the
10   co-chairs are working on a plan, they can work on
11   it and follow the criteria separately, and for any
12   reports they produce, would just use that
13   information.
14        SEN. RUCHO: To follow up on what his
15   question is, is there a clear wall that we have to
16   actually request that information before it's
17   eligible -- eligible for us to use? Am I correct?
18   I mean, you're talking a firewall?
19        SEN. HISE: Yeah, making sure that no
20   one -- once it's loaded in, anyone could draw --
21   could pull it up. I want to make sure that you
22   don't have access to that information.
23        MR. FRYE: Right. No, there is a
24   firewall.
25        SEN. RUCHO: Okay.

|  | 147 |
|---|---|

1        MR. FRYE: It is not a central server
2    that would be --
3        SEN. RUCHO: Are you okay, Senator Hise?
4    Ms. Churchill, you okay?
5        REP. LEWIS: Mr. Chairman?
6        SEN. RUCHO: Where am I?
7        REP. LEWIS: Mr. Chairman?
8        SEN. RUCHO: Oh, excuse me.
9        REP. LEWIS: I think perhaps we can --
10   can summarize this by saying that all people will
11   have access to all of the data. This committee has
12   directed the chairs not to use some of it, so the
13   computer on which this committee's map is drawn
14   will only contain the criteria that was adopted by
15   the committee, so to kind of get the gist of what
16   Senator Blue was trying to ask, he can have access
17   to more stuff than we can, not less.
18        SEN. RUCHO: Okay. Representative --
19        REP. MICHAUX: Yeah, I just wanted to be
20   clear on this. It says that you-all must do your
21   maps according to the criteria that this body has
22   passed. It also says that our group can use any --
23   this criteria or any other criteria we deem
24   necessary. Is that correct?
25        SEN. RUCHO: That's correct.

|  | 148 |
|---|---|

1        SEN. MICHAUX: Okay.
2        SEN. RUCHO: Okay. Are we close with the
3    language?
4        REP. LEWIS: Mr. Chairman?
5        SEN. RUCHO: Yes, sir, Representative?
6        REP. LEWIS: Could we deal with another
7    matter while this is being perfected?
8        SEN. RUCHO: Yes, sir. Let's just
9    displace this amendment if we can, Senator Hise,
10   while we're working on the language, and
11   Representative Lewis has another issue he'd like to
12   bring before -- before us.
13        REP. LEWIS: Mr. Chairman, what I'd like
14   to do is offer a motion that the committee directs
15   the ISD to establish a computer and to populate
16   the database of that computer with only the information
17   that is consistent with the criteria adopted by the
18   committee today, and to ensure that the firewalls
19   that Mr. Frye spoke of are in place during the
20   entire time that the map for this committee is
21   drawn.
22        SEN. RUCHO: We have a motion before us.
23   Do we have a second on that, David?
24        SEN. APODACA: Second.
25        SEN. RUCHO: Second, Senator Apodaca.

|  | 149 |
|---|---|

1    Second. Representative Michaux?
2        REP. MICHAUX: I was trying to get the
3    gist of what he -- what his motion is.
4        REP. LEWIS: May I speak on my motion?
5        SEN. RUCHO: Yes, sir.
6        REP. LEWIS: Members, the motion would
7    direct ISD to establish a computer with the
8    Maptitude software that has only the criteria as
9    defined and authorized by this committee to use,
10   and it is on that computer that the chairs would
11   work, along with any consultant they would hire, to
12   produce a map to return back to this committee for
13   review.
14       What it's doing in essence is limiting
15   the chairs to only the criteria that this committee
16   has adopted, while making sure that it does not
17   limit the minority party to have access to whatever
18   they deem important to be able to fully participate
19   in this process.
20        SEN. RUCHO: Follow-up?
21        SEN. MICHAUX: Follow-up. What about the
22   firewall separating the two on that?
23        REP. LEWIS: Thank you for that -- that
24   question, Representative Michaux. I was trying to
25   use the same language that Mr. Frye. What I'm --

