# EXHIBIT B

NORTH CAROLINA GENERAL ASSEMBLY

NORTH CAROLINA HOUSE OF REPRESENTATIVES

_____

TRANSCRIPT OF THE PROCEEDINGS

FLOOR SESSION ONE (11:30 A.M.)

_____

In Raleigh, North Carolina

Friday, February 19, 2016

Reported by Rachel L. Hammond, CVR-M

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

EXHIBIT
1016
1:16-CV-1026

```
1                    (Reporter's note:  Proceedings in this matter
2          began at 11:30 a.m. on February 19, 2016.)
3                    SPEAKER MOORE:   The House will come to order.
4          Members will take their seats.  Visitors will retire
5          from the chamber.  The Sergeant-at-Arms will close the
6          doors.  Members and guests are asked to please silence
7          all electronic devices.
8                    This morning's prayer will be offered by
9          Representative Avila.  We'd ask all members and all
10         guests in the gallery to please stand for the prayer
11         and remain standing for the Pledge of Allegiance.
12                   Representative Avila.
13                   (Prayer and the Pledge of Allegiance.)
14                   SPEAKER MOORE:   The gentleman from Harnett,
15         Representative Lewis, is recognized for a motion.
16                   REP. LEWIS:  Mr. Speaker, the journal for
17         February 18, has been examined and found to be correct.
18         I move that it stand approved as written.
19                   SPEAKER MOORE:   Representative Lewis moves that
20         the journal for February 18 be approved as written;
21         those in favor will say "aye."
22                   (Voice vote.)
23                   SPEAKER MOORE:   Those opposed "no."
24                   The ayes have it.  The journal is approved as
25         written.  Notices and announcements -- strike that.
```

1          Reports of standing committees.

2                    Representative Lewis, the Chair on the

3          Committee -- the Redistricting Committee is recognized

4          to send forward the committee report.  The clerk will

5          read.

6                    CLERK:  Representative Lewis Redistricting

7          Committee reported Senate Bill 2 2016 Contingent

8          Congressional Plan.

9                    SPEAKER MOORE:  Calendar for this morning.

10                   Senate Bill 2, the clerk will read.

11                   (Bill read by clerk.)

12                   SPEAKER MOORE:  The gentleman from Harnett,

13         Representative Lewis, is recognized to debate the bill.

14         The House will come to order.

15                   Members, before the gentleman starts, I want to

16         remind the body we do have the court reporter with us

17         again here today.  So all of the extra noise and the

18         chatter that is occurring makes it very difficult for

19         her to hear.  So, again, if you need to have any extra

20         conversations, I would ask members to please step off

21         the floor to do so or to keep that to a very low tone.

22                   The gentleman from Harnett has the floor to

23         debate the bill.

24                   REP. LEWIS:  Thank you, Mr. Speaker.  Members

25         of the House, we are here today to comply with a court

1   order issued in the Harris versus McCrory case, which

2   instructed us not to hold the 2016 race for the United

3   States House of Representatives under the current map

4   and instructed us to redraw the districts.  We, as you

5   know, have appealed and sought a stay of that decision.

6   However, as of this moment, that stay has not been

7   granted.  We are still hopefully optimistic that it

8   will, in fact, come.  However, out of respect for the

9   rule of law and the court's findings, I will present to

10  you today a 2016 Contingent Congressional Map.  I will

11  point out that this map was created based on criteria

12  that was adopted by a Joint Select Committee of the

13  House and the Senate appointed by the Speaker and the

14  President Pro Tem; the committee adopted this criteria

15  on February 16.

16         I will point out to you the criteria on which

17  the maps before you were drawn.  First, was the

18  criteria of equal population.  All of the districts

19  were drawn with either 733,499 total persons or 733,498

20  total persons.  This is as equal as practicable and is

21  in accordance with federal law.  Another criteria was

22  contiguity.  All the areas of every district are

23  composed within contiguous territories.  Another

24  criteria was political data.  The stat pack attached to

25  the maps placed on each one of your desk show which

1    election results were used in building these districts.

2    Race was not considered and is not present in these

3    reports.  A further criteria was partisan advantage.

4    We believe that this map will produce an opportunity to

5    elect ten Republican members of Congress, but make no

6    mistake, this is a weaker map than the enacted plan in

7    that respect.  The Committee further adopted criteria

8    to do away with the 12th district, which has been

9    described as serpentine in nature because of the shape,

10   the way it appears on a map.  The drawing of this

11   corrected -- the drawing of this plan before you

12   corrects that.  An additional criteria was compactness.

13   Only 13 counties and 12 voting districts were split in

14   this map.  In accordance with the criteria, more whole

15   counties and more whole precincts are the best

16   indicator of compactness that we believe to be

17   available.  An additional criteria adopted by the

18   committee was incumbency.  In this map, only two

19   incumbent members of Congress reside in the same

20   congressional district, one Republican and one

21   Democrat.  They are Representative Holding and

22   Representative Price, both of whom reside within the

23   geographic territory that makes up the proposed 4th

24   Congressional District.  Eleven incumbents were placed

25   in a congressional district by themselves.

6

1           I want to offer only a bit of historical

2      context that I hope you will consider when you're

3      voting for those maps.  The 1992 Congressional Plan

4      split 44 counties; the 1997 plan split 22 counties; the

5      1998 plan split 21 counties; the 2001 plan split 28

6      counties and 22 Voting Tabulation Districts; the 2011

7      Congressional Plan, which I'll refer to henceforth as

8      the enacted plan, split 40 counties and 68 voting

9      districts, or VTDs; and the map that you have before

10     you splits 13 counties and 12 VTDs.

11          I am very proud and appreciative of all of the

12     work that members of the committee gave, that our

13     central staff dedicated themselves to do.  I appreciate

14     all of the members who brought forward constructive

15     advice on how to design these maps to comply with the

16     court decision.  And I look forward to being able to

17     more fully debate and explain these maps as directed by

18     the Speaker.  But I would ask for your support.  I

19     believe that this is a major step forward and should

20     the stay not be granted by the U.S. Supreme Court, I

21     believe that this map, drawn in accordance with the

22     criteria that I have mentioned in my earlier remarks,

23     will help us comply with the court order from the

24     Harris case.  And I would respectfully ask at the

25     conclusion of this debate that you would vote "aye" on

1       this bill.  Thank you, Mr. Speaker.

2                    SPEAKER MOORE:  For what purpose does the

3       gentleman from Durham, Representative Michaux, arise?

4                    REP. MICHAUX:  To speak on the bill.

5                    SPEAKER MOORE:  The gentleman has the floor to

6       debate the bill.

7                    REP. MICHAUX:  Mr. Speaker and ladies and

8       gentlemen of the House, I'm not going to ask

9       Representative Lewis any questions on this.  I think

10      that has been thoroughly covered in committee, and the

11      record has been made in committee on this.  What I want

12      to do very simply is to caution you about what you're

13      about to do.  And in order to set the framework for

14      that -- what I want to say about this, I want to quote

15      a couple of things from the Harris decision that got us

16      where we are today.  The first is that on page 2 of

17      that decision -- page 3 it says, "This does not mean

18      that race can never play a role in redistricting.

19      Legislatures are almost always cognizant of race when

20      drawing district lines, and simply being aware of race

21      poses no constitutional violation.  Only when race is

22      the 'dominant and controlling' consideration in drawing

23      district lines does strict scrutiny, strict scrutiny

24      apply."  What the Court is saying very simply in this

25      is that race can still be used in drawing lines, but if

1    you use race, "strict scrutiny" applies.  It doesn't

2    mean it can't be applied, but you have to look at it a

3    little bit closer than the way you normally look at.

4    What this body has done in this -- I'm sorry, what the

5    committee has done, is they have taken race out of the

6    equation totally and completely.  In other words, this

7    map that you have before you today was drawn without

8    consideration of race.

9          Now everybody tries to think that we're going

10   to have a colorblind situation and wishes for one,

11   which is the ultimate dream in euphoria.  Race will

12   always be there because there will always be

13   differences either race, class, whatever way you want

14   to put it.  So you cannot, you cannot do maps without

15   including race as a part of it.

16          The second part of that, or other part of that

17   decision says this, "redistricting legislation must,"

18   and I repeat, "redistricting legislation must comply

19   with the Voting Rights Act of 1965."  Many people have

20   thought that the Shelby case knocked out the Voting

21   Rights Act.  It did not.  It only knocked out Section 4

22   from the Voting Rights Act, that section which set up a

23   formula for which preclearance was required.  The

24   Voting Rights Act of 1965 still stands.  And I repeat,

25   that it says that any district lines must comply with

1     the Voting Rights Act of 1965.  And in that same vein,

2     they said that, "the Voting Rights Act prohibits states

3     from adopting plans that would result in vote dilution

4     under section 2."  So, Section 2 basically is the

5     operative clause under which we operate and draw

6     district lines.

7          Now, what you have done with this map is you

8     have gone in the complete opposite, and you have made

9     race a predominant factor again because you left it

10    out.  You don't consider whether or not these districts

11    that have been drawn on this map create any dilution of

12    minority registrants, minority voting.  You don't have

13    any clue as to whether or not minorities, African

14    Americans in particular, are able to elect

15    representatives of their choice.  That's because you

16    cut out race as a factor in determining what these

17    lines are being drawn for.  So I say that you set up an

18    unconstitutionally drawn map, and you're sending back

19    another unconstitutionally drawn map.  But that is not

20    for me to decide.  That is for the Court to decide.

21    But just taking a simple look at it you say, well, how

22    do we do this?  All you have to do -- you don't have to

23    make it a predominant factor.  You can look at it and

24    you can draw lines that fall within parameters that

25    don't make race a predominant factor and still

1            guarantee that you don't have voter dilution and still

2            guarantee that you have a position where African

3            Americans are able to elect persons of their choosing.

4                    Now, there is one other thing I want to call to

5            your attention out of that same decision.  It says that

6            there is strong evidence -- and this comes from the

7            Harris decision -- "There is strong evidence that race

8            was the only nonnegotiable criterion and that

9            traditional redistricting principles were subordinated

10           to race."  I say again, "There is strong evidence that

11           race was the only nonnegotiable criterion."  Here

12           again, in these maps that are being drawn, race is the

13           only nonnegotiable criterion that has brought these

14           maps about.

15                   Finally, it says, "A congressional district

16           necessarily is crafted because of race, when a racial

17           quota is the single filter through which all

18           line-drawing decisions are made."  Now, folks, it

19           doesn't take a rocket scientist or a mathematician to

20           figure that if you're going to draw district lines,

21           you've got to take into account the population of that

22           district.  How it affects not just one part of the

23           population, but the total, the total population, and

24           that includes members of any ethnic group, any racial

25           group, anything.  It all has to be considered.  Here,

1      in this map that was drawn, none of that was

2      considered.  And I say to you that I know what you're

3      going to do.  Everybody is going -- both sides are

4      going to probably go lockstep, no question about it.

5      But what you're doing is you're setting up a situation

6      where there is a good possibility of you coming back

7      here again if the courts find that you have not

8      followed their instructions.  They could send it back.

9      They could do it themselves, or they could put in a

10     Special Master to draw the lines.  There are other

11     things here, everybody says, well, it is confusing.

12     Chaos reigns as a result of this.  Well, folks, those

13     of us on this side did not cause that chaos.  We were

14     never asked to have any input into this.  We got -- to

15     give you an example, this map that you have drawn

16     today, I think the decision was handed down February 5

17     or February 6, and before any criteria was set up, I

18     understand from folks on the other side, that plans

19     were already being drawn and criteria was already being

20     set up -- not having been set up, but maps were being

21     drawn without that.  And then to come in on, I think,

22     Tuesday of this -- Monday or Tuesday of this week and

23     pass criteria, and on Wednesday we've got a map, then

24     there's a problem.  There are many things wrong with

25     this, and I know this was done in a hurry.  But we need

1    to take the time to make sure that every facet of this

2    thing is covered. A lot of folks don't want to talk

3    about race. I don't particularly. One thing about my

4    good friend Martin Luther King, Jr., Martin told me --

5    I never heard him use the word "colorblind" because in

6    his thinking we will never have a colorblind society.

7    And unfortunately, or fortunately, it is here, and it's

8    faced. And we have to take it into consideration. And

9    when you take it out, then that becomes a predominant

10   factor in this whole thing. So you're going to do what

11   you're going to do, but I don't think you've seen the

12   end of this problem yet.

13           REP. LEWIS: Mr. Speaker.

14           SPEAKER MOORE: For what purpose does the

15   gentleman from Harnett, Representative Lewis, arise?