150

1    to be absolutely clear, the only data the map
2    drawers on behalf of this committee can have is the
3    data that the criteria adopted by this committee
4    allows.  There -- the firewall means that you won't
5    be able -- the map drawer won't have access to flip
6    a switch and say, "Well, I really do want to see
7    what the 2008 presidential race was."  That will
8    not be loaded on the computer that he has access
9    to.
10        SEN. RUCHO:  Okay.  Senator McKissick?
11        SEN. MCKISSICK:  Representative Lewis,
12   just to get some clarification here, if we as the
13   minority caucus want to look at the 2008 race, or
14   we want to look at other variables other than those
15   that were approved today, in the past, we had our
16   own computer available that also had Maptitude, or
17   whatever the appropriate program was at that time,
18   which we could utilize for crafting maps that
19   were -- met our criteria, so I'm just wanting to
20   determine if we will have a separate computer
21   available to us that we can use that will give us
22   the additional data that we might seek to use in
23   preparing maps.
24        REP. LEWIS:  Senator --
25        SEN. RUCHO:  Representative Lewis?

151

1        REP. LEWIS:  Thank you, Mr. Chairman.
2    Senator McKissick and Mr. Chairman, if my motion is
3    adopted, I will offer the identical motion for the
4    minority party, except that they are able to
5    populate the data with whatever they want to
6    populate it with.
7        SEN. MCKISSICK:  With that being said, I
8    could support this, but I want to make sure that
9    the minority party does have their own computer
10   populated with their own data, separate and apart
11   from the fields or subcategories which have been
12   identified as appropriate criteria today.
13        REP. LEWIS:  Yes, sir, we're on the exact
14   same page on that point.
15        SEN. MCKISSICK:  Thank you.
16        SEN. RUCHO:  Okay.  You -- any additional
17   questions on --
18        REP. MICHAUX:  Yeah.  Can we get that in
19   writing?
20        (Laughter.)
21        REP. LEWIS:  Mr. Chairman?
22        SEN. RUCHO:  Yes, sir?
23        REP. LEWIS:  We do have a court reporter,
24   so perhaps we could forward that to Representative
25   Michaux, and he could read it.

152

1        SEN. RUCHO:  We'll get a copy of that.
2    All right.  We have a motion before us from
3    Representative Lewis.  It's been explained; it's
4    been debated.  Any additional thoughts or questions
5    on that before we move to adopt his motion?
6        (No response.)
7        SEN. RUCHO:  Seeing none, Mr. Clerk, if
8    you'd be kind enough to call roll?
9        CLERK:  Lewis?
10       REP. LEWIS:  Aye.
11       CLERK:  Lewis, aye.  Jones?
12       REP. JONES:  Aye.
13       CLERK:  Jones, aye.  Brawley?
14       REP. BRAWLEY:  Aye.
15       CLERK:  Brawley, aye.  Cotham?
16       REP. COTHAM:  No.
17       CLERK:  Cotham, no.  Davis?
18       REP. DAVIS:  No.
19       CLERK:  Davis, aye.  Farmer-Butterfield?
20       (No response.)
21       CLERK:  Hager?
22       REP. HAGER:  Aye.
23       CLERK:  Hager, aye.  Hanes?
24       REP. HANES:  No.
25       CLERK:  No?  Hanes, no.  Hardister?

153

1        REP. HARDISTER:  Aye.
2        CLERK:  Hardister, aye.  Hurley?
3        REP. HURLEY:  Aye.
4        CLERK:  Hurley, aye.  Jackson?
5        REP. JACKSON:  No.
6        CLERK:  Jackson, no.  Johnson?
7        REP. JOHNSON:  Aye.
8        CLERK:  Johnson, aye.  Jordan?
9        REP. JORDAN:  Aye.
10       CLERK:  Jordan, aye.  McGrady?
11       REP. MCGRADY:  Aye.
12       CLERK:  McGrady, aye.  Michaux?
13       REP. MICHAUX:  No.
14       CLERK:  Michaux, no.  Moore?
15       REP. MOORE:  Nay.
16       CLERK:  Moore, nay.  Stam?
17       REP. STAM:  Aye.
18       CLERK:  Stam, aye.  Stevens?
19       (No response.)
20       CLERK:  Rucho?
21       SEN. RUCHO:  Aye.
22       CLERK:  Rucho, aye.  Apodaca?
23       SEN. APODACA:  Aye.
24       CLERK:  Apodaca, aye.  Barefoot?
25       SEN. BAREFOOT:  Aye.