16           REP. LEWIS: Would the distinguished gentleman

17   from Durham yield to a question?

18           SPEAKER MOORE: Does the gentleman from Durham,

19   Representative Michaux, yield to the gentleman from

20   Harnett?

21           REP. MICHAUX: The gentleman will yield. I

22   don't know how distinguished he is.

23           SPEAKER MOORE: He yields.

24           REP. MICHAUX: I yield.

25           REP. LEWIS: Mr. Speaker, I appreciate not only

1          the distinguished but the well-dressed gentleman taking

2          time to yield to me.

3                    Representative Michaux, you referenced the

4          Harris decision in your remarks.  Would I be safe to

5          operate under the belief that you have it before you?

6                    REP. MICHAUX:  You -- yes, sir.  Here it is,

7          yes.

8                    REP. LEWIS:  Thank you.  May I ask another

9          question, Mr. Speaker?

10                   SPEAKER MOORE:  The gentleman is recognized for

11         a second question.  Does the gentleman from Durham

12         yield?

13                   REP. MICHAUX:  Yes, I yield.

14                   SPEAKER MOORE:  He yields.

15                   REP. LEWIS:  Thank you, Mr. Speaker.

16         Representative, may I ask you to please look at page 57

17         of that opinion?

18                   REP. MICHAUX:  57?

19                   REP. LEWIS:  Page 57, yes, sir.  And, sir, the

20         particular --

21                   REP. MICHAUX:  Yes, sir, I have it.

22                   REP. LEWIS:  Right before the number 2 there,

23         there is a sentence that reads in part, "As the

24         defendants," which would have been us, "fail to meet

25         the third Gingles factor, the Court concludes that

1          section 2 did not require the defendants to create a

2          majority-minority district in CD 1." Is that not

3          saying that the Court finds that racially polarized

4          voting was not present or proven so that we shouldn't

5          have used it in drawing the map?

6                    REP. MICHAUX: That's not what it says to me,

7          Representative Lewis. What is says to me is that there

8          was racially polarized showing in that. You didn't

9          meet the requirements, the third requirement of --

10         requirements in the Gingles case. Which set up the

11         fact that if you have racial polarization, you have got

12         to take into consideration these factors.

13                   REP. LEWIS: Mr. Speaker, may I ask the

14         gentleman another question?

15                   SPEAKER MOORE: Does the gentleman from Durham

16         yield to an additional question?

17                   REP. MICHAUX: Yes, I yield.

18                   SPEAKER MOORE: He yields.

19                   REP. LEWIS: Thank you, Mr. Speaker, and thank

20         you, Representative. If I may, would you turn to

21         page 56 of the same opinion of which we were just

22         looking.

23                   REP. MICHAUX: I have it, yes, sir.

24                   REP. LEWIS: Thank you, sir. When the Court

25         writes, "the composition and election results under the

1       earlier version of CD 1 vividly demonstrate that,

2       though not previously a majority-BVAP district, the

3       white majority" -- this is the operative part I'd like

4       your advice on -- "the white majority did not vote as a

5       bloc to defeat the African-Americans' candidate of

6       choice.  In fact, precisely the opposite occurred in

7       these two districts: significant crossover voting by

8       white voters supported the African-American candidate."

9       Does that not indicate that the Harris court did not

10      find racially polarized voting?

11             REP. MICHAUX:  I'm not sure that it does,

12      Representative Lewis, because you have to have certain

13      iterations in these types of situations.  It's known,

14      and it is a known fact, and it has been proved.

15      Gingles proved it and several of the other cases,

16      Stevens' case proved it, that whites sometimes

17      basically vote as a bloc in order to keep

18      African-Americans, or whatever ethnic group, out.  And

19      that has happened -- it has happened in my case.  I

20      personally had it happen to me.  So this iteration in

21      here is actually stating what should not or could not

22      have to happen.  And of course, you know, you're on

23      that segment.  I've got that page marked also.

24             REP. LEWIS:  May I ask the gentleman an

25      additional question?

16

1           SPEAKER MOORE:   Does the gentleman from Durham

2      yield to an additional question?

3           REP. MICHAUX:   Yes, sir.

4           SPEAKER MOORE:   He yields.

5           REP. LEWIS:   Just for the sake of this

6      conversation, Representative Michaux, and I've

7      acknowledged freely in earlier meetings that you are an

8      attorney and I'm not.   You're much more versed in the

9      law.   Would you acknowledge at least with me -- and I

10     apologize to skip around in this opinion, but do --

11     would I be correct to operate under the understanding

12     of this opinion that at least in the opinion issued in

13     the Harris court, that the third Gingles element of

14     establishing racially polarized voting per this court

15     decision was not met?

16           REP. MICHAUX:   Yes, it says that.

17           REP. LEWIS:   Thank you, sir.   Mr. Speaker, may

18     I ask the gentleman another question on another subject

19     matter?

20           SPEAKER MOORE:   Does the gentleman from Durham

21     yield to an additional question from the gentleman from

22     Harnett?

23           REP. MICHAUX:   Yes, sir.   I yield.

24           SPEAKER MOORE:   He yields.

25           REP. LEWIS:   Thank you, Mr. Speaker, and thank

1    you, Representative.   You mentioned in your remarks the

2    map that is prepared before us and also perhaps the

3    steps that were taken in the preparation of those maps,

4    I was wondering, sir, if you would speak to what -- and

5    of course, I only ask for your personal knowledge, of

6    what steps the Democratic Party took, or the Democratic

7    members of this House took, to comply with the court

8    order that we were all notified about on February 6.

9             REP. MICHAUX:  My answer to you, Representative

10   Lewis, on that is we were not ordered to comply with

11   that decision.  You were ordered to comply with that

12   decision.  We did not draw the maps.  You drew the

13   maps, so that decision was aimed at you.  The matter is

14   in court.  If the Court wants our advice, we will give

15   them that advice.  We tried to give you our advice on

16   the mistakes that you made.  You could take them any

17   kind of way you see, and it comes back, you say, well,

18   the minority party helped us do this.

19             This is a problem that you created.  This is a

20   problem that you have to solve.  If the Courts want our

21   opinion on it, they will ask us, and we are prepared --

22   we will be prepared to answer any questions that the

23   Court raises with us on it.  And by the way,

24   Representative Lewis, let me just -- since you are

25   referring to the opinion, you referred to page 55 on

1        that -- 56 on that.  On 54, "Strikingly, there is no

2        evidence that the General Assembly conducted or

3        considered any sort of a particularized

4        polarized-voting analysis during the 2011 redistricting

5        process."  So I just wanted to clear that up.

6             REP. LEWIS:  Mr. Speaker, may I ask the

7        gentleman another question?

8             SPEAKER MOORE:  Does the gentleman from Durham

9        yield to an additional question?

10            REP. MICHAUX:  Anytime.  Yes, sir.

11            SPEAKER MOORE:  He yields.

12            REP. LEWIS:  Thank you, Mr. Speaker, and thank

13        you, Representative.  I just wanted to -- and this is

14        along the lines of the last question I asked, if I may.

15        Would it be fair to say that you, as a member of the

16        General Assembly, as a member of the Joint Select

17        Committee, and of the House Committee, while, by your

18        own remarks, had the opportunity to participate and

19        offer input to the map, have instead elected not to do

20        that and are preparing instead to offer maps that you

21        developed to the Court?  So it would be fair to say

22        that you declined largely to constructively participate

23        in the legislative process, preferring to focus on the

24        judicial process?

25            REP. MICHAUX:  In the joint meeting of the

1        committee, several amendments were offered by the

2        minority party.  They were all killed.  In other

3        instances in this body when we have tried to

4        participate and offer what we thought were constructive

5        amendments, whether some, even folks on your side have

6        agreed, we have been struck down.  And here again, I

7        refer to my good friend Martin Luther King, Jr.  Martin

8        said, Mickey, you have always got to be able to -- if

9        they hit you on one side to turn the other cheek and

10       let them hit you on -- you know, don't hit back.  Well,

11       I've been hit on both cheeks by you-all, and I am just

12       not going to let you hit me anymore.  And that's -- I

13       mean, that's it, Mr. Lewis, why should we, why should

14       we -- when you haven't sought our help in the beginning

15       and you haven't sought our help now.  You haven't asked

16       us anything.  You have already gone on and done these

17       maps before we even had a committee meeting.

18              REP. LEWIS:  Mr. Speaker, may I ask the

19       gentleman another question?

20              SPEAKER MOORE:  Does the gentleman from Durham

21       yield to an additional question from the gentleman from

22       Harnett?

23              REP. MICHAUX:  Yes, I yield.

24              SPEAKER MOORE:  He yields.

25              REP. LEWIS:  Thank you, Mr. Speaker, and thank

1    you, Representative.  I do not have the committee

2    minutes before me, and I am certainly prepared to be

3    corrected.  Did members of the minority party, the

4    Democratic Party, offer amendments in the form of a map

5    or guidelines to how the map should look, or were those

6    amendments largely unrelated to the drawing of a map?

7              REP. MICHAUX:  The amendments affected the

8    criteria under which the maps were to be drawn.

9              REP. LEWIS:  Thank you, sir, for your time.

10   And thank you, Mr. Speaker.

11             SPEAKER MOORE:  For what purpose does the

12   gentleman from Bladen, Representative Brisson, arise?

13             REP. BRISSON:  To see if Representative Lewis

14   will yield for a couple of questions.

15             SPEAKER MOORE:  Does the gentleman from Harnett

16   yield to the gentleman from Bladen?

17             REP. LEWIS:  I do, Mr. Speaker.

18             SPEAKER MOORE:  He yields.

19             REP. BRISSON:  Thank you, Mr. Speaker.  Thank

20   you, Representative Lewis.  It may take me a minute

21   here to get through my questions, but in the beginning

22   when the Courts made the decision, it was certainly

23   on -- obviously it was on district 1 and 12, which was

24   two out of the 13 districts.  And, I guess, I'm

25   certainly not speaking for any of the other members,

| | |
|---|---|
| 1 | but I kind of assumed that should we -- evidently, |
| 2 | we've got a problem there.  When we started off I |
| 3 | thought, I assumed, that maybe the problem could be |
| 4 | worked out in the general consensus of that district. |
| 5 | Do you understand what I'm saying?  That maybe it |
| 6 | didn't involve the whole state.  One of my questions, |
| 7 | how much time did the committee spend on concentrating |
| 8 | on trying to get in compliance in that general area |
| 9 | versus -- and when was the decision made to do it |
| 10 | statewide because it changed?  In the original |
| 11 | committee was kind of -- I saw the members.  It looked |
| 12 | like that it was maybe not intentionally set up, but |
| 13 | basically a lot of -- it was close by neighbors |
| 14 | involved in that general vicinity of the state on the |
| 15 | committee, maybe one or two scattered out away from, |
| 16 | kind of, more distant away.  And after the two |
| 17 | questions that I'm trying to ask, and I'll them both is |
| 18 | how much time, or if any time was spent on just the |
| 19 | general consensus and vicinity of the question -- the |
| 20 | two districts in question?  And at what time did the |
| 21 | committee decide to expand and redo the whole state? |
| 22 | And did the committee look at maybe taking a look at |
| 23 | the committee then when they went to the full state to |
| 24 | maybe justify expanding the committee or make sure we |
| 25 | have broader input from throughout the state? |

1           REP. LEWIS:  Thank you for that question,

2     Representative.  Let me do my very best to answer.

3     First of all, you are right when you say the case that

4     was brought and adjudicated by the three-judge panel

5     involved the 1st Congressional District and the 12th,

6     not all 13.  However, when you're drawing districts,

7     what you're talking about is assigning geographic areas

8     where 733,498 or 499 people can elect a member to the

9     U.S. House.  So, when you change lines in one part of

10    the state, you are essentially moving people.  And as

11    you move people that a cause in one district almost

12    certainly causes a change in those around it.  So what

13    you'll notice when you look at the proposed map is that

14    some districts seem to have changed very little.  The

15    11th, for instance, the mountain district, really I

16    think the only change that was made there had to do

17    with trying to equalize some population because

18    additional population had been pushed west, if you

19    will, from the 10th and from the 5th.  So, as far as

20    the time spent, what the committee did was debate the

21    criteria that we felt would help us comply with the

22    Harris court decision.  We respect the judges and want

23    to honor both the written law and the spirit in which

24    they issued the opinion.  But in candor, there was not

25    a great deal of curative language in the opinion that

1      said had you done X, Y and Z, we would not have found

2      the way we found.  So what the committee did instead is

3      it went through in a full and open session in which

4      amendments were, in fact, considered, and it adopted

5      criteria that it felt would help us be able to comply

6      with the court order.  Those, as I have said, were the

7      equal population, the contiguity, the political data,

8      partisan advantage, doing away with the serpentine

9      nature of the 12th, compactness, and incumbency.  So

10     once the committee adopted those criteria, we set about

11     and have been able to produce a map which is based on

12     those criteria.