154

```
1          CLERK:  Barefoot, aye.  Blue?
2          SEN. BLUE:  No.
3          CLERK:  Blue, no.  Brown?
4          SEN. BROWN:  Aye.
5          CLERK:  Brown, aye.  Clark?
6          SEN. CLARK:  No.
7          CLERK:  Clark, no.  Harrington?
8          SEN. HARRINGTON:  Aye.
9          CLERK:  Harrington, aye.  Hise?
10         SEN. HISE:  Aye.
11         CLERK:  Hise, aye.  Jackson?
12         SEN. JACKSON:  Aye.
13         CLERK:  Jackson, aye.  Lee?
14         SEN. LEE:  Aye.
15         CLERK:  Lee, aye.  McKissick?
16         SEN. MCKISSICK:  No.
17         CLERK:  McKissick, no.  Randleman?
18         SEN. RANDLEMAN:  Aye.
19         CLERK:  Randleman, aye.  Sanderson?
20         SEN. SANDERSON:  Aye.
21         CLERK:  Sanderson, aye.  Smith?
22         SEN. SMITH:  No.
23         CLERK:  Smith, no.  Smith-Ingram?
24         SEN. SMITH-INGRAM:  Nay.
25         CLERK:  Smith-Ingram, nay.  Wells?
```

155

```
1          SEN. WELLS:  Aye.
2          CLERK:  Wells, aye.
3          SEN. RUCHO:  All right, members of the
4     committee, a motion by Representative Lewis
5     requiring and asking that the computer that will be
6     used by the majority party will only contain the
7     criteria that's been established and voted upon
8     today, and that vote was aye, 21, no, 11, so that
9     passed.
10         REP. LEWIS:  Mr. Chairman?
11         SEN. RUCHO:  Representative Lewis?
12         REP. LEWIS:  For motion.
13         SEN. RUCHO:  Motion.
14         REP. LEWIS:  Mr. Chairman, I move that
15    the minority party be given access to a computer
16    and whatever information they deem necessary to
17    populate that computer in order to fully
18    participate in this pro- -- in this process.
19    Further, I move that the minority party members of
20    this committee may caucus and designate that
21    responsibility to one or more members, and if they
22    are not able to do that, that the responsibility
23    would fall to Senator Blue.
24         SEN. MCKISSICK:  I'll second that.
25         SEN. RUCHO:  All right.  The motion by
```

156

```
1     Representative Lewis, seconded by Senator
2     McKissick, was that -- for the minority party to
3     have access to the computer and have all the
4     information they deem necessary for them to
5     participate in trying to see what was requested as
6     a remedy for the three-judge panel's decision.  Any
7     questions or comments?
8          REP. MICHAUX:  Yeah.  I want to know what
9     the last part of that motion was that he made.  It
10    was sort of sub rosa.
11         SEN. RUCHO:  Is that a question to
12    Representative Lewis?
13         REP. MICHAUX:  Representative Lewis.
14         REP. LEWIS:  Representative Michaux, what
15    I said was that the minority members -- the members
16    of the minority party on this committee may caucus
17    and elect a member or members to direct the drawing
18    of these maps on their behalf, and if they're
19    unable to do so, that the responsibility would be
20    vested in Senator Blue.
21         SEN. RUCHO:  Do you have a follow-up
22    question?
23         REP. MICHAUX:  We -- what I -- you are
24    vesting -- you're telling us what to do?  Is that
25    what I'm hearing?
```

157

```
1          REP. LEWIS:  To repeat for the third
2     time, Representative Michaux, the minority party
3     members of this committee would caucus and
4     designate members or members to act on their
5     behalf, and if they are unable to do so, that that
6     responsibility would fall to Senator Blue.
7          REP. MICHAUX:  Mr. Chairman?
8          SEN. RUCHO:  Yes, sir?
9          REP. MICHAUX:  Why don't you --
10         SEN. RUCHO:  Follow-up?
11         REP. MICHAUX:  Yes.  Why don't you let us
12    make that decision as to who it should fall -- fall
13    to?
14         REP. LEWIS:  Mr. Chairman?
15         SEN. RUCHO:  Yes, sir?
16         REP. LEWIS:  Could we have maybe staff
17    clarify what it means that the minority party can
18    caucus and designate members or members, if that's
19    not allowing them to make a decision?  Could
20    somebody explain exactly what language I'm not
21    communicating?
22         SEN. RUCHO:  Okay.  Senator Apodaca, you
23    had a comment?
24         SEN. APODACA:  Mr. Chairman, inquiry of
25    the Chair.
```

## 158

1    SEN. RUCHO: Yes, sir?

2    SEN. APODACA: I'm somewhat confused. I

3  thought Representative Jackson asked this question

4  about how they could nominate somebody. I thought

5  this is what we were trying to fix.