13             I think what you're asking about in particular

14     is there are some counties that seem to be

15     geographically far away from either the 1st or the 12th

16     that their district lines have changed.  And I will

17     openly concede that you are right in the observation

18     that you have made.  But, again, for lack of a better

19     analogy, if you picture a child playing with a balloon,

20     when the child will squeeze the balloon in one part,

21     another part will change its shape.  And that is

22     largely why districts all across the state changed.

23     But, again, I would point out, even though certain

24     counties may have changed the district they were in or

25     certain counties may be divided that weren't divided

1    before, this map divides only 13 counties and only 12

2    VTDs.  So this map, to the extent that it has to be

3    used because a stay is not granted, at least based on

4    the criteria adopted by the committee, is a superior

5    map and we believe complies with what we were ordered

6    to do by the Court.

7              REP. BRISSON:  Thank you.

8              SPEAKER MOORE:  Does the gentleman from Bladen

9    wish to ask an additional question?

10             REP. BRISSON:  I just --

11             SPEAKER MOORE:  Or does the gentleman wish to

12   debate the bill?

13             REP. BRISSON:  I just wanted to ask to make

14   sure that I got my question, both questions answered.

15             SPEAKER MOORE:  Does the gentleman from Harnett

16   yield to an additional question?

17             REP. LEWIS:  I yield.

18             SPEAKER MOORE:  He yields.  The gentleman is

19   recognized -- and Representative Brisson, I am trying

20   to do this orderly because the court reporter is trying

21   to make a record, so bear with me on that.  The

22   gentleman has the floor for a question.

23             REP. BRISSON:  Thank you, Mr. Speaker.  Thank

24   you, Representative Lewis.  What -- so did the

25   committee ever look at expanding when we decided to

```
 1        go -- that was one of my questions, expanding the

 2        committee to make sure that we had a pretty much

 3        representation statewide on the committee?

 4             REP. LEWIS:  Thank you for that question,

 5        Representative.  And I did fail to answer it the first

 6        time you asked it, I apologize.  The Speaker and the

 7        President Pro Tem made these appointments about a week

 8        ago today.  We have been operating under -- I think

 9        even those opposed to the maps, would acknowledge that

10        we have been operating under a very compressed

11        timetable.  And when the decisions were made, I did not

12        ask the Speaker and the President Pro Tem to expand the

13        membership of the committees.  They certainly have the

14        authority to do that.  I don't even know, in candor,

15        that it was contemplated to expand the committee.  We

16        did make clear though, in every effort that we could,

17        that all members of the General Assembly, regardless if

18        they were voting members of the committee or not, were

19        encouraged to attend the committee and were certainly

20        given a chance to speak.  I think, in fact, I think

21        several did actually ask questions or take part in the

22        debate that were not actually seated members of the

23        committee.  And I would point out that while it is

24        pretty much a expected tradition of the General

25        Assembly that a member of the General Assembly that
```

1          wants to address a standing committee can certainly do

2          so, I think we actually went above and beyond trying to

3          reassure members that their input or their questions

4          were welcomed whether or not they were a seated member

5          of the committee.

6                    REP. BRISSON:  Thank you, Representative Lewis.

7          Mr. Speaker, can I speak on the bill?

8                    SPEAKER MOORE:  The gentleman has the floor to

9          debate the bill.

10                   REP. BRISSON:  Thank you, Mr. Speaker.  Ladies

11         and gentlemen, I just -- and I know that we have ended

12         up with less split counties, divided counties, which is

13         great.  But I just want to remind this body that with

14         small populated counties, and I represent -- two out of

15         three that I represent are kind of considered small

16         population -- any time that the smaller counties have

17         to be divided, it does make a big difference to the

18         people.  Maybe not statewide concerns, but the

19         general -- people in general in small populations, they

20         feel like divided, when you divide them, they are not

21         whole.  And we don't get a whole lot of recognition

22         with the small population to begin with.  We don't feel

23         that maybe our word is not heard.  Our message is not

24         heard quite as well as the larger counties populated.

25         But when you divide us in half or take a third of our

27

1          folks, it does have the people concerned that maybe we

2          don't end up with the representation in Congress or

3          wherever it be.  And that is my concern and it is all

4          about the small populated.  Anytime that we can do

5          anything to help those situations, I hope that we will

6          certainly consider that.  Thank you so much, Mr.

7          Speaker.

8                SPEAKER MOORE:  For what purpose does the

9          gentleman from Wake, Rep. Martin, arise?

10               REP. MARTIN:  To see if the gentleman from

11         Harnett would yield to a few questions.

12               SPEAKER MOORE:  Does the gentleman from

13         Harnett, Representative Lewis, yield to the gentleman

14         from Wake?

15               REP. LEWIS:  I yield, Mr. Speaker.

16               SPEAKER MOORE:  He yields.

17               REP. MARTIN:  Thank you, Mr. Speaker, and thank

18         you, Representative Lewis.  I was in attendance in the

19         committees and tried to pay attention to the questions

20         that were asked.  Unfortunately, I made the mistake of

21         the sitting next to Representative Torbett, and we were

22         cutting up in class a little bit.  So, Representative

23         Lewis, I may repeat some of the questions that you have

24         already attempted to answer and for that I apologize,

25         but blame Representative Torbett for that.

1          Mr. Speaker, the first question I would ask the

2      gentleman from Harnett is regarding Dr. Hofeller who I

3      believe he said was the map drawer. And my question

4      is, was Dr. Hofeller paid for his services with public

5      funds? And if so, how much did he receive in public

6      money?

7          REP. LEWIS: Thank you for that question,

8      Representative. Dr. Hofeller has not, to my knowledge,

9      invoiced the state yet. I do anticipate that he will.

10     I don't have access to that at the moment. It

11     certainly would not exceed the 25,000 that was

12     authorized to Chairman Rucho and myself on behalf of

13     the Republicans and the 25,000 that was authorized to

14     the Democrats to be able to produce the maps. But I

15     don't have an exact figure. I'm sorry.

16         REP. MARTIN: Thank you, sir. Mr. Speaker, to

17     ask another question of the gentleman.

18         SPEAKER MOORE: Does the gentleman from Harnett

19     yield to an additional question from the gentleman from

20     Wake?

21         REP. LEWIS: I yield.

22         SPEAKER MOORE: He yields.

23         REP. MARTIN: Thank you, Mr. Speaker. Thank

24     you, Representative Lewis. Representative Lewis has

25     been quite up front that this is an attempt to get ten

1          seats for Republicans and three for Democrats and that

2          this has partisan purposes.  So my question to the

3          gentleman from Harnett is, is this essentially a

4          partisan gerrymander?

5                    REP. LEWIS:  Well, thank you for that question,

6          Representative.  To be clear, the map that you have

7          before you was drawn using criteria that was openly

8          debated and adopted by the Joint Redistricting

9          Committee.  Those factors that went into this were of

10         course the requirement to have equal population,

11         contiguity.  Political data did play a part in drawing

12         the map.  We did seek partisan advantage in drawing the

13         map.  We did seek to eliminate the shape of the 12th

14         Congressional District.  We did strive for compactness,

15         a lot to what Representative Brisson was just referring

16         to, trying not to split the smaller rural counties if

17         we could.  And we considered incumbency.  So, as I said

18         earlier in the committee, when a partisan such as you

19         or I look at a political map, some of us see an evil

20         sinister gerrymander if it doesn't meet the objectives

21         that we would like for it to meet.  And some see it as

22         a work of art or a work of good public policy.  So I

23         would submit to you that the map was drawn based on the

24         criteria adopted by the committee, and is, in fact,

25         good public policy.

1          REP. MARTIN:   Thank you, Representative Lewis.

2     And, Mr. Speaker, to see if the gentleman would yield

3     to another question.

4          SPEAKER MOORE:   Does the gentleman from Harnett

5     yield to an additional question from the gentleman from

6     Wake?

7          REP. LEWIS:  I yield.

8          SPEAKER MOORE:  He yields.

9          REP. MARTIN:  And I apologize, Mr. Speaker, you

10    can rule me out of order pretty quickly, but a slight

11    editorial comment.  Representative Lewis and I are both

12    fathers, and I will note that when our babies made

13    their first production in their diaper, we think it is

14    beautiful also.  And I will withdraw that, and with it,

15    an apology.

16          Representative Lewis, the next question I would

17    have for you is do you believe that a partisan

18    gerrymander -- that -- I will restate that.  That a

19    plan that would elect ten Republicans and three

20    Democrats in a state that is much more evenly divided

21    in electorates would violate the U.S. Constitution or

22    our State Constitution?

23          REP. LEWIS:  Thank you for that question,

24    Representative.  To be clear, when I went through the

25    criteria earlier, we did not look at political

1           registration because we believe that election results,

2           election outcome are much better predictors of how the

3           people actually vote than partisan registration is.  I

4           mean, you and I have had conversations in the past

5           about the continued growth of the total percentage of

6           voters that choose to list themselves as unaffiliated.

7           We have talked about that in the past.  So we believe

8           that we looked at the political results of past

9           elections and have been able to produce a map that will

10          still require the political parties or the individual

11          seeking to be elected within those districts to offer a

12          good solid candidate who can appeal to their base, be

13          it Democrat or Republican, but also be able to appeal

14          to the ever-growing unaffiliated.  So, we believe that

15          while -- and I freely acknowledge that I sought

16          partisan advantage as based on the criteria in drawing

17          this map.  We do believe that the map has been drawn in

18          a fair and open attempt to comply with the court

19          ruling.

20               REP. MARTIN:  Mr. Speaker, to see if the

21          gentleman would yield to another question.

22               SPEAKER MOORE:  Does the gentleman from Harnett

23          yield to an additional question from the gentleman from

24          Wake?

25               REP. LEWIS:  I yield.

1          SPEAKER MOORE:  He yields.

2          REP. MARTIN:  Thank you, sir.  Representative

3     Lewis, my question actually is intended to get more at

4     the issue not of partisan registration but actual

5     election results, and more specifically, election

6     results in congressional elections since we are talking

7     about congressional districts here.  So my question is,

8     do you believe that it is constitutional under the

9     federal and the state constitutions to draw a plan, to

10    have a plan that elects ten Republicans and three

11    Democrats where election results of the past several

12    cycles are much more -- would suggest a much more --

13    are much closer than a ten to three margin?

14         REP. LEWIS:  Thank you for that question,

15    Representative.  And let me try to answer it a

16    different way.  But for the criteria adopted by the

17    committee which instructed the map drawers to do

18    certain things like try to maintain compactness, try to

19    make, you know -- take incumbency into account, try to

20    make the districts look more compact, be more compact,

21    keep more counties compact, we could have been much

22    more aggressive partisan-wise trying to obtain a map

23    that would elect 11 Republicans.  But you can't really

24    do that if you simply consider partisanship as a part

25    of the criteria adopted by the committee, which is what

1        we did.

2                REP. MARTIN:  Mr. Speaker, to see if the

3        gentleman would yield to another question.

4                SPEAKER MOORE:  Does the gentleman from Harnett

5        yield to an additional question from the gentleman from

6        Wake?

7                Actually before the gentleman does -- before

8        these students leave, the students up on the right, the

9        Chair wanted to recognize a group of elementary

10       students from Easley Elementary School in Durham.

11       Would you all please stand so that we can welcome you

12       and thank you for being with us today.  From Durham

13       your representatives are Representative Hall,

14       Representative Michaux, I believe Representative Meyer

15       has part of Durham.  Am I missing anybody?

16                REP. MICHAUX:  Luebke.

17                SPEAKER MOORE:  Representative Luebke is not

18       here, I don't think.  So those are your representatives

19       also.  Thanks for being with us today.

20                Sorry for the interruption.  I believe the

21       gentleman from Wake was stating a question at this

22       point.  The gentleman from Wake has the floor to

23       continue propounding the question to the gentleman from

24       Harnett.

25                REP. MARTIN:  Thank you very much, Mr. Speaker.

1          Representative Lewis, the question I'm going to ask is

2          an attempt to restate the question I've previously

3          asked, and the fault is all with me for not stating it

4          clearly.  You've produced a district with ten

5          Republicans, likely to elect ten Republicans and three

6          Democrats.  You stated, I think, just stated that you

7          could have even done 11 Republicans and two Democrats,

8          and I am trying to understand and get an answer from

9          you as to whether or not you think that the plan you

10         have now with the partisan result it has, in light of

11         congressional election results of North Carolina, is

12         constitutional?