6    SEN. RUCHO: All right. Then you're the

7  one that's going to explain to -- to Senator --

8  Representative Michaux. Okay? All right. A

9  motion is before us. It's been seconded. Any

10  additional questions or comments on Representative

11  Lewis' motion?

12    (No response.)

13    SEN. RUCHO: Seeing none --

14    CLERK: Lewis?

15    SEN. RUCHO: -- Mr. Clerk, roll call,

16  please?

17    CLERK: Lewis?

18    REP. LEWIS: Aye.

19    CLERK: Lewis, aye. Jones?

20    REP. JONES: Aye.

21    CLERK: Jones, aye. Brawley?

22    REP. BRAWLEY: Aye.

23    CLERK: Brawley, aye. Cotham?

24    REP. COTHAM: Aye.

25    CLERK: Cotham, aye. Davis?

## 159

1    REP. DAVIS: Aye.

2    CLERK: Davis, aye. Farmer-Butterfield?

3    REP. FARMER-BUTTERFIELD: Aye.

4    CLERK: Aye? Farmer-Butterfield, aye.

5  Hager?

6    SEN. RUCHO: Please speak loudly, folks.

7    REP. HAGER: Aye.

8    CLERK: Hager, aye. Hanes?

9    REP. HANES: Aye

10    CLERK: Hanes, aye. Hardister?

11    REP. HARDISTER: Aye.

12    CLERK: Hardister, aye. Hurley?

13    REP. HURLEY: Aye.

14    CLERK: Hurley, aye. Jackson?

15    REP. JACKSON: Aye.

16    CLERK: Jackson, aye. Johnson?

17    REP. JOHNSON: Aye.

18    CLERK: Johnson, aye. Jordan?

19    REP. JORDAN: Aye.

20    CLERK: Jordan, aye. McGrady?

21    REP. MCGRADY: Aye.

22    CLERK: McGrady, aye. Michaux?

23    REP. MICHAUX: No.

24    CLERK: Michaux, no. Moore?

25    REP. MOORE: Aye.

## 160

1    CLERK: Moore, aye. Stam?

2    REP. STAM: Aye.

3    CLERK: Stam, aye. Stevens?

4    (No response.)

5    CLERK: Rucho?

6    SEN. RUCHO: Aye.

7    CLERK: Rucho, aye. Apodaca?

8    SEN. APODACA: Aye.

9    CLERK: Apodaca, aye. Barefoot?

10    SEN. BAREFOOT: Aye.

11    CLERK: Barefoot, aye. Blue?

12    SEN. BLUE: Aye.

13    CLERK: Blue, aye. Brown?

14    SEN. BROWN: Aye.

15    CLERK: Brown, aye. Clark?

16    SEN. CLARK: Aye.

17    CLERK: Clark, aye. Harrington?

18    SEN. HARRINGTON: Aye.

19    CLERK: Harrington, aye. Hise?

20    SEN. HISE: Aye.

21    CLERK: Hise, aye. Jackson?

22    SEN. JACKSON: Aye.

23    CLERK: Jackson, aye. Lee?

24    SEN. LEE: Aye.

25    CLERK: Lee, aye. McKissick?

## 161

1    SEN. MCKISSICK: Aye.

2    CLERK: McKissick, aye. Randleman?

3    SEN. RANDLEMAN: Aye.

4    CLERK: Randleman, aye. Sanderson?

5    SEN. SANDERSON: Aye.

6    CLERK: Sanderson, aye. Smith?

7    SEN. SMITH: Aye.

8    CLERK: Smith, aye. Smith-Ingram?

9    SEN. SMITH-INGRAM: Aye.

10    CLERK: Smith-Ingram, aye. Wells?

11    SEN. WELLS: Aye.

12    CLERK: Wells, aye.

13    SEN. RUCHO: Members of the committee,

14  after a roll-call vote, 32 aye and 1 no, so

15  therefore, that has been settled. Senator Hise, do

16  we have language?