13              REP. LEWIS:  Representative, thank you for that

14         question.  As -- and I'm not trying to sound like a

15         broken record.  I know that you're an attorney.  I'm

16         not.  I will tell you that the committee adopted

17         criteria, one of which was to seek partisan advantage

18         for the Republicans.  Now, if you ask me personally if

19         I think that is a good thing, I will tell you I do.  I

20         think you are a great man.  I think you are a fine

21         public servant.  I think electing Republicans is better

22         than electing Democrats.  So I drew this map in a way

23         to help foster what I think is better for the country.

24              REP. MARTIN:  Mr. Speaker, to see if the

25         gentleman would yield to another question.

1           SPEAKER MOORE:   Does the gentleman from Harnett

2      yield to an additional question from the gentleman from

3      Wake?

4           REP. LEWIS:   I yield.

5           SPEAKER MOORE:   He yields.

6           REP. MARTIN:   Thank you, Mr. Speaker.  And let

7      me add for the record that I think the gentleman from

8      Harnett is a fine public servant also with the interest

9      in the public at heart, and to boot, he has wonderful

10     hair also.

11           Mr. Speaker and members, I do feel that we have

12     a tendency to treat questioning on the floor of the

13     General Assembly like a cross-examination.  We've heard

14     the adage, physician heal thyself.  I think in this

15     case lawyer heal thyself is appropriate.  So I don't

16     want to turn this into a cross-examination, but I've

17     tried to answer the question about his opinion on the

18     constitutionality of a partisan gerrymander.  I don't

19     think it has been answered, but to avoid this from

20     turning into cross-examination, I would like to move on

21     to another question.  And that question is, Dr.

22     Hofeller and anyone else involved in the map drawing,

23     what data did they use to meet your stated criteria of

24     attempting to get a ten to three Republican advantage?

25           REP. LEWIS:   Well, thank you for that question,

1    Representative.   On every member's desk and also before

2    every member in the committee, the Joint Committee, the

3    Committee in the Senate, and the Committee in the

4    House, is a stat pack, if you will, that lists a

5    variety of races that over 2008, 2010, and 2014, we

6    list out all of the political contests that were used.

7    I'll be happy, if you would like me to, to let you know

8    which ones they were, but I think it's pretty clear to

9    the members and on the record which political contests

10   we used.  Just real quick, Attorney General 2008,

11   Commissioner of Agriculture 2008, you know, in fact --

12   yeah, I mean, we used a variety of political contests

13   from 2008 through 2014, all of which we provided to the

14   members on their desk.

15            REP. MARTIN:  Mr. Speaker, to see if the

16   gentleman would yield to another question.

17            SPEAKER MOORE:  Does the gentleman from Harnett

18   yield to an additional question from the gentleman from

19   Wake?

20            REP. LEWIS:  Yes, sir, I yield.

21            SPEAKER MOORE:  He yields.

22            REP. MARTIN:  Thank you, Mr. Speaker.  And Mr.

23   Speaker, the gentleman from Harnett has been most

24   gracious with his time in committee, in several

25   committee meetings over going through the lists and

1       explaining what the races are and what the codes meant.

2       But I do want to ask just a couple of clarifying

3       questions on that if I could.  Representative Lewis,

4       would it be accurate to say that the mapmakers

5       considered every one of the races that's listed in the

6       charts that were presented at committee several times.

7               REP. LEWIS:  Yes, sir.

8               REP. MARTIN:  And another question, Mr.

9       Speaker.

10              SPEAKER MOORE:  Does the gentleman wish to ask

11      an additional question?

12              REP. MARTIN:  Yes, sir.

13              SPEAKER MOORE:  And does the gentleman from

14      Harnett yield to an additional question?

15              REP. LEWIS:  Yes, sir.

16              SPEAKER MOORE:  He yields.

17              REP. MARTIN:  Thank you, Mr. Speaker.  And,

18      Representative Lewis, are there any races that are not

19      listed on these charts that the mapmakers considered?

20              REP. LEWIS:  No, sir.

21              REP. MARTIN:  Mr. Speaker, to see if the

22      gentleman would yield to another question.

23              SPEAKER MOORE:  Does the gentleman yield to an

24      additional question?

25              REP. LEWIS:  I yield.

1     SPEAKER MOORE: He yields.

2     REP. MARTIN: Thank you, Mr. Speaker. Thank

3     you, Representative Lewis. In looking at those

4     different races, did you weigh, for example, the

5     results in lieutenant gubernatorial elections equally

6     with those of say a gubernatorial election?

7     REP. LEWIS: Thank you for that question,

8     Representative. I think it is important to understand,

9     the races that we used were statewide. We were trying

10    to get, you know, the broadest swath of data that would

11    apply equally in every district. I've had a couple of

12    members say, well, why didn't you look at the race for

13    Congress and whatnot, and it was just too hard to

14    figure out how the data -- you know, for districts that

15    have changed over time would work. So in terms of did

16    we weigh them equally, to be candid with you, I think

17    that those of us that spend way too much time in

18    politics know that certain races, maybe weren't as

19    equal as they should be because one party or the other

20    either had a nonincumbent candidate that was trying to

21    seek the office, which we believe -- you know, I'm sure

22    you would agree, that most of the time, most the time

23    incumbency is an advantage. Sometimes it might have

24    been an underfunded campaign. So we looked at all of

25    them, but, no, my gut would tell me that I would gain

1    more or garner more by looking at the Governor's

2    results than I would the Lieutenant Governor's results

3    and so on.  But we looked at all of them and tried to

4    blend the results.  I mean, you know, frankly they

5    don't always come up like we want them to.  The

6    Attorney General, the Democratic nominee for AG has won

7    in all 13 of these.  So certainly the strength of the

8    candidate, if that is what you're trying to ask,

9    certainly that matters.

10        REP. MARTIN:  Mr. Speaker, to see if the

11    gentleman would yield to another question.

12        SPEAKER MOORE:  Does the gentleman from Harnett

13    yield to an additional question from the gentleman from

14    Wake?

15        REP. LEWIS:  I yield.  Yes, sir.

16        SPEAKER MOORE:  He yields.

17        REP. MARTIN:  Thank you, Mr. Speaker.  I would

18    like to thank the gentleman from Harnett for his

19    patience also.

20        SPEAKER MOORE:  Representative Martin, I

21    apologize, the gentleman's time has expired.  The Chair

22    will, however, at the Chair's discretion will allow the

23    gentleman to ask one additional question.

24        REP. MARTIN:  I would be happy to yield in my

25    time if that is permissible under the rules because

1          this is my fault.

2                  SPEAKER MOORE:  It is actually the gentleman's

3          time spending to ask the question.  But the Chair will

4          give the gentleman one additional question.

5                  REP. MARTIN:  Thank you, Mr. Speaker.

6          Representative Lewis, the question I would ask is, do

7          you believe under these maps that African American

8          voters have a reasonable opportunity to elect a

9          candidate of their choice in any of the districts

10         you've drawn?  And if so, which of those districts do

11         they have such an opportunity?  And if so, how did you

12         determine that?

13                 REP. LEWIS:  Thank you for that question,

14         Representative.  As I've said before, the criteria that

15         we used in drawing these maps has been spelled out.

16         One of those criteria was not race.  Race was not

17         considered in the drawing of these maps.  I do not know

18         what the racial composition of the voters that reside

19         in these districts is.  So I don't feel that is a

20         question that I can give a direct answer to as race was

21         not among the criteria considered when we drew these

22         maps, based on our understanding of the Harris case,

23         which said that racially polarized voting did not

24         exist.  Thank you.

25                 SPEAKER MOORE:  And, Representative Martin,

1          should the gentleman wish additional questions, the

2          gentleman will be recognized a second time for that in

3          just a bit if the gentleman so desires.

4                  For what purpose does the lady from Buncombe,

5          Representative Fisher, arise?

6                  REP. FISHER:  To ask a question of the bill

7          sponsor, please.

8                  SPEAKER MOORE:  Does the gentleman from Harnett

9          yield to the lady from Buncombe?

10                 REP. LEWIS:  Yes, sir.  I yield.

11                 SPEAKER MOORE:  He yields.

12                 REP. FISHER:  Take a breath, Representative.  I

13         know you've been on the spot for a little while, but I

14         appreciate your taking a moment to answer.  I had a

15         concern passed along to me and because it happens to

16         deal with my district, which I thought was kind of

17         unusual because I thought that this was only going to

18         deal with a couple of congressional districts, but it

19         seems like it is stretching even further west.  Can you

20         tell me why, for example, Calvary Baptist Church area

21         on Haywood Road in West Asheville might have been moved

22         from the 10th to the 11th district?

23                 REP. LEWIS:  Thank you for the question,

24         Representative.  And sadly, while I know you represent

25         one of the most beautiful parts of our state, I am not

1          immediately familiar with the church that you

2          referenced.  I will tell you that the changes that were

3          made in Buncombe County were to equalize population

4          that had been moved around because other districts were

5          redrawn.

6                    REP. FISHER:  A follow-up.

7                    SPEAKER MOORE:  Does the gentleman from Harnett

8          yield to an additional question from the lady from

9          Buncombe?

10                    REP. LEWIS:  Yes, sir.  I yield.

11                    SPEAKER MOORE:  He yields.

12                    REP. FISHER:  And I think then from your

13          answer -- from your previous answer, that I can assume

14          that the same would be true for having moved part of

15          Biltmore Forest in Asheville to the 11th, east of

16          Sweeten Creek Road, from the 11th to the 10th.  And

17          then an area of North Asheville in Woodfin from the

18          10th to the 11th; am I assuming correctly?

19                    REP. LEWIS:  Thank you for the question,

20          Representative.  The reason that we would have divided

21          counties would have been one of the criteria that was

22          listed earlier and considered by the committee.  I have

23          a map on my desk that shows only whole VTDs of Buncombe

24          County.  I'm afraid I just don't know -- my wife

25          actually fussed at me because I've been gone for two

```
 1         weeks doing this.  She would like to go to Grove Park
 2         this weekend.  So maybe I could visit Biltmore Forest
 3         when I'm there, but I don't that we're going to be able
 4         to make it.
 5               REP. FISHER:  Well, I hope you'll be able to.
 6         There's a great Arts and Crafts Mission Furniture
 7         Conference going on there right now that my daughter
 8         helped plan.  But I think --
 9               SPEAKER MOORE:  Does the lady wish to ask an
10         additional question?
11               REP. FISHER:  I would like to speak on the bill
12         for just briefly, Mr. Speaker.
13               SPEAKER MOORE:  The lady is recognized to
14         debate the bill and to do a public service announcement
15         for Asheville as well.
16               REP. FISHER:  Sure, I can do an advertisement
17         anytime.  I'm very proud of my town.  I appreciate the
18         representative taking the time to try to address my
19         questions.  But the point, I guess, I would like to
20         make in having asked the questions in the first place
21         is that we are, again, embarking on an exercise that
22         will further confuse the voters.  I know from having
23         listened to the four or so hours of the public hearing
24         that we had several examples of people who have gone to
25         their polling places, filled out their ballot, only to
```

1       find out that they didn't know who their congressperson

2       was.  So they were surprised to see either one name or

3       another on their ballot.  They thought that this person

4       was their Congressperson, but it turns out it was

5       somebody else.  And I would just caution us that if

6       we're going to have to do this, there needs to be some

7       way, some efficient way, to educate the voters about

8       the changes that are being made.  And try to make it

9       easier for them to do what is their right to do, which

10      is exercise their vote.  So, I just felt it important

11      to make the body aware, or again aware, of how

12      difficult this whole thing is making it for the voters

13      in North Carolina.  Thank you, Mr. Speaker.

14              SPEAKER MOORE:  Members, I hope you'll join me

15      in welcoming, we have another school group with us

16      today.  We have students from the Longleaf School of

17      the Arts here in Raleigh with us.  If you all would

18      please stand and let us welcome you.  Thank you for

19      being with us today.

20              For what purpose does the lady from Wilson,

21      Representative Farmer-Butterfield, arise?

22              REP. FARMER-BUTTERFIELD:  To speak on the bill.

23              SPEAKER MOORE:  The lady has the floor to

24      debate the bill.