17    SEN. HISE: I think we have two

18  amendments.

19    SEN. RUCHO: Two amendments?

20    SEN. HISE: Yeah.

21    SEN. RUCHO: All right. Are you going to

22  present it, or staff?

23    SEN. HISE: I can present them. I think

24  staff's going to read them. The first one is to

25  clarify the payments made for work performed.

162

1      SEN. RUCHO:  Let's pay attention, here.
2   I know we're moving forward.  Go ahead, please.
3      SEN. HISE:  The first is to add some
4   clarification for the -- to allow payments for work
5   performed prior to the stay.
6      SEN. RUCHO:  All right.  First -- the
7   first amendment, Ms. Churchill, would you explain
8   what that amendment says and what it does?
9      MS. CHURCHILL:  Yes, Mr. Chair.  The
10  amendment would be to the end, to the last sentence
11  of Paragraph 2 and Paragraph 3 of Senator Hise's
12  motion.  It would remove the period at the end of
13  that sentence, inset a semicolon, and all of the
14  following at the end of each sentence:  "Provided,
15  however, this authorization shall permit
16  compensation to be paid for any work performed
17  prior to the issuance of such stay."
18     SEN. RUCHO:  Members of the committee,
19  you have that before you.  Is there any questions
20  on that first amendment that has been put forward
21  by Senator Hise on trying to provide some clarity
22  in what was brought up by Senator Blue?
23  Representative Jackson?
24     REP. JACKSON:  Thank you, Mr. Chairman.
25  Would that -- that would amendment allow payment

163

1   for services provided prior to the approval of
2   this?
3      SEN. RUCHO:  No, sir, I don't believe so.
4      REP. JACKSON:  Thank you.
5      SEN. RUCHO:  Yeah.  Questions?  Any
6   additional?
7      (No response.)
8      SEN. RUCHO:  All right, we have an
9   amendment before us that was read by staff, and we
10  will ask the Clerk to have a roll-call vote on
11  that, please.
12     CLERK:  Lewis?
13     REP. LEWIS:  Aye.
14     CLERK:  Lewis, aye.  Jones?
15     REP. JONES:  Aye.
16     CLERK:  Jones, aye.  Brawley?
17     REP. BRAWLEY:  Aye.
18     CLERK:  Brawley, aye.  Cotham?
19     REP. COTHAM:  Aye.
20     CLERK:  Cotham, aye.  Davis?
21     REP. DAVIS:  Yes.
22     CLERK:  Davis, yes.  Farmer-Butterfield?
23     REP. FARMER-BUTTERFIELD:  Yes.
24     CLERK:  Farmer-Butterfield, yes.  Hager?
25     REP. HAGER:  Yes.

164

1      CLERK:  Hager, yes.  Hanes?
2      REP. HANES:  Yes.
3      CLERK:  Hanes, yes.  Hardister?
4      REP. HARDISTER:  Aye.
5      CLERK:  Hardister, aye.  Hurley?
6      REP. HURLEY:  Aye.
7      CLERK:  Hurley, aye.  Jackson?
8      REP. JACKSON:  Yes.
9      CLERK:  Jackson, yes.  Johnson?
10     REP. JOHNSON:  Aye.
11     CLERK:  Johnson, aye.  Jordan?
12     REP. JORDAN:  Aye.
13     CLERK:  Jordan, aye.  McGrady?
14     REP. MCGRADY:  Aye.
15     CLERK:  McGrady, aye.  Michaux?
16     REP. MICHAUX:  Aye.
17     CLERK:  Michaux, aye.  Moore?
18     REP. MOORE:  Aye.
19     CLERK:  Moore, aye.  Stam?
20     REP. STAM:  Aye.
21     CLERK:  Stam, aye.  Stevens?
22     (No response.)
23     CLERK:  Rucho?
24     SEN. RUCHO:  Aye.
25     CLERK:  Rucho, aye.  Apodaca?