25              REP. FARMER-BUTTERFIELD:  Thank you,

```
1         Mr. Speaker.  I feel compelled to speak on this as an

2         African American.  If I think about redistricting for

3         me in my district, I went from Wilson and Edgecombe to

4         Wilson and Pitt.  My constituents from Edgecombe and

5         Wilson were reluctant about the change in terms of

6         redistricting as it related to my having Pitt County.

7         But if I look back, I am happy with Pitt County and I

8         consider it a blessing that I was able to move from

9         Wilson, Edgecombe with experience and represent the

10        economic engine of the East in Pitt County.

11             So today in looking at the congressional

12        districts, I want to talk about the process.  Public

13        hearings were convened before the release of draft maps

14        for the public to view.  Was that really cost efficient

15        and necessary?  Nothing was available for the public to

16        respond to.  Why would we do that?  Let's talk about

17        moving from one extreme to the other.  In drawing the

18        initial maps, we went from African Americans exceeding

19        50 percent in those districts, the two key districts

20        that we're talking about that have been changed.  Now,

21        we are looking at no consideration at all for race.

22        It's overreaching in that the maps guarantee election

23        of ten Republicans and three Democrats so is said.

24        Democrats are 43 percent of the voters in this state

25        and only given an opportunity for three districts for
```

1       Congress doesn't seem balanced at all.  In fact, one of

2       the districts that was recently drawn, we were told

3       that it was leaning Republican.  What about

4       legislators, are they required to protect minority

5       communities from racially polarized voting patterns?

6       Yes, they are.  Voter discrimination matters.  If,

7       indeed, public hearings mattered and the input of

8       African Americans had been taken into consideration,

9       perhaps we would not be in this position we are in

10      today.  In fact, I know we would not be in the position

11      we are in today.

12            Finally, when the leadership was asked in

13      committee this morning if the map was drawn prior to

14      the public hearings held on Monday and prior to the

15      criterion being decided on Tuesday the response was, I

16      can't say.  So given all of these factors I share with

17      you, I ask that you vote against these maps that have

18      been redrawn.  Thank you.

19            SPEAKER MOORE:  For what purpose does the

20      gentleman from Forsyth, Representative Hanes, arise?

21            REP. HANES:  To ask the bill sponsor a question

22      and to speak on the bill.

23            SPEAKER MOORE:  Does the gentleman from Harnett

24      yield to the gentleman from Forsyth?

25            REP. LEWIS:  I yield.

1           SPEAKER MOORE:  He yields.

2           REP. HANES:  Representative Lewis, let's talk

3     about race for just a second, and some of the

4     representatives here know that I like this

5     conversation.  And I fashion myself as a person who can

6     do it -- talk about race without getting racial.  So I

7     want to ask you a question, and it is a little nuanced

8     from the questions that have been asked to you

9     regarding race this morning.  Representative Lewis,

10    does race impact the maps that have been drawn?  The

11    question is not did you consider race, but does race

12    impact the maps that have been drawn?

13          REP. LEWIS:  Thank you for the question,

14    Representative.  All I can tell you is that race was

15    not a consideration when the maps were drawn.  I am

16    not, to be candid with you, sure I truly understand the

17    nature of the nuanced question.

18          REP. HANES:  Okay.  Okay.  Thank you.

19    Mr. Speaker, to speak on the bill, please.

20          SPEAKER MOORE:  The gentleman from Forsyth has

21    the floor to debate the bill.

22          REP. HANES:  So, ladies and gentlemen, let's

23    have a brief conversation about race, and it goes all

24    of the way back to the beginning.  So as you know, in

25    the beginning God created heaven and earth.  He created

1    man and woman and said, this is good. And then he

2    created America, and he said, I like that too. And

3    then black folk and white folk got together in a most

4    disagreeable one-sided contract negotiation. And I can

5    assure you that both black folk and white folk got to

6    America on a boat. Okay? And over the years black

7    folk, my folks, continued to have disagreement about

8    this contract that we got brought into here. And over

9    the years we got our freedom. Representative Michaux

10   was elected to the House of Representatives, and here

11   we are today talking about race and elections.

12        The question I asked was, does race impact this

13   map? That is either directly or indirectly. And the

14   answer is, of course it does; of course it does. What

15   we have here is we have Democrats submerged in majority

16   Republican districts, ten of them, and Republicans

17   submerged in majority Democratic districts, three of

18   them. Of course, it matters. If you look at the

19   numbers for the state, there are 1.9 million

20   Republicans; 95 percent of them are white. The

21   2.6 million Democrats; 41 percent of them are black.

22   So saying in some way that we did not use race is

23   frankly just simple subterfuge toward achieving a

24   broader goal. And that is a goal that was admitted

25   during our committee, and that goal was the maintenance

1          of districts that disenfranchise Democrats.   And in

2          many ways, whether that is intentional or not, those

3          districts silenced the voices of people who look like

4          me.

5                    Two of the largest minority populations in this

6          state, Forsyth and Guilford County, have been silenced

7          with regard to congressional politics.   We could have

8          gone nine to four, with a district there in the Triad

9          maintained Representative Alma Adams, and we could have

10         achieved this goal of eliminating the serpentine

11         districts, as we've called them, of the 12th district.

12         And we could have been gone away from here hours ago.

13         We chose not to do that, and we continue to think about

14         these maps as not impacting race.

15                   Let me just make one more statement, and it is

16         from a op-ed I wrote in the Winston-Salem Chronicle

17         this week.   And I want to read for you the last

18         paragraph of that statement as it regards to how we

19         need to think about and how race actually does matter,

20         you know, for us.   I said, "Black people are, in fact,

21         people and should be counted in the whole!   Our lives,

22         our voices, and our votes matter from Murphy to Manteo.

23         We are part of the fabric of North Carolina and have

24         earned our right to representation through

25         constitutionally consistent districts in every corner

```
 1          of this state.  We paid for that right by whip, through

 2          blood, by protest, and through eventual freedom.  It is

 3          never the wrong time to do the right thing."  Thank

 4          you.

 5                    SPEAKER MOORE:  For what purpose does the

 6          gentleman from Rockingham, Representative Jones, arise?

 7                    REP. JONES:  To debate the bill.

 8                    SPEAKER MOORE:  The gentleman has the floor to

 9          debate the bill.

10                    REP. JONES:  Thank you, Mr. Speaker.  Ladies

11          and gentlemen of the House, I have to say that I have

12          been quite fascinated with so many aspects of this

13          debate, and discussion throughout the committee process

14          and today on the floor, and I just want to speak to

15          that a little bit.  You know, as someone who has lived

16          in the state of North Carolina for all of my life and

17          has been kind of a student of election history over the

18          past few decades in particular, I continue to be quite

19          fascinated and have really enjoyed this conversation,

20          particularly when we have heard about gerrymandering.

21          And I think it behooves us a little bit to consider

22          maybe a little trip down memory lane when we think

23          about gerrymandering.  Because, quite frankly, I'm not

24          sure that a lot of people knew that the word was

25          invented until Republicans took the majority in 2010.
```

1        I never really heard it reported on very much through

2        the media.  I never heard it spoken about in the

3        General Assembly.  I thought it was fascinating as we

4        were in committee this week as we saw the maps up on

5        the wall that went all the way back to 1992 at least.

6        I also happen to recall a time that the state

7        legislature looked very different than it does today.

8        And, you know, there was no stone unturned.  We

9        remember a time of single-member districts and

10       two-member districts and three-member districts and

11       four-member districts.  You know, whatever it took to

12       keep the majority in the time at the majority that

13       seemed to be fine.  And so a lot of the voices that I

14       hear today representing the minority party that used to

15       be in the majority, I have to wonder, you know, where

16       were those voices in the Democratic Party for decades

17       and decades and decades?

18            You know, I've heard it also a lot of

19       complaining about the fact that there are ten

20       Republican congressman and three Democrats.  That there

21       currently are and that these maps as, Representative

22       Lewis has been very candid and transparent and honest,

23       something that I for one greatly appreciate, and

24       would've greatly appreciated that conversation over the

25       decades.  So thank you, Representative Lewis, for your

1          honesty and integrity and transparency in coming right

2          out and saying that, yes, I do believe as we adopted in

3          the committee that there was an attempt made at that

4          partisan advantage.  And I keep hearing the complaints

5          from the other side that enjoyed that partisan

6          advantage because of gerrymandering for so many

7          decades.

8                    I would just remind the members of this body

9          that if you look over the last 40 years and see how

10         North Carolinians have voted consistently in federal

11         races, I would remind you that in eight of the last

12         nine presidential elections, they have voted

13         Republican.  That is 89 percent of the time.  And I

14         would remind you that you may not know that in the last

15         16 United States Senate races in North Carolina, 13 of

16         those races went Republican.  That was 81 percent of

17         the time.  So to me, I don't see a problem in thinking

18         that if you have ten Republicans and three Democrats,

19         which is 77 percent, you might could make the argument

20         that Republicans are underrepresented.  But the point

21         of the matter is these maps are not your problem.  The

22         problem is that your national party has left the values

23         of the majority of the people in North Carolina.  And I

24         would take you back to the 2010 election of the

25         legislature when this Republican majority gained its

1    majority by 16 votes.  Those were under maps that the

2    Democrats drew.  And fortunately, we had court cases

3    over the years that eliminated the two and three and

4    four-member districts, and we have the pod system now

5    where you can't just divide counties wherever.  But I

6    would just remind the listeners and the voters and the

7    students from North Carolina to study your history and

8    to understand when you hear all these comments and all

9    these complaints about gerrymandering, well, we sat at

10   the master's feet for decades and perhaps some people

11   learned something.  But I would suggest that they are

12   fair.  Okay?  I understand the Democrats don't like it.

13   The Republicans didn't like the map for decades, but

14   they are fair, they are legal, and they are by the

15   rules.

16            And finally, ladies and gentlemen, I would not

17   accept that Democrats cannot be elected in these

18   districts.  If you look at the voting data before you,

19   for instance, we mentioned this in committee, the 2008

20   election for the Attorney General, the Democrat won 13

21   out of 13 of these congressional districts.  You go

22   down the line, the State Auditor, the Democrat won 9 of

23   13 of these districts.  I believe the Commissioner of

24   Insurance won a majority of these districts.  And so,

25   ladies and gentlemen, I would submit that the people of

```
 1              North Carolina are not robots.  They have the perfect
 2              opportunity to elect the candidate of their choice, and
 3              they can and they do cross party lines whenever they
 4              feel it necessary.  They look at the candidates.  And
 5              so I would suggest that we trust the voters of North
 6              Carolina to go out there and make their choice.
 7              Recognize that we are putting forward fair and legal
 8              maps based on what the courts have directed us to do,
 9              and I commend, for one, the people who have worked
10              very, very hard.  I want to mention once again the
11              staff that has worked hard, the people that have worked
12              hard to put this forward.  We have been given a very
13              difficult task in a very short period of time, and I
14              think we should be proud of the process and the
15              results.  Thank you, Mr. Speaker.
16                      SPEAKER MOORE:  For what purpose does the
17              gentleman from Cumberland, Representative Floyd, arise?
18                      REP. FLOYD:  Inquiry, with the Chair.
19                      SPEAKER MOORE:   The gentleman may state his
20              inquiry.
21                      REP. FLOYD:  It is a very simple inquiry, Mr.
22              Chair.  Are we going to meet the 5:00 deadline?
23                      SPEAKER MOORE:  One way or another.
24                      For what purpose does the gentleman from
25              Haywood, Representative Queen, arise?
```

1               REP. QUEEN:  To speak on the bill.

2               SPEAKER MOORE:  The gentleman has the floor to

3       debate the bill.

4               REP. QUEEN:  You know, we have heard a lot of

5       good points being made, but whenever your criteria is

6       for political advantage, this General Assembly is

7       disenfranchising voters.  Where politicians get to

8       select their voters versus voters selecting their

9       politicians, something is awry.

10              Now, Representative Jones was talking about

11      history and the 2010 election was a historic one

12      because it was the first election since Citizens United

13      was passed, and there was about $20 million that was

14      never in our elections that swung a lot of them.  I was

15      in that election, and I experienced that tsunami of

16      outside money.  So things have historically affected

17      races, but for this body to work on a bill that

18      basically empowers the politicians, not the citizens,

19      for the vote when the absolute foundation of our system

20      is one vote per citizen and every vote is equal.  I

21      think if there was a -- or I will just -- I'll say, how

22      does -- whenever you do that, whenever you gerrymander

23      in a manner that we are speaking and in the manner it

24      was done after the last census by this body, how does

25      that affect the voters' trust in the system?  Will

1           their vote count equally or have they been

2           disenfranchised by the drawing of the district that

3           they live in where their vote really won't count in

4           that particular district? And one of the things that

5           I'll use as a data point on that is registered voters

6           self-identify themselves in this state, over

7           2.76 million Democrats and 2.01 million Republicans.