165

1      SEN. APODACA:  Aye.
2      CLERK:  Apodaca, aye.  Barefoot?
3      SEN. BAREFOOT:  Aye.
4      CLERK:  Barefoot, aye.  Blue?
5      SEN. BLUE:  Aye.
6      CLERK:  Blue, aye.  Brown?
7      SEN. BROWN:  Aye.
8      CLERK:  Brown, aye.  Clark?
9      SEN. CLARK:  Aye.
10     CLERK:  Clark, aye.  Harrington?
11     SEN. HARRINGTON:  Aye.
12     CLERK:  Harrington, aye.  Hise?
13     SEN. HISE:  Aye.
14     CLERK:  Hise, aye.  Jackson?
15     SEN. JACKSON:  Aye.
16     CLERK:  Jackson, aye.  Lee?
17     SEN. LEE:  Aye.
18     CLERK:  Lee, aye.  McKissick?
19     SEN. MCKISSICK:  Aye.
20     CLERK:  McKissick, aye.  Randleman?
21     SEN. RANDLEMAN:  Aye.
22     CLERK:  Randleman, aye.  Sanderson?
23     SEN. SANDERSON:  Aye.
24     CLERK:  Sanderson, aye.  Smith?
25     SEN. SMITH:  Aye.

## 166

1    CLERK:  Smith, aye.  Smith-Ingram?
2    SEN. SMITH-INGRAM:  Aye.
3    CLERK:  Smith-Ingram, aye.  Wells?
4    SEN. WELLS:  Aye.
5    CLERK:  Wells, aye.
6    SEN. RUCHO:  Members of the committee,
7    we -- okay.  Members of the committee, Amendment 1,
8    which was read by staff, was agreed upon
9    unanimously, 33 to zero.
10    Senator Hise, Amendment Number 2?
11    SEN. HISE:  Thank you, Mr. Chairman.
12    This was with some further consultation with
13    Senator Blue, and clarifies for a legislative
14    confidentiality amendment when that applies, and
15    applies to once it's submitted to this committee,
16    and she has specific language they can read.
17    SEN. RUCHO:  Ms. Churchill, can you read
18    the clarifying language there, please?
19    MS. CHURCHILL:  Yes, sir.  In Paragraph
20    2, this new sentence would be inserted at the --
21    following the first sentence.  "The co-chairs shall
22    control legislative confidentiality of any drafting
23    requests or maps produced from this authority
24    unless and until presented to the committee in the
25    co-chairs' discretion."

## 167

1    For Paragraph 3, this sentence would be
2    inserted after -- following the first sentence:
3    "The minority caucus' designee, Senator Blue, shall
4    control legislative confidentiality of any drafting
5    requests or maps produced from this authority
6    unless and until presented to the committee in
7    Senator Blue's discretion."
8    SEN. RUCHO:  Members of the committee,
9    you have that before you.  Any questions or
10    comments?
11    (No response.)
12    SEN. RUCHO:  Seeing -- seeing none, Mr.
13    Clerk, would you do the roll call?
14    CLERK:  Lewis?
15    REP. LEWIS:  Aye.
16    CLERK:  Lewis, aye.  Jones?
17    REP. JONES:  Aye.
18    CLERK:  Jones, aye.  Brawley?
19    REP. BRAWLEY:  Aye.
20    CLERK:  Brawley, aye.  Cotham?
21    REP. COTHAM:  Aye.
22    CLERK:  Cotham, aye.  Davis?
23    REP. DAVIS:  Yes.
24    CLERK:  Davis, yes.  Farmer-Butterfield?
25    REP. FARMER-BUTTERFIELD:  Yes.

## 168

1    CLERK:  Farmer-Butterfield, yes.  Hager?
2    REP. HAGER:  Yes.
3    CLERK:  Hager, yes.  Hanes?
4    REP. HANES:  Yes.
5    CLERK:  Hanes, yes.  Hardister?
6    REP. HARDISTER:  Aye.
7    CLERK:  Hardister, aye.  Hurley?
8    REP. HURLEY:  Aye.
9    CLERK:  Hurley, aye.  Jackson?
10    REP. JACKSON:  Yes.
11    CLERK:  Jackson, yes.  Johnson?
12    REP. JOHNSON:  Aye.
13    CLERK:  Johnson, aye.  Jordan?
14    REP. JORDAN:  Aye.
15    CLERK:  Jordan, aye.  McGrady?
16    REP. MCGRADY:  Aye.
17    CLERK:  McGrady, aye.  Michaux?
18    REP. MICHAUX:  Yes.
19    CLERK:  Michaux, yes.  Moore?
20    REP. MOORE:  Aye.
21    CLERK:  Moore, aye.  Stam?
22    REP. STAM:  Aye.
23    CLERK:  Stam, aye.  Rucho?
24    SEN. RUCHO:  Aye.
25    CLERK:  Rucho, aye.  Apodaca?