8           The democrats self-identify, but they are

9           disenfranchised in many of their districts by the

10          gerrymandering that has gone on. If we want to make

11          voting a truthful one vote per person, we need to

12          recognize every vote should count equally. I don't

13          think we're doing that here. I think it is clearly the

14          criteria that has been stated, been stated quite

15          clearly that that's not what we're doing, but that is

16          what we should be doing. So that's that point. The

17          second one is, in my region I would contend the

18          criteria that should be in addition to one vote per

19          citizen and every vote counts equally, that should be

20          certainly the criteria, the first one. The second one

21          is communities of interest should be contained in this

22          compactness. And I live in the mountains, as you all

23          know, and we have one urban core, one city, Asheville,

24          a wonderful city, that has been the center of our

25          mountain region since our state was founded. It has

1    grown to be a fabulous center.  Well, the

2    gerrymandering last time that the courts have thrown

3    out -- or -- has taken our urban core away from our

4    region.  So our congressman does not have the city of

5    his region in his district.  So whether he's a Charles

6    Taylor or Heath Shuler, he's Democrat or Republican,

7    because you know the 11th district has flipped back and

8    forth for decades, but we always had a unified district

9    with our urban core in it.  But for complete political

10   advantage, our congressional district has been neutered

11   from its urban core, and we all know that the urban

12   cores drive the economics of regions.  So for these two

13   reasons I think this is a very unfortunate bill because

14   neither of these important issues, communities of

15   interest and one vote per citizen, are embodied in the

16   criteria that have been used to draw it.  Thank you.

17              REP. STAM:  Mr. Speaker.

18              SPEAKER MOORE:  For what purpose does the

19   gentleman from Wake, Representative Stam, arise?

20              REP. STAM:  Would Representative Queen yield

21   for one question?

22              SPEAKER MOORE:  Does the gentleman from Haywood

23   yield to the gentleman from Wake?

24              REP. QUEEN:  I will.

25              SPEAKER MOORE:  He yields.

1          REP. STAM:   Representative Queen, I chaired our

2     State Platform Committee for a few years; it's

3     available.  Have you ever thought of maybe changing the

4     policies and platform of your party so that you would

5     attract voters?

6          REP. QUEEN:   I try to speak to the needs of the

7     citizens in this state every day, Representative Stam.

8          SPEAKER MOORE:   For what purpose does the

9     gentleman from Wake, Representative Martin, arise?

10          REP. MARTIN:   Mr. Speaker, I think to speak a

11     second time.

12          SPEAKER MOORE:   The gentleman is recognized to

13     speak on the bill a second time.

14          REP. MARTIN:   Thank you very much, Mr. Speaker.

15     Members, I'll leave the gentleman from Harnett alone

16     now.  He was good to indulge me in a long series of

17     questions.  But I do want to respond to a couple of

18     statements that were made both in the course of this

19     debate and throughout the committee debate and also to

20     the press.

21          There has been a contention made somehow that

22     Democrats failed to participate in this process, that

23     we offered no alternatives, and nothing could be

24     further from the truth.  We offered several

25     amendments -- which I think I'm correct in saying that

1       the record will show were opposed by every single

2       Republican member of the committees.  In those

3       committees the Democratic members of the committee told

4       you that you needed to draw districts that gave

5       minority voters the opportunity to elect candidates of

6       their choice, that you have said that you refuse to

7       even consider that data.  The Democratic members of

8       these committees told you that they thought it was

9       important to keep Representative Alma Adams, a highly

10      capable minority member of the North Carolina

11      Congressional Delegation, a district in which she has a

12      hope of getting reelected, but you declined to

13      incorporate that request.  We told you that it is

14      important to consider one of the basic principles of

15      redistricting, communities of interest, which you heard

16      the gentleman from Bladen, Representative Brisson, I

17      think elude to in his comments and also the gentleman

18      from Forsyth, Representative Hanes, talk about also.

19      But you declined to incorporate that input.  And

20      without a doubt, we told you that we did not want to

21      see a partisan gerrymander.  Yet you shamelessly and

22      proudly got up and proclaimed that that was exactly

23      what you were going to do.  We participated in full;

24      you just chose to ignore our participation.  Anyone who

25      says differently is selling something.

1       The gentleman from Rockingham, Representative

2       Jones, also talked about the importance of history, and

3       any Democrat that gets up and tells you that Democrats

4       have not participated in partisan gerrymandering

5       doesn't know what they're talking about and is paying

6       no attention to history. But that's a very 20th

7       Century way of looking at things, and it is not what

8       the public in North Carolina in the 21st Century wants

9       to hear. Folks, people are turning away from your

10      party and mine.

11      Representative Stam's comment about platforms

12      and so forth was from out of nowhere. Democrats have

13      had success in elections as much as Republicans. I

14      think the statistics show and the consensus is we are a

15      purple state now, but in the end, we are a state that

16      is losing a partisan flavor because voters are turning

17      away in droves from you and us. The leading candidate

18      right now for your presidential nomination is a guy who

19      gave significant amounts of money to Hillary Clinton,

20      the leading candidate for my party's nomination. The

21      other leading candidate for my party's nomination is a

22      senator who was unaffiliated until 2015. That should

23      tell both of our parties something. We ignore what the

24      voters are telling us at our peril. They do not want

25      to see partisan gerrymanderers like what the Democrats

1       used to do and what the Republicans are doing now.

2           Now, I was not here the last time Democrats

3       drew statewide districts, but I was here and

4       participated significantly in drawing the Pender and

5       New Hanover districts, which were ordered by the

6       courts.  That district came into my committee with a

7       two to one Republican advantage, and it left with a two

8       to one Republican advantage.  There was probably no way

9       for us to screw with the partisan mixture of that, but

10      we didn't.  And it left -- I think it is safe to say,

11      with the two Republican members from those counties

12      very satisfied with the result.  So don't try to lay

13      the quilt of the Democratic party's past on me.  I can

14      say that I never have and never will support partisan

15      gerrymandering, and I think it is safe to say that a

16      good number of my colleagues on the other side of the

17      aisle joined me in that also.

18          So folks, let's join together and at least

19      acknowledge that the public does not think that the

20      definition of fair is the childish statement, you did

21      it first.  These districts are going to pass just like

22      the gerrymandered districts that Democrats did in the

23      past passed also.  I'm under no illusions that we have

24      the ability to stop it.  But next time we have the

25      chance to do this, let's find a better way.

1          SPEAKER MOORE:  For what purpose does the

2     gentleman from Durham, Representative Michaux, arise?

3          REP. MICHAUX:  To ask Representative Lewis a

4     question.

5          SPEAKER MOORE:  Does the gentleman from Harnett

6     yield to the gentleman from Durham?

7          REP. LEWIS:  I yield.

8          SPEAKER MOORE:  He yields.

9          REP. MICHAUX:  And, David, honestly, this will

10     be my last question to you.  In drawing the maps, was

11     anything made or said or asked to what extent we must

12     preserve the existing minority percentages in order to

13     maintain the minority's present ability to elect its

14     candidate of choice?

15          REP. LEWIS:  Representative, thank you for the

16     question.  It is my understanding of the Harris

17     decision that they did not find the tests were met that

18     racially polarized voting existed and, as such, we did

19     not consider race in any way when we drew these

20     districts.

21          REP. MICHAUX:  Thank you.

22          SPEAKER MOORE:  For what purpose does the

23     gentleman from Cumberland, Representative Lucas, arise?

24          REP. LUCAS:  To speak briefly on the bill.

25          SPEAKER MOORE:  The gentleman has the floor to

1        debate the bill.

2                REP. LUCAS:  Thank you, Mr. Speaker.  Ladies

3        and gentlemen, I have sat here very attentively as I

4        have contemplated what we are about to do.  And that

5        is, we are about to sanction maps that will identify

6        folk who will represent us in the United States

7        Congress.  And I would have to say that we should live

8        in a democracy.  We do live in a democracy.  And when

9        you live in a democracy, our personal feelings and

10       doubts ought to be superseded by what is best for our

11       people.  And I'm not so sure that I'm getting that.

12       I've heard some snide snickering.  I've heard some

13       snide remarks about, well, you all gerrymandered, so

14       therefore, we're going to do it.  Well, if it was wrong

15       then, it is wrong now.  Let's do what's right by the

16       people of this great state of North Carolina.  They

17       deserve better than this.  It is not about partisan

18       bickering.  I am saddened to see that we're turning it

19       into that.  It should be about who can best do the job

20       for the people of this great state.  And people who

21       live in this state, many of them are now saying I don't

22       care whether you are identified as a Democrat or as a

23       Republican.  They want to be identified as a citizen,

24       an independent.  And they want to have good

25       representation.  And that model is trending more and

1    more, and the more we sit here and bicker, the more

2    we're going to see that trend grow.

3         We, last session, I thought were on the right

4    track here in the House when we voted to have an

5    independent commission draw boundary lines, and I

6    thought that was great.  I wish that we could get the

7    Senate on board to do the very same thing.  That is the

8    most honest and the fairest way to get what we want to

9    have done accomplished.  Let's get serious about this;

10   let's stop this partisan bickering; let's move on for

11   the state of North Carolina.  Thank you.

12        SPEAKER MOORE:  For what purpose does the

13   gentleman from Durham, Representative Hall, arise?

14        REP. L. HALL:  To speak on the bill.

15        SPEAKER MOORE:  The gentleman has the floor to

16   debate the bill.

17        REP. L. HALL:  Thank you, Mr. Speaker.  And I

18   want to certainly give thanks to all of those who

19   worked on these maps and have made what I will take to

20   be an effort to satisfy some different interests.

21        I referenced it yesterday when we talked about

22   what we were going to do for voting, and I want to

23   reference it again today because I think we may be

24   missing the boat on this.  And I think because you

25   occupy this leadership position and the Court has told

1          you to back and draw these districts, they really

2          weren't saying come back and draw the districts for

3          yourself or to perpetuate your party's power.  They

4          were under the impression, and if they didn't

5          explicitly say it, I think they meant to say it, and

6          thought you understood it, that these districts should

7          be drawn for the people of the state of North Carolina.

8          Now we've already heard people talk about the

9          statistics and whether or not there is a certain number

10         of Democrats, a certain number of Republicans and

11         almost a equal number of unaffiliated as there are

12         Republicans, certainly a much larger number of

13         registered Democrats.  So we know factually,

14         statistically that is the case.  Now that would be

15         turned on the head by the 10-3 districts that we've

16         drawn here now.  That is a fact.  We can't get around

17         it.  And Representative Lewis did say that was his

18         intention, so that has been achieved.  So the partisan

19         advantage has been maintained, but not really in

20         compliance with the registered voters of North

21         Carolina.

22              I heard in response to the question about

23         expert map drawers that there was some confusion that

24         maybe the Democrats had authorized or entered into a

25         contract for the person who drew these maps to be paid

1         from the $25,000 that the committee indicated could be

2         used by Democrats.  We did not do that.  I hope there

3         is no accounting problem, that someone gets confused

4         and thinks that the $25,000 that was supposed to be

5         authorized by the committee to Democrats had been

6         waived and authorized to be paid to the person who drew

7         these maps who we don't know how much he charged for

8         them.  But we certainly did not -- and under the terms

9         of the committee, I think it says they have to be

10        authorized and released by us.  We did not do that, and

11        I just want to make sure that is clear on the record

12        because I heard it stated otherwise.

13                Now, we've ended up with a difference without a

14        distinction here, 10-3, that was our intent to keep it

15        the way it was, and so we understand that.  Not maps

16        for the citizens, maps to keep the partisan advantage.

17        And much has been made and I understand it, that the

18        intent was to maintain this partisan advantage.  I

19        appreciate those who in this House, and that is one

20        thing we did agree on, at least the majority of us,

21        that we need a Redistricting Committee.  A lot of

22        people signed onto that bill that went out of here and

23        voted for it because we recognized we need a

24        Redistricting Committee.

25                We could have tried to do work in the spirit of

1           a redistricting committee, try to draw fair districts

2           for the citizens of North Carolina, try to have

3           communities of interest together so they can be

4           represented effectively and efficiently, and not make a

5           partisan advantage or make an incumbency advantage the

6           priority.  We didn't do that.