## 169

1    SEN. APODACA:  Aye.
2    CLERK:  Apodaca, aye.  Barefoot?
3    SEN. BAREFOOT:  Aye.
4    CLERK:  Barefoot, aye.  Blue?
5    SEN. BLUE:  Aye.
6    CLERK:  Blue, aye.  Brown?
7    SEN. BROWN:  Aye.
8    CLERK:  Brown, aye.  Clark?
9    SEN. CLARK:  Aye.
10    CLERK:  Clark, aye.  Harrington?
11    SEN. HARRINGTON:  Aye.
12    CLERK:  Harrington, aye.  Hise?
13    SEN. HISE:  Aye.
14    CLERK:  Hise, aye.  Jackson?
15    SEN. JACKSON:  Aye.
16    CLERK:  Jackson, aye.  Lee?
17    SEN. LEE:  Aye.
18    CLERK:  Lee, aye.  McKissick?
19    SEN. MCKISSICK:  Aye.
20    CLERK:  McKissick, aye.  Randleman?
21    SEN. RANDLEMAN:  Aye.
22    CLERK:  Randleman, aye.  Sanderson?
23    SEN. SANDERSON:  Aye.
24    CLERK:  Sanderson, aye.  Smith?
25    SEN. SMITH:  Aye.

## 170

1    CLERK:  Smith, aye.  Smith-Ingram?
2    SEN. SMITH-INGRAM:  Aye.
3    CLERK:  Smith-Ingram, aye.  Wells?
4    SEN. WELLS:  Aye.
5    CLERK:  Wells, aye.
6    SEN. RUCHO:  Members of the committee,
7  the roll-call vote was 33 aye, zero nay.
8    Now, what you have before you is a motion
9  set forth by Senator Hise which has been amended,
10  and now it's before you for any further discussion
11  or questions, and if there are none, then we will
12  take a vote to adopt Senator Hise's motion.
13  Thoughts, questions?
14    (No response.)
15    SEN. RUCHO:  Seeing none, Mr. Clerk, a
16  vote, please?
17    CLERK:  Lewis?
18    REP. LEWIS:  Aye.
19    CLERK:  Lewis, aye.  Jones?
20    REP. JONES:  Aye.
21    CLERK:  Jones, aye.  Brawley?
22    REP. BRAWLEY:  Aye.
23    CLERK:  Brawley, aye.  Cotham?
24    REP. COTHAM:  No.
25    CLERK:  Cotham, no.  Davis?

## 171

1    REP. DAVIS:  Yes.
2    CLERK:  Davis, yes.  Farmer-Butterfield?
3    REP. FARMER-BUTTERFIELD:  No.
4    CLERK:  Farmer-Butterfield, no.  Hager?
5    REP. HAGER:  Aye.
6    CLERK:  Hager, aye.  Hanes?
7    REP. HANES:  No.
8    CLERK:  Hanes, no.  Hardister?
9    REP. HARDISTER:  Aye.
10    CLERK:  Hardister, aye.  Hurley?
11    REP. HURLEY:  Aye.
12    CLERK:  Hurley, aye.  Jackson?
13    REP. JACKSON:  No.
14    CLERK:  Jackson, no.  Johnson?
15    REP. JOHNSON:  Aye.
16    CLERK:  Johnson, aye.  Jordan?
17    REP. JORDAN:  Aye.
18    CLERK:  Jordan, aye.  McGrady?
19    REP. MCGRADY:  Aye.
20    CLERK:  McGrady, aye.  Michaux?
21    REP. MICHAUX:  No.
22    CLERK:  Michaux, no.  Moore?
23    REP. MOORE:  Nay.
24    CLERK:  Moore, nay.  Stam?
25    REP. STAM:  Aye.