7                 I want to make sure that it is clear on the

8           record as well, and there has been some reference to

9           it, I think Representative Martin who was at the

10          committee meetings when the criteria was adopted.  Now,

11          Representative Hagar said that they were working on the

12          maps for two weeks before we came to Raleigh, and that

13          was his statement in the committee.  That was before

14          the maps were even issued.  So if there was some

15          question of someone saying we can't comment as to

16          whether these maps were drawn before the criteria was

17          established, go back and check the record.  That was a

18          statement from Representative Hager, and I believe him

19          to be an honest Representative.

20                The question now is, what happened in the

21          committee?  When we adopted the criteria for the maps

22          that were already being drawn or worked on for two

23          weeks.  So you wonder, does the criteria come first, or

24          do the maps come first?  But at any rate, on the

25          timeline when we went to adopt the criteria, I think

1          Representative Martin already referenced it, and you

2          can go back and check the record.  That every

3          Democratic criteria that was put forward was voted down

4          along party lines, every one.  Certainly you had a

5          two-thirds one-third majority on the committee, and

6          every one was voted down.  I think it is important to

7          note that one of those criteria specifically stated

8          division of counties shall only be made for reasons of

9          equalizing population, preserving communities defined

10         by actual shared interests.  That shared interest has

11         been addressed by people already, and some of you I'm

12         sure have districts but are not satisfied because

13         communities of shared interest were not respected.  And

14         Representative Brisson was certainly right to bring

15         that forward and ask that question, how did you violate

16         that principle?  Well, the answer, again, was, when

17         that request was put forward in committee, it was voted

18         down.  And so I take people at their word in what

19         they're saying, but we also can't live in an alternate

20         reality.

21              Race is on the ground in North Carolina based

22         on where we live, based on hundreds of years of

23         history, and Jim Crow laws and slavery and

24         discrimination and redlining.  It's there.  We see it

25         every day when we drive through communities on our way

1            to Raleigh.  We live it every day when we're back home,
2            and it is still there.  We talk about it in our
3            university system and other places when we do
4            budgeting.  So we see it, and we know it.  So to draw
5            this plan and say we don't recognize race in North
6            Carolina, and we recognize the racial impact of the
7            plan.  But we won't say the word.  We're going to do
8            enough in theory to get by the court order, but we're
9            not going to do enough to do good service to the
10           citizens of North Carolina and respect them I think is
11           a short coming that we could do better.  So I hope, as
12           someone has already said, that we'll make sure we get a
13           redistricting commission.  We shouldn't have to have
14           this discussion.  We should be able to recognize what
15           the composition of the voters of North Carolina is,
16           what they would express, and not hold them back from
17           being able to work together and be effectively
18           represented.

19                  I heard, finally, a lot of times throughout the
20           committee discussions sitting there -- and one of the
21           responses continued to be, well, when you were in
22           charge, you did it.  Now, I don't remember how many of
23           you remember Sherman and Mr. Peabody when they used to
24           get in the time machine, and they would go back in
25           history and visit all of these different places.  Well,

1          the people of North Carolina are trying to go forward,

2          and we continue to talk about rebranding this state and

3          looking at the future.  Hopefully, as Representative

4          Jones said, you learn not what to do going forward by

5          the failings of Democratic redistricting efforts.  You

6          should have learned what not to do going forward in

7          redistricting.  And so, the canority (ph) of saying,

8          well you did it so I can do it, and there should not be

9          any response is not enough.  We should be trying to get

10         better.  That is what redistricting commission is

11         about.  And so again, I hope that we will leave that

12         behind, leave it behind with the Model T, leave it

13         behind with the horse and buggy, leave it behind with

14         the flip phone.  We're not going back.  Unaffiliated

15         voters are about to eclipse registered Republican

16         voters in North Carolina.  Let's go forward.  Let's not

17         continue to use the mistakes of the past as

18         justification for making mistakes now that will affect

19         our future.  So I hope you'll vote against this bill.

20         Put us to the test to do better.  Let's free ourselves

21         from the mistakes of the past.  Let's pursue a better

22         future for the citizens of North Carolina.  Let's draw

23         a map that lets them be full participants in their

24         government.  Thank you.

25                    SPEAKER MOORE:  For what purpose does the

1          gentleman from Rutherford, Representative Hager, arise?

2                    REP. HAGER:  To speak on the bill.

3                    SPEAKER MOORE:  The gentleman has the floor to

4          debate the bill.

5                    REP. HAGER:  Thank you, Mr. Speaker.  You know,

6          we've said this several times.  I've said it in

7          committee and to everyone that would listen,

8          Representative Stam accused me of practicing law

9          without a license, but I think I'm okay on the floor

10         just as long as I don't do it outside of here.

11                   Representative Michaux and I have talked about

12         this, you know, page 53 of the statement from the

13         three-judge court says, "A failure to establish any

14         (one) of the Gingles factors is fatal to the

15         defendants' claim."  Now, there is three thresholds we

16         talked about to meet, and I'm going to go over them

17         real quick because I've got other stuff we need to talk

18         about.  Vote dilution must meet all three of these

19         thresholds.  This report said that the vote dilution

20         has to -- as a failure of it has shown because there is

21         no voting prioritization in there.  It shows it time

22         and time again in this.  Representative Jones contends

23         that we are in violation of the Voter Rights Act of

24         Section 2, and he made the statement that sometimes

25         whites vote as a bloc.  Well, that's not one of the

```
1          criteria.  The criteria says they regularly vote as a
2          bloc, not sometimes.  Sometimes is not the requirement.
3          It's regularly.
4               Now, again, and I would like to talk a little
5          bit of what Representative Hall talked about.  I did
6          not say in committee that we had been working on the
7          those for two -- I said, you guys had the same
8          opportunity as we did to work on those.  That is what I
9          said.  You can check the record.  And you would think
10         that most folks in this body would say, well, my
11         district is a gerrymandered district because I won by
12         32 percent my first election.  Let me read you a little
13         statistics from the first election I had.  In
14         Rutherford County, there's 22,000 Democrats, 12,000
15         Republicans, and 8,000 Independents.  I agree with what
16         Representative Jones says.  People aren't dumb.
17         They're going to vote where their philosophy is.
18         They're going to vote where their values are; 22,000
19         Democrats, 12,000 Republicans, and I won by 32 percent.
20         The voters know what is going on.  They will vote with
21         their values.  The voters of the Democrats did not
22         leave the party; the party left them.
23              SPEAKER MOORE:  For what purpose does the
24         gentleman from Rockingham, Representative Jones, arise?
25              REP. JONES:  To debate the bill a second time.
```

1             SPEAKER MOORE:  The gentleman is recognized to

2        debate the bill a second time.

3             REP. JONES:  Thank you, Mr. Speaker.  I realize

4        the hour is late, and I will try to make a few brief

5        points.  I would just suggest that the minority side

6        has used the vast majority of the time in debate today.

7        So there are a few points that I think deserve to be

8        made just simply for the record.

9             First of all, briefly I would just humbly

10       suggest that we do not live in a democracy.  We live in

11       a constitutional republic.  And there is quite a change

12       about that, you know, democracy is like two lions and a

13       lamb deciding what to have for dinner.  And I would say

14       that things would look very different in our country

15       and if we were really a democracy.  But this is the out

16       workings of a system -- of a constitutional republic,

17       and that is why we are here today as representatives of

18       the people to do the work of the people.

19             Secondly, I would just say that with all due

20       respect, there is a degree of hypocrisy to stand up and

21       just suggest that this is no more than partisan

22       bickering.  Nobody is saying that, well, you know, it

23       is just great that one side is doing it because the

24       other side used to do it.  But I would suggest that

25       everyone in this room, every representative in this

1    room, benefited from the system whether you are in the

2    General Assembly or not, and I was not in the general

3    assembly in the past decade.  But in the past decade

4    and some of you in the decades before that benefited

5    from this system quite well, and I never heard a

6    complaint.  I never heard a suggestion that we need to

7    change the process.  We need to do something

8    differently.

9         Thirdly, I just want to reiterate, just

10   remember these three numbers, 89 percent in the last 40

11   years, the people of North Carolina have voted for the

12   Republican candidate for president 89 percent of the

13   time; 81 percent in the last 16 U.S. Senate races in

14   the last 40 years the people of North Carolina have

15   voted for the Republican candidate 81 percent of the

16   time.  And then 77 percent, 77 percent is ten

17   Republicans out of 13 congressional districts.  So I

18   would suggest that all of the stuff that we've heard

19   today that, in fact, that is not overrepresentation,

20   that these maps are not overrepresenting.  The people

21   of North Carolina have clearly stated that on the

22   federal level, they are identifying more with the

23   Republican Party and that -- you can't gerrymander a

24   statewide election, okay?  So when you --

25        REP. HAMILTON:  Mr. Speaker.

1        SPEAKER MOORE:  For what purpose does the lady

2     from New Hanover, Representative Hamilton, arise?

3        REP. HAMILTON:  To see if the gentleman would

4     yield for a question.

5        SPEAKER MOORE:  Does the gentleman from

6     Rockingham yield to the lady from New Hanover?

7        REP. JONES:  I will gladly yield when I

8     conclude my remarks.

9        SPEAKER MOORE:  He doesn't yield at this time.

10    The lady will be recognized if she would like to ask a

11    question later.

12        The gentleman from Rockingham has the floor to

13    continue debating the bill.

14        REP. JONES:  Thank you, Mr. Speaker.  So, the

15    point that I'm making is that I believe it is wrong to

16    suggest that a split of the three Democrats and ten

17    Republicans is somehow very unfairly wrong.  This is a

18    federal election, and when you look at the federal

19    elections that we have conducted over the past 40 years

20    for the U.S. Senate and for the President of the United

21    States, it is very clear that even in a greater

22    percentage of the time, the people have voted for the

23    Republican nominee.

24        Finally, I would like to also talk about voter

25    registration.  We keep hearing voter registration, and

1       I think Representative Lewis has very aptly said that

2       we believe that voting history, voting result is a

3       better indicator than voter registration.  And the

4       other side continues to point out that we have more

5       registered Democrats than we do registered Republicans

6       in this state, and that is true.  And it is also true

7       that we have a rising number of unaffiliated voters.

8       And quite frankly, we incentivize that with the laws in

9       this state because we allow unaffiliated voters to vote

10      in the primary of their choice.  It is very easy for

11      people to go back and forth or whatever.  But we

12      incentivize people often times to be unaffiliated.  I

13      would simply suggest to you that if every registered

14      Democrat goes out and votes Democrat and the registered

15      Republicans vote Republican, and you can split

16      unaffiliateds down the middle, I think Democrats would

17      do very well under these maps.  It is very clear that

18      Democratic candidates can win in these districts as

19      we've pointed out.  It has been done in other races

20      before.

21           And, finally, my last point, we keep hearing

22      this call for a somehow independent redistricting

23      committee and this idea that maybe we will put on two

24      Democrats and two Republicans, and then we're going to

25      have this one individual that has the great wisdom of

1       King Solomon that has absolutely no partisan

2       affiliation, has no bias whatsoever.  Somehow there's

3       this one perfect individual out there that is going to

4       have no bias and is going to have the wisdom of Solomon

5       and we're going to have these perfect maps.  And,

6       ladies and gentlemen, I would conclude that that is not

7       going to happen because it is not possible to find that

8       individual.  So, again, we thank you for the debate.

9              And, Mr. Speaker, if the lady has her question,

10      I would be happy to yield.

11             SPEAKER MOORE:  Does the lady from New Hanover

12      wish to propound a question to the gentleman from

13      Rockingham?

14             REP. HAMILTON:  I do, sir.

15             SPEAKER MOORE:  She is recognized, and the

16      gentleman has indicated he would yield.  The lady has

17      the floor to state her question.