## 172

1    CLERK:  Stam, aye.  Rucho?
2    SEN. RUCHO:  Aye.
3    CLERK:  Rucho, aye.  Apodaca?
4    SEN. APODACA:  Aye.
5    CLERK:  Apodaca, aye.  Barefoot?
6    SEN. BAREFOOT:  Aye.
7    CLERK:  Barefoot, aye.  Blue?
8    SEN. BLUE:  No.
9    CLERK:  Blue, no.  Brown?
10    SEN. BROWN:  Aye.
11    CLERK:  Brown, aye.  Clark?
12    SEN. CLARK:  No
13    CLERK:  Clark, no.  Harrington?
14    SEN. HARRINGTON:  Aye.
15    CLERK:  Harrington, aye.  Hise?
16    SEN. HISE:  Aye.
17    CLERK:  Hise, aye.  Jackson?
18    SEN. JACKSON:  Aye.
19    CLERK:  Jackson, aye.  Lee?
20    SEN. LEE:  Aye.
21    CLERK:  Lee, aye.  McKissick?
22    SEN. MCKISSICK:  No.
23    CLERK:  McKissick, no.  Randleman?
24    SEN. RANDLEMAN:  Aye.
25    CLERK:  Randleman, aye.  Sanderson?

## 173

1    SEN. SANDERSON:  Aye.
2    CLERK:  Sanderson, aye.  Smith?
3    SEN. SMITH:  No.
4    CLERK:  Smith, no.  Smith-Ingram?
5    SEN. SMITH-INGRAM:  No.
6    CLERK:  Smith-Ingram, no.  Wells?
7    SEN. WELLS:  Aye.
8    CLERK:  Wells, aye.
9    SEN. RUCHO:  Okay, members of the
10  committee, when that motion was up for adoption as
11  amended, we have 22 aye and 11 no.  I believe that
12  we have concluded our business for today.
13    SEN. BLUE:  Just a request, Mr. Chair.
14    SEN. RUCHO:  Senator Blue?
15    SEN. BLUE:  As I prepare to do this,
16  could you have the Clerk available to me his
17  roll-call votes on these items, since it's all
18  official now?
19    SEN. RUCHO:  That can be done.
20    SEN. BLUE:  Thank you.
21    SEN. RUCHO:  Okay.  Senator Blue requests
22  that he gets a copy of the roll-call votes.  Thank
23  you.
24    Before we finish up, let me just make it
25  clear.  Now that we have criteria established, and

174

1   understanding that there is access to computers and
2   the necessary resources to accomplish that, I'm
3   sure that the map drawers will do their job, come
4   forward with a map.  We will possibly have a
5   meeting tomorrow.  The chairs will allow you
6   notice.  We're going to need to give the map
7   writers -- or drawers a chance to do their work.
8   We are also waiting for a decision by the Supreme
9   Court on the motion for stay to allow that election
10  to take place in an orderly manner, without any
11  voter dysfunction, so we will let you know at what
12  time tomorrow, or whether we will be meeting
13  tomorrow.
14          REP. STAM:  Mr. Chair?
15          SEN. RUCHO:  Sir?
16          REP. STAM:  What is the earliest we would
17  be -- I mean, can we block out the morning for real
18  work, other work?
19          SEN. RUCHO:  I think to give sufficient
20  time for map drawers to work, I think we would be
21  looking at -- the earliest would be 1:00.  Okay?
22  Members of the committee, any questions on what was
23  discussed?
24          (No response.)
25          SEN. RUCHO:  You all know what we've got,

176

STATE OF NORTH CAROLINA
COUNTY OF WAKE
        CERTIFICATE
    I, Carol M. Smith, a duly commissioned Notary
Public in and for the State of North Carolina, do hereby
certify that on February 16, 2016, this proceeding was held
before me, this proceeding being reported by me verbatim
and then reduced to typewritten form under my direct
supervision; that the foregoing is a true and correct
transcript of said proceedings to the best of my ability
and understanding; that I am not related to any of the
parties to this action; that I am not interested in the
outcome of this case; that I am not of counsel nor in the
employ of any of the parties to this action.
    IN WITNESS WHEREOF, I have hereto set my hand, this
the 29th day of February, 2016.

        _____
            Notary Public

            Carol M. Smith
            Notary Number
            19943320153

175

1   so stay tuned, and thank you for your quick
2   response.  Meeting adjourned.
3   (WHEREUPON, THE MEETING WAS CONCLUDED AT 1:43 P.M.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Worley Reporting
Case 2:19-cv-00037-FL   Document 41-2   Filed 11/22/19   Page 46 of 46
Case 1:13-cv-00949-WO-JEP   Document 159-9   Filed 03/07/16   Page 45 of 45