18             REP. HAMILTON:  Thank you, Representative

19      Jones.  Just curious, over the last 40 years how many

20      state elections that are also run statewide, for

21      instance Governor, Attorney General, et cetera, how

22      many of those positions have elected Republican versus

23      Democrat?

24             REP. JONES:  Thank you to the lady for that

25      question; I appreciate that.  The point I was making is

| | |
|---|---|
| 1 | that this is a federal election. And I don't have the |
| 2 | statistics in front of me; perhaps you do. My point is |
| 3 | that I think it's irrelevant because we're talking |
| 4 | about a federal election, and we all know that there |
| 5 | are people in this state that might vote one way on the |
| 6 | local election or even the state election but they see |
| 7 | the national parties in a very different way. And the |
| 8 | minority here can respectfully disagree, but there are |
| 9 | many people that feel that on the national level that |
| 10 | your party has moved quite a bit to the left and away |
| 11 | from the majority of the voters in this state. And |
| 12 | that is reflected in the fact that they have voted |
| 13 | 89 percent of the time for the Republican candidate for |
| 14 | president, 81 percent of the time for the Republican |
| 15 | candidate for the U.S. Senate. And they might do that, |
| 16 | and they might still vote Democrat on a local or state |
| 17 | level. |
| 18 | REP. HAMILTON: Thank you. |
| 19 | SPEAKER MOORE: For what purpose does the |
| 20 | gentleman from Harnett, Representative Lewis, arise? |
| 21 | REP. LEWIS: I wanted to ask a series of |
| 22 | questions to Representative Michaux. No, Mr. Speaker, |
| 23 | I would like to speak a second time. |
| 24 | SPEAKER MOORE: The gentleman is recognized to |
| 25 | debate the bill a final and second time. |

1          REP. LEWIS:   Thank you, Mr. Speaker.   Mr.

2     Speaker and members, I want to thank all of you for

3     your patience today, for the dignity that has been

4     shown in this chamber.   Obviously, this is an issue

5     that all of us care very much about in our attempt to

6     best comply with the court ruling.   I did want to state

7     a couple of last thoughts for the record and prior to

8     the vote if I could.

9          First of, with all due respect, the Harris

10    opinion does not find racially polarized voting, nor

11    has any member of the body submitted any kind of

12    document showing that there is racially polarized

13    voting in the state.   Further, I realize the time has

14    been short, but we've even had members of the minority

15    stand up and speak about possible ways that districts

16    could have been drawn.   Yet despite the fact that

17    central staff and even special staff was made available

18    to them, nobody has submitted a map showing how they

19    think the districts should be drawn.

20         I also want to say that these plans in no way

21    guarantee the election of ten Republicans.  If you will

22    look at -- I know the lady from New Hanover asked about

23    statewide election results; they're actually -- most of

24    them are on our desk.  And you will see that in all 13

25    of these districts, for instance, Attorney General

1    Cooper won them.  I think -- I'm not going to go into

2    what some has been said before, but I think it has a

3    great deal to do with the quality of the candidate and

4    the message that they have in trying to elect -- or

5    trying to offer themselves.

6        The final thing that I would like to say is

7    while it has been talked about much throughout the

8    committee and through today's hearing, we did adopt in

9    an open forum what the criteria for these maps would

10   be.  We did say that all of the criteria would be

11   considered together, and we would make every effort to

12   harmonize them.  I believe the map that you have before

13   you addresses the concerns of the Harris opinion.  I

14   believe it provides a way for us to move forward and to

15   move on and comply with the order of the Court, and I

16   would respectively ask for your support in voting "aye"

17   on adopting these maps.  Thank you, Mr. Speaker, and

18   thank you, members of the House.

19       SPEAKER MOORE:  Further discussion, further

20   debate.  If not, the question before the House is the

21   passage of Senate Bill 2 on its second reading.  Those

22   in favor will vote "aye;" those opposed will vote "no."

23   The clerk will open the vote.

24       The clerk will lock the machine and record the

25   vote; 65 having voted in the affirmative and 43 in the

```
1          negative.   Senate Bill 2 passes its second reading and
2          will be read a third time.
3                  Further discussion, further debate?
4                  For what purpose does the gentleman from
5          Cumberland, Representative Floyd, arise?
6                  Further discussion, further debate?  If not the
7          question before the House is the passage of Senate Bill
8          2 on it's third reading.  Those in favor will say
9          "aye."
10                 (Voice vote.)
11                 SPEAKER MOORE:   Those opposed "no."
12                 (Voice vote.)
13                 SPEAKER MOORE:   In the opinion of the Chair,
14         the ayes have it.  The ayes do have it.  Senate Bill
15         2 passes its third reading.  The bill is ordered
16         enrolled.
17                 Special message from the Senate, the clerk will
18         read.
19                 CLERK:   House Bill 2, Senate Committee
20         Substitute, third edition.  A bill to be entitled An
21         Act to Revise Procedures for the Conduct of the 2016
22         Primary Election to Comply with the Court Order in
23         Harris v. McCrory.
24                 SPEAKER MOORE:   The bill is ordered calendared
25         for immediate consideration.  The clerk will read.
```

1          REP. FLOYD:  Mr. Speaker.

2          SPEAKER MOORE:  Just a moment.  The clerk will

3     read the bill.

4          CLERK:  Representative Jones and Hardister,

5     House Bill 2.  A bill to be entitled An Act to Revise

6     Procedures for the Conduct of the 2016 Primary Election

7     to Comply with the Court Order in Harris v. McCrory.

8     The General Assembly of North Carolina enacts.

9          SPEAKER MOORE:  For what purpose does the

10    gentleman from Cumberland, Representative Floyd, arise?

11         REP. FLOYD:  Inquiry, Mr. Speaker.

12         SPEAKER MOORE:  The gentleman may state his

13    inquiry.

14         REP. FLOYD:  I know my light came on but I also

15    thought I pushed the red button for the last vote.

16         SPEAKER MOORE:  How does the gentleman wish to

17    be recorded on the passage of the previous bill on the

18    vote?

19         REP. FLOYD:  No.

20         SPEAKER MOORE:  The gentleman was recorded as a

21    "no" vote on the prior bill.  If the gentleman would

22    like to change it to a yes the Chair will be glad to do

23    that.

24         For what purpose does the gentleman from

25    Rockingham, Representative Jones, arise?

1           REP. JONES:  To debate the bill.

2           SPEAKER MOORE:  The gentleman has the floor to

3     debate the bill.

4           And again, members, we would ask that the

5     conversations could be held down.  We still have our

6     court reporter here recording the proceedings.

7           The gentleman has the floor.

8           REP. JONES:  Thank you, Mr. Speaker.  Ladies

9     and gentlemen of the House, House Bill 2 that we passed

10    yesterday the Senate has amended and we are in support

11    of the Senate Committee Substitute.  The difference is

12    that section 3 of that bill is taken out.  We discussed

13    yesterday that section 3 has to do with the

14    presidential election, the electors to the electoral

15    college.  And what we voted to do yesterday was to

16    adopt the old or existing congressional primary -- I'm

17    sorry.  Congressional maps for the parties to use to

18    submit their presidential electors.  That was done by

19    request with both political parties.  However, they've

20    changed their mind on that, they would rather go with

21    the new districts if there are new districts and so

22    this section has been taken out.  And so what that

23    simply means is that if this plan goes forth and there

24    is a congressional primary on June 7 and we adopt these

25    congressional maps or any congressional maps, whatever

1    congressional districts we end up using to elect our

2    congressmen, we will use those same districts to select

3    the presidential electors.  So that is the change, and

4    I would ask for a green vote that we support the Senate

5    Committee Substitute to House Bill 2.

6        SPEAKER MOORE:  So, does the gentleman wish to

7    make a motion to concur with the Senate Committee

8    Substitute for House Bill 2?

9        REP. JONES:  Yes, sir.  I make a motion to

10   concur.

11       SPEAKER MOORE:  The gentleman has made that

12   motion and has debated the motion.  Further discussion,

13   further debate on the motion to concur?  If not, the

14   question before the House is the motion to concur with

15   the Senate Committee Substitute to House Bill 2.  Those

16   in favor will vote "aye" those opposed will vote "no."

17   The clerk will open the vote.

18       Do the following members wish to record on this

19   vote:  Representatives Cleveland, Steinburg, Whitmire,

20   and Blust?

21       The clerk will lock the machine and record the

22   vote; 75 having voted in the affirmative and 30 in the

23   negative.  The motion to concur with the Senate

24   Committee Substitute to House Bill 2 is adopted.  The

25   bill is ordered enrolled and sent to the Governor by a

1    special messenger.

2              The House will be at ease.

3              (At ease.)

4              SPEAKER MOORE:   The House will come back to

5    order.   Members, the House is about to go into recess

6    until 3:00.   However, I want the members to know at

7    3:00 there will be no votes.   The only purpose for the

8    3:00 session is for ratification. We are going to wait

9    on ratification for awhile until we hear some news

10   perhaps from Washington.   So for those members who

11   would like to be back at 3:00, you're welcome to do so,

12   but the Chair does not anticipate any votes at that

13   time.

14              Notices and announcements?

15              For what purpose does the lady from Yancey,

16   Representative Presnell, arise?

17              REP. PRESNELL:   For a moment of personal

18   privilege.

19              SPEAKER MOORE:   The lady has the floor to speak

20   to a point of personal privilege.

21              The house will come to order.

22              REP. PRESNELL:   I just wanted to wish my seat

23   mate, Representative Turner, a Happy Birthday.

24              SPEAKER MOORE:   Further notices and

25   announcements?   If not, the House will stand in recess

86

1          until 3:00 p.m.

2          (THE PROCEEDINGS IN THIS MATTER ADJOURNED AT 1:34 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF NORTH CAROLINA

COUNTY OF WAKE

### CERTIFICATE

I, Rachel L. Hammond, a Notary Public in and for the State
of North Carolina duly commissioned and authorized to
administer oaths and to take and certify hearings, do hereby
certify that on February 19, 2016, this hearing was held before
me at the time and place aforesaid, that all parties were
present as represented, and that the record as set forth in the
preceding 86 pages represents a true and accurate transcript of
the proceedings to the best of my ability and understanding.

IN WITNESS WHEREOF, I have hereto set my hand, this the
25th day of February, 2016.

_Rachel L. Hammond_
Notary Public

Rachel L. Hammond
Notary Number
201126500152

NORTH CAROLINA GENERAL ASSEMBLY

NORTH CAROLINA HOUSE OF REPRESENTATIVES

_____

TRANSCRIPT OF THE PROCEEDINGS

FLOOR SESSION TWO (3:00 P.M.)

_____

In Raleigh, North Carolina

Friday, February 19, 2016

Reported by Rachel L. Hammond, CVR-M

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

1               (Reporter's note:   Proceedings in this matter

2       began at 3:00 p.m. on February 19, 2016.)

3               SPEAKER MOORE:   The House will come back to

4       order.   Ratification of bills and resolutions.   The

5       clerk will read.

6               CLERK:   The Enrolling Clerk reports the

7       following:   Bills duly ratified, properly enrolled, and

8       prepared for presentation to the office of the

9       Secretary of State:   Senate Bill 2, An Act to Realign

10      the Congressional Districts, As Recommended by the

11      Joint Select Committee on Congressional Redistricting,

12      and Comply to the Court Order in Harris v. McCrory.

13              The enrolling clerk reports the following bills

14      duly ratified for presentation to the Governor:   House

15      Bill 2, An Act to Revise Procedures for the Conduct of

16      the 2016 Primary Election to Comply with the Court

17      Order in Harris v. McCrory.

18              The enrolling clerk reports the following

19      resolution duly ratified, properly enrolled, and

20      prepared for the presentation to the office of the

21      Secretary of State:   House Joint Resolution 3, A Joint

22      Resolution Providing for Adjournment Sine Die of the

23      2016 Extra Session.

24              SPEAKER MOORE:   Notices and announcements?

25              The gentleman from Gaston, Representative

1   Torbett, is recognized for a motion.

2       REP. TORBETT: Thank you, Mr. Speaker. Mr.

3   Speaker, I move that the 2016 Extra House of

4   Representatives Session do now adjourn sine die.

5       SPEAKER MOORE: Representative Torbett moves

6   seconded by Representative Langdon, that the 2016

7   Special Session of the House of Representatives do now

8   adjourn sine die.

9       Those in favor will say "aye."

10       (Voice vote.)

11       SPEAKER MOORE: Those opposed "no." The ayes

12   have it.

13       It is ordered that a message be sent to the

14   Senate informing that honorable body that the House has

15   concluded the public business and now stands ready to

16   adjourn.

17       Message from the Senate. The clerk will read.

18       CLERK: Mr. Speaker: The Senate has concluded

19   the business of the 2016 Extra Session of the 2015

20   General Assembly and is adjourning sine die, pursuant

21   to House Joint Resolution 3, A Joint Resolution

22   Providing for Adjournment Sine Die of the 2016 Extra

23   Session. Respectfully, Sarah Lang, Principal Clerk.

24       SPEAKER MOORE: Noted. I now declare this

25   House of the 2016 General Assembly Extra Session

4

1           adjourned sine die.

2           (THE PROCEEDINGS IN THIS MATTER ADJOURNED AT 3:11 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